# IN THE UNITED STATES DISTRICT COURT

# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| RAYMOND G. PERELMAN CHARITABLE REMAINDER UNITRUST, )<br>  Plaintiff, )<br>v. )<br> )<br>BEAR STEARNS & CO., INC., )<br> )<br>  Defendant. ) | Civil Action No.  02-CV-3530 |

## <u>ORDER</u>

Upon motion of the Defendant, and the Court being otherwise sufficiently advised,

**IT IS HEREBY ORDERED**, this _____ day of August, 2002, that Defendants' Motion to Compel Arbitration is **GRANTED**, and **IT IS FURTHER ORDERED** that the claims against Defendant in this matter are **STAYED** until the Arbitration before the National Association of Security Dealers captioned <u>Raymond G. Perelman Charitable Remainder Unitrust v. Bear Stearns Securities Corp and Mark Seruya</u>, Case No. 01-06336, is fully resolved or dismissed.

_____
Thomas N. O'Neill, Jr., S.J.

# IN THE UNITED STATES DISTRICT COURT

# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| RAYMOND G. PERELMAN CHARITABLE REMAINDER UNITRUST, | ) ) ) | |
| Plaintiff, | ) | |
| v. | ) ) | Civil Action No. 02-CV-3530 |
| BEAR STEARNS & CO., INC., | ) ) | |
| Defendant. | ) ) ) | |

## MOTION TO COMPEL ARBITRATION AND STAY THIS ACTION

Pursuant to the Federal Arbitration Act, Defendant Bear Stearns & Co., Inc. hereby

moves to compel arbitration and stay this action. The grounds for the Motion are set forth in the

accompanying Memorandum of Law, and the Motion is further supported by the Declaration of

Elizabeth Goldberg and the Exhibits attached to such Declaration.

*M. Duncan Grant*

M. Duncan Grant (Bar No. 21726)
Joanna J. Cline (Bar No. 83195)
PEPPER HAMILTON LLP
3000 Two Logan Square
Eighteenth and Arch Streets
Philadelphia, PA 19103
(215) 981-4000

Eric Rieder
Elizabeth J. Goldberg
BRYAN CAVE LLP
1290 Avenue of the Americas
New York, NY 10104
(212) 541-2000

Counsel for Defendant

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

— — — — — — — — — — — — — — — — — — — — — — — — x

Raymond G. Perelman Charitable Remainder    :
Unitrust,    :
   :    Civil Action No. 02-CV-3530
                 Plaintiff    :
   :

- against -    :
   :
Bear, Stearns & Co. Inc.,    :
   :
                 Defendant.    :
   :
   :

— — — — — — — — — — — — — — — — — — — — — — — — x

## MEMORANDUM IN SUPPORT OF DEFENDANT'S MOTION
## TO COMPEL ARBITRATION AND TO STAY THIS ACTION

      This memorandum of law is submitted in support of Defendant's motion to compel arbitration and to stay the proceedings in this action pending arbitration, pursuant to the Federal Arbitration Act ("FAA"), 9 U.S.C. § 1 *et seq.*

## PRELIMINARY STATEMENT

      The Plaintiff in this action, the Raymond G. Perelman Charitable Remainder Unitrust ("Unitrust"), seeks to sue Bear, Stearns & Co. Inc. ("Bear Stearns"), a brokerage firm. There are two independent reasons why this Court should grant Bear Stearns' motion to compel arbitration and stay this action. First, it is undisputed that the Unitrust opened an account with Bear Stearns, and entered into a Customer Agreement with Bear Stearns ("Customer Agreement"). The Customer Agreement requires that all disputes between the Unitrust and Bear Stearns be submitted to arbitration.

In fact, the Unitrust has brought an arbitration against Bear Stearns, concerning the very same investment as is at issue in the Complaint in this court ("Complaint"). That arbitration is pending before the National Association of Securities Dealers ("NASD"). The NASD has appointed a panel of arbitrators, and a pre-hearing conference is scheduled in that arbitration for September 23, 2002.

When it submitted its claim to the NASD in November, 2001, the Unitrust executed a Submission Agreement in which it agreed to submit the matter in controversy to arbitration. The Submission Agreement constitutes a second, completely independent basis for why this Court must compel arbitration. As noted above, that arbitration concerns the same subject matter as the Complaint -- the Unitrust's investment in certain debt securities issued by an entity named Augusta Funding Limited B ("Augusta B"). The claims in that arbitration are inextricably intertwined with the claims in the Complaint, and must be arbitrated under the Submission Agreement.

In short, the Unitrust's action in this Court is a remarkable display of audacity. After signing a contract with an arbitration clause and submitting a claim against Bear Stearns to arbitration, the Unitrust in mid-stream seeks to derail the arbitration it initiated, by filing an entirely separate action in this Court against the same person, Bear Stearns, and concerning the very same subject matter, in an attempt to inflict on Bear Stearns the cost and burden of duplicative legal proceedings. This is precisely the kind of harassing and vexatious conduct that Rule 11 is designed to prevent.

Indeed, even if there were no enforceable agreement to arbitrate, the facts here warrant a discretionary stay of the action in this Court in the interest of judicial economy. It

-2-

would make no sense to have two separate proceedings concerning the Unitrust's claims against Bear Stearns arising out of the same investment.

Accordingly, this litigation should be stayed, and the Unitrust should be compelled to arbitrate its claims in the Complaint in the proceeding before the NASD.

## STATEMENT OF FACTS

**The Customer Agreement**

In or about April of 1996, the Unitrust opened an account at Bear Stearns. See Statement of Claim ¶ 6 (Exhibit 1 to Goldberg Decl.).[1] The Customer Agreement for that account, among other things, provides that:

> You [the customer] agree, and by maintaining an account for you Bear Stearns agrees, that controversies arising between you and Bear Stearns, its control persons, predecessors, subsidiaries and affiliates and all respective successors, assigns and employees, whether arising prior to, on or subsequent to the date hereof, shall be determined by arbitration.

See Customer Agreement ¶ 21 (Exhibit 2 to Goldberg Decl.).

**The Arbitration**

The arbitration now pending before the NASD was commenced in November 2001, when the Unitrust filed a Statement of Claim with the NASD. It named as respondents Bear Stearns and Mark Seruya, a Bear Stearns employee. At issue in the Statement of Claim is the Unitrust's investment in April 1997 in certain debt securities (Class B-2 Junior Notes due 2015) issued by Augusta B ("Class B Notes"). The Unitrust bought the Notes at a discount,

---

[1]    Citations to "Goldberg Decl." refer to the August 2, 2002 declaration of Elizabeth Goldberg, Esq. submitted with this motion.

paying $2,607,792.10 for $3,000,000 face amount of Notes. <u>See</u> Statement of Claim ¶ 13. The Unitrust seeks damages, contending that it had been defrauded into purchasing the Notes.

In short, the Unitrust alleges in the Statement of Claim that Bear Stearns made misrepresentations concerning (i) the investor's right to receive interest under the Class B Notes and (ii) the investor's right to redeem the Notes. The Unitrust alleges that the Notes were not as valuable as they were represented to be. <u>See</u> Statement of Claim, ¶ 16.

As to interest, the Statement of Claim asserts that Bear Stearns (and Seruya) told the Unitrust that "even with annual defaults in the bond portfolio over seven (7) percent, there would still be a positive return on the investment." Statement of Claim, ¶ 9. The Unitrust alleges that the Notes did not pay interest in 1999 and that Bear Stearns' statement regarding how defaults in the portfolio could affect payment of interest was incorrect. <u>Id</u>. ¶¶ 10, 14, 16.

As to redemption, the Unitrust asserts in the Statement of Claim that it was induced to invest in Augusta B based on false representations that the Notes could be readily redeemed because they had a "put" option which was very easy to exercise. The Unitrust claims that it learned that "it is extremely difficult, if at all possible, to exercise the put option along with the other noteholders." <u>Id</u>. ¶¶ 17, 19. It claims that it attempted to do so by contacting the Trustee for Augusta B, but that it has been unable to redeem the Notes. <u>Id</u>. ¶¶ 19-20. (As set forth below, on March 15, 2002, the Unitrust sold the Class B Notes to Bear Stearns for $2,475,000.)

In its Arbitration Answer, Bear Stearns denies the Unitrust's allegations, and asserts that it fully disclosed all risks associated with the Class B Notes to the Unitrust. It also asserts several affirmative defenses, including, but not limited to, that the Unitrust did not suffer

-4-

any damages.  <u>See generally</u> Goldberg Decl., Ex. 3 (Answer).

In submitting its claim to the NASD, the Unitrust was required to execute a Uniform Submission Agreement.  In that Uniform Submission Agreement, it agreed to "submit the present matter in controversy, as set forth in the attachment statement of claim, answers, and all related counterclaims and/or third party claims which may be asserted, to arbitration in accordance" with the rules of the NASD.  Goldberg Decl., Ex. 4

**The Complaint**

In June 2002, with the arbitration pending, the Unitrust commenced the current action against Bear Stearns in this Court.  The Complaint in this action also alleges that Bear Stearns committed a fraud upon the Unitrust in connection with the Class B Notes.  Specifically, the Complaint claims that Bear Stearns defrauded the Unitrust in connection with the Unitrust's sale to Bear Stearns in May 2002 of the Unitrust's Class B Notes, a sale that arose out of the Unitrust's desire to redeem its Class B Notes.  <u>See generally</u> Goldberg Decl., Ex. 5 (Complaint).

In the Complaint, the Unitrust asserts that it agreed to sell its Class B Notes to Bear Stearns because Bear Stearns put pressure on the Unitrust to do so by claiming that the Unitrust was required to mitigate its damages in the NASD Arbitration.  The Unitrust further asserts that Bear Stearns tricked the Unitrust into selling the Class B Notes by failing to disclose information regarding the payment of interest under the Class B Notes.  <u>See</u> Complaint ¶¶ 9, 15-17.  Based upon these allegations, the Unitrust asserts in the Complaint that Bear Stearns is liable under §10 of the 1934 Act, Rule 10b-5, and under common law and Pennsylvania state

statutes.[2]

       As further set forth below, the claims asserted in the Complaint must be decided in arbitration.

## ARGUMENT

### VALID ARBITRATION AGREEMENTS EXECUTED BY THE PLAINTIFF MANDATE ARBITRATION OF PLAINTIFF'S CLAIMS AGAINST THE DEFENDANT

       Two factors are relevant to deciding a motion to compel arbitration: "(1) whether the parties entered into a valid arbitration agreement, and (2) whether the specific dispute falls

---

[2]    In fact, Bear Stearns intends to demonstrate in the arbitration that all of the Unitrust's claims are baseless on the merits, whether relating to the Unitrust's initial purchase of the Class B Notes in 1997 or the sale to Bear Stearns in 2002. Bear Stearns disclosed all of the relevant facts regarding the Class B Notes to the Unitrust's many representatives -- Raymond Perelman, his attorney Barry Katz, and his accountant Michael Cull -- when the Unitrust purchased the Class B Notes.

Similarly, Bear Stearns intends to show that it made no misrepresentations to the Unitrust when it agreed to purchase the Unitrust's Class B Notes. Indeed, that purchase arose in the following manner: the Unitrust indicated that it was interested in redeeming its Notes beginning in or about September 2001. Statement of Claim ¶ 17. As it had alleged it intended to do, the Unitrust "continue[d] to follow up on this issue." Id. ¶ 20. In response, Bear Stearns notified the Unitrust in February, 2002 that it might have an opportunity to redeem the Class B Notes, effective April 10. Goldberg Decl., Ex. 6. The Unitrust wanted to redeem, but did not want to take any market risk between the time of election and the time of redemption. Thus, it was the Unitrust, not Bear Stearns, that proposed that rather than redeeming the Class B Notes pursuant to the terms of the Class B Notes, the Unitrust would sell its Class B Notes to Bear Stearns at a fixed price so that the Unitrust could avoid any market risk and Bear Stearns would bear the risk of price fluctuation. Goldberg Decl., Exs. 7, 8 ("The Unitrust would tender the Notes to Bear Stearns in exchange for an 82.5 price . . . Bear Stearns can then take the market risk between now and the April 10th redemption date . . . ") There was also extensive, explicit discussion not only of the market risk of a lower price at the time of redemption, but also of the possibility that the market price could rise after the Unitrust sold its

                            (...continued)

within the scope of that agreement." <u>Dabney v. Option One Mortg. Corp</u>, Civ A. 00-5831, 2001

U.S. Dist. LEXIS 4949, at *3 (E.D.Pa. Apr. 19, 2001).  <u>Accord</u> <u>Sena v. Gruntal & Co. LLC</u>, Civ.

A. 99-3042, 1999 WL 732974, at *2 (E.D.Pa. Sept. 21, 1999); <u>St. Julien v. Charles Schwab &</u>

<u>Co.</u>, Civ. A. 98-3290, 1998 U.S. Dist. LEXIS 15614, at *9-10 (E.D.Pa. Oct. 6, 1998).

     In conducting this inquiry, the court should apply "ordinary contractual principles,

with a healthy regard for the federal policy concerning arbitration." <u>Moses H. Cone Memorial</u>

<u>Hosp. v. Mercury Const. Corp.,</u> 460 U.S. 1,  24-25 (1983).  <u>See also</u> <u>John Hancock Mut. Life</u>

<u>Ins. Co. v. Olick</u>, 151 F.3d 132, 137 (3rd Cir. 1998).  Moreover, in light of the strong federal

policy favoring arbitration, any doubts concerning the scope of an arbitrable issue should be

resolved in favor of arbitration. <u>See</u> <u>Neurosource, Inc. v. Jefferson Univ. Physicians</u>, 00-CV-

5401, 2001 U.S. Dist. LEXIS 1811, at *6 (E.D. Pa. Feb. 14, 2001); <u>Glencore A.G. v. Alexander</u>

<u>Finance C.D. Inc.</u>, 00-CV-2513, 2001 U.S. Dist. LEXIS 1867, at *3 (E.D.Pa. Jan. 18, 2001).

     If there is a valid agreement to arbitrate and the matter in dispute falls under the

scope of the arbitration clause, the court must stay the action pending the outcome of the

arbitration.  The Federal Arbitration Act provides:

> If any suit  . . . be brought in any of the courts of the United States upon any issue
> referable to arbitration under an agreement in writing for such arbitration, the
> court in which such suit is pending, upon being satisfied that the issue involved in
> such suit or proceeding is referable to arbitration under such an agreement, shall
> on application of one of the parties stay the trial of the action until such arbitration
> has been had in accordance with the terms of the agreement . . . "

9 U.S.C.A. §3 (1999).

---

(...continued)
    position to Bear Stearns.  Goldberg Decl., Ex. 9.  The Unitrust's various claims are
                    (...continued)

Thus, if the two criteria described above are satisfied, it is mandatory that the matter be arbitrated and that the proceedings be stayed. See Dabney, 2001 US Dist. LEXIS 4949, at *1; Marschall v. Smith Barney, Inc., Civ. No. 95-1647, 1995 U.S. Dist. LEXIS 6680, at *6 (E.D. Pa. May 17, 1995.)

A.    The Customer Agreement Requires Arbitration

Under the Customer Agreement, the claims asserted by the Unitrust in this action are plainly arbitrable. In the Customer Agreement, the Unitrust agreed "that controversies arising between you and Bear Stearns, . . . shall be determined by arbitration." Thus, it is irrelevant whether the claims asserted against Bear Stearns in the Complaint are even topically related to those raised in the NASD arbitration (and they certainly are related); they are "controversies arising" between the Unitrust and Bear Stearns and thus they are arbitrable under the plain language of the arbitration provision of the Customer Agreement. See Konits v. Bear, Stearns Securities Corp., No. 98 Civ. 8364, 2000 WL 52521, * 2 (S.D.N.Y. Jan. 24, 2000) (holding that "undeniably broad" clause, identical to that contained in the Unitrust's Customer Agreement, required arbitration "of all controversies" between the plaintiff and Bear Stearns Securities Corp. "regardless of whether the controversy arises in connection with a particular account").

The Unitrust may argue that at some point it transferred the Class B Notes from Bear Stearns to Barclay's Bank. This argument, however, is irrelevant to application of the arbitration clause, which applies to "all controversies" between Bear Stearns and the Unitrust,

_____

(...continued)
   baseless.

-8-

including this Complaint, which involves an investment made in the Unitrust's Bear Stearns'

account. In fact, the Customer Agreement explicitly states that it covers disputes arising before

or after the date of the Agreement. Customer Agreement ¶ 21.[3]

Under the Customer Agreement, the Unitrust's claims must be arbitrated.

B.    The Submission Agreement Requires Arbitration

The matters raised in this action are also required to be arbitrated for an entirely

independent reason: the Unitrust also agreed to arbitrate them in the Uniform Submission

Agreement. A Uniform Submission Agreement is enforceable as a binding agreement to

arbitrate. Quaker Sec., Inc. v. Mid-Atlantic Sec., Inc., Civ. A. 96-0151, 1996 WL 524094, *4

(E.D. Pa. 1996), aff'd, 116 F.3d 469 (3d Cir. 1997); John Hancock Distrib., Inc. v. Saponaro, 901

F.Supp. 194, 195 n.2 (E.D.Pa. 1995). See First Montauk Sec. Corp. v. Menter, 26 F. Supp. 2d

688, 689 (S.D.N.Y. 1998); Mihalakis v. Pacific Brokerage Services, Inc., No. 91 CIV 994, 1991

WL 280236, *3 (S.D.N.Y. Dec. 23, 1991).

In the Uniform Submission Agreement, the Unitrust agreed to submit the "matter

in controversy" to arbitration. Goldberg Decl., Ex. 4. The matter in controversy is defined to

include those matters included in the "statement of claim, answers, cross claims and all related

counterclaims and/or third party claims which may be asserted." Id. The issues before the

NASD, as reflected in the Statement of Claim and the Answer, and the issues raised in the

---

[3]    Moreover, Bear Stearns continued to maintain the Unitrust's account at Bear Stearns after
the NASD arbitration was filed in November 2001. In fact, the Unitrust's sale of the
Class B Notes to Bear Stearns and Bear Stearns' payment to the Unitrust of the
$2,475,000 in March 2002 were effected in that account. Goldberg Decl. Ex. 10.

-9-

Complaint in this action are part of the same "matter in controversy" that the Unitrust agreed to arbitrate before the NASD when it elected to file a case there.

There are clearly critical overlapping factual issues to be resolved in both the Court action and the pending arbitration before the NASD. For example, the Complaint makes allegations regarding how Bear Stearns marketed the Class B Notes to the Unitrust; among other things, it makes allegations regarding Bear Stearns' knowledge regarding the Unitrust's having as its "primary objective" earning a steady stream of interest. Complaint, ¶ 8. Allegations on that same issue are made in the Statement of Claim, ¶¶ 8-9. Similarly, the Unitrust's allegation in the Complaint (¶ 8) regarding its dissatisfaction with the Notes because "they ceased paying interest" is also raised in the Statement of Claim (see, e.g., ¶ 16).

Bear Stearns raised as a defense in its Answer, among other things, that the Unitrust "has suffered no injury or damages" (see Answer, Affirmative Defenses). Thus, Bear Stearns intends to rely on the Unitrust's sale of its Class B Notes, and the attendant circumstances, as proof that the Unitrust did not suffer any damages because (i) the sale indicates that the Class B Notes had substantial value, contrary to the Unitrust's claim and (ii) the Unitrust did not suffer any out-of-pocket loss.

Further, in the discussions in February and March, 2002 between Bear Stearns and the Unitrust regarding possible redemption and/or sale of the Class B Notes by the Unitrust -- the principal subject of the Complaint -- it was clearly acknowledged that Bear Stearns was contending that redemption and/or sale was directly relevant to the issue of damages in the pending arbitration. The correspondence between counsel for both parties is replete with express references to "mitigation of damages," and the fact that Bear Stearns would argue in the

-10-

arbitration, as expressly acknowledged by the Unitrust's counsel, that "the amount that is actually received for the redemption would obviously reduce the amount of any award." Goldberg Decl., Exs. 11-13. Further, once the parties discussed the notion of a sale at a price of 82.5 (generating proceeds of $2,475,000, in addition to coupon interest previously received of $386,085, for a total of $2,861,000), Bear Stearns stated that this would mean that the Unitrust had incurred only a gain, and thus no damages, on its investment of $2,607,792. Goldberg Decl., Ex. 6.[4]

Because the claims asserted in the Complaint concern the same "matter in controversy" as in the NASD Arbitration, they must therefore be arbitrated pursuant to the Uniform Submission Agreement.[5]

---

[4]    The Unitrust further acknowledged that the circumstances of the sale would be at issue in the arbitration, since it took pains to reserve its rights in the arbitration when it agreed to sell the Class B Notes to Bear Stearns. In a March 6, 2002 letter, its counsel stated: "Without waiver of any of our rights or information requests we have made, and in accordance with Bear Stearns request that the Unitrust mitigate its damages pursuant to the non-waiver of rights position previously set forth, the Unitrust agrees to tender its Notes to Bear Stearns for the 82.5 price." Goldberg Decl., Ex. 13. By stating this reservation of rights, the Unitrust's counsel sought to preserve its position that the sale of the Class B Notes did not defeat the Unitrust's claim in the arbitration, and thus clearly acknowledged that Bear Stearns would use the sale in the arbitration and that it was, therefore, part of the matter at issue in the arbitration.

[5]    While unnecessary given the existence of two valid enforceable agreements to arbitrate covering the issues raised in this Complaint, in light of the great overlap of issues in this case and the NASD arbitration, this Court may also stay this action as a matter of discretion to control its docket. Landis v. North American Co., 299 U.S. 248, 254 (1936) ("the power to stay proceedings is incidental to the power inherent in every court to control the disposition of the causes of action on its docket with economy of time and effort for itself, for counsel, and for litigants"). See G. & V. General Contractors, Inc. v. Goode, Civ. A. No. 86-7408, 1987 WL 9786, * 7 (E.D.Pa. Apr. 21, 1987); Bechtel Corp. v. Local 215, Laborers' Int'l Union of North American, AFL-CIO, 544 F.2d 1207, 1215 (3d Cir. 1976) (staying action under discretionary ability because arbitration could

(...continued)

-11-

## CONCLUSION

For the foregoing reasons, Bear Stearns & Co., Inc. respectfully requests that

(i)     Plaintiff be compelled to arbitrate its claims;

(ii)    This action be stayed while the arbitration is pending;

(iii)   Plaintiff be required to pay Bear, Stearns & Co. Inc.'s costs in this action; and

(iv)    The Court grant such further and other relief as it deems fair and appropriate.


Dated:   August 5, 2002                          Respectfully submitted,

                                                 *M Duncan Grant*
                                                 _____
                                                 M. Duncan Grant (Bar No. 21726)
                                                 Joanna J. Cline (Bar No. 83195)
                                                 PEPPER HAMILTON LLP
                                                 3000 Two Logan Square
                                                 Eighteenth and Arch Streets
                                                 Philadelphia, PA 19103
                                                 (215) 981-4000

                                                 Eric Rieder
                                                 Elizabeth J. Goldberg
                                                 BRYAN CAVE LLP
                                                 1290 Avenue of the Americas
                                                 New York, NY 10104
                                                 (212) 541-2000

                                                 Counsel for Defendant

---

(…continued)

"substantially affect [action] or be dispositive of the issues"); Merritt-Chapman & Scott Corp. v. Pennsylvania Turnpike Commission, 387 F.2d 768, 773 (3d Cir. 1967).

Here, the arbitration will clearly be dispositive of issues raised in the Complaint and a discretionary stay would be warranted. It would make no sense for there to be two separate proceedings concerning the Unitrust's claims against Bear Stearns arising out of its investment in the Class B Notes.

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

- - - - - - - - - - - - - - - - - - - - - - - - - - x

Raymond G. Perelman Charitable Remainder   :
Unitrust,   :

  :    Civil Action No. 02-CV-3530

            Plaintiff   :

  :

- against -   :

  :

Bear Stearns & Co., Inc.   :

  :

            Defendant.   :

  :

  :

- - - - - - - - - - - - - - - - - - - - - - - - - - x

## DECLARATION OF ELIZABETH GOLDBERG

        1.      I am an attorney licensed to practice law in New York. I am associated with Bryan Cave LLP, one of the law firms representing defendant Bear Stearns & Co., Inc. ("Bear Stearns") in this lawsuit. Unless otherwise indicated below, I make this Declaration based upon my own personal knowledge.

        2.      I submit this Declaration in support of Bear Stearns' motion to compel arbitration and stay this matter and to place before the Court the exhibits cited in Bear Stearns' accompanying Memorandum of Law in Support of its Motion to Compel Arbitration.

        3.      Annexed as Exhibit "1" is a true and correct copy of the Statement of Claim, dated November 20, 2001, filed by the Plaintiff in the matter captioned <u>Raymond G. Perelman Charitable Remainder Unitrust v. Bear Stearns Securities Corp. and Mark Seruya</u>, with the NASD Dispute Resolution, Case No. 01-0636 (the "NASD Arbitration").

1

4.      Annexed as Exhibit "2" is a true and correct copy of the Customer Agreement dated April 26, 1996 executed by Raymond Perelman for the Raymond G. Perelman Charitable Remainder Unitrust ("Unitrust").

5.      Annexed as Exhibit "3" is a true and correct copy of Bear Stearns' and Mark Seruya's Answer to the Statement of Claim in the NASD Arbitration.

6.      Annexed as Exhibit "4" is a true and correct copy of the Uniform Submission Agreement executed by Raymond Perelman for the Unitrust in connection with the NASD Arbitration.

7.      Annexed as Exhibit "5" is a true and correct copy of the Complaint filed by the Unitrust in this action.

8.      Annexed as Exhibit "6" is a true and correct copy of a letter dated February 26, 2002 from Darya Geetter of Bear Stearns to Barry Katz, an attorney representing the Unitrust, informing him, among other things, that the Unitrust could redeem its Class B Notes at 82.5.

9.      Annexed as Exhibit "7" is a true and correct copy of a letter dated February 27, 2002 from Barry Katz to Eric Rieder, an attorney representing the Unitrust, requesting, in part, that Bear Stearns purchase the Unitrust's Class B Notes.

10.     Annexed as Exhibit "8" is a true and correct copy of a letter dated February 28, 2002 from Barry Katz to Darya Geetter repeating the Unitrust's request that Bear Stearns purchase the Unitrust's Class B Notes.

11.     Annexed as Exhibit "9" is a true and correct copy of a letter dated February 28, 2002 from Darya Geetter to Barry Katz regarding the Unitrust's potential redemption of its Class B Notes.

2

12.     Annexed as Exhibit "10" is a true and correct copy of the Unitrust's account statement for its account at Bear Stearns for the period from February 23, 2002 through March 28, 2002.

13.     Annexed as Exhibit "11" is a true and correct copy of a letter dated February 26, 2002 from Barry Katz to Eric Rieder regarding the Unitrust's possible redemption of its Class B Notes.

13.     Annexed as Exhibit "12" is a true and correct copy of a letter dated February 27, 2002 from Eric Rieder to Barry Katz regarding the Unitrust's possible redemption of its Class B Notes.

14.     Annexed as Exhibit "13" is a true and correct copy of a letter dated March 6, 2002 from Barry Katz to Eric Rieder reflecting the Unitrust's agreement to sell its Class B Notes to Bear Stearns for 82.5.

15.     Annexed as Exhibit "14" is a true and correct copy of a letter dated March 5, 2002 from Eric Rieder to Barry Katz to regarding Bear Stearns' acceptance of the Unitrust's offer to sell its Class B Notes to Bear Stearns at 82.5.

Pursuant to 28 U.S.C. § 1746(2), I declare under penalty of perjury that the foregoing is true and correct.  Executed in New York, New York on August ___, 2002.

3

Dated: New York, New York
      August 2, 2002

_____
Elizabeth Goldberg

**EXHIBIT 1**

NASD DISPUTE RESOLUTION, INC.

---

RAYMOND G. PERELMAN CHARITABLE
REMAINDER UNITRUST,

                Claimant,              **STATEMENT OF CLAIM**

   - against -

BEAR STEARNS SECURITIES CORP.
and MARK SERUYA,

                Respondents.

---

Claimant Raymond G. Perelman Charitable Remainder Unitrust, by its attorney,

the Law Offices of Michael Conley, for its statement of claim against Respondents Bear, Stearns

Securities Corp. and Mark Seruya (collectively, "Respondents"), hereby applies to NASD Dispute

Resolution, Inc. for submission of the controversy described herein to arbitration pursuant to Rule

10101 of the National Association of Securities Dealers Code of Arbitration Procedure, and seeks

an award against the Respondents, alleging as follows:

## INTRODUCTION

This dispute arises from fraudulent misrepresentations and omissions by the

Respondents to a charitable remainder unitrust in connection with the sale of certain junior notes

as part of a collateral bond offering by Respondent Bear Stearns Securities Corp. In order to

further their own interests the Respondents solicited the purchase of the notes by the unitrust, and

made material misrepresentations in order to induce the unitrust to purchase $3 million face amount of the notes.

## PARTIES

1. The Raymond G. Perelman Charitable Remainder Unitrust (the "Unitrust") is a trust within the meaning of Section 4 of the Revenue Procedure 90-30 and Section 664 (d)(2) of the Internal Revenue Code. The Unitrust is located at 225 City Avenue, Suite 14, Bala Cynwyd, PA 19004, which is just outside of Philadelphia, PA. At all relevant times, the Trust maintained a securities brokerage account with Respondent Bear Stearns Securities Corp.

2. Respondent Bear, Stearns Securities Corp. ("Bear Stearns") is and was at all relevant times, on information and belief, a corporation with headquarters in the City and State of New York. At all relevant times, Bear Stearns was a securities broker-dealer firm and a member of the National Association of Securities Dealers.

3. Respondent Mark Seruya ("Seruya") is, on information and belief, an individual who maintains his principal offices at Bear Stearns' offices in New York City. Mr. Seruya was at all relevant times an employee and registered representative of Bear Stearns. His actions, described below, were performed within the scope of his duties at Bear Stearns.

## FACTS

4. In or about 1994, Raymond Perelman caused several accounts that he controlled to be transferred to and/or opened at Bear Stearns. Those accounts were first handled by Bear Stearns representative Barbara Reguero. In or about that same year, another Bear Stearns representative, Mr. Mark Seruya, contacted Mr. Perelman one day and touted his expertise and experience in debt securities. Mr. Perelman continued to do business with Ms.

Reguero because he trusted her. However, in or about 1995, after Ms. Reguero moved to another department in Bear Stearns, Mr. Seruya assumed responsibility for those accounts.

5. Mr. Perelman informed Mr. Seruya that his primary investment objective was the generation of income, primarily through debt securities. Mr. Seruya reiterated that he had a substantial background in debt securities, both foreign and domestic. He thereafter began to have extensive communications with Mr. Perelman and his accountant, Michael Cull, with respect to Mr. Perelman's significant investments. The total amount Mr. Perelman and his entities invested with Mr. Seruya and Bear Stearns over the years exceeded $100 million.

6. In 1996, Mr. Perelman caused the Unitrust to open an account with Mark Seruya at Bear Stearns. As with the other accounts Mr. Perelman maintained with Mr. Seruya, Mr. Perelman relied heavily on Mr. Seruya's advice and recommendations on the understanding that Mr. Seruya was an experienced and competent professional who had Mr. Perelman's best interests in mind.

7. The relationship between Mr. Perelman and the Unitrust, on the one hand, and Mr. Seruya, on the other hand, was one of trust. Mr. Seruya spoke with Messrs. Cull and/or Perelman almost every day and often more than once a day and visited Mr. Perelman in Florida several times. He constantly offered investment advice, including recommendations for investment opportunities, to them. Although Mr. Perelman is a very wealthy man, he did not spread his securities investments over many investment firms but instead did virtually all of his investment business through Mr. Seruya. Mr. Seruya was informed that Mr. Perelman invested largely through him and was well aware that Mr. Perelman relied almost exclusively on him for investment advice. Mr. Perelman and the Unitrust invested in many of the securities

3

recommended by Mr. Seruya. Mr. Seruya and Bear Stearns profited handsomely from their

relationship with Mr. Perelman, as they generated substantial fees and commissions through the

large transactions Mr. Perelman effected through them upon their recommendations.

       8.  On March 20, 1997, Mr. Seruya called Messrs. Perelman and Cull to solicit Mr.

Perelman's purchase of Augusta Fund Junior Notes (the "Notes") as part of a collateralized

bond offering ("CBO") for sale by Bear Stearns.  Major selling points represented by Bear Stearns

were that the Notes enjoyed a high rate of return and that the fund would have to experience

significant annual defaults in its bond portfolio for interest not to be paid.  In connection with the

solicitation of Mr. Perelman's investment in the Notes, Mark Seruya faxed to Messrs. Perelman

and Cull three pages of a proprietary and confidential document reiterating those major selling

points (the "Selling Points Document").  A copy of that document is annexed hereto as Exhibit A.

       9.  Several parts of the Selling Points Document were especially critical to Mr.

Perelman's decision on whether to invest in the Notes.  That document showed that even with

annual defaults in the bond portfolio over seven (7) percent, there would still be a positive return

on the investment. The annual default rate cushion was also orally emphasized by Mr. Seruya in

his sales effort.  He added that the investment had significant potential upside and that the

likelihood of annual defaults was not high, especially considering that almost all of the bonds in

the portfolio were to be sovereign debt of the countries issuing the bonds. Indeed, as stated in the

Selling Points Document, the Notes enjoyed "High current interest income, increasing over time."

Moreover, the bond portfolio was to be managed by Bear Stearns, which meant, as stated by Mr.

Seruya orally and in the Selling Points Document, "[p]otential appreciation (and reduction of risk)

through professional portfolio management."  Mr. Seruya also emphasized that the investment

<div align="center">4</div>

had a put option that was "like cashing in a mutual fund," with the put reaching its optimal value after five years. He stated more than once that the put option was capable of easy and efficient exercise.

10. The foregoing representations, made in writing in the Selling Points Document and orally by Mr. Seruya, were false and Respondents knew or were grossly reckless in not knowing that they were false. The Respondents knew or were reckless in not knowing that interest payments could and would cease at times when the annual default rate was less than seven percent. They also knew, or willfully kept themselves ignorant of, the fact that redeeming the notes was not nearly as easy or possible as redeeming mutual fund shares. They certainly had no reasonable basis for those misrepresentations. Further, the Respondents knew, from their history of dealings with Mr. Perelman, the dialogue regarding the potential purchase of the Notes, and the fact that they had not provided Mr. Perelman and the Unitrust with an offering memorandum or other detailed documentation regarding the Notes, that the Unitrust was relying on them, and particularly on those representations, in purchasing the Notes.

11. The Respondents had ample motivation to shade the truth in their sale of the Notes. Their sale was very important to Bear Stearns and Mr. Seruya, since it would generate significant fees for them. At the very least, those fees included not only direct selling fees for sales of the Notes and the related securities that comprised the CBO, but also fees for Bear Stearns Asset Management, a division of Bear Stearns, as collateral manager of the bond portfolio. Bear Stearns Financial Products, Inc. was also to earn fees as the Swap Counterparty for the CBO. Finally, the sale of any Notes to Mr. Perelman would generate commissions for Mr. Seruya and Bear Stearns.

5

12. In reliance on the March 20, 1997 oral and written representations made by Mr. Seruya and Bear Stearns, Mr. Perelman agreed to have the Unitrust purchase Notes with a face value of $3,000,000. Thereafter, Mr. Seruya transmitted to Messrs. Perelman and Cull some documents, including at least one that was backdated to March 20, which Mr. Seruya identified as formalities necessary for the confirmation of the purchase of the Notes that had been effected. The documents were signed and the transaction formally confirmed. These documents are Exhibits B and C hereto.

13. On or about April 10, 1997, Bear Stearns closed the offering of the Notes and transferred Notes with a face amount of $3,000,000 to the Unitrust's account. Mr. Seruya effected that transaction for the Unitrust without any further consent from or action by Messrs. Perelman or Cull. The Notes were issued at a discount and the Unitrust paid a total price of $2,607,792.10 for them. A copy of a Bear Stearns statement evidencing ownership of the Notes is Exhibit D hereto.

14. In 1998 interest was paid on the Notes. Then, in April 1999, no payment of the interest was made to the noteholders. At that time, Mr. Seruya indicated to Messrs. Perelman and Cull that the failure of the interest payment was due to temporary liquidity and credit problems with the portfolio.

15. In or about March, 2000, Bear Stearns furnished Mr. Perelman and the Unitrust with the following documents:

- the Collateral Manager Report, by Bear Stearns Asset Management;

- a detailed summary of the portfolio's holdings as of September 30, 1999;

- a schedule of transactions of 3rd Quarter, 1999; and

- an 8-month projection of interest cash flows.

A copy of that report, dated February 11, 2000, is annexed hereto as Exhibit E. The provision of that report was the first time that Mr. Perelman and the Unitrust had been furnished with documents disclosing the percentage of bonds in the portfolio that had defaulted.

16. The percentage of annual defaults was much less than the annual percentage of defaults represented in the Selling Points Document that would cause interest not to be paid. Nonetheless, interest was not being paid to the Noteholders. As a result, the interest payments to the Noteholders and the market value of the Notes are substantially less than they would be were the facts as Respondents had represented them to be. By the same token, those Notes were not worth as much, and the Unitrust would not have paid as much, had the Respondents not provided them with the foregoing false and misleading statements or had they provided them with accurate information regarding those matters.

17. The Unitrust soon learned that the Respondents' representations regarding the Notes' "put" option were also false and misleading. By letter dated September 21, 2001, Mr. Perelman wrote to Mr. Seruya and Bear Stearns and demanded, among other things, that it return the purchase price the Unitrust had paid for the Notes, together with an appropriate return of interest thereon. Mr. Perelman also demanded information necessary to be able to seek to exercise the put option on behalf of all noteholders. A copy of this letter is Exhibit F hereto (the enclosures with the letter are not included separately, since they are Exhibits A, B and C hereto).

18. By letter dated October 4, 2001, Bear Stearns responded to Mr. Perelman's letter. Bear Stearns did not address any of the specific misrepresentations of which Mr. Perelman complained in his September 21, 2001 letter. Moreover, Bear Stearns refused to provide the

7

information Mr. Perelman needed to contact other noteholders about the put option and provided him with no assistance in that regard.

19.  As the Unitrust has recently discovered, it is extremely difficult, if at all possible, to exercise the put option along with the other noteholders.  The Unitrust attempted to do so without success.  After Bear Stearns refused to provide the identity of the other noteholders, the Unitrust contacted the United States Trust Company of New York, the Trustee for the CBO (the "Trustee").  The Trustee said it did not have that information and directed the Unitrust to the paying agent, the London Branch of Deutsche Bank AG.  Deutsche Bank referred the Unitrust back to the Trustee. Thereafter, Deutsche Bank said it would send a letter to the other noteholders if supplied such by the Unitrust.

20.  While the Unitrust intends to continue to follow up on this issue, it is apparent that attempting to exercise the put option, either individually or along with the other noteholders, is anything but like cashing in a mutual fund.  Moreover, it now appears that any attempt to exercise the put option might be futile, since there are significant financial tests that must be met or hurdles to overcome before the option can be exercised, if it can be exercised at all.

21.  The Respondents, of course, never disclosed those facts to Messrs. Perelman and Cull; on the contrary, they were told that exercising the put would be as easy as cashing in a mutual fund.

WHEREFORE, the Raymond G. Perelman Charitable Remainder Unitrust demands judgment as follows:

A.    Compensatory damages jointly and severally against Bear Stearns and Mark Seruya in the amount of $2,607,792.10, plus interest thereon;

8

   B.  punitive damages in an amount to be determined at trial but which should at

least be $7,823,376.30;

   C.  the Unitrust's attorneys' fees and costs; and

   D.  Such other and further relief as the Arbitrators deem just and proper.

Bala Cynwyd, PA
November 20, 2001

          Michael Conley, Esquire
          Attorney I.D. No.: 54142
          225 City Avenue – Suite 114
          Bala Cynwyd, PA 19004
          (610) 660-8814



3-20-1997 9:01AM    FROM INVESTMENT MGMT GRP 212 272 6503

P. 1

Petersburg 3,000,000 → Augusta Funding limited B.

Proprietary and Confidential

# Selling Points of the Subordinated Notes (Class B)

- 5:1 Leveraged investment in Emerging Markets portfolio – hibor + 2½
- Term financing with no risk of margin call in volatile markets – 10%again 4½
- Financing is at a fixed spread and non-recourse –
- Globally diversified exposure across EM sovereign credits for relatively small investment
- 5 year reinvestment of portfolio principal income ↩
- Call option after 4 years at the direction of Class B holders ↩
  - In whole at election of 2/3rds of the Class B holders ↩
  - In part at election of an individual holder owning at least $5MM
- High current interest income, increasing over time ↩
- Potential appreciation (and reduction of risk) through professional portfolio management
- Consolidates into a single security the operational responsibilities for an entire portfolio

BEAR STEARNS

8

Attention Michael

From Mark

3-29-02  FROM INVESTMENT MGMT GRP 212 272 6523    P. 2

Proprietary and Confidential

# Portfolio Breakdown

| Region | Port. % | # of Issuers | # of Countries |
|---|---|---|---|
| Asia | 14% | 4 | 3 |
| Caribbean | 4% | 2 | 1 |
| Eastern Europe | 30% | 5 | 4 |
| Latin America | 37% | 7 | 6 |
| Middle East/ Africa | 10% | 2 | 2 |
| Investment Grade | 5% | 1 | 1 |
| Total | 100% | 21 | 17 |

| | |
|---|---|
| Wtd. Avg. Life | 7.98 yrs. |
| Wtd. Avg. Maturity | 10.45 yrs. |
| Wtd. Avg. Coupon | 6.57% |
| Wtd. Avg. Rating | 'B1' |

BEAR STEARNS

11

3-20-1997 9:22AM    FROM INVESTMENT MGMT GRP 212 272 6503

P.3

Proprietary and Confidential

# Class B Interest Rate and Default Sensitivity (YTM)

| Annual Defaults | -100 | base | +100 | +200 | +300 | +400 |
|---|---|---|---|---|---|---|
| | | | | Rate Movements (bps) | | |
| 0% | 15.09% | 15.50% | 15.91% | 16.34% | 16.78% | 17.24% |
| 1% | 13.39% | 13.76% | 14.14% | 14.53% | 14.94% | 15.38% |
| 2% | 11.32% | 11.69% | 12.08% | 12.48% | 12.91% | 13.37% |
| 3% | 9.21% | 9.60% | 10.00% | 10.41% | 10.85% | 11.32% |
| 4% | 7.22% | 7.62% | 8.03% | 8.45% | 8.90% | 9.37% |
| 5% | 5.32% | 5.72% | 6.13% | 6.56% | 7.02% | 7.50% |
| 6% | 3.46% | 3.90% | 4.34% | 4.79% | 5.25% | 5.73% |
| 7% | 1.40% | 1.92% | 2.44% | 2.96% | 3.47% | 4.02% |
| 8% | -1.15% | -0.42% | 0.24% | 0.97% | 1.61% | 2.23% |

BEAR STEARNS

12



To Mr. Schmyk

March 20      , 19 97

United States Trust Company of New York
114 West 47th Street
New York, New York  10036

Attention:  Augusta Funding Limited B

RE:   U.S.$30,424,000 Class B-2 Junior Notes Due 2015

Ladies and Gentlemen:

Raymond G. Perelman Charitable
Remainder Unitrust_____ (the "Purchaser") intends to purchase from
Bear Stearns & Co., Inc. (the "Seller") U.S.$ 3,000,000.00# aggregate principal amount
of Class B-2 Junior Notes Due 2015 (the "Notes"), issued pursuant to the Indenture (the
"Indenture"), dated as of April 10, 1997 among Augusta Funding Limited B, as issuer (the
"Company"), MBIA Insurance Corporation, as insurer, and United States Trust Company of
New York, as trustee (the "Trustee").  All terms used herein and not otherwise defined shall
have the meanings set forth in the Indenture.  The Purchaser hereby certifies, represents and
warrants to, and covenants with, the Company and the Trustee that:

(1)   We have received and reviewed the Offering Memorandum dated April __, 1997
      relating to the Notes, and such other information as we deem necessary in order to
      make our investment decision.

(2)   As a purchaser of the Notes in a private placement, we represent that (i) we are (or
      any account for which we are purchasing under (ii) below) is an Accredited Investor
      as defined in Rule 501 of Regulation D promulgated under the United States
      Securities Act of 1933, as amended (the "Securities Act") and (ii) we are purchasing
      such Notes for our own account (or for accounts as to which we exercise sole
      investment discretion) and have authority to make, and do make, the statements
      contained in this letter and not with a view to any distribution thereof.

(3)   We have such knowledge and experience in financial and business matters with
      respect to collateralized securities as to be capable of evaluating the merits and risks
      of an investment in the Notes and forming an investment decision with respect thereto
      and we are (or any account for which we are purchasing is) able to bear the risk of
      such investment for an indefinite period and to afford a complete loss thereof.

(4)   We understand that the Notes have not been registered under the Securities Act by
      reason of their issuance in a transaction that does not require registration under the
      Securities Act, and that such Notes must be held indefinitely unless exempt from such
      registration.  We agree that, if in the future we should decide to dispose of any of the
      Notes, we will not offer, sell, or deliver any such Notes directly or indirectly, except
      in a transaction pursuant to Regulation D under the Securities Act, Rule 144A under
      the Securities Act or pursuant to another exemption from the Securities Act.

# - designates $3,000,000.00 face value of purchase.

(5)    We agree not to sell or transfer any of the Notes except upon compliance with the provisions of the Indenture and the Notes, including obtaining from any persons purchasing one or more Notes from us and delivering to the addressees hereof a letter substantially in the form of this letter.

(6)    The Notes that we have purchased shall be issued in registered form and such Notes shall bear the following legend:

THIS SECURITY HAS NOT BEEN AND WILL NOT BE REGISTERED UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), AND THE ISSUER HAS NOT BEEN REGISTERED UNDER THE UNITED STATES INVESTMENT COMPANY ACT OF 1940, AS AMENDED (THE "1940 ACT"). THIS SECURITY MAY NOT BE OFFERED, SOLD, PLEDGED OR OTHERWISE TRANSFERRED, EXCEPT (A)(1) TO A PERSON WHOM THE SELLER REASONABLY BELIEVES IS A QUALIFIED INSTITUTIONAL BUYER WITHIN THE MEANING OF RULE 144A UNDER THE SECURITIES ACT PURCHASING FOR ITS OWN ACCOUNT OR FOR THE ACCOUNT OF A QUALIFIED INSTITUTIONAL BUYER IN A TRANSACTION MEETING THE REQUIREMENTS OF RULE 144A SO LONG AS THIS SECURITY IS ELIGIBLE FOR RESALE PURSUANT TO RULE 144A SUBJECT TO THE SATISFACTION OF CERTAIN CONDITIONS SPECIFIED IN THE INDENTURE REFERRED TO BELOW OR (2) TO A NON-U.S. PERSON IN AN OFFSHORE TRANSACTION IN ACCORDANCE WITH RULE 903 OR RULE 904 (AS APPLICABLE) OF REGULATION S UNDER THE SECURITIES ACT OR (3) TO AN ACCREDITED INVESTOR AND (B) IN ACCORDANCE WITH ALL APPLICABLE SECURITIES LAWS OF ANY STATE OF THE UNITED STATES AND ANY OTHER APPLICABLE JURISDICTION. EACH PURCHASER OF THIS SECURITY WILL BE REQUIRED TO EXECUTE A TRANSFER CERTIFICATE IN ACCORDANCE WITH SECTION 2.05 OF THE INDENTURE. ANY TRANSFER IN VIOLATION OF THE FOREGOING WILL BE OF NO FORCE AND EFFECT, WILL BE VOID AB INITIO, AND WILL NOT OPERATE TO TRANSFER ANY RIGHTS TO THE TRANSFEREE, NOTWITHSTANDING ANY INSTRUCTIONS TO THE CONTRARY TO THE ISSUER, THE TRUSTEE OR ANY INTERMEDIARY.

(7)    We understand that, in connection with any proposed transfer or exchange of Notes, an opinion of counsel experienced in giving opinions with respect to questions relating to the securities laws of the United States may be required, to the effect that such transfer or exchange will be in compliance with the Securities Act and the Investment Company Act of 1940, as amended, together with such other documentation (including a letter to substantially the same effect as this letter) as the Trustee may reasonably request; provided that no such opinion or other documentation relating to compliance with the Securities Act shall be required if such transfer is made in accordance with Rule 144A under the Securities Act and the transferee furnishes a letter, signed by its chief financial officer or other executive officer, to substantially the same effect as this letter (excluding paragraph (1)).

2

03/25/97  TUE 15 53 FAX 212 508 3579    O.E.A SUTCLIFFE LLP    ☎004

(8)    We are the sole "beneficial owner" of the Note or are acquiring the Note for the sole "beneficial owner" of such Note (as such term is defined in Section 3(c)(1) of the Investment Company Act).

(9)    We understand that no employee benefit or other plan that is subject to ERISA or Section 4975 of the Code, and no entity whose underlying assets include "plan assets" by reason of any such plan's investment in the entity (excluding any entity registered under the Investment Company Act), may purchase or hold such Note or any interest therein, unless it is an insurance company, it is acquiring such Note or an interest therein with assets of its general account in reliance on the availability of the exemptive relief afforded by U.S. Department of Labor Prohibited Transaction Class Exemption ("PTCE") 95-60, 60 Federal Register 35925 (July 12, 1995), such general account satisfies the conditions set forth in Section I(a) of PTCE 95-60 and its holding of such Note or an interest therein after the date that is eighteen months after the issuance of final regulations under Section 401(c) of ERISA will be permissible thereunder or under such final regulations, PTCE 95-60 or another exemption under ERISA.  Each prospective purchaser of a Note or any interest therein, by purchase such Note or any interest therein, represents that (A) it is neither an employee benefit or other plan that is subject to ERISA or Section 4975 of the Code nor any entity whose underlying assets include "plan assets" by reason of such plan's investment in the entity (excluding any entity registered under the Investment Company Act or (B) it is an insurance company, and it is acquiring such Note or interest therein with assets of its general account in reliance on the availability of the exemptive relief afforded by PTCE 95-60 and its holding of such Note or an interest therein after the date that is eighteen months after the issuance of final regulations under Section 401(c) of ERISA is permissible thereunder or under such final regulations, PTCE 95-60 or another exemption under ERISA.


                             Very truly yours,


                             _____
                             Raymond G. Perelman Charitable
                             Remainder Unitrust
                             By:  _____
                             Name: Raymond G. Perelman
                             Title: Trustee

FROM : BELMONT HOLDINGS CORP

10-26-1997 2:24PM    FROM INVESTMENT MGMT CORP

03/23/97  TCN 14:11 FAX 212 546 3379    O.M.& SUTCLIFFE LLP

(8)   We are the sole "beneficial owner" of the Note or are acquiring the Note for the sole "beneficial owner" of each Note (as such term is defined in Section 3(c)(1) of the Investment Company Act).

(9)   We understand that no employee benefit or other plan that is subject to ERISA or Section 4975 of the Code, and an entity whose underlying assets include "plan assets" by reason of any such plan's investment in the entity (excluding any entity registered under the Investment Company Act), may purchase or hold such Note or any interest therein, unless it is an insurance company, it is acquiring such Note or an interest therein with assets of its general account in reliance on the availability of the exemptive relief afforded by U.S. Department of Labor Prohibited Transaction Class Exemption ("PTCE") 95-60, 60 Federal Register 35925 (July 12, 1995), such general account satisfies the conditions set forth in Section I(A) of PTCE 95-60 and its holding of such Note or an interest therein after the date that is eighteen months after the issuance of final regulations under Section 401(c) of ERISA will be permissible thereunder or under such final regulations, PTCE 95-60 or another exemption under ERISA.  Each prospective purchaser of a Note or any interest therein, by purchase such Note or any interest therein, represent that (A) it is neither an employee benefit or other plan that is subject to ERISA or Section 4975 of the Code nor any entity whose underlying assets include "plan assets" by reason of such plan's investment in the entity (excluding any entity registered under the Investment Company Act or (B) it is an insurance company, and it is acquiring such Note or interest therein with assets of its general account in reliance on the availability of the exemptive relief afforded by PTCE 95-60 and its holding of such Note or an interest therein after the date that is eighteen months after the issuance of final regulations under Section 401(c) of ERISA is permissible thereunder or under such final regulations, PTCE 95-60 or another exemption under ERISA.

Very truly yours,

Raymond G. Perelman Charitable
Remainder Unitrust

By:

Name: Raymond G. Perelman
Title: Trustee

5

# BEAR STEARNS

OFFICE SERVICING YOUR ACCOUNT
Bear, Stearns & Co. Inc.
245 Park Avenue
New York, New York 10167
(212) 272-2000

CLEARED THROUGH ITS WHOLLY OWNED SUBSIDIARY

Bear, Stearns Securities Corp.
One Metrotech Center North
Brooklyn, New York 11201-3859
(212) 272-1000

RAYMOND G PERELMAN

STATEMENT PERIOD  September 1, 2001
THROUGH    September 28, 2001
ACCOUNT NUMBER : 220-47881 28
TAXPAYER NUMBER : On File
LAST STATEMENT : August 31, 2001

11 of 17

## Your Portfolio Holdings (continued)

### Corporate Bonds (continued)

| DESCRIPTION | SYMBOL/CUSIP | ACCT TYPE | QUANTITY | PRICE | MARKET VALUE | ACCRUED INTEREST | ESTIMATED ANNUAL INCOME | CURRENT YIELD (%) |
|---|---|---|---|---|---|---|---|---|
| AUGUSTA FDG LTD B<br>CLASS B-2 FRN 14.1A<br>DATED DATE 01/10/97<br>BOOK ENTRY ONLY<br>DUE 04/10/2015        AO   10 | 05114 4AC7 | CASH | 3,000,000 | Unpriced | | | | |
| VENEZUELA REPUBLIC<br>GLOBAL BOND<br>DATED DATE 09/18/97<br>DUE 09/15/2027 9.250% MS  15<br>RATING: MOODY B2   S&P B | 922646AS3 | CASH | 4,000,000 | 65.6000 | 2,624,000 | 13,381 | 370,000 | 14.1006 |
| ARGENTINA<br>GLOBAL BOND<br>DATED DATE 09/12/97<br>BOOK ENTRY ONLY<br>DUE 09/19/2027 9.750% MS  19<br>RATING: MOODY CAA1  S&P B. | 040114AV2 | CASH | 1,000,000 | 53.7500 | 537,500 | 2,438 | 97,500 | 18.1395 |
| REPUBLIC OF ECUADOR<br>1.4A MULTI CPN<br>DATED DATE 08/23/00<br>BOOK ENTRY ONLY<br>DUE 08/15/2030  4.000% FA  15<br>RATING: MOODY CAA2   S&P CCC+ | 27927WAD4 | CASH | 923,000 | 40.2500 | 371,508 | 4,410 | 36,920 | 9.9379 |
| **Total Corporate Bonds** | | | | | **$23,009,486** | **$602,292** | **$3,747,974** | |
| **TOTAL FIXED INCOME** | | | | | **$23,009,486** | **$602,292** | **$3,747,974** | |

| | |
|---|---|
| YOUR TOTAL ACCRUED INTEREST | $602,292 |
| YOUR TOTAL ESTIMATED ANNUAL INCOME | $5,522,119 |
| YOUR PRICED PORTFOLIO HOLDINGS | $39,053,936 |

# BEAR STEARNS

EDWARD R. VAIMBERG
MANAGING DIRECTOR

BEAR STEARNS
ASSET MANAGEMENT INC.
575 LEXINGTON AVENUE
NEW YORK, NEW YORK 10022
(212) 272-2887
(800) 436-4148
FAX (212) 350-1697

February 11, 2000

We have enclosed for your review the following information on Augusta Funding Limited B:

-the Collateral Manager Report, by BSAM

-a detailed summary of the portfolio's holdings as of September 30, 1999

-a schedule of transactions for 3rd Quarter, 1999

-a 8 - month projection of interest cash flows.

We look forward to hearing your thoughts regarding these reports.

Very truly yours,

cc:

Ralph Cioffi
Bear Stearns

John Geissinger
Bear Stearns Asset Management

Felicia Grumet
Bear Stearns

Earl Hedin
Bear Stearns Asset Management

Andrew Langerman
Bear Stearns

Bruce Merivale-Austin
Bear Stearns London

John Niblo
Bear Stearns

Matthew Tannin
Bear Stearns

Augusta B

Collateral Manager Report – September 30, 1999

Portfolio Structure

The portfolio allocation by region and country appears below (subtotals reflect rounding).

| Latin America | | | Africa | | |
|---|---|---|---|---|---|
| Argentina | 0.3% | | Algeria | 2.7% | |
| Brazil | 5.3% | | Morocco | 6.3% | |
| Colombia | 5.0% | | Nigeria | 2.9% | |
| Costa Rica | 3.3% | | Subtotal | 11.9% | |
| Dominican Republic | 1.0% | | | | |
| Ecuador | 3.6% | | | | |
| Mexico | 3.7% | | | | |
| Panama | 6.0% | | Asia | | |
| Venezuela | 4.3% | | China/Hong Kong | 6.0% | |
| Subtotal | 32.6% | | Indonesia | 4.7% | |
| | | | Korea | 4.3% | |
| | | | Philippines | 4.7% | |
| | | | Thailand | 1.7% | |
| | | | Vietnam | 3.7% | |
| | | | Subtotal | 25.0% | |
| Eastern Europe | | | | | |
| Bulgaria | 4.8% | | | | |
| Croatia | 2.9% | | | | |
| Kazakhstan | 3.0% | | Caribbean Basin | | |
| Poland | 3.0% | | | | |
| Russia | 9.2% | | Jamaica | 2.7% | |
| Slovak Republic | 4.0% | | Subtotal | 2.7% | |
| Subtotal | 26.9% | | | | |
| | | | Principal Cash | 0.9% | |

The allocation between sovereign government securities and other assets appears below:

| | |
|---|---|
| Sovereign Government Securities | 83.6% |
| Corporate Securities/Sovereign Loan Participations | 15.5% |
| Principal Cash | 0.9% |
| | 100.0% |

Key Changes

During the 3rd quarter of 1999, we agreed with the insurer on a plan to reinvest the proceeds of principal paydowns and prior sales of Credit Risk Securities. We also lowered our net position in Bulgaria by approximately 3%, to 5%. Proceeds were used to modestly increase our exposure to the Slovak Republic by approximately 2%, to 4% (through Vodohospodarska, a quasi-sovereign bond guaranteed by the Slovak Republic), and to diversify into 3 new sovereign credits including Vietnam (3.7%), Dominican Republic (1.0%) and Algeria (2.7%).

Credit Rating Developments

With respect to public credit ratings, the portfolio experienced two downgrades during the third quarter of 1999 (Colombia: Baa3 to Ba2 by Moody's and BBB- to BB+ by S&P), as well as three upgrades (Mexico Ba2 to Ba1 by Moody's; Russia CC to CCC by S&P; Poland Baa3 to Baa1 by Moody's). There were also two downgrades in private ratings.

Mechala

At inception in 1997, Augusta B held about 3.8% par value of bonds issued by Mechala, a privately-owned Jamaican corporation. By March 1999, this position had been reduced to 2.7% because of concerns about the company's poor financial health. Mechala failed to pay the coupon and principal due on a bond maturing on 30 June 1999, as well as the coupon due on August 15, 1999 on another bond held by Augusta B. The bond held by Augusta B went into payment default on 15 September 1999 after a 30-day grace period.

In July, the owners of Mechala extended a tender offer for all of the outstanding bonds. After much negotiation with the bondholders committee (of which BSAM is a member), a revised offer of about 47¢ on the dollar was accepted. However, because a dissenting bondholder challenged the agreement, Mechala withdrew the tender offer and extended the same offer under Jamaican statue. The challenge is currently being adjudicated in a Jamaican court.

Greater Beijing First Expressway

Augusta B holds approximately 1.0% of Greater Beijing 9.25% 6/15/04. On December 15, 1999, the coupon was paid not by the company, but from a debt service reserve fund which has not been replenished in the time required by the indenture. On February 11, 2000, the bond trustee Chase Manhattan Bank sent a notice of acceleration, stating that principal and unpaid interest are due immediately under the indenture, and which the Trustee has deemed an event of default. As managers, we are aware that a committee of bondholders has formed and is currently discussing restructuring with the company management. Consequently, we do not know if the June 2000 coupon will be paid on time, or the outcome of the restructuring negotiations.

Coverage and Quality Tests

The portfolio as of 9/30/99 passed the S&P quality test but exceeded the threshold level for the Moody's quality test. The implication of the Moody's score is that until the threshold is met, any subsequent trades must not worsen the quality score; in certain circumstances, the Moody's score must be improved. The portfolio passed the Par Coverage test but was below the required level for the Interest Coverage test. Because the Interest Coverage test ultimately fell below the required level on the October 1999 Determination Date, a partial paydown of the Class A Notes took place. This is discussed in more detail in the next section.

| | | | |
|---|---|---|---|
| **Moody's Quality Test** | | | |
| Portfolio | 2,430 | Failed | |
| Required | <2,220 | | |
| | | | |
| **Par Coverage Test** | | | |
| Portfolio | 136% | Passed | |
| Required | >135% | | |
| | | | |
| **Interest Coverage Test** | | | |
| Portfolio | 112% | Failed | |
| Required | >125% | | |
| | | | |
| **Standard & Poor's Quality Test** | | | |
| Portfolio | 33.9% | Passed | |
| Required | <37.5% | | |

CHRONOLOGY OF KEY DEVELOPMENTS

As you know, the indenture contains provisions that require minimum levels of coverage on certain key variables before certain payments can be made to Class B noteholders. *Par coverage* is defined as the ratio of the total face amount of bonds in the collateral portfolio (after adjustment for "Defaulted Securities") and undistributed interest proceeds from debt securities, divided by the outstanding face amount of senior (Class A) notes. (Defaulted securities are written down to the lesser of 10–25% of par, or market value, depending on the type of issuer.) *Interest coverage* is defined as the sum of the scheduled interest proceeds due in the Due Period (excluding scheduled interest proceeds of Defaulted Securities) and any payments to be received under the Hedge Agreement, minus fees and expenses payable pursuant to the indenture, divided by the sum of the total amount of scheduled interest payments due on the Class A notes and any amounts to be paid under the Hedge Agreement. If the par coverage or interest coverage ratio falls below 135% or 125%, respectively, on the measurement date several days before the scheduled distribution of collected interest to noteholders, the principal of the Senior notes must be amortized to the extent necessary to re-establish par and interest coverage of 135% and 125%, respectively. Only then can the Trustee distribute the subordinated fees and expenses, and, if available, interest due to the Class B noteholders.

The Trustee has not distributed excess interest to Class B noteholders on either of the last two Payment Dates because the required levels of coverage were not met. At inception of the CBO in April 1997, par coverage for Augusta B was approximately 137%. Later that year, par coverage had fallen to 133.5%, largely as a result of the default of GMD, a Mexican corporate bond that represented approximately 5% of the portfolio's par value. Following this default, several transactions were implemented to restore par coverage to 135%. However, par coverage was approximately 134.1% on the April 1999 Determination Date as a result of sales of bonds. We sold our position in Romania and part of our position in Mechala (Jamaica) and Ecuador as Credit Risk securities because we believed there was a significant and growing risk of default. We were unable to agree with the insurer on an appropriate reinvestment for the sale proceeds by the Determination Date immediately preceding the April 1999 Payment Date. (The insurer has the right to decline all reinvestment proposals.) Because the level of par coverage was below 135%, the Class A notes of Augusta Funding B amortized $1.5 million of principal, equal to 0.7% of the Class A notes outstanding on the April 12th Payment Date. The holders of Class B notes did not receive a distribution because, after the distribution to Class A note holders (of interest and principal), and payments for fees and expenses pursuant to the terms of the indenture, the level of par coverage fell to approximately 130.1%. Both events were triggered under the indenture because the level of par coverage was below 135% on April 5, the Determination date for the April 12 payment.

Following this Determination Date, we came to terms with the insurer on a mutually satisfactory reinvestment strategy for the proceeds of the sales. On October 11, the most recent Determination Date, par coverage was 135%, the required level. The increase from 134.1%, the level on the prior Determination Date, reflected the reinvestment of principal cash, largely offset by the default of Mechala, a Jamaican corporate bond that represents approximately 3% of the portfolio's par value. In the absence of other developments, this level of par coverage would have been sufficient to preclude another amortization in October 1999, but would have still been too low to allow the distribution of excess interest proceeds to the holders of Class B notes, because the level of par

coverage was approximately 131% after the payment of interest to Class A note holders and payments for fees and expenses. However, on this most recent Determination Date, the level of *interest* coverage had fallen to approximately 112%, below the required level of 125%, as a result of the default of Mechala, and a scheduled rise in the fixed payment under the hedge agreement. Because the interest coverage test fell below the required level, the trustee was obligated to use the remaining excess interest proceeds, as well as uninvested principal paydowns that were received within several months of the Payment Date, to amortize approximately $3.4 million of Class A notes, equal to 1.5% of the Class A notes outstanding on the October Payment Date.

Most recently, following the October 1999 Determination Date, Ecuador defaulted on some of its Brady and Euro bonds. The defaults triggered an event of default on the Ecuador PDI bonds, which represent approximately 4% of the portfolio. As a result, par coverage declined by approximately 3.7%, and stands at 128% (excluding undistributed interest proceeds from debt securities) as of 12/31/99, versus the required level of 135%. As reported by the trustee, interest coverage as of 12/31/99 is 114%, compared to the required level of 125%.

The probability of default in the emerging markets has increased over the last couple of years, reflected in the large number of credit downgrades over the period. As collateral managers, we have been most concerned with a small number of issuers where we believe the probability of default is greatest. We have reduced or eliminated exposure to the weakest credits. Because we have undertaken additional sales in an effort to restore par coverage, the Augusta B portfolio has exceeded the 30% lifetime limit on total sales (excluding defaults) prescribed in the indenture. Thus, the insurer's consent will be required for any future sales from the portfolio.

Looking forward, we will continue to propose to the insurer transactions that take advantage of changes in relative prices and credit ratings, to further improve the level of par or interest coverage. Distribution of excess interest to Class B holders will not resume until the par and interest coverage recover to 135% and 125%, respectively. If the level of par coverage and interest coverage on a subsequent Determination Date exceeds the required levels after the payment of fees, expenses, and Class A interest, the Trustee can resume distribution of excess interest on the Class B notes in an amount that does not cause the coverages to fall below the required levels. In the interim, if either par coverage or interest coverage are below 120% and 115%, respectively, the insurer also has the right under the indenture to instruct the collateral manager to direct the sale or purchase of any Debt Security without compliance with the Reinvestment Criteria. To date, the insurer has not exercised this right.

The total amounts of Class A, Class B-1 Notes and Class B-2 notes outstanding as of 12/31/99 are US$219,624,185 CHF40,000,000 and US$30,424,000, respectively.

EMERGING MARKETS ENVIRONMENT AND OUTLOOK

Emerging market debt generated total returns of +1.49% in the third quarter of 1999, according to the JP Morgan EMBI Global Index. The average "stripped" yield spread of sovereign debt over U.S. Treasury bonds increased 47 basis points, to 9.81%, while the market's cash flow spread rose 41 bp, to 8.11%.

Fundamentally, economic growth in the world's industrialized economies is strong and improving. This is contributing to further upward revisions in the outlook for growth in the emerging markets. Terms of trade continued to improve with additional increases in oil and other commodity prices. Exports continued to support rising economic growth in Asia, and Latin American recessions showed some signs of bottoming. While investors periodically expressed concerns over the prospects for more significant tightening by the U.S. Fed, these fears receded somewhat as inflation in the U.S. remained under control.

Algeria was the best performing market, returning 22% during the quarter. Algeria rallied in response to the favorable impact of rising oil prices on its balance of payments, and optimism regarding efforts to rein in government spending. The worst performer, Ecuador, fell 37% during the quarter, reflecting country's default near quarter-end on the Discount bond, one of its Brady bonds, as well as the lack of progress in addressing its budget deficit and high inflation. Ivory Coast bonds fell 26%; the IMF has suspended financial assistance at least until they have finished inspecting the results of government budget audits. Russian bonds also suffered, falling 16%. Although higher oil prices and the devalued ruble have raised the current account surplus and supported local manufacturers, political uncertainty and alleged money laundering on a huge scale delayed the latest tranche of IMF support. Terrorist bombings and a renewal of the Chechen conflict did not help, either. Despite this pullback, however, Russian bonds were still up over 65% year to date.

Regional Highlights

Latin America

The most significant events in Latin America during the quarter were the runup to the November presidential election in Argentina, the November presidential primary of the "ruling" PRI party in Mexico, and the unfolding default in Ecuador. The political campaigns in both Argentina and Mexico generated concern over the direction of policy in the future. In both cases, the possibility that a member of the political opposition could rise to lead the country was met with some concern. It ended up happening in Argentina and is still a possibility in Mexico. Nonetheless, both of these markets managed to generate positive returns in excess of the market average. Ecuador was a study in confusion and despair. The administration could not assemble any consensus to deal with the deficits, recession, and growing debt burden. In this vacuum, the IMF chose not to ride to the rescue with short-term liquidity. Ecuador's gambit to stave off technical default by asking Discount bond holders to accept a "release of collateral" to pay coupons was rejected by bondholders, who felt they were getting inferior treatment to the holders of PDI bonds, who were paid their coupons. Ecuador's default was the first on a Brady bond.

Eastern Europe and CIS

The most significant developments in this region pertained to Russia. Russian bonds sold off some of their impressive gains year-to-date on heightened concerns over the country's ability to refinance itself, rather than on economic fundamentals. Trade accounts continued to improve on the flow-through of higher oil prices and cheap ruble, contributing to modest increases in the country's foreign currency reserves. However, bonds suffered most from political bombings in Moscow and a revival of the regional Chechen war, a money laundering scandal possibly involving the Russian government, related delays in IMF funding, and the firing of yet another prime minister.

Asia

With growth numbers being revised upward both in Japan, and Asia ex-Japan, yield spreads in Asia are now the highest since the 1997-98 crisis. The most important developments in the region were the presidential election in Indonesia, and events leading to the default of the huge Daewoo conglomerate in Korea. In Indonesia, the actual election took place in October, but the third quarter set the stage when the entrenched business/military alliance of the Suharto era was thoroughly discredited. Although led by some very capable individuals, the Indonesian military had lost domestic credibility throughout the student protests, then earned international disgust by failing to stop the genocide waged by their irregular militias in East Timor. On the government front, moderates and reformers leaked enough details of a bank scandal to implicate President Habibie and much of the ruling Golkar party of extortion and graft. All things considered, Indonesia's first open and fair change of government was a very large accomplishment. In Korea, the government-arranged rollovers of Daewoo debt came to an end and some sort of partial liquidation will proceed. This is a landmark event because it is the first top-tier chaebol to fail, and thus is the beginning of the end for the Korean model in which government allocates almost all domestic credit. Smaller chaebols had recently been allowed to fail, but none in the top five. The outcome of recent developments in Indonesia and Korea should be favorable for the long list of fundamental economic reforms needed.

Looking Forward

While the near-term outlook for emerging market debt remains uncertain, the outlook for strong total returns over the medium term remains excellent. As of September 30, the market's cash-flow spread was 811 bp and the stripped spread was 981 bp. By December 1999, investor appetite for riskier assets of all types had increased noticeably, narrowing these spreads to 631 and 751, respectively.

The list of positive fundamentals favoring further reduction in the yield spreads of sovereign emerging debt is the same as last quarter. Credit ratings and outlooks for some sovereigns are rising again. Moreover, it looks like the credit cycle has bottomed or is turning positive for the asset class. This is in large part because year 2000 increasingly looks to be one of synchronous growth in the largest economies, with strong transmission to emerging economies in both trade volumes and terms of trade. Also, the economic philosophy of emerging countries is increasingly orthodox; when they suffer serious downturns, conventional wisdom among most economic policy makers is that there is no realistic alternative to opening economies to investment, trade, and competition. While governments typically delay introducing reforms for as long as possible, they typically do eventually make the minimum reforms necessary for IMF or market funding because they recognize that the alternative is worse. Combined with increasing risk tolerance on the part of investors, this portends rising capital flows to emerging market countries, and better use of proceeds.

On the negative side, emerging economies still face many of the same issues they faced during most of 1999. How many more times will the Fed have to raise interest rates? A significant decline in oil and commodity prices would raise concerns for most emerging economies. There remains country-specific political risk as well, often focusing on elections and the (potential for policy changes) and specific refinancing risks. Some important examples include elections in Mexico and Russia, currency concerns in Argentina, Brazil's endless budget travails, and the efforts to bail-in private creditors to share the cost of restructuring the weakest economies such as Pakistan and Ecuador.

The fact that Ecuador's default had little effect on credit spreads in other countries is a sign of the market's increasing sophistication. As recently as 1998, the default of Russian domestic debt had the contagion effect of making most other emerging market bonds sell off. This time with Ecuador, the default was widely expected, and recognized to have little economic impact on its neighbors and trade partners.

as of 09/30/99

| Country | Security ID Cusip, Sedol, ISIN | Bond Type | Current Face | Current Face Allocation (%) | Inception | Moody's Rating 09/30/99 | S&P's Rating Inception | S&P's Rating 09/30/99 |
|---|---|---|---|---|---|---|---|---|
| *Latin America:* | | | | | | | | |
| Argentina FLRB (bearer) 03/31/05 | 40251A0 | BFLT | GOVT | 880,000 | 0.3% | Ba3 | Ba3 | BB | BB |
| **Subtotal Argentina** | | | | 880,000 | 0.3% | | | |
| Brazil FLIRB 04/15/09 | 4738824 | BFLT | GOVT | 16,000,000 | 5.3% | B1 | B2 | B+ | BB- |
| **Subtotal Brazil** | | | | 16,000,000 | 5.3% | | | |
| Columbia Rep 7.625 2/15/07 | 520A369 | BF | GOVT | 15,000,000 | 5.0% | Ba3 | Ba2 | BBB | BBB- |
| **Subtotal Columbia** | | | | 15,000,000 | 5.0% | | | |
| Costa Rica A 6.25% 05/21/10 | 411Z107 | BF | GOVT | 10,000,000 | 3.3% | Ba3 | | Bi | Bi |
| **Subtotal Costa Rica** | | | | 10,000,000 | 3.3% | | | |
| Dominican Rep FDI 6.625 8/30/09 | 5019937 | BF | GOVT | 10,000,000 | 3.3% | B1 | Ba1 | Bi | Bi |
| **Subtotal Dominican Rep.** | | | | 10,000,000 | 3.3% | | | |
| Ecuador FDI 2/27/15 | 4410348 | BFLT | GOVT | 2,914,600 | 1.0% | B2 | | Bi | Bi |
| **Subtotal Ecuador** | | | | 2,914,600 | 1.0% | | | |
| Venezuela DCB 12/18/07 | 4934439 | BFLT | GOVT | 12,952,365 | 4.3% | Ba2 | B2 | B | Bi |
| **Subtotal Venezuela** | | | | 12,952,365 | 4.3% | | | |
| Panama IRB 7/17/14 | 5107991 | BFLT | GOVT | 18,000,000 | 6.0% | Ba1 | Ba1 | BBB- | BBB- |
| **Subtotal Panama** | | | | 18,000,000 | 6.0% | | | |
| Mexico BNCE reg S 11.25 5/30/2006 | 80660843 | BF | GOVT | 11,000,000 | 3.7% | Ba1 | Ba1 | BB | BB |
| **Subtotal Mexico** | | | | 10,886,672 | 3.6% | | | |
| **Subtotal Latin America** | | | | 97,633,637 | 32.6% | | | |
| *Asia:* | | | | | | | | |
| APP Global Finance 10/04/01 | 5130333 | BFLT | NON-GOVT | 14,000,000 | 4.7% | Ba1 | Caa1 | N/A | BBB- |
| **Subtotal Indonesia** | | | | 14,000,000 | 4.7% | | | |
| AES China Gen LTD 10.125% 12/15/06 | 0009AA4 | BF | NON-GOVT | 7,000,000 | 2.3% | Ba3 | Ba3 | BBB- | BBB- |
| Greater Beijing 9.25% 06/15/04 | 5264038 | BF | NON-GOVT | 3,000,000 | 1.0% | Ba3 | Ba3 | BBB- | BBB- |
| Zhuhai Highway 144A 11.5% 7/1/08 | 2989077 | BF | NON-GOVT | 5,000,000 | 1.7% | Ba1 | Ba1 | BBB | BBB |
| **Subtotal China** | | | | 15,000,000 | 5.0% | | | |
| GS SuperHighway IIIigs 9.875 08/15/04 | 40165YAC3 | BF | GOVT | 3,000,000 | 1.0% | Ba3 | | BBB- | BBB- |
| **Subtotal Hong Kong** | | | | 3,000,000 | 1.0% | | | |
| Philippines FLIRB 6/1/08 | 4179081 | BFLT | GOVT | 13,950,000 | 4.7% | Ba2 | Ba1 | BBB- | BBB- |
| **Subtotal Philippines** | | | | 13,950,000 | 4.7% | | | |
| Korea Dev Bank 6.75% 12/01/05 | 500630A1 | BF | GOVT | 4,000,000 | 1.3% | Ba2 | | BBB- | BBB- |
| Korea Ex-Imp Bank 6.375% 02/15/06 | 30215AD1 | BF | GOVT | 13,000,000 | 4.3% | Ba1 | Ba1 | BBB- | BBB- |
| **Subtotal Korea** | | | | 13,000,000 | 4.3% | | | |
| Kingdom of Thailand MTN 8.25% 9/30/03 | 88322LAD5 | BF | GOVT | 4,000,000 | 1.3% | Ba1 | Ba1 | BBB- | BBB- |
| Kingdom of Thailand 7.75% 4/15/07 | 88322KAC5 | BF | GOVT | 1,000,000 | 0.3% | Ba1 | Bi2 | BBB- | BBB- |
| **Subtotal Thailand** | | | | 5,000,000 | 1.7% | | | |
| Vietnam FDI 18 yr VRN 3/14/16 (Euro) | 230716 | BFLT | GOVT | 11,000,000 | 3.7% | | | N/A | N/A |
| **Subtotal Vietnam** | | | | 11,000,000 | 3.7% | | | |
| **Subtotal Asia:** | | | | 74,950,000 | 25.0% | | | |

Bear Stearns asset Management

| Country | Security ID Cusip, Sedol, ISIN | Bond Type | Current Face | Current Face Allocation (%) | Moody's Rating Inception | Moody's Rating 09/30/99 | S&P's Rating Inception | S&P's Rating 09/30/99 |
|---|---|---|---|---|---|---|---|---|
| **Eastern Europe** | | | | | | | | |
| Bulgaria FLIRB 07/28/12 | 4042525 | BFLT | GOVT | 14,100,000 | 4.8% | B3 | B2 | B- | B |
| *Subtotal Bulgaria* | | | | 14,100,000 | 4.8% | | | | |
| Croatia Flt 7/14/06 | 5110874 | BFLT | GOVT | 8,654,405 | 2.9% | Baa3 | Baa3 | BBB- | |
| *Subtotal Croatia* | | | | 8,654,405 | 2.9% | | | | |
| Russia Ministry of Fin 3% 5/14/11(VII) | 2553524 | BF | GOVT | 15,000,000 | 5.0% | Ba2 | Ca | | |
| Russia Govt(Euro) 8.75% 07/24/2005 | 5511369 | BF | GOVT | 12,500,000 | 4.2% | B3 | | | |
| *Subtotal Russia* | | | | 27,500,000 | 9.2% | | | | |
| Kazakhstan 8.375% 10/02/02 | 536829 | BF | GOVT | 9,000,000 | 3.0% | Baa3 | B1 | | |
| *Subtotal Kazakhstan* | | | | 9,000,000 | 3.0% | | | | |
| Poland Reg'd Par 3.00% 10/27/24 | 4668631 | BF | GOVT | 9,000,000 | 3.0% | Baa3 | Baa1 | BBB- | BBB |
| *Subtotal Poland* | | | | 9,000,000 | 3.0% | | | | |
| Slovak Republic 9.50% 05/28/03 | 008760870 | BF | GOVT | 5,500,000 | 1.8% | Ba1 | | BB | |
| Vseobecna Uverova Banka 9.50% Reg 5.3.15 12/1/06 | 5269442 | BF | NON-GOVT | 6,500,000 | 2.2% | Baa1 | | BBB | |
| *Subtotal Slovak* | | | | 12,000,000 | 4.0% | | | | |
| ***Subtotal Eastern Europe*** | | | | 80,454,405 | 26.9% | | | | |
| **Africa/Middle East** | | | | | | | | |
| Algeria Loan Tranche 1 (Salmon) | 015990C7 | BFL1 | GOVT | 8,000,000 | 2.7% | B3 | | | |
| *Subtotal Algeria* | | | | 8,000,000 | 2.7% | | | | |
| Morocco Loan (Sal Jan) 6.375% 01/01/09 | 2554709 | BFL1 | GOVT | 19,000,000 | 6.3% | Ba1 | | BB | |
| *Subtotal Morocco* | | | | 19,000,000 | 6.3% | | | | |
| Nigeria P Ser BC 5.092% 1/5/10 | 4198428 | BF | GOVT | 8,741,630 | 2.9% | Ba1 | | B- | |
| *Subtotal Nigeria* | | | | 8,741,630 | 2.9% | | | | |
| ***Subtotal Africa/Middle East*** | | | | 35,741,630 | 11.9% | | | | |
| **Caribbean/Basin** | | | | | | | | |
| Mechala Group Jamaica 12.0% 02/15/02 | 6468EAB04 | BF | NON-GOVT | 8,000,000 | 2.7% | B3 | | D | |
| *Subtotal Jamaica* | | | | 8,000,000 | 2.7% | | | | |
| ***Subtotal Caribbean Basin*** | | | | 8,000,000 | 2.7% | | | | |
| **Total Portfolio** | | | | 299,459,313 | 100.0% | | | | |
| Principal Cash | | CASH | | 2,679,635 | 0.9% | | | | |

Bear Stearns asset Management

as of 09/30/99

| Country | Security ID Cusip, Seed, ISIN | Bond Type | Current Face | Current Face Allocation (%) | Moody's Rating Inception | Moody's Rating 09/30/99 | S&P's Rating Inception | S&P's Rating 09/30/99 |
|---|---|---|---|---|---|---|---|---|
| **SECTOR ALLOCATION AS OF 09/30/99** | | | | | | | | |
| Fixed Rate Bonds | | BF | | 48.8% | | | | |
| Floating Rate Bonds | | BFLT | | 50.3% | | | | |
| Cash | | CASH | | 0.9% | | | | |
| **TOTAL ASSETS:** | | | | 100.00% | | | | |
| | | | | | | | | |
| **SOVEREIGN ALLOCATION** | | | | | | | | |
| GOVERNMENT | | GOVT | 83.6% | | | | | |
| NON-GOVT/SOV LOAN | | NON-GOVT | 15.5% | | | | | |
| CASH | | CASH | 0.9% | | | | | |
| | | TOTAL | 100.00% | | | | | |

**Moody's Quality Test**

| | Inception | 09/30/99 |
|---|---|---|
| As of 09/30/99 | | 2,430 |
| Required | | 2,220  Failed |

**S&P's Quality Test**

| As of 09/30/99 | |
|---|---|
| Break-even Scenario Loss | 37.5% |
| Required | 33.9%  Passed |

**Par Coverage Test**

| As of 09/30/99 | 136% |
|---|---|
| Required | 135%  Passed |

**Int Coverage Test (Provided by U.S. Trust)**

| As of 09/30/99 | 112% |
|---|---|
| Required | 125%  Failed |

as of 09/30/99

| Country | Security ID Cusp, Seed, ISIN | Bond Type | Current Face | Current Face Allocation (%) | Moody's Rating Inception | Moody's Rating 09/30/99 | S&P's Rating Inception | S&P's Rating 09/30/99 |
|---|---|---|---|---|---|---|---|---|
| **SECTOR ALLOCATION AS OF 09/30/99** | | | | | | | | |
| Fixed Rate Bonds | | nF | 48.8% | | | | | |
| Floating Rate Bonds | | BFLT | 50.3% | | | | | |
| Cash | | CASH | 0.9% | | | | | |
| **TOTAL ASSETS:** | | | 100.00% | | | | | |

| **SOVEREIGN ALLOCATION** | | | | |
|---|---|---|---|---|
| GOVERNMENT | | GOVT | 83.6% | |
| NON-GOVT / SOV LOAN | | NON-GOVT | 15.5% | |
| CASH | | CASH | 0.9% | |
| | | **TOTAL** | 100.00% | |

**Moody's Quality Test**

| | |
|---|---|
| As of 09/30/99 | 2,430 |
| Required | 2,220  Failed |

**S&P's Quality Test**

| | |
|---|---|
| As of 09/30/99 | |
| Breakeven Scenario Loss | 37.5% / 33.9%  Passed |

**Par Coverage Test**

| | |
|---|---|
| As of 09/30/99 | 136% |
| Required | 135%  Passed |

**Int Coverage Test (Provided by U.S. Trust)**

| | |
|---|---|
| As of 09/30/99 | 112% |
| Required | 125%  Failed |

Bear Stearns asset Management

## EXHUSTA "B" 'PROJECTED COUPON PAYMENTS BEGINNING 10/01/99

| No. | DESCRIPTION | PAR VALUE | DATE | OCTOBER | NOVEMBER | DECEMBER | JANUARY | FEBRUARY | MARCH | APRIL | MAY |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 20 | APP GLOBAL FINANCE | FLTR 10/04/2001 | 4-Apr | 697,288 | | | | | | 697,288 | |
| 21 | NIGERIA P NOTES RC | 5,092 01/05/2010 | 5-Apr | | | | | | | 102,760 | |
| | THAILAND KINGDOM (EURO) | NOTE 7.250 4/15/2007 | 15-Apr | 38,750 | | | | | | 38,750 | |
| | BRAZIL FLIRI (BEARER) | 4.50 04/15/09 | 15-Apr | 400,000 | | | | | | 400,000 | |
| 04 | POLAND REGD PAR | 3.00 10/27/24 | 27-Oct | 135,000 | | | | | | 135,000 | |
| 019 | MOROCCO LOAN (SALI PART) | 6.375 DUE 01/01/2009 | 1-Nov | | 637,343 | | | | | 637,343 | |
| 20 | COSTA RICA SER A | DEB 6.250 03/21/2010 | 21-Nov | | 312,500 | | | | | 312,500 | |
| | GREATER BEIJING | 11.25% 05/20/2006 | 20-Nov | | 618,750 | | | | | 618,750 | |
| 005 | KOREA DEV BK (DTC) | DEB 6.750 12/01/2005 | 1-Dec | | | 203,750 | | | | 203,750 | |
| | PHILIPPINE FLIRI SER D | 5.00% 06/01/2008 | 1-Dec | | | 418,500 | | | | 418,500 | |
| | AES CHINA GENERATING LTD | NOTE 10.125 12/15/2006 | 15-Dec | | | 354,375 | | | | | |
| 030 | GREATER BEIJING | 9.25% 06/15/2004 | 15-Dec | | | 146,250 | | | | | |
| 039 | VODODIOSPODARSKA VYSTAVDA | 7.25% 12/19/2006 REG S | 19-Dec | | | 235,625 | | | | | |
| | ZHOHAII IWY CO LTD 144A | NOTE 11.500 7/01/2008 | 1-Jan | | | | 287,500 | | | | |
| 081 | NIGERIA P NOTES RC | 5,092 01/05/2010 | 5-Jan | | | | 109,260 | | | | |
| JORA | PANAMA IRD | FLTR 07/17/2014 | 17-Jan | | | | 160,000 | | | | |
| | VENEZUELA DCB (FRN) | DEB 5.750 12/18/2007 | 18-Jan | | | | 372,381 | | | | |
| | RUSSIA GOVT (EUROCLEAR) | 8.75% 07/24/2005 | 24-Jan | | | | 546,875 | | | | |
| 020 | BULGARIA FLIRI A BEARER | FLTR 07/28/2012 | 28-Jan | | | | 178,750 | | | | |
| 2P2 | CROATIA | FLTR 07/31/2006 | 31-Jan | | | | 283,933 | | | | |
| 04CA | GUANGZHOU SHENZHEN | 9.875 8/15/2004 | 15-Feb | | | | | 148,125 | | | |
| 020 | KOREA EX-IM BK (EUROCLEA | 6.375% 02/15/2006 | 15-Feb | | | | | 127,500 | | | |
| 003 | MECHALA GROUP JAMAICA | SER D 12% 02/15/2002 | 15-Feb | | | | | 480,000 | | | |
| 2A7 | COLOMBIA REP (DTC) | SER 7.625 2/15/2007 | 15-Feb | | | | | 571,875 | | | |
| 009 | DOMINICAN REP BR PDI | 6.625 08/20/2009 | 1-Mar | | | | | | 96,540 | | |
| 7020 | ALGERIA LOAN TRANCHE I | (SALOMON) | 4-Mar | | | | | | 249,000 | | |
| 020 | VIETNAM PDI 18YR | VRN 03/14/16 (EURO) | 12-Mar | | | | | | 165,000 | | |
| 003 | ARGENTINA (BEARER) | FRI 03/31/05 | 27-Mar | | | | | | 29,995 | | |
| 003 | THAILAND KINGDOM MTN BE | MTNF 6.270 9/30/2003 | 30-Mar | | | | | | 125,400 | | |
| 081 | RUSSIA MINISTRY OF FIN | 3.00 03/14/2011 (VII) | 14-May | | | | | | | | 225,000 |
| 020 | SLOVAK REPUBLIC REG S | 9.50% 05/28/2003 | 28-May | | | | | | | | 261,093 |
| | | | | 1,380,298 | 1,563,593 | 1,458,500 | 2,138,739 | 1,327,500 | 656,941 | 1,300,298 | 2,536,093 |
| | | | | | | | | | | | 12,441,962 |

209 - 000209  AUGUSTA 'B'

TRANSACTION SCHEDULE

07/01/99 THRU 09/30/99

PAGE   1

|  |  |  | CASH EQUIVALENTS | | | | | |
| DATE | AMOUNT | SECURITY | UNIT COST | TOT COST | UNIT PROC | TOT PROCEEDS | GAIN/LOSS |
| --- | --- | --- | --- | --- | --- | --- | --- |
| SALES/MATURATIONS (*) | | | | | | | |
| 07/02 | 12,141,428* | GECC CP 4.73000 DUE 07/02/1999 | 100.00 | 12,141,428.00 | 100.00 | 12,141,428.00 | 0.00 |
| 08/02 | 7,859,199* | AMERICAN EXP CP 5.06000 DUE 08/02/1999 | 100.00 | 7,859,199.00 | 100.00 | 7,859,199.00 | 0.00 |
| 08/12 | 287,500 | GECC CP 5.10000 DUE 10/01/1999 | 100.00 | 287,500.00 | 100.00 | 287,500.00 | 0.00 |
| 08/17 | 150,000 | AMERICAN EXP CP 5.12000 DUE 10/01/1999 | 100.00 | 150,000.00 | 100.00 | 150,000.00 | 0.00 |
| 09/02 | 1,367,142* | AMERICAN EXP CP 5.21000 DUE 09/02/1999 | 100.00 | 1,367,142.00 | 100.00 | 1,367,142.00 | 0.00 |
| 09/08 | 1,173,571 | GECC CP 5.09000 DUE 10/04/1999 | 100.00 | 1,173,571.00 | 100.00 | 1,173,571.00 | 0.00 |
| 09/22 | 1,384,949 | GECC CP 5.26000 DUE 10/01/1999 | 100.00 | 1,384,949.00 | 100.00 | 1,384,949.00 | 0.00 |

**BEAR STEARNS**
*Asset Management*

209 - 000209  AUGUSTA 'B'

TRANSACTION SCHEDULE

07/01/99 THRU 09/30/99

PAGE  2

CASH EQUIVALENTS

| DATE | AMOUNT | SECURITY | UNIT COST | TOT COST | UNIT PROC | TOT PROCEEDS | GAIN/LOSS |
|------|--------|----------|-----------|----------|-----------|--------------|-----------|
| SALES/MATURATIONS (*) | | | | | | | |
| 09/29 | 609,618 | GECC CP 4.79000 DUE 10/01/1999 | 100.00 | 609,618.00 | 100.00 | 609,618.00 | 0.00 |
| | | TOTALS: | | 24,973,407.00 | | 24,973,407.00 | 0.00 |
| PURCHASES | | | | | | | |
| 07/02 | 287,500 | GECC CP 5.10000 DUE 10/01/1999 | 100.00 | 287,500.00 | | | |
| 07/07 | 1,008,258 | GECC CP 5.11000 DUE 10/01/1999 | 100.00 | 1,008,258.00 | | | |
| 07/09 | 269,377 | GECC CP 5.09000 DUE 10/01/1999 | 100.00 | 269,377.00 | | | |
| 07/21 | 360,048 | GECC CP 5.06000 DUE 10/01/1999 | 100.00 | 360,048.00 | | | |

*BEAR STEARNS*
*Asset Management*

209 - 000209  AUGUSTA 'B'

TRANSACTION SCHEDULE

07/01/99 THRU 09/30/99

PAGE   3

CASH EQUIVALENTS

| DATE | AMOUNT | SECURITY | UNIT COST | TOT COST |
|------|--------|----------|-----------|----------|
| **PURCHASES** | | | | |
| 07/27 | 559,375 | AMERICAN EXP CP 5.07000 DUE 10/01/1999 | 100.00 | 559,375.00 |
| 07/30 | 7,859,199 | AMERICAN EXP CP 5.06000 DUE 08/02/1999 | 100.00 | 7,859,199.00 |
| 08/05 | 547,593 | AMERICAN EXP CP 5.12000 DUE 10/01/1999 | 100.00 | 547,593.00 |
| 08/13 | 136,501 | GECC CP 5.15000 DUE 10/01/1999 | 100.00 | 136,501.00 |
| 08/18 | 111,536 | GECC CP 5.22000 DUE 10/01/1999 | 100.00 | 111,536.00 |
| 08/25 | 1,367,142 | AMERICAN EXP CP 5.21000 DUE 09/02/1999 | 100.00 | 1,367,142.00 |
| 09/09 | 1,384,949 | GECC CP 5.26000 DUE 10/01/1999 | 100.00 | 1,384,949.00 |

BEAR STEARNS
*Asset Management*

209 - 000209  AUGUSTA 'B'

TRANSACTION SCHEDULE

CASH EQUIVALENTS

07/01/99 THRU 09/30/99

PAGE   4

| DATE | AMOUNT | SECURITY | UNIT COST | TOT COST |
|------|--------|----------|-----------|----------|
| PURCHASES | | | | |
| 09/10 | 1,110,261 | GECC CP 5.24000 DUE 10/01/1999 | 100.00 | 1,110,261.00 |
| 09/27 | 527,446 | AMERICAN EXP CP 5.30000 DUE 10/01/1999 | 100.00 | 527,446.00 |
| 09/30 | 210,337 | AMERICAN EXP CP 5.57000 DUE 10/01/1999 | 100.00 | 210,337.00 |
| | | | TOTALS: | 15,739,522.00 |

**BEAR STEARNS**
*Asset Management*

209 - 000209  AUGUSTA 'B'

TRANSACTION SCHEDULE

07/01/99 THRU 09/30/99

PAGE   6

FIXED INCOME –

| DATE | AMOUNT | SECURITY | UNIT COST | TOT COST |
|------|--------|----------|-----------|----------|
| **PURCHASES** | | | | |
| 07/27 | 2,425,000 | VIETNAM PDI 18YR VRN 03/14/16 (EURO) | 40.37 | 979,093.75 |
| 07/28 | 507,000 | VIETNAM PDI 18YR VRN 03/14/16 (EURO) | 40.20 | 203,814.00 |
| 07/28 | 2,000,000 | VIETNAM PDI 18YR VRN 03/14/16 (EURO) | 40.20 | 804,000.00 |
| 07/29 | 5,000,000 | ALGERIA LOAN TRANCHE 1 (SALOMON) | 69.75 | 3,487,500.00 |
| 07/30 | 1,300,000 | VIETNAM PDI 18YR VRN 03/14/16 (EURO) | 40.37 | 524,875.00 |
| 08/04 | 4,768,000 | VIETNAM PDI 18YR VRN 03/14/16 (EURO) | 41.12 | 1,960,840.00 |
| 08/12 | 960,000 | DOMINICAN REP BR PDI 6.625 08/30/2009 | 76.00 | 729,600.00 |

**BEAR STEARNS**
*Asset Management*

209 - 000209  AUGUSTA 'B'

TRANSACTION SCHEDULE

07/01/99 THRU 09/30/99

PAGE 5

**- FIXED INCOME -**

| DATE | AMOUNT | SECURITY | UNIT COST | TOT COST | UNIT PROC | TOT PROCEEDS | GAIN/LOSS |
|------|--------|----------|-----------|----------|-----------|--------------|-----------|
| **SALES/MATURATIONS (*)** | | | | | | | |
| 07/05 | 156,735 | NIGERIA P NOTES RC 5.092 01/05/2010 | 75.14 | 117,775.42 | 100.00 | 156,735.00 | 38,959.58 |
| 08/31 | 196,691 | CROATIA FLTR 07/31/2006 | 89.87 | 176,776.10 | 100.00 | 196,691.07 | 19,914.97 |
| 08/31 | 10,000 | DOMINICAN REP BR PDI 6.625 08/30/2009 | 76.00 | 7,600.00 | 100.00 | 10,000.00 | 2,400.00 |
| 09/30 | 50,000 | ARGENTINA (BEARER) FRB 03/31/05 | 80.05 | 40,025.00 | 100.00 | 50,000.00 | 9,975.00 |
| | | **TOTALS:** | | 342,176.52 | | 413,426.07 | 71,249.55 |
| **PURCHASES** | | | | | | | |
| 07/27 | 3,000,000 | ALGERIA LOAN TRANCHE 1 (SALOMON) | 69.75 | 2,092,500.00 | | | |

**BEAR STEARNS**
*Asset Management*

209 - 000209  AUGUSTA 'B'

TRANSACTION SCHEDULE

07/01/99 THRU 09/30/99

PAGE  7

FIXED INCOME -

| DATE | AMOUNT | SECURITY | UNIT COST | TOT COST |
|------|--------|----------|-----------|----------|
| PURCHASES | | | | |
| 08/30 | 125,103 | ECUADOR PDI BEARER FLTR 02/27/2015 | 100.00 | 125,103.00 |
| 09/17 | 1,964,600 | DOMINICAN REP BR PDI 6.625 08/30/2009 | 77.25 | 1,517,653.50 |
| | | TOTALS: | | 12,424,979.25 |

BEAR STEARNS
*Asset Management*

209 - 000209  AUGUSTA 'B'

TRANSACTION SCHEDULE

07/01/99 THRU 09/30/99

PAGE    8

FIXED INCOME - GOVERNMENT BONDS

| DATE | AMOUNT | SECURITY | UNIT COST | TOT COST | UNIT PROC | TOT PROCEEDS | GAIN/LOSS |
|------|--------|----------|-----------|----------|-----------|--------------|-----------|
| SALES/MATURATIONS (*) | | | | | | | |
| 07/01 | 1,000,000 | MOROCCO LOAN (SALI PART) 6.375 DUE 01/01/2009 | 87.25 | 872,500.00 | 100.00 | 1,000,000.00 | 127,500.00 |
| 08/05 | 2,000,000 | BULGARIA FLIRB A BEARER FLTR 07/28/2012 | 45.75 | 915,000.00 | 58.50 | 1,170,000.00 | 255,000.00 |
| 08/13 | 1,000,000 | BULGARIA FLIRB A BEARER FLTR 07/28/2012 | 45.75 | 457,500.00 | 60.62 | 606,250.00 | 148,750.00 |
| 09/20 | 2,200,000 | BULGARIA FLIRB A BEARER FLTR 07/28/2012 | 45.75 | 1,006,500.00 | 63.94 | 1,406,625.00 | 400,125.00 |
| 09/24 | 3,500,000 | BULGARIA FLIRB A BEARER FLTR 07/28/2012 | 45.75 | 1,601,250.00 | 63.12 | 2,209,375.00 | 608,125.00 |
| | | TOTALS: | | 4,852,750.00 | | 6,392,250.00 | 1,539,500.00 |

209 - 000209  AUGUSTA 'B'

TRANSACTION SCHEDULE                              07/01/99 THRU 09/30/99

FIXED INCOME - GOVERNMENT BONDS                                    PAGE   9

| DATE | AMOUNT | SECURITY | UNIT COST | TOT COST |
|------|--------|----------|-----------|----------|
| **PURCHASES** | | | | |
| 07/27 | 330,000 | VODOHOSPODARSKA VYSTAVBA 7.25% 12/19/2006 REG S | 79.00 | 260,700.00 |
| 07/27 | 1,530,000 | VODOHOSPODARSKA VYSTAVBA 7.25% 12/19/2006 REG S | 80.00 | 1,224,000.00 |
| 07/27 | 2,295,000 | VODOHOSPODARSKA VYSTAVBA 7.25% 12/19/2006 REG S | 79.50 | 1,824,525.00 |
| 09/24 | 2,345,000 | VODOHOSPODARSKA VYSTAVBA 7.25% 12/19/2006 REG S | 84.50 | 1,981,525.00 |
| | | TOTALS: | | 5,290,750.00 |

**BEAR STEARNS**
*Asset Management*

209 - 000209  AUGUSTA 'B'

## TRANSACTION SCHEDULE

### ACCOUNT TRANSACTIONS

07/01/99 THRU 09/30/99

PAGE 10

| DATE | DESCRIPTION | AMOUNT |
|------|-------------|--------|
| RECEIPTS | | |
| INTEREST INCOME | | |
| 07/01 | MOROCCO LOAN (SALI PART) 6.375 DUE 01/01/2009 | 8,203.12 |
| 07/01 | ZHUHAI HWY CO LTD 144A NOTE 11.500 7/01/2008 | 287,500.00 |
| 07/02 | GECC CP 4.73000 DUE 07/01/1999 | 25,523.98 |
| 07/02 | GECC CP 4.73000 DUE 07/02/1999 | 53.77 |
| 07/05 | NIGERIA P NOTES RC 5.092 01/05/2010 | 113,276.17 |
| 07/05 | NIGERIA P NOTES RC 5.092 01/05/2010 | -633.80 |

**BEAR STEARNS**
*Asset Management*

209 - 000209  AUGUSTA 'B'

## TRANSACTION SCHEDULE

### ACCOUNT TRANSACTIONS

07/01/99 THRU 09/30/99

PAGE  11

| DATE | DESCRIPTION | AMOUNT |
|------|-------------|--------|
| RECEIPTS | | |
| INTEREST INCOME - CONTINUED | | |
| 07/16 | INTEREST ON CP | 23,989.06 |
| 07/17 | PANAMA IRB<br>FLTR 07/17/2014 | 360,000.00 |
| 07/18 | VENEZUELA DCB (FRN)<br>DEB 5.750 12/18/2007 | 394,285.71 |
| 07/24 | RUSSIA GOVT (EUROCLEAR)<br>8.75% 07/24/2005 | 546,875.00 |
| 07/27 | VIETNAM PDI 18YR<br>VRN 03/14/16 (EURO) | -32,535.42 |
| 07/27 | VODOHOSPODARSKA VYSTAVBA<br>7.25% 12/19/2006 REG S | -12,633.13 |

**BEAR STEARNS**
*Asset Management*

209 - 000209   AUGUSTA 'B'

TRANSACTION SCHEDULE

07/01/99 THRU 09/30/99

PAGE 12

## ACCOUNT TRANSACTIONS

| DATE | DESCRIPTION | AMOUNT |
|------|-------------|--------|
| RECEIPTS | | |
| INTEREST INCOME - CONTINUED | | |
| 07/27 | VODOHOSPODARSKA VYSTAVBA 7.25% 12/19/2006 REG S | -1,981.67 |
| 07/27 | VODOHOSPODARSKA VYSTAVBA 7.25% 12/19/2006 REG S | -18,949.69 |
| 07/27 | VODOHOSPODARSKA VYSTAVBA 7.25% 12/19/2006 REG S | -2,724.79 |
| 07/27 | VODOHOSPODARSKA VYSTAVBA 7.25% 12/19/2006 REG S | 1,981.67 |
| 07/28 | BULGARIA FLIRB A BEARER FLTR 07/28/2012 | 287,500.00 |
| 07/28 | VIETNAM PDI 18YR VRN 03/14/16 (EURO) | -27,222.22 |

**BEAR STEARNS**
*Asset Management*

209 - 000209  AUGUSTA 'B'

TRANSACTION SCHEDULE

07/01/99 THRU 09/30/99

PAGE  13

## ACCOUNT TRANSACTIONS

| DATE | DESCRIPTION | AMOUNT |
|------|-------------|--------|
| RECEIPTS | | |
| INTEREST INCOME - CONTINUED | | |
| 07/28 | VIETNAM PDI 18YR VRN 03/14/16 (EURO) | -6,900.83 |
| 07/29 | ALGERIA LOAN TRANCHE 1 (SALOMON) | -125,833.33 |
| 07/29 | ALGERIA LOAN TRANCHE 1 (SALOMON) | 125,833.33 |
| 07/30 | INTEREST ON CP | 23,512.73 |
| 07/30 | VIETNAM PDI 18YR VRN 03/14/16 (EURO) | -17,947.22 |
| 07/31 | CROATIA FLTR 07/31/2006 | 290,426.72 |

**BEAR STEARNS**
*Asset Management*

209 - 000209  AUGUSTA 'B'

TRANSACTION SCHEDULE

ACCOUNT TRANSACTIONS

07/01/99 THRU 09/30/99

PAGE 14

| DATE | DESCRIPTION | AMOUNT |
|------|-------------|--------|
| RECEIPTS | | |
| INTEREST INCOME - CONTINUED | | |
| 08/01 | VENEZUELA DCB (FRN) DEB 5.750 12/18/2007 | -394,285.71 |
| 08/02 | AMERICAN EXP CP 5.06000 DUE 08/02/1999 | 471.74 |
| 08/02 | INTEREST ON CP | -471.74 |
| 08/02 | INTEREST ON CP | 3,315.36 |
| 08/03 | INTEREST ON CP | -989.13 |
| 08/03 | INTEREST ON CP | 989.13 |

BEAR STEARNS
Asset Management

209 - 000209  AUGUSTA 'B'

TRANSACTION SCHEDULE

ACCOUNT TRANSACTIONS

07/01/99 THRU 09/30/99

PAGE  15

| DATE | DESCRIPTION | AMOUNT |
|------|-------------|--------|
| RECEIPTS | | |
| INTEREST INCOME – CONTINUED | | |
| 08/04 | INTEREST ON CP | -943.79 |
| 08/04 | INTEREST ON CP | 943.79 |
| 08/04 | INTEREST ON CP | 943.79 |
| 08/04 | VIETNAM PDI 18YR VRN 03/14/16 (EURO) | -68,142.67 |
| 08/05 | BULGARIA FLIRB A BEARER FLTR 07/28/2012 | -1,680.56 |
| 08/05 | BULGARIA FLIRB A BEARER FLTR 07/28/2012 | 1,680.56 |

**BEAR STEARNS**
*Asset Management*

209 - 000209  AUGUSTA 'B'

TRANSACTION SCHEDULE

07/01/99 THRU 09/30/99

ACCOUNT TRANSACTIONS

PAGE  16

| DATE | DESCRIPTION | AMOUNT |
|------|-------------|--------|
| **RECEIPTS** | | |
| **INTEREST INCOME - CONTINUED** | | |
| 08/05 | BULGARIA FLIRB A BEARER FLTR 07/28/2012 | -1,680.56 |
| 08/05 | BULGARIA FLIRB A BEARER FLTR 07/28/2012 | 1,680.56 |
| 08/05 | BULGARIA FLIRB A BEARER FLTR 07/28/2012 | 1,833.33 |
| 08/05 | INTEREST ON CP | 854.86 |
| 08/05 | INTEREST ON CP | -854.86 |
| 08/05 | INTEREST ON CP | 854.86 |

**BEAR STEARNS**
*Asset Management*

209 - 000209   AUGUSTA 'B'

TRANSACTION SCHEDULE

07/01/99 THRU 09/30/99

PAGE   17

ACCOUNT TRANSACTIONS

| DATE | DESCRIPTION | AMOUNT |
|------|-------------|--------|
| RECEIPTS | | |
| INTEREST INCOME - CONTINUED | | |
| 08/09 | INTEREST ON CP | -2,565.62 |
| 08/09 | INTEREST ON CP | 2,565.62 |
| 08/09 | INTEREST ON CP | 2,565.62 |
| 08/11 | INTEREST ON CP | 735.60 |
| 08/11 | INTEREST ON CP | -735.60 |
| 08/11 | INTEREST ON CP | 735.60 |

**BEAR STEARNS**
*Asset Management*

209 - 000209  AUGUSTA 'B'

TRANSACTION SCHEDULE

ACCOUNT TRANSACTIONS

07/01/99 THRU 09/30/99

PAGE  18

| DATE | DESCRIPTION | AMOUNT |
|------|-------------|--------|
| RECEIPTS | | |
| INTEREST INCOME - CONTINUED | | |
| 08/12 | DOMINICAN REP BR PDI<br>6.625 08/30/2009 | 27,520.00 |
| 08/12 | DOMINICAN REP BR PDI<br>6.625 08/30/2009 | -27,520.00 |
| 08/12 | DOMINICAN REP BR PDI<br>6.625 08/30/2009 | -27,520.00 |
| 08/12 | GECC CP<br>5.10000 DUE 10/01/1999 | 1,679.65 |
| 08/12 | INTEREST ON CP | 734.20 |
| 08/12 | INTEREST ON CP | -734.20 |

BEAR STEARNS
*Asset Management*

209 - 000209  AUGUSTA 'B'

TRANSACTION SCHEDULE

07/01/99 THRU 09/30/99

ACCOUNT TRANSACTIONS

PAGE  19

| DATE | DESCRIPTION | AMOUNT |
|------|-------------|--------|
| RECEIPTS | | |
| INTEREST INCOME - CONTINUED | | |
| 08/12 | INTEREST ON CP | 734.20 |
| 08/13 | BULGARIA FLIRB A BEARER FLTR 07/28/2012 | 1,451.39 |
| 08/13 | INTEREST ON CP | 989.13 |
| 08/15 | COLOMBIA REP (DTC) DEB  7.625  2/15/2007 | 571,875.00 |
| 08/15 | GUANGZHOU SHENZHEN NOTE  9.875  8/15/2004 | 148,125.00 |
| 08/15 | KOREA EX-IM BK (EUROCLEA 6.375% 02/15/2006 | 127,500.00 |

**BEAR STEARNS**
*Asset Management*

209 - 000209  AUGUSTA 'B'

TRANSACTION SCHEDULE

07/01/99 THRU 09/30/99

PAGE  20

ACCOUNT TRANSACTIONS

| DATE | DESCRIPTION | AMOUNT |
|------|-------------|--------|
| RECEIPTS | | |
| INTEREST INCOME - CONTINUED | | |
| 08/15 | MECHALA GROUP JAMAICA SER B 12% 02/15/2002 | -480,000.00 |
| 08/15 | MECHALA GROUP JAMAICA SER B 12% 02/15/2002 | 480,000.00 |
| 08/17 | AMERICAN EXP CP 5.12000 DUE 10/01/1999 | 251.42 |
| 08/25 | INTEREST ON CP | 1,321.19 |
| 08/29 | ECUADOR PDI BEARER FLTR 02/27/2015 | 10,761.56 |
| 08/29 | ECUADOR PDI BEARER FLTR 02/27/2015 | 322,847.09 |

BEAR STEARNS
*Asset Management*

209 - 000209  AUGUSTA 'B'

TRANSACTION SCHEDULE

07/01/99 THRU 09/30/99

ACCOUNT TRANSACTIONS

PAGE  23

| DATE | DESCRIPTION | AMOUNT |
|------|-------------|--------|
| RECEIPTS | | |
| INTEREST INCOME - CONTINUED | | |
| 09/09 | INTEREST ON CP | 1,401.34 |
| 09/12 | VIETNAM PDI 18YR VRN 03/14/16 (EURO) | 165,000.00 |
| 09/13 | VIETNAM PDI 18YR VRN 03/14/16 (EURO) | 916.74 |
| 09/17 | DOMINICAN REP BR PDI 6.625 08/30/2009 | -8,103.98 |
| 09/20 | BULGARIA FLIRB A BEARER FLTR 07/28/2012 | 9,243.06 |
| 09/22 | GECC CP 5.26000 DUE 10/01/1999 | 2,635.64 |

BEAR STEARNS
Asset Management

209 - 000209  AUGUSTA 'B'

TRANSACTION SCHEDULE

07/01/99 THRU 09/30/99

ACCOUNT TRANSACTIONS

PAGE 24

| DATE | DESCRIPTION | AMOUNT |
|------|-------------|--------|
| **RECEIPTS** | | |
| **INTEREST INCOME - CONTINUED** | | |
| 09/24 | BULGARIA FLIRB A BEARER FLTR 07/28/2012 | -16,309.03 |
| 09/24 | BULGARIA FLIRB A BEARER FLTR 07/28/2012 | 16,309.03 |
| 09/24 | BULGARIA FLIRB A BEARER FLTR 07/28/2012 | 16,309.03 |
| 09/24 | VODOHOSPODARSKA VYSTAVBA 7.25% 12/19/2006 REG S | -47,225.69 |
| 09/27 | ARGENTINA (BEARER) FRB 03/31/05 | 27,627.19 |
| 09/29 | GECC CP 4.79000 DUE 10/01/1999 | 11,487.17 |

**BEAR STEARNS**
*Asset Management*

209 - 000209  AUGUSTA 'B'

TRANSACTION SCHEDULE

07/01/99 THRU 09/30/99

ACCOUNT TRANSACTIONS

PAGE  25

| DATE | DESCRIPTION | AMOUNT |
|------|-------------|--------|
| **RECEIPTS** | | |
| **INTEREST INCOME - CONTINUED** | | |
| 09/30 | ARGENTINA (BEARER) FRB 03/31/05 | 460.45 |
| 09/30 | THAILAND KINGDOM MTN BE MTNF 6.270 9/30/2003 | 125,400.00 |
| | TOTAL: | 3,283,022.42 |
| **OTHER INCOME** | | |
| 07/23 | ZHUHAI HWY CO LTD 144A NOTE 11.500 7/01/2008 | 12,500.00 |
| | TOTAL: | 12,500.00 |
| | PORTFOLIO TOTAL: | 3,295,522.42 |

**BEAR STEARNS**
*Asset Management*



RAYMOND G. PERELMAN
225 CITY AVENUE, SUITE 14
BALA CYNWYD, PA 19004
Direct:(610) 660-8304
Fax: (610) 660-8317

September 21, 2001

Mark Seruya
Bear Stearns and Co.
245 Park Avenue, 20th Floor
New York, NY 10167

Dear Mark,

     This letter is written with respect to your solicitation for, and my subsequent investment in, the Augusta Fund Subordinated Notes ("Augusta").

     On or about March 20, 1997 Michael Cull and I were solicited by you about a potential investment in Augusta. In connection with this investment you made representations to us about Augusta, and also provided us with three pages from a Bear Stearns document marked "Proprietary and Confidential." A copy of this document, showing it was sent from you to Mike Cull, is enclosed herewith.

     As evidenced by the third page of what was sent to us, numbered page 12 at the bottom, a significant Bear Stearns selling point was that even with annual defaults up to seven percent (7%), there would still be interest paid on this investment. As you know, in each year there has not been annual defaults of this magnitude, yet interest is not being paid to the Class B Noteholders. As you are well aware, an income stream from my investments is a significant requirement for me, and had the true default rate impact and risk been known to me, I would not have made this investment.

     In addition, the first page of the enclosure emphasizes the positives of this investment, without disclosing the true risk. In particular, it states "High current interest income increasing over time" and also emphasizes the "Potential appreciation (reduction in risk)" through professional portfolio management. These were significant selling points, both of which did not fully set forth the extent of risk to the Subordinated Noteholders. Indeed, I believe that an investment with the extent of risk of this note should not have been sold to me.

     I also point out that on or about March 26, 1997, I was sent the enclosed letter by Bear Stearns. The letter is dated March 20, 1997 because that is the date we committed to this investment. I was sent this letter by Bear Stearns and told that I had to sign it to confirm the investment. I did so without reading it, as is particularly evidenced by paragraph numbered (1). This paragraph states that by that time we had received and reviewed an Offering Memorandum dated in April 1997. Obviously, I had not done this, and Bear Stearns was fully aware that I could not have done this. I viewed this document as a typical formality, sent by my broker, for

me to sign to <u>confirm</u> an investment I had already made. Therefore, this investment was clearly made based upon the representations of Bear Stearns, and not based upon any review of the Offering Memorandum.

The above list of misrepresentations and omissions is not intended to be exhaustive by any means. I strongly believe that I was misled as to the nature and risk of this investment, and that it was not a proper investment to solicit my participation. Therefore, I demand that Bear Stearns rescind this investment and return the money invested, along with an appropriate return thereon (which should be 9%, a reasonable average of the percentage offered.)

In addition, as is evidenced by the first page of the enclosed Proprietary and Confidential document, I was told that this investment provided a call option after four years "in whole at election of 2/3s of the Class B holders." Since four years have now expired, please provide me with a list of all the other Class B holders and explain to me the mechanism for seeking their permission to call Class B in whole.

I also demand to know the commission that Bear Stearns earned on selling the whole Augusta Fund, and any management or other fees earned on Augusta to date. I believe that Bear Stearns put its own economic interests, and possibly the interests of its Class A clients, above mine when it solicited me for this investment. This I consider to be very inappropriate.

Please be assured that I am very serious about this matter, and that unless you agree to make me whole I will pursue all my legal rights. In addition, I will cease to use Bear Stearns as our investment advisor and move all accounts that I presently direct.

I look forward to your prompt response to this letter.

Sincerely,

Raymond G. Perelman

encl.

CC:   Michael Tarnapol, Vice Chairman, Bear Stearns & Co.
      Edward Vaimberg, Managing Director, Asset Management, Bear Stearns & Co.
      Darya Geetter, Esq., Managing Director, Legal Dept., Bear Stearns & Co.



Bear, Stearns & Co. Inc.
245 Park Avenue
New York, NY 10167
www.bearstearns.com

Darya Geetter
Managing Director
Phone (212) 272-2541
Fax (212) 272-5586
dgeetter@bear.com

October 4, 2001

Raymond G. Perelman
225 City Avenue, Suite 14
Bala Cynwyd, PA 19004

Re: Augusta Funding Limited B

Dear Mr. Perelman:

This letter responds to yours dated September 21, 2001 addressed to Mark Seruya.

As we informed your earlier counsel, Judge Adams, your investment in the Augusta Funding Limited B ("Augusta"), a collateralized bond offering ("CBO") comprised of emerging market debt securities is typical of your overall portfolio. Therefore, this investment was consistent with your stated investment objectives of investing in high yielding U.S. and emerging market bonds.

Before you invested in Augusta, your broker, Mark Seruya, had several conference calls with you, your attorney Barry Katz, and Michael Cull, to discuss the CBO investment. On one conference call, Mr. Seruya included Michael Barns and Bruce Jaegar of Bear Stearns, specialists in the CBO, to answer the questions you and your advisors asked. You, your attorney and Mr. Cull reviewed all the documentation and details of the transaction before you made any investment. The documents you reviewed and the discussions you had with Bear Stearns personnel fully described the nature of the investment including the significant risks involved. Moreover, you certified in writing that you were able to bear the risks and afford a complete loss.

Furthermore, we cannot provide you with a list of all the other Class B holders. Our policy prohibits the disclosure of the account information of other clients of the firm.

Based on the foregoing we believe that you were fully informed when you made this investment and that an adjustment to your account is not warranted. Finally, should you choose to transfer any accounts out of Bear Stearns, please provide Mark Seruya with transfer instructions for your new financial institution.

Please feel free to contact me if you have any questions.

Sincerely,

Darya Geetter
Managing Director
Legal Department

Cc: Mark Seruya

**BEAR STEARNS**

BEAR, STEARNS & CO. INC.
Darya Geetter, Esq.
245 Park Avenue
New York, New York 10167
(212) 272-2541
Fax No.: (212) 272-5586

ATLANTA · BOSTON
CHICAGO · DALLAS · LOS ANGELES
NEW YORK · SAN FRANCISCO

HONG KONG
LONDON · TOKYO

August 6, 2001

**VIA AIRBORNE**
Honorable Arlen Adams
1600 Market Street, 36th Floor
Philadelphia, PA 19104

Re: Augusta Funding Limited B

Dear Judge Adams:

This letter follows our telephone conversation concerning the investment of your client, Ray Perelman, in Augusta Funding Limited B ("Augusta"), a collateralized bond offering ("CBO") comprised of emerging market debt securities.

Mr. Perelman's investment in Augusta is not atypical of his overall portfolio, which is primarily in high yield/high risk vehicles, in accordance with his stated investment objectives of identifying high yielding U.S. and emerging market bonds.

I have been informed that before Mr. Perelman invested in Augusta, his broker, Mark Seruya, had several conference calls with Mr. Perelman, Barry Katz (his attorney), and Michael Cull, to discuss the CBO investment. On one conference call, Mr. Seruya included Michael Barns and Bruce Jaegar, specialists in the CBO, to answer the questions Mr. Perelman and his advisors asked. Mr. Perelman and his attorney and advisor reviewed all the documentation and details of the transaction before Mr. Perelman made any investment. Copies of the documents provided to and signed by Mr. Perelman are enclosed. As you can see, the offering documents describe the nature of the investment and the risks in great detail and Mr. Perelman certified that he was able to bear the risks and afford a complete loss.

I hope this information responds to Mr. Perelman's concerns. Please feel free to contact me if you have any questions.

Sincerely,

Darya Geetter
Managing Director
Legal Dept.

Enclosures
Cc: Mark Seruya

AUG-01-2001  12:05                                                           7-01/03

MAR.26.1997   2:53PM  P 2
FROM : BELMONT HOLDINGS CORP        PHONE NO. : 610 6608817        P. 2

3-28-1997 2:19PM    FROM INVESTMENT MGMT GRP 212 272 6503

03/25/97  TUE 16:51 FAX 212 586 3678        O.M.A SUTCLIFFE LLP        @002

To Mark Somya.

March 20    , 19 97

United States Trust Company of New York
114 West 47th Street
New York, New York 10036

Attention:  Augusta Funding Limited B

RE:  U.S.$30,424,000 Class B-2 Senior Notes Due 2015

Ladies and Gentlemen:

Raymond G. Perelman Charitable
Remainder Unitrust                    (the "Purchaser") intends to purchase from
Bear Stearns & Co., Inc.(as "seller") U.S.$ 3,000,000.00/ aggregate principal amount
of Class B-2 Junior Notes Due 2015 (the "Notes"), issued pursuant to the Indenture (the
"Indenture"), dated as of April 10, 1997 among Augusta Funding Limited B, as issuer (the
"Company"), MBIA Insurance Corporation, as insurer, and United States Trust Company of
New York, as trustee (the "Trustee").  All terms used herein and not otherwise defined shall
have the meanings set forth in the Indenture.  The Purchaser hereby certifies, represents and
warrants to, and covenants with, the Company and the Trustee that:

(1)     We have received and reviewed the Offering Memorandum dated April __, 1997
        relating to the Notes, and such other information as we deem necessary in order to
        make our investment decision.

(2)     As a purchaser of the Notes in a private placement, we represent that (i) we are (or
        any account for which we are purchasing under (ii) below) is an Accredited Investor
        as defined in Rule 501 of Regulation D promulgated under the United States
        Securities Act of 1933, as amended (the "Securities Act") and (ii) we are purchasing
        such Notes for our own account (or for accounts as to which we exercise sole
        investment discretion) and have authority to make, and do make, the statements
        contained in this letter and not with a view to any distribution thereof.

(3)     We have such knowledge and experience in financial and business matters with
        respect to collateralized securities as to be capable of evaluating the merits and risks
        of an investment in the Notes and forming an investment decision with respect thereto
        and we are (or any account for which we are purchasing is) able to bear the risk of
        such investment for an indefinite period and to afford a complete loss thereof.

(4)     We understand that the Notes have not been registered under the Securities Act by
        reason of their issuance in a transaction that does not require registration under the
        Securities Act, and that such Notes must be held indefinitely unless exempt from such
        registration.  We agree that, if in the future we should decide to dispose of any of the
        Notes, we will not offer, sell, or deliver any such Notes directly or indirectly, except
        in a transaction pursuant to Regulation D under the Securities Act, Rule 144A under
        the Securities Act or pursuant to another exemption from the Securities Act.

        / - designates $3,000,000.00 face value of purchase.

10

AUG-01-2001  12:05

MAR.26.1997   2:54PM  P 3
PHONE NO. : 610 6608817

FROM : BELMONT HOLDINGS CORP
3-26-1997 2:20PM     FROM INVESTMENT MGMT GRP 212 272 6603

03/15/97  TUE 15:53 FAX 212 308 3579          O.E.& SUTCLIFFE LLP

(5)    We agree not to sell or transfer any of the Notes except upon compliance with the provisions of the Indenture and the Notes, including obtaining from any persons purchasing one or more Notes from us and delivering to the addressees hereof a letter substantially in the form of this letter.

(6)    The Notes that we have purchased shall be issued in registered form and such Notes shall bear the following legend:

THIS SECURITY HAS NOT BEEN AND WILL NOT BE REGISTERED UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), AND THE ISSUER HAS NOT BEEN REGISTERED UNDER THE UNITED STATES INVESTMENT COMPANY ACT OF 1940, AS AMENDED (THE "1940 ACT"). THIS SECURITY MAY NOT BE OFFERED, SOLD, PLEDGED OR OTHERWISE TRANSFERRED, EXCEPT (A)(1) TO A PERSON WHOM THE SELLER REASONABLY BELIEVES IS A QUALIFIED INSTITUTIONAL BUYER WITHIN THE MEANING OF RULE 144A UNDER THE SECURITIES ACT PURCHASING FOR ITS OWN ACCOUNT OR FOR THE ACCOUNT OF A QUALIFIED INSTITUTIONAL BUYER IN A TRANSACTION MEETING THE REQUIREMENTS OF RULE 144A SO LONG AS THE SECURITY IS ELIGIBLE FOR RESALE PURSUANT TO RULE 144A SUBJECT TO THE SATISFACTION OF CERTAIN CONDITIONS SPECIFIED IN THE INDENTURE REFERRED TO BELOW OR (2) TO A NON-U.S. PERSON IN AN OFFSHORE TRANSACTION IN ACCORDANCE WITH RULE 903 OR RULE 904 (AS APPLICABLE) OF REGULATION S UNDER THE SECURITIES ACT OR (3) TO AN ACCREDITED INVESTOR AND (B) IN ACCORDANCE WITH ALL APPLICABLE SECURITIES LAWS OF ANY STATE OF THE UNITED STATES AND ANY OTHER APPLICABLE JURISDICTION. EACH PURCHASER OF THIS SECURITY WILL BE REQUIRED TO EXECUTE A TRANSFER CERTIFICATE IN ACCORDANCE WITH SECTION 2.05 OF THE INDENTURE. ANY TRANSFER IN VIOLATION OF THE FOREGOING WILL BE OF NO FORCE AND EFFECT, WILL BE VOID AB INITIO, AND WILL NOT OPERATE TO TRANSFER ANY RIGHTS TO THE TRANSFEREE, NOTWITHSTANDING ANY INSTRUCTIONS TO THE CONTRARY TO THE ISSUER, THE TRUSTEE OR ANY INTERMEDIARY.

(7)    We understand that, in connection with any proposed transfer or exchange of Notes, an opinion of counsel experienced in giving opinions with respect to questions relating to the securities laws of the United States may be required, to the effect that such transfer or exchange will be in compliance with the Securities Act and the Investment Company Act of 1940, as amended, together with such other documentation (including a letter to substantially the same effect as this letter) as the Trustee may reasonably request; provided that no such opinion or other documentation relating to compliance with the Securities Act shall be required if such transfer is made in accordance with Rule 144A under the Securities Act and the transferee furnishes a letter, signed by its chief financial officer or other executive officer, to substantially the same effect as this letter (excluding paragraph (11)).

2

AUG-01-2001  12:06

MAR.26.1997  2:54PM  F 4
PHONE NO. : 610 6608817    P. 4

FROM : BELMONT HOLDINGS CORP
3-26-1997 2:21PM      FROM INVESTMENT MGMT GRP 212 272 6803                      ☎004

03/26/97  TUE 15:53 FAX 212 506 3570        O.M.& SUTCLIFFE LLP

(8)   We are the sole "beneficial owner" of the Note or are acquiring the Note for the sole
"beneficial owner" of such Note (as such term is defined in Section 3(c)(1) of the
Investment Company Act).

(9)   We understand that no employee benefit or other plan that is subject to ERISA or
Section 4975 of the Code, and no entity whose underlying assets include "plan assets"
by reason of any such plan's investment in the entity (excluding any entity registered
under the Investment Company Act), may purchase or hold such Note or any interest
therein, unless it is an insurance company, it is acquiring such Note or an interest
therein with assets of its general account in reliance on the availability of the
exemptive relief afforded by U.S. Department of Labor Prohibited Transaction Class
Exemption ("PTCE") 95-60, 60 Federal Register 35925 (July 12, 1995), such general
account satisfies the conditions set forth in Section I(a) of PTCE 95-60 and its holding
of such Note or an interest therein after the date that is eighteen months after the
issuance of final regulations under Section 401(b) of ERISA will be permissible
thereunder or under such final regulations, PTCE 95-60 or another exemption under
ERISA.  Each prospective purchaser of a Note or any interest therein, by purchase
such Note or any interest therein, represents that (A) it is neither an employee benefit
or other plan that is subject to ERISA or Section 4975 of the Code nor any entity
whose underlying assets include "plan assets" by reason of such plan's investment in
the entity (excluding any entity registered under the Investment Company Act or (B) it
is an insurance company, and it is acquiring such Note or interest therein with assets
of its general account in reliance on the availability of the exemptive relief afforded
by PTCE 95-60 and its holding of such Note or an interest therein after the date that
is eighteen months after the issuance of final regulations under Section 401(b) of
ERISA is permissible thereunder or under such final regulations, PTCE 95-60 or
another exemption under ERISA.

Very truly yours,

Raymond G. Perelman Charitable
Remainder Unitrust
By:
Name: Raymond G. Perelman
Title: Trustee

5

**EXHIBIT 2**

BEAR STEARNS

BEAR, STEARNS SECURITIES CORP.
ONE METROTECH CENTER NORTH
BROOKLYN, NEW YORK 11201

# Customer Agreement

PLEASE READ CAREFULLY, SIGN AND RETURN

[illegible]

1. APPLICABLE LAW AND REGULATIONS. [illegible]

2. SECURITY INTEREST AND LIEN. [illegible]

3. DEPOSITS ON TRANSACTIONS. [illegible]

4. BREACH, BANKRUPTCY OR DEFAULT. [illegible]

5. FEES AND CHARGES. [illegible]

6. TRANSACTION REPORTS AND ACCOUNT STATEMENTS. [illegible]

7. DEBIT BALANCES/TRUTH-IN-LENDING. [illegible]

8. CLEARANCE ACCOUNTS. [illegible]

9. COSTS OF COLLECTION. [illegible]

10. IMPARTIAL LOTTERY ALLOCATION. [illegible]

11. WAIVER, ASSIGNMENT AND NOTICES. [illegible]

12. FREE CREDIT BALANCES. [illegible]

13. RESTRICTIONS ON ACCOUNT. [illegible]

14. CREDIT INFORMATION AND INVESTIGATION. [illegible]

15. SHORT AND LONG SALES. [illegible]

16. MARGIN ACCOUNTS. [illegible]

17. CONSENT TO LOAN OR PLEDGE OF SECURITIES. [illegible]

18. LEGALLY BINDING. You hereby agree that the provisions and all the terms hereof shall be binding upon you and your estate, heirs, executors, administrators, personal representatives, successors and assigns. You agree that all purchasers and sales shall be for your accounts in accordance with your oral or written instructions. You hereby waive any and all defenses that any such instruction was not in writing as may be required by the Statute of Frauds or any other law, rule or regulation.

19. AMENDMENT; ENTIRE AGREEMENT. You agree that Bear Stearns may modify the terms of this Agreement at any time upon prior written notice. By continuing to accept services after such notice you will have indicated your acceptance of the modification. If you do not accept such modification, you must notify Bear Stearns in writing and your account may then be terminated by Bear Stearns. In such case you remain liable to Bear Stearns for all debit balances. Otherwise, this Agreement may not be waived or modified absent a written instrument signed by an authorized representative of Bear Stearns. Except as set forth above, this Agreement represents the entire agreement and understanding between you and Bear Stearns concerning the subject matter hereof.

20. NEW YORK LAW TO GOVERN. THIS AGREEMENT SHALL BE DEEMED TO HAVE BEEN MADE IN THE STATE OF NEW YORK AND SHALL BE CONSTRUED, AND THE RIGHTS AND LIABILITIES OF THE PARTIES DETERMINED, IN ACCORDANCE WITH THE LAW OF THE STATE OF NEW YORK.

21. ARBITRATION.
  • ARBITRATION IS FINAL AND BINDING ON THE PARTIES.
  • THE PARTIES ARE WAIVING THEIR RIGHT TO SEEK REMEDIES IN COURT, INCLUDING THE RIGHT TO JURY TRIAL.
  • PRE-ARBITRATION DISCOVERY IS GENERALLY MORE LIMITED THAN AND DIFFERENT FROM COURT PROCEEDINGS.
  • THE ARBITRATORS' AWARD IS NOT REQUIRED TO INCLUDE FACTUAL FINDINGS OR LEGAL REASONING AND ANY PARTY'S RIGHT TO APPEAL OR TO SEEK MODIFICATION OF RULINGS BY THE ARBITRATORS IS STRICTLY LIMITED.
  • THE PANEL OF ARBITRATORS WILL TYPICALLY INCLUDE A MINORITY OF ARBITRATORS WHO WERE OR ARE AFFILIATED WITH THE SECURITIES INDUSTRY.
  • NO PERSON SHALL BRING A PUTATIVE OR CERTIFIED CLASS ACTION TO ARBITRATION, NOR SEEK TO ENFORCE ANY PRE-DISPUTE ARBITRATION AGREEMENT AGAINST ANY PERSON WHO HAS INITIATED IN COURT A PUTATIVE CLASS ACTION OR WHO IS A MEMBER OF A PUTATIVE CLASS WHO HAS NOT OPTED OUT OF THE CLASS WITH RESPECT TO ANY CLAIMS ENCOMPASSED BY THE PUTATIVE CLASS ACTION UNTIL:
  (i) THE CLASS CERTIFICATION IS DENIED;
  (ii) THE CLASS IS DECERTIFIED; OR
  (iii) THE CUSTOMER IS EXCLUDED FROM THE CLASS BY THE COURT. SUCH FORBEARANCE TO ENFORCE AN AGREEMENT TO ARBITRATE SHALL NOT CONSTITUTE A WAIVER OF ANY RIGHTS UNDER THIS AGREEMENT EXCEPT TO THE EXTENT STATED HEREIN.

  YOU AGREE, AND BY MAINTAINING AN ACCOUNT FOR YOU BEAR STEARNS AGREES, THAT CONTROVERSIES ARISING BETWEEN YOU AND BEAR STEARNS, ITS CONTROL PERSONS, PREDECESSORS, SUBSIDIARIES AND AFFILIATES AND ALL RESPECTIVE SUCCESSORS, ASSIGNS, AND EMPLOYEES, WHETHER ARISING PRIOR TO, ON OR SUBSEQUENT TO THE DATE HEREOF, SHALL BE DETERMINED BY ARBITRATION. ANY ARBITRATION UNDER THIS AGREEMENT SHALL BE HELD AT THE FACILITIES AND BEFORE AN ARBITRATION PANEL APPOINTED BY THE NATIONAL ASSOCIATION OF SECURITIES DEALERS, INC., THE AMERICAN STOCK EXCHANGE, or any other NATIONAL ASSOCIATION OF SECURITIES DEALERS, INC. (AND ONLY BEFORE SUCH EXCHANGES OR ASSOCIATION). YOU MAY ELECT ONE OF THE FOREGOING FORUMS FOR ARBITRATION, BUT IF YOU FAIL TO MAKE SUCH ELECTION BY REGISTERED MAIL OR TELEGRAM ADDRESSED TO BEAR STEARNS SECURITIES CORP. 245 PARK AVENUE, NEW YORK NEW YORK, ATTENTION: CHIEF LEGAL OFFICER (OR ANY OTHER ADDRESS OF WHICH YOU ARE ADVISED IN WRITING), BEFORE THE EXPIRATION OF TEN DAYS AFTER RECEIPT OF A WRITTEN REQUEST FROM BEAR STEARNS TO MAKE SUCH ELECTION, THEN BEAR STEARNS MAY MAKE SUCH ELECTION. FOR ANY ARBITRATION SOLELY BETWEEN YOU AND A BROKER FOR WHICH BEAR STEARNS ACTS AS CLEARING AGENT, SUCH ELECTION SHALL BE MADE BY REGISTERED MAIL TO SUCH BROKER AT ITS PRINCIPAL PLACE OF BUSINESS. THE AWARD OF THE ARBITRATORS, OR OF THE MAJORITY OF THEM, SHALL BE FINAL, AND JUDGMENT UPON THE AWARD RENDERED MAY BE ENTERED IN ANY COURT, STATE OR FEDERAL, HAVING JURISDICTION.

22. SEVERABILITY. If any provision herein shall become inconsistent with any present or future law, rule or regulation of any sovereign government or regulatory body having jurisdiction over the subject matter of this Agreement, such provision shall be deemed to be rescinded or modified in accordance with any such law, rule or regulation. In all other respects, this Agreement shall continue in full force and effect.

23. CAPACITY TO CONTRACT; CUSTOMER AFFILIATION. You represent that you are of legal age and that, unless you have otherwise notified Bear Stearns to the contrary, neither you nor any member of your immediate family is an employee of any exchange or member thereof, the National Association of Securities Dealers, Inc. or a member or employee of any corporation, firm or individual engaged in the business of dealing, as broker or principal, in securities, options or futures, or of any bank, trust company or insurance company.

24. EXTRAORDINARY EVENTS. Bear Stearns shall not be liable for losses caused directly or indirectly by government restrictions, exchange or market rulings, suspension of trading, war, strikes or other conditions beyond its control.

25. HEADINGS. The headings of the provisions hereof are for descriptive purposes only and shall not modify or qualify any of the rights or obligations set forth in each such provision.

26. TELEPHONE CONVERSATIONS. You acknowledge that both you and Bear Stearns, and as is their right to protect themselves, hereby authorize Bear Stearns or their respective agents to tape record and transmit any conversation with any officer or employee of Bear Stearns and any of their respective agents.

If this is a Joint Account, both parties must sign. Persons signing on behalf of others should indicate the titles or capacities in which they are signing.

BY SIGNING THIS AGREEMENT YOU ACKNOWLEDGE THAT:

1. THE SECURITIES IN YOUR MARGIN ACCOUNTS AND ANY SECURITIES FOR WHICH YOU HAVE NOT FULLY PAID, TOGETHER WITH ALL ATTENDANT OWNERSHIP RIGHTS, MAY BE LOANED TO BEAR STEARNS OR LOANED OUT TO OTHERS; AND

2. YOU HAVE RECEIVED A COPY OF THIS AGREEMENT.

THIS AGREEMENT CONTAINS A PRE-DISPUTE ARBITRATION CLAUSE AT PARAGRAPH 21.

THIS AGREEMENT DATED AS OF ____April 26____ , 19 96 .

Raymond G. Perelman

X _Raymond G. Perel_ (signature)
(Type or Printed Name)
(Signature)

X _____
(Signature)

Accepted By: _____
(Bear Stearns Securities Corp.)

Raymond G. Perelman
Charitable Remainder Unitrust
225 City Line Ave, Suite 2116
Bala Cynwyd, PA 19004

Account No.: _____

Date: _____

Date: _____

**EXHIBIT 3**

NASD REGULATION, INC.

- - - - - - - - - - - - - - - - - - - - - - - - x
RAYMOND G. PERELMAN CHARITABLE      :
REMAINDER UNITRUST,                 :
                                    :    Case No: 01-06336
                    Claimant,       :
                                    :
                                    :
        - against -                 :
                                    :
BEAR STEARNS SECURITIES CORP. and   :
MARK SERUYA,                        :
                                    :
                    Respondents.    :
- - - - - - - - - - - - - - - - - - - - - - - - x

## ANSWER OF RESPONDENTS

Respondents Bear Stearns & Co., Inc., named herein as Bear Stearns Securities

Corp. ("Bear Stearns"), and Mark Seruya ("Seruya") (collectively, "Respondents"), for their

answer to the Statement of Claim ("Claim") by Claimant Raymond G. Perelman Charitable

Remainder Unitrust ("Unitrust") hereby allege as follows:

Respondents deny the material allegations of the Claim, and deny any liability to

Claimant.  Respondents request that the Claim be dismissed with prejudice, and that they be

awarded the costs, including attorneys' fees, of defending this action.

Introduction

At the heart of the Claim is a false portrayal of fact.  Claimant seeks to portray

Raymond Perelman ("Perelman"), decision maker for the Unitrust, as having been deceived into

investing in a Bear Stearns investment product based on one document and one conversation

with one Bear Stearns broker that allegedly included false statements about the risks of not

13632-00002/943100.6

receiving interest on the investment in any given year and about the ease of redeeming the product. Such a picture is false in every respect.

Perelman, whose net worth exceeds $200 million, is a highly sophisticated investor with longstanding experience in debt instruments ranging from Mexican treasury bills to high-yield corporate bonds. His decision to invest in the Bear Stearns product at issue in this case was based on a series of conversations, not just one, with several Bear Stearns representatives, not just Seruya. The potential risks of the investment were fully explored and explained in these conversations. Perelman was joined in those discussions, moreover, by his accountant as well as an attorney-adviser, who vigorously probed the workings of the investment.

The Claim also refers to a document that Perelman states that he received before making his investment. However, it misstates the contents of that document, which refute, rather than reinforce, the allegations in the Claim. Moreover, the Claim omits any reference to the extensive risk disclosures made to Perelman by Bear Stearns (and acknowledged by him in writing) in a letter concerning the investment, as well as the risk disclosures in the prospectus for the investment.

The investment, in short, was consistent with Perelman's trading history and objectives, and Bear Stearns did not mislead him about it, negating the Claim's allegations of fraud.

Moreover, the Unitrust has suffered no loss in connection with the investment. The Claim alleges only that the investment did not pay interest during a certain period (and it is undisputed that interest was not promised or guaranteed), and the investment may well still yield a positive return. Thus there has been no injury, and the Claim fails for this reason as well.

13632-00002/943100.6                              -2-

Perelman Was An Experienced Investor

The accounts Perelman maintained with Bear Stearns, including the Unitrust's account, were non-discretionary accounts in which he, not Bear Stearns, made all decisions. Far from automatically accepting Bear Stearns' recommendations, Perelman employed an accountant, Michael Cull, and a lawyer, Barry Katz, as advisers to assist him in selecting investments and monitoring their progress.

The Unitrust Made An Informed
Decision To Purchase Augusta B Notes

In March, 1997, Seruya brought to the attention of Perelman the possibility of investing in a new product, the Class B-2 Junior Notes due 2015 ("Class B Notes") issued by Augusta Funding Limited B ("Augusta B"). Although not a plain-vanilla debt security, Augusta B was not dissimilar to other holdings in Perelman's portfolio. As was related to Perelman, Augusta B is a Collateralized Bond Offering ("CBO"), in which investors obtained securities issued by an entity, which in turn invested in a portfolio of bonds issued by governments and some corporations in emerging market nations. Further, Bear Stearns made clear to Perelman that there would be two different classes of investors, holders of Class A Notes, who would receive priority in interest payment, and holders of Class B Notes, whose interests, as Bear Stearns stated, were "junior" and "subordinated," but who had the opportunity to make a leveraged investment and seek a higher return. Moreover, as Bear Stearns made clear, the Class B Notes were not to receive fixed contractually promised interest payments; instead, interest payments would only be made after, and if, a variety of prerequisites were satisfied.

Perelman was interested in possibly investing in the product, but by no means did he make the decision to invest based on a single initial conversation with Seruya, as the Claim

would have it.  After the initial conversation, he was joined in a series of conversations by either

or both of his advisers, Cull and Katz.  Further, they spoke at varying times not only with Seruya,

but also with Bruce Jaegar, liaison to the private client services department and a product

specialist for equity derivatives, and Michael Barnes, co-head of the equity derivatives group

who was involved in developing the Augusta B CBO.  In these conversations, Perelman and his

advisers fully explored the possible risks as well as benefits of the investment he was

contemplating for the Unitrust.

       In the Claim, Perelman asserts that false representations were made to him

concerning interest payments on the Class B Notes, relying on a three page excerpt from a

document he refers to as the "Selling Points Document" (Exhibit A to the Claim).  He asserts that

the document  "showed that even with annual defaults in the bond portfolio over seven (7)

percent, there would still be a positive return on the investment." (Claim ¶ 9).  The Claim then

alleges that this was untrue, because the Class B Notes did not pay interest in 1999.  (Claim ¶¶

14, 16).

       This allegation, however, is based on a distortion of the document on which it

purports to rely.  The document it refers to makes no statement about interest payment by

Augusta B; instead, it shows a series of projections about how various movements in market

interest rates, and defaults in Augusta B's underlying bond portfolio, would affect total return on

the investment over its entire life, "YTM," or "Yield to Maturity."  The Selling Points Document

simply does not say what the Claim contends it does.   Moreover, there is no basis for Claimant

to allege that the document is untrue, since the document concerns the issue of return on the

investment over its lifetime, to "maturity," which is years away.  (As noted above and as related

to Perelman at the time, the Class B Notes mature in 2015).

The Claim's allegations regarding Seruya's oral representations regarding the payment of interest by Augusta B are similarly untrue. He, like the other Bear Stearns representatives to whom Perelman and his advisers spoke, made no promises that the Class B Notes would pay interest in any given year or years and accurately described the risks.

Also untrue is the contention that Bear Stearns induced Perelman to invest by asserting that the Notes had a "put" option which enabled the investor to "cash in" the investment as easily as selling a mutual fund. Again, the Claim is contradicted on this point by the document on which it purports to rely. (Claim, Exhibit A). That document refers to a call option which clearly has a variety of criteria, relating to the number of Class B Note holders seeking to exercise that option, or the amount of notes held by an individual Class B Note holder in the case of a partial call, that would need to be satisfied before it could be exercised. (Claim, Exhibit A). Bear Stearns accurately described the redeemability of the Class B Notes.

That Perelman had ample disclosure of risks, and unfettered opportunity to explore those risks, is further demonstrated by the accredited investor letter he signed (Exhibits B and C to Claim) (the "Accredited Investor Letter"), in which he acknowledged his sophistication as to "collateralized securities" and the Unitrust's ability "to bear the risk of such investment for an indefinite period and to afford a complete loss thereof." The Claim seeks to downplay the significance of this letter by calling it a "formality" and noting that when it was sent to Perelman, it was "backdated" to March 20, 1997, which allegedly was the date of his first conversation with Seruya. The Claim does not allege that the Accredited Investor Letter was sent to him on March 20th or that he executed and sent back the letter on March 20th (or whatever day he received it), nor does he allege that he purchased, or was obligated to purchase, the Class B Notes that day.

In fact, he acknowledges elsewhere in the Claim that the transaction closed, and the Unitrust purchased the notes, on or about April 10, 1997, after the date of the Augusta B Offering Memorandum (dated April 8, 1997) (Exhibit 1 hereto). Moreover, nowhere in the Claim does Perelman dispute the contents of the Accredited Investor Letter, including the statement that the investor has received and reviewed the "Offering Memorandum" for the Class B Notes, and has received and reviewed "such other information as we [the investor] deem necessary in order to make our investment decision."

Perelman Knew That There Was No Guarantee
That Augusta B Would Pay Interest

The Offering Memorandum also made clear that interest payments to Class B Note holders were not certain. It states that payment on Class B Notes "will be made to the extent possible on each April 10 and October 10," that the Class B Notes would mature on April 10, 2015 and that the Class B Notes "will receive as interest only Excess Interest (as defined . . .) on each Payment Date and on final maturity, subject to the priority of payments described herein." (Exhibit 1, Cover Page and p. 18).

The Offering Memorandum describes the priority of interest payments. Payment of interest to Class B Note holders is the last item of priority, with twelve items receiving higher preference, including Issuer Expenses, Trustee Fees, Administrative Expenses, payments due the Collateral Manager, payments to the insurer, payments of accrued and unpaid interest on Class A Notes, and accrued and unpaid liabilities to the insurer. (Exhibit 1 at 25-26).

It further states that no interest payments may be made unless two Coverage Tests - - the Par Value Test and the Interest Test (both of which are described in detail) - - are satisfied. (Exhibit 1 at 25, 45-46). In essence, the Par Value Test requires that the value of

-6-

bonds in the portfolio together with undistributed interest exceed the outstanding Class A Notes by a specified percentage. The Interest Test requires that certain interest proceeds and certain other assets exceed the total amount of scheduled interest payments on the Class A Notes and certain other liabilities by a specified percentage.

As the Offering Memorandum states, in the event either test is not satisfied, interest on Class B Notes will not be paid.

Certain Interest Payments Were Not Made
Because the CBO Failed to Meet Coverage Tests

While interest payments were initially made on the Class B Notes, emerging market debt in the late 1990's suffered severe turbulence and the CBO experienced some defaults in the portfolio. As a result, for a period of time at least one of the Coverage Tests was not satisfied and no interest payments were made.

As Perelman acknowledges in the Claim, Bear Stearns informed investors of the reason that interest distributions had not been made to Class B Note holders, i.e., one or both of the Coverage Tests had not been met.

This reflects no wrongdoing on Respondents' part. As noted above, interest payments to Class B Note holders were not guaranteed on any given interest payment date. Further, the absence of any given interest distribution does not translate to the Class B Notes not having a positive return, or causing an investor to suffer a loss. Not only are interest payments possible for any given future interest payment date, the anticipated maturity date of the CBO is still thirteen years away. It is impossible to determine what the average annual rate of return will be and Class B Note holders may receive a positive return on investment. The Claimant has

incurred no loss to date, and there is no basis to support an allegation that it will ever incur a loss from its investment in Augusta B.

**Perelman Knew That Augusta B**
**Provided Limited Redemption Rights**

The Offering Memorandum also set forth that before any redemption rights could be exercised, at least four years would have to pass, and a series of criteria would have to be satisfied. This description in no way suggests that redeeming the Class B Notes was "as easy or possible as redeeming mutual fund shares," as the Claimant contends. (Claim ¶10).

As set forth in the Offering Memorandum, for a call in whole of the Class B Notes, two-thirds of the Class B Note holders would have to seek such a call. That event has not occurred. The Offering Memorandum also sets forth the terms for exercise of a partial call, by an individual holder: it states that in order for such a call to be exercised by an individual holder, such holder would have to own $3 million of Class B Notes and sets forth that other criteria must be met for such a call to be exercised, including the approval of the insurer. (Exhibit 1 at 19-20). Thus, Bear Stearns made accurate disclosure regarding possible redemption of the Class B Notes.

**Affirmative Defenses**

As affirmative defenses to the claims asserted in the Claim, Respondents assert:

- Claimant did not justifiably rely on any representations or omissions by Respondents.

- No alleged conduct by Respondents was the cause of any alleged injury suffered by Claimant.

- Claimant has suffered no injury or damages.

- The Claim is barred by the doctrine of waiver, estoppel and ratification.

- The Claim is barred, in whole or in part, by the Statute of Limitations.

- The Claim is barred by laches.

- The Claim fails to plead fraud with particularity.

- The Claim fails to state a claim upon which relief may be granted.

- The Claimant knew or was reckless in not knowing the facts or information alleged to have been misrepresented or omitted, and some or all of the claims are barred by the doctrine of assumption of risk.

Demand for Relief

Respondents request that the panel dismiss the Claim with prejudice, or in the alternative issue an award declaring that they have no liability to Claimant, and that the panel direct Claimant to bear all costs incurred by Respondents in defending this action including Respondents' attorneys' fees.

Dated:   January 18, 2002

ROBINSON SILVERMAN PEARCE
ARONSOHN & BERMAN, LLP

By: _____
       Eric Rieder

1290 Avenue of the Americas
New York, New York 10104
Attorneys for Respondents

13632-00002/943100.6

Exhibit 1

OFFERING MEMORANDUM

# U.S. $30,424,000

# AUGUSTA FUNDING LIMITED B

## Class B-2 Junior Notes Due 2015

Augusta Funding Limited B, a Cayman Islands company (the "Issuer"), will issue the U.S. $30,424,000 Class B-2 Junior Notes Due 2015 (the "Class B-2 Notes"). The Issuer will also issue CHF 40,000,000 Class B-1 Junior Notes Due 2015 (the "Class B-1 Notes," and together with the Class B-2 Notes, the "Class B Notes") and U.S. $224,568,355 Guaranteed Floating Rate Secured Senior Notes Due 2010 (the "Class A Notes" and, together with the Class B Notes, the "Notes"). The Class A Notes and the Class B-1 Notes are not being offered hereby. The Notes will be issued and secured pursuant to an Indenture (the "Indenture"), dated as of April 10, 1997 among the Issuer, MBIA Insurance Corporation ("MBIA") and United States Trust Company of New York, as trustee (the "Trustee"). The net proceeds from the sale of the Notes will be used by the Issuer to purchase a portfolio (the "Collateral Portfolio") of U.S. dollar denominated emerging markets bonds and loans (the "Debt Securities") satisfying the criteria specified herein. The Debt Securities will be pledged to the Trustee pursuant to the Indenture, for the benefit of the holders of the Notes, the Trustee, MBIA and Bear Stearns Financial Products Inc., as Swap Counterparty (the "Swap Counterparty"). Bear, Stearns & Co. Inc., acting through its division, Bear Stearns Asset Management, will serve as Collateral Manager (as defined herein) of the Collateral Portfolio. The Class B-2 Notes are subordinated to the Class A Notes in right of payment, as described herein. The Issuer will have no substantial assets other than the Debt Securities, Hedge Agreements (as defined herein), if any, and certain short-term investments, all of which have been pledged to secure the Issuer's obligations under the Notes. As described herein, the use by the Issuer of payments received in respect of the Class B-2 Notes is (including sale proceeds), the Hedge Agreement(s) and short-term investments for the payment of interest on and the principal of the Class B-2 Notes is subordinated to the use of such payments (and proceeds) for the payment of interest on and principal of the Class A Notes, and will be payable to the extent possible, with respect to any Payment Date, only after all required payments are made to the holders of the Class A Notes, MBIA, Hedge Counterparties and after the payment of all fees and expenses required to be made on such date.

Payment on the Class B-2 Notes will be made to the extent funds are available on each April 10 and October 10, commencing October 10, 1997, or, if any such day is not a business day, the next succeeding business day (each, a "Payment Date") and will be junior to the payment of interest on and principal of the Class A Notes on each Payment Date.

The Class B-2 Notes will mature on April 10, 2015 unless repaid prior thereto. The Class B-2 Notes will receive as interest only Excess Interest (as defined herein) on each Payment Date and on final maturity, subject to the priority of payments described herein.

Prior to this offering there has been no public market for the Class B-2 Notes. Application has been made to list the Class B-2 Notes on the Luxembourg Stock Exchange.

THE CLASS B-2 NOTES WILL NOT BE RATED BY ANY CREDIT RATING AGENCY

The Class B-2 Notes will be initially offered in negotiated transactions at prices to be determined at the time of sale.

FOR INFORMATION THAT SHOULD BE CONSIDERED BY PROSPECTIVE INVESTORS,
SEE "RISK FACTORS."

THE CLASS B-2 NOTES BEING OFFERED HEREBY IN THE OFFERING (AS DEFINED HEREIN) HAVE NOT BEEN AND WILL NOT BE REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT") AND THE ISSUER WILL NOT BE REGISTERED UNDER THE UNITED STATES INVESTMENT COMPANY ACT OF 1940, AS AMENDED (THE "1940 ACT"). THE CLASS B-2 NOTES MAY NOT BE OFFERED OR SOLD WITHIN THE UNITED STATES OR TO U.S. PERSONS (AS DEFINED IN REGULATION S UNDER THE SECURITIES ACT), EXCEPT THAT CLASS B-2 NOTES MAY BE OFFERED OR SOLD TO ACCREDITED INVESTORS (AS DEFINED IN RULE 501 UNDER THE SECURITIES ACT) IN RELIANCE ON THE EXEMPTION FROM THE REGISTRATION REQUIREMENTS PROVIDED BY REGULATION D UNDER THE SECURITIES ACT AND IN ACCORDANCE WITH ANY OTHER APPLICABLE LAW. PROSPECTIVE PURCHASERS ARE HEREBY NOTIFIED THAT THE SELLER OF ANY CLASS B-2 NOTES MAY BE RELYING ON THE EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF SECTION 5 OF THE SECURITIES ACT PROVIDED BY REGULATION D UNDER THE SECURITIES ACT. EACH PURCHASER OF NOTES OFFERED HEREBY IN MAKING ITS PURCHASE WILL BE REQUIRED TO MAKE OR WILL BE DEEMED TO HAVE MADE CERTAIN ACKNOWLEDGMENTS, REPRESENTATIONS AND AGREEMENTS AS SET FORTH UNDER "TRANSFER RESTRICTIONS."

CERTAIN ASSETS OF THE ISSUER ARE THE SOLE SOURCE OF PAYMENTS ON THE NOTES. THE CLASS B-2 NOTES DO NOT REPRESENT AN INTEREST IN OR OBLIGATION OF, AND ARE NOT INSURED OR GUARANTEED BY, ANY OF THE CLASS A NOTEHOLDERS, THE CLASS B NOTEHOLDERS, BEAR, STEARNS & CO. INC., BEAR, STEARNS INTERNATIONAL LIMITED OR ANY OF THEIR AFFILIATES.

The Class B-2 Notes are offered, subject to prior sale, when, as, and if, accepted by Bear, Stearns & Co. Inc. or Bear, Stearns International Limited (each in such capacity, an "Initial Purchaser," and collectively, the "Initial Purchasers"). It is a condition of issuance that the Class B-1 Notes, the Class B-2 Notes and the Class A Notes be issued concurrently. The Class B-2 Notes offered in reliance on the exemption from registration provided for in Regulation S under the Securities Act will initially be represented by a temporary global Class B-2 Note which will be deposited on or about April 10, 1997 (the "Closing Date") with a common depositary on behalf of Morgan Guaranty Trust Company of New York, Brussels office, as operator of the Euroclear System (the "Euroclear Operator") and Cedel Bank, société anonyme ("Cedel Bank"). After the date falling 40 days after the later of the commencement of this offering and the Closing Date, beneficial interests in the temporary global Class B-2 Note will be exchangeable for interests in a permanent global Class B-2 Note upon certification as to non-beneficial U.S. ownership in the manner and upon compliance with the procedures described herein. The Class B-2 Notes offered to Accredited Investors in reliance on the exemption from registration provided for in Regulation D under the Securities Act will be issued in definitive, fully registered form.

## Bear, Stearns International Limited
## Bear, Stearns & Co. Inc.

April 8, 1997

# TABLE OF CONTENTS

Section                                                                                     Page

SUMMARY OF TERMS ................................................................................. 1

RISK FACTORS ........................................................................................... 11

DESCRIPTION OF THE CLASS B-2 NOTES ................................................. 16

USE OF PROCEEDS ..................................................................................... 39

SECURITY FOR THE NOTES ........................................................................ 39

THE SWAP AGREEMENT ............................................................................. 51

DESCRIPTION OF THE INSURANCE POLICY ............................................. 55

MATURITY AND PREPAYMENT CONSIDERATIONS ................................... 60

THE COLLATERAL MANAGER ..................................................................... 61

THE COLLATERAL MANAGEMENT AGREEMENT ....................................... 61

THE ISSUER ................................................................................................. 64

EMERGING MARKETS OBLIGATIONS ........................................................ 65

TAX CONSIDERATIONS ............................................................................... 66

ERISA CONSIDERATIONS ........................................................................... 71

SUBSCRIPTION AND SALE ......................................................................... 72

TRANSFER RESTRICTIONS ........................................................................ 73

LISTING AND GENERAL INFORMATION .................................................... 76

LEGAL MATTERS ........................................................................................ 76

NO PERSON IS AUTHORIZED IN CONNECTION WITH ANY OFFERING MADE HEREBY TO GIVE ANY INFORMATION OR MAKE ANY REPRESENTATION OTHER THAN AS CONTAINED HEREIN AND, IF GIVEN OR MADE, SUCH INFORMATION OR REPRESENTATION MUST NOT BE RELIED UPON AS HAVING BEEN AUTHORIZED BY THE ISSUER, THE INITIAL PURCHASERS OR THE COLLATERAL MANAGER. THIS OFFERING MEMORANDUM DOES NOT CONSTITUTE AN OFFER TO SELL, OR A SOLICITATION OF AN OFFER TO BUY, ANY OF THE SECURITIES OFFERED HEREBY BY ANY PERSON IN ANY JURISDICTION IN WHICH IT IS UNLAWFUL FOR SUCH PERSON TO MAKE SUCH AN OFFER OR SOLICITATION. NEITHER THE DELIVERY HEREOF NOR ANY SALE MADE HEREUNDER SHALL UNDER ANY CIRCUMSTANCES IMPLY THAT NO CHANGE IN THE AFFAIRS OF THE ISSUER HAS OCCURRED OR THAT THE INFORMATION HEREIN IS CORRECT AS OF ANY DATE SUBSEQUENT TO THE DATE HEREOF. THE ISSUER AND THE INITIAL PURCHASERS, AS THE CASE MAY BE, RESERVE THE RIGHT TO REJECT ANY OFFER TO PURCHASE CLASS B-2 NOTES IN WHOLE OR IN PART, FOR ANY REASON, OR TO SELL LESS THAN THE STATED INITIAL PRINCIPAL AMOUNT OF CLASS B-2 NOTES OFFERED HEREBY.

----

This Offering Memorandum has been prepared by the Issuer solely for use in connection with the offering and the listing of the Class B-2 Notes, described herein (the "Offering"). The Issuer has taken reasonable care to ensure that facts stated in this Offering Memorandum are true and accurate in all material respects and that there have not been omitted material facts the omission of which would make misleading any statements of fact or opinion herein. The Issuer accepts responsibility accordingly.

----

No representation or warranty, express or implied, is made by the Initial Purchasers as to the accuracy or completeness of the information set forth herein, and nothing contained herein is or shall be relied upon as, a promise or representation as to the past or the future. The Initial Purchasers have not independently verified any such information and assumes no responsibility for its accuracy or completeness.

----

In this Offering Memorandum, references to "Dollars," "$" and "U.S. $" are to United States Dollars.

----

This Offering Memorandum does not constitute an offer to sell or the solicitation of an offer to buy the Class B-2 Notes in any jurisdiction in which such offer or solicitation is unlawful. This document may not be issued or passed on in the United Kingdom to any person unless that person is of a kind described in Article 11(3) of the Financial Services Act 1986 (Investment Advertisements) (Exemptions) Order 1996, as amended, or is a person to whom the document may otherwise lawfully be issued or passed on. Offers, sales and deliveries of the Class B-2 Notes are subject to certain restrictions in the United States and the United Kingdom. See "Subscription and Sale."

i

--------------------

No invitation may be made to the public in the Cayman Islands to purchase the Class B Notes.

--------------------

IN MAKING AN INVESTMENT DECISION, INVESTORS MUST RELY ON THEIR OWN EXAMINATION OF THE ISSUER AND THE TERMS OF THE OFFERING, INCLUDING THE MERITS AND RISKS INVOLVED. THESE SECURITIES HAVE NOT BEEN RECOMMENDED BY ANY FEDERAL OR STATE SECURITIES COMMISSION OR ANY OTHER REGULATORY AUTHORITY. FURTHERMORE, THE FOREGOING AUTHORITIES HAVE NOT CONFIRMED THE ACCURACY OR DETERMINED THE ADEQUACY OF THIS DOCUMENT. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

--------------------

IN CONNECTION WITH THE OFFERING, THE INITIAL PURCHASERS MAY, AS PERMITTED BY APPLICABLE LAW, OVER-ALLOT OR EFFECT TRANSACTIONS WHICH STABILIZE OR MAINTAIN THE PRICE OF THE CLASS B-2 NOTES AT A LEVEL WHICH MIGHT NOT OTHERWISE PREVAIL IN THE OPEN MARKET, SUCH STABILIZING, IF COMMENCED, MAY BE DISCONTINUED AT ANY TIME.

--------------------

The Class B-2 Notes have not been and will not be registered under the securities and exchange law of Japan (the "Securities and Exchange Law") and may not be offered or sold, directly or indirectly, in Japan or to, or for the benefit of, any resident of Japan (which term as used herein means any person resident in Japan, including any corporation or other entity organized under the laws of Japan) or to others for re-offering or resale, directly or indirectly, in Japan, or to a resident of Japan except pursuant to an exemption from the registration requirements of, and otherwise in compliance with the Securities and Exchange Law and any relevant laws, regulations and ministerial guidelines promulgated by the relevant governmental and regulatory authorities in effect at the relevant time in Japan.

## INFORMATION AS TO PLACEMENT WITHIN THE UNITED STATES

This Offering Memorandum is highly confidential and has been prepared by the Issuer solely for use in connection with the Offering. The Issuer and the Initial Purchasers reserve the right to reject any offer to purchase Class B-2 Notes in whole or in part for any reason, or to sell less than the stated initial principal amount of the Class B-2 Notes offered hereby. This Offering Memorandum is personal to each offeree to whom it has been delivered by the Issuer, the Initial Purchasers or affiliates thereof and does not constitute an offer to any other person or to the public generally to subscribe for or otherwise acquire the Class B-2 Notes. Distribution of this Offering Memorandum to any persons other than the offeree and those persons, if any, retained to advise such offeree with respect thereto is unauthorized and any disclosure of any of its contents, without the prior written consent of the Issuer, is prohibited.

Each prospective purchaser in the United States, by accepting delivery of this Offering Memorandum, agrees to the foregoing and to make no photocopies of this Offering Memorandum or any documents attached hereto and, if the offeree does not purchase the Class B-2 Notes or the Offering is terminated, to return this Offering Memorandum and all documents attached hereto to Bear Stearns International Limited, One Canada Square, London E14 5AD, England, Attention: Derivatives/Structured Products.

## AVAILABLE INFORMATION

To permit compliance with Rule 144A under the Securities Act in connection with the sale of the Class B-2 Notes, the Issuer, pursuant to the Indenture referred to on the cover, will be required to furnish upon request of a holder of a Class B-2 Note to such holder and a prospective purchaser designated by such holder the information required to be delivered under Rule 144A(d)(4) under the Securities Act if at the time of the request the Issuer is not a reporting company under Section 13 or Section 15(d) of the United States Securities Exchange Act of 1934, as amended (the "Exchange Act"), or exempt from reporting pursuant to Rule 12g3-2(b) under the Exchange Act.

## NOTICE TO NEW HAMPSHIRE RESIDENTS

NEITHER THE FACT THAT A REGISTRATION STATEMENT OR AN APPLICATION FOR A LICENSE HAS BEEN FILED UNDER CHAPTER 421-B OF THE NEW HAMPSHIRE REVISED STATUTES WITH THE STATE OF NEW HAMPSHIRE NOR THE FACT THAT A SECURITY IS EFFECTIVELY REGISTERED OR A PERSON IS LICENSED IN THE STATE OF NEW HAMPSHIRE CONSTITUTES A FINDING BY THE SECRETARY OF STATE THAT ANY DOCUMENT FILED UNDER RSA 421-B IS TRUE, COMPLETE AND NOT MISLEADING.  NEITHER ANY SUCH FACT NOR THE FACT THAT AN EXEMPTION OR EXCEPTION IS AVAILABLE FOR A SECURITY OR A TRANSACTION MEANS THAT THE SECRETARY OF STATE HAS PASSED IN ANY WAY UPON THE MERITS OR QUALIFICATIONS OF, OR RECOMMENDED OR GIVEN APPROVAL TO, ANY PERSON, SECURITY, OR TRANSACTION.  IT IS UNLAWFUL TO MAKE, OR CAUSE TO BE MADE, TO ANY PROSPECTIVE INVESTOR, CUSTOMER OR CLIENT ANY REPRESENTATION INCONSISTENT WITH THE PROVISIONS OF THIS PARAGRAPH.

## SUMMARY OF TERMS

The following summary does not purport to be complete and is qualified in its entirety by reference to the detailed information appearing elsewhere in this Offering Memorandum and related documents referred to herein. An index of defined terms appears at the back of this Offering Memorandum.

Securities Offered:

U.S. $30,424,000 of Class B-2 Junior Notes Due April 10, 2015 (the "Class B-2 Notes").

The Issuer will also issue U.S. $224,568,355 of principal amount of Guaranteed Floating Rate Secured Senior Notes, Class A Due April 10, 2010 (the "Class A Notes") and CHF 40,000,000 Class B-1 Junior Notes Due 2015 (the "Class B-1 Notes"; and, together with the Class B-2 Notes, the "Class B Notes" and, together with the Class A Notes, the "Notes"). Neither the Class A Notes nor the Class B-1 Notes are being offered hereby.

The Notes will be issued pursuant to an indenture (the "Indenture") among the Issuer, MBIA Insurance Corporation ("MBIA" or "Insurer") and United States Trust Company of New York, as trustee (the "Trustee").

The Class B Notes will be junior in right of payment on each Payment Date to the payment due in respect of (i) the Class A Notes, (ii) Hedge Agreements, (iii) the semi-annual premium due to MBIA and (iv) other required payments and expenses, as described herein. See "Description of the Class B-2 Notes—Subordination."

The Class B-2 Notes have not been insured or guaranteed by any Person.

The Issuer:

Augusta Funding Limited B (the "Issuer"), a company incorporated under the laws of the Cayman Islands for the sole purpose of acquiring the Debt Securities, entering into the Hedge Agreements (each as defined below) and issuing the Notes and certain related transactions.

The issued share capital of the Issuer is held on behalf of Queensgate Bank & Trust Company Ltd., a licensed trust company incorporated in the Cayman Islands, which holds the benefit thereof on the terms of a charitable trust as the trustee (the "Share Trustee"). The assets of the Issuer will

1

include the Debt Securities, any interest rate exchange or protection agreements (including any confirmations evidencing the transactions thereunder, the "Hedge Agreements") as may be entered into in accordance with the requirements described herein, and certain other eligible assets.

Use of Proceeds:

The net proceeds for the sale of the Notes will be used by the Issuer to purchase a diversified portfolio consisting, at the time of acquisition of such portfolio, of approximately $308,000,000 (in outstanding principal amount) of U.S. dollar denominated emerging markets bonds and loans satisfying the investment criteria described herein (the "Debt Securities"), to pay amounts due to the Swap Counterparty in respect of the Swap Agreement and to purchase the Class B-1 Collateral (as defined herein). See "Security for the Notes—Debt Securities." Pending investment in the Debt Securities, the uninvested net proceeds will be invested in Eligible Investments (as defined herein). See "Use of Proceeds."

Interest Payments:

The Class B Notes will receive as interest only Excess Interest. Interest on the Class B Notes will be payable, to the extent funds are available therefor, semi-annually in arrears on April 10 and October 10 of each year, commencing October 10, 1997, or, if any such day is not a Business Day (as defined herein), the next succeeding Business Day (each, a "Payment Date") and at maturity. See "Description of the Class B Notes—Interest" and "Priority of Payments." If either of the Coverage Tests (as defined herein) with respect to the Class A Notes is not satisfied, funds which would otherwise be used to pay interest on the Class B Notes will be used to repay Class A Notes, to the extent and as described herein.

Principal Distributions:

The stated maturity of the Class B Notes will be April 10, 2015 (the "Stated Maturity"). The average life of the Class B Notes is expected to be shorter than the number of years until Stated Maturity for the Class B Notes. See "Risk Factors—Average Life and Prepayment Considerations" and "Maturity and Prepayment Considerations."

Principal Proceeds will not be distributed in respect of the Class B Notes during the Reinvestment Period (as defined herein). Thereafter, Principal Proceeds will only be distributed in respect of the Class B Notes after the Class A

Notes have been repaid or otherwise paid in full. The Class B Notes are subordinated to the Class A Notes and except in connection with a concurrent redemption, in whole or in part, of the Class A Notes, Principal Proceeds will only be distributed in respect of the Class B Notes after the Class A Notes are repaid or otherwise paid in full.

After the Reinvestment Period, Principal Proceeds will be distributed in respect of the Class B-2 Notes in accordance with the priorities set forth under "Description of the Class B-2 Notes—Priority of Payments."

The "Reinvestment Period" will commence on the Closing Date and continue through and including the earlier of (i) April 10, 2002, (ii) the Measurement Date (as defined herein) on which either of the Coverage Tests are not satisfied (provided if the Coverage Tests are subsequently satisfied the Reinvestment Period shall be reinstated) or (iii) the Measurement Date on which the Standard & Poor's Collateral Quality Test fails to be satisfied. With respect to any Payment Date that does not occur during the Reinvestment Period, Interest Proceeds and Principal Proceeds will be used to redeem Class A Notes in accordance with the priorities set forth under "Description of the Class B Notes—Priority of Payments."

**Optional Redemption at Direction of Class B Noteholder(s):**

The Class A Notes and the Class B Notes may, subject to certain conditions, be simultaneously redeemed in whole or in part by the Issuer, at the direction of one or more holders of the Class B Notes, from Sale Proceeds (as defined herein) after the expiration of the period beginning on the Closing Date and ending April 10, 2001 (the "Non-Call Period"). The Class A Notes may be redeemed in whole by the Issuer, at the direction of the holders of at least 66 2/3%, by principal amount, of the Class B Notes, from Sale Proceeds on any Payment Date (each, a "Class A Note Call Date") occurring after the Non-Call Period. The Class A Notes and the Class B Notes may be simultaneously redeemed in part by the Issuer from Sale Proceeds on any Class A Note Call Date, at the direction of one or more holders of the Class B Notes holding in the aggregate not less than $3,000,000 in principal amount, of Class B Notes. In the case of a simultaneous redemption of the Class A Notes and the Class B Notes, the redemption price of the

Class A Notes will be 100% of the principal amount of the Class A Notes to be redeemed, plus accrued interest thereon.

No Class A Notes may be redeemed at the direction of Class B Notes unless the Issuer has received the written consent of MBIA, which consent shall not be unreasonably withheld. In determining whether to withhold its consent to any redemption of Class A Notes, MBIA shall act in a commercially reasonable manner and may (i) take into account its obligations provided for under the Insurance Policy and (ii) withhold its consent if in the sole judgment of MBIA, security or collateral protection afforded to MBIA or the Class A Noteholders would be adversely affected, or it could be required to make a payment under the Insurance Policy as a result of such redemption.

In the case of a simultaneous redemption of the Notes in part, the holders of the Class B Notes directing such redemption will specify the principal amount of the Class B Notes to be redeemed. The percentage of the outstanding principal amount of the Class A Notes, in the case of a partial redemption of the Class A Notes only, and, as applicable, the Class B Notes, in the case of a simultaneous partial redemption of the Notes, to be repaid (the "Partial Redemption Percentage") will be determined as described herein. In the case of a simultaneous partial redemption, the Partial Redemption Percentage for the Class B Notes will equal the Partial Redemption Percentage for the Class A Notes. The Collateral Manager will, in its discretion, direct the sale of Debt Securities and the Sale Proceeds therefrom (after payment of any amounts due to all Hedge Counterparties as described below) will be applied pro rata to the repayment of the Partial Redemption Percentage of the principal of each outstanding Class A Note and, thereafter, will be applied to the redemption of the Class B Notes to be redeemed, if any, provided, however, that so long as any Class A Notes are outstanding, the aggregate principal amount of the Class B Notes, after giving effect to the redemption of the Class A Notes, shall not be less than the Class B Note Redemption Floor Amount (as defined herein).

No redemption of Class A Notes will occur at the direction of Class B Noteholders unless the Sale Proceeds to be applied in respect thereof are sufficient to pay in full (i) the

4

principal amount of, plus accrued interest on, the Class A Notes to be redeemed, (ii) all amounts due to any Hedge Counterparty under any Hedge Agreement on or prior to such date of redemption or as a result of such redemption and (iii) any Accrued Liabilities (as defined herein) owing to MBIA (so long as it is the Controlling Beneficiary). See "Description of the Class B-2 Notes—Optional Redemption."

The Class A Notes shall not be optionally redeemed unless (1) with respect to a redemption in whole or in part, at least seven Business Days before the scheduled redemption date, the Collateral Manager shall have furnished to the Trustee and MBIA evidence, in form reasonably satisfactory to the Trustee and MBIA, that the Collateral Manager on behalf of the Issuer has entered into a binding agreement or agreements with a financial institution or institutions whose short-term unsecured debt obligations have a credit rating of at least "P-1" and of at least "A-1" from Moody's and Standard & Poor's, respectively, to purchase, not later than the Business Day immediately preceding the scheduled redemption date in immediately available funds, all or part of the Debt Securities at a purchase price at least equal to an amount sufficient, together with the Eligible Investments maturing on or prior to the scheduled redemption date to pay all administrative and other fees and expenses payable under "Description of the Class B-2 Notes—Priority of Payments" prior to the payment of the Class A Notes and to redeem the Class A Notes on the scheduled redemption date at the appropriate redemption price, together with all accrued interest to the date of redemption or to pay principal on the Class A Notes and, if applicable, the Class B Notes based on the Partial Redemption Percentage of the applicable class of Notes, and (2) with respect to a redemption in whole, prior to selling any Debt Securities and/or Eligible Investments, the Collateral Manager shall certify that the expected proceeds from such sale would equal (a) at least 110% of the sum of (i) the principal amount of the outstanding Class A Notes and (ii) all administrative and other fees and expenses payable under "Description of the Class B-2 Notes—Priority of Payments" prior to the payment of the Class A Notes, if the Debt Securities and/or Eligible Investments are to be sold within five Business Days after such certification or (b) 125% of the sum of clauses (i) and (ii) above if the Debt Securities

5

and/or Eligible Investments are to be sold more than five but within ten Business Days after such certification.

**Optional Redemption of Class A Notes by Issuer:**

The Class A Notes will be redeemed, if directed by the Controlling Beneficiary (so long as it is MBIA) on any Payment Date in whole but not in part if (a) the Issuer, or interest or other amounts payable on or with respect to the Collateral, the Swap Agreement or any Hedge Agreement will be subject to taxes imposed by the United States, the Cayman Islands or any other jurisdiction and such taxes, after taking into account any gross-up amounts available to the Issuer, result in an inability to make payments on the Class A Notes on a materially timely basis, (b) interest payments on the Class A Notes are subject to withholding tax (other than "backup withholding" as described in the Internal Revenue Code of 1986 (the "Code") or other similar withholding tax), (c) payments under the Insurance Policy are subject to withholding tax (other than "backup withholding" as described in the Code or other similar withholding tax) and if a substitution for, or relocation of, the Issuer in accordance with the terms of the Indenture would fail to remedy any such result or (d) the Class A Notes are not treated as indebtedness of the Issuer for United States federal tax purposes.

**Security for the Notes:**

The Notes will be secured by the Collateral which will consist of (a) the Debt Securities that are delivered to the Trustee on the Closing Date or in the future and all payments thereon or with respect thereto, (b) the Issuer's rights under the Collateral Management Agreement, (c) the Issuer's rights under the Master Agreement (including the confirmations evidencing the transactions thereunder) dated as of April 10, 1997 between the Issuer and Bear Stearns Financial Products Inc. (the "Swap Agreement"), (d) the Issuer's rights under any other Hedge Agreements delivered to the Trustee pursuant to the terms of the Indenture, (e) the Collection Account, including, without limitation, Eligible Investments purchased with funds on deposit therein, and all income from the investment of funds therein and (f) all proceeds of the foregoing (collectively, the "Collateral") and will be pledged to the Trustee as security for the Issuer's obligations under the Notes pursuant to the Indenture and recourse against the Issuer in respect thereof will be limited to such assets.

The portfolio of Debt Securities will consist of U.S. dollar denominated emerging markets bonds and loans with an aggregate principal balance expected to be approximately U.S. $308,000,000 on the Effective Date (as defined herein) having the characteristics set forth herein and satisfying the Collateral Quality Test and the Coverage Tests (constituting a Class A Par Value Test and a Class A Interest Coverage Test). See "Security for the Notes." Substantially all of the Debt Securities will either be unrated or rated below investment grade and accordingly will have greater credit and liquidity risk than investment grade sovereign or corporate bonds or loans. See "Risk Factors."

Each Hedge Counterparty, MBIA and the Trustee will also have a security interest in the Collateral. The security interest of (i) Bear Stearns Financial Products Inc. (the "Swap Counterparty") and any other Hedge Counterparty will secure the Issuer's obligations to the Swap Counterparty and any other Hedge Counterparty under the Swap Agreement and any other Hedge Agreement, (ii) MBIA will secure the Issuer's obligation to MBIA under the Indenture and the Insurance Agreement and (iii) the Trustee will secure the Issuer's obligation to the Trustee under the Indenture.

The Class B-1 Notes will also be separately secured by a CHF 40,000,000 Zero Coupon Bond, due November 26, 2021 issued by the International Bank for Reconstruction and Development (the "Class B-1 Collateral") which will be pledged to the Trustee solely for the benefit of the Class B-1 Noteholders. None of the Trustee, the Class A Noteholders, the Class B-2 Noteholders or any other secured party under the Indenture shall have any rights in or to the Class B-1 Collateral.

Purchase of Debt Securities:    The Collateral Manager expects that, by the Closing Date, the Issuer will have purchased, or entered into agreements to purchase, the expected portfolio (the "Expected Portfolio") of Debt Securities which were selected by the Collateral Manager on or prior to the Closing Date. To the extent that the Issuer is unable to purchase, or enter into agreements to purchase, any of the Expected Portfolio by the Closing Date, the Issuer will have a 30-day period from the Closing Date (the "Ramp-Up Period") to purchase such Debt Securities or to replace such Debt Securities, subject

FFNY03\ISAACLA\NORMAL.154068.03

to certain restrictions. See "Security for the Notes—Debt Securities."

|  |  |
|---|---|
| Reinvestment in Debt Securities: | Principal Proceeds received with respect to the Debt Securities may, subject to the limits described under "Description of the Notes—Priority of Payments" herein, be used during the Reinvestment Period to purchase substitute Debt Securities meeting the criteria set forth herein. See "Security for the Notes—Substitute Securities and Reinvestment Criteria." |
| The Swap Agreement: | On the Closing Date, the Issuer will enter into the Swap Agreement with the Swap Counterparty. The payment obligations of the Issuer to the Swap Counterparty under the Swap Agreement will be insured by MBIA pursuant to a financial guaranty insurance policy (the "Swap Insurance Policy") to be issued in favor of the Swap Counterparty. Other Hedge Agreements may be entered into from time to time by the Issuer in accordance with the Indenture and with the consent of MBIA (so long as it is the Controlling Beneficiary). See "The Swap Agreement." |
| The Offering: | The Class B-2 Notes are being offered to certain persons in offshore transactions in reliance on Regulation S under the Securities Act ("Regulation S") and to Accredited Investors (as defined under Rule 501 under the Securities Act; each, an "Accredited Investor"). |
| Ratings: | The Class B-2 Notes will not be rated by any credit rating agency. |
| Denominations: | CHF 1,000,000, and integral multiples of CHF 1 in excess thereof. |
| Form, Denomination and Registration of the Class B-2 Notes: | The Class B-2 Notes sold in reliance on Regulation S will initially be represented by a temporary global Class B-2 Note, in bearer form without interest coupons attached which will be deposited on the Closing Date with a common depositary in London (the "Common Depositary") for the Euroclear Operator and Cedel Bank. The temporary global Class B-2 Note will be exchanged for a permanent global Class B-2 Note, in bearer form on the Exchange Date so long as certification as to non-U.S. beneficial |

ownership by each of the beneficial owners of the Class B-2 Notes represented by such temporary global Class B-2 Note shall have occurred. Any interest in the temporary or permanent global Class B-2 Note will be transferable only in accordance with the rules and procedures of the Euroclear Operator or Cedel Bank. The permanent global Class B-2 Notes will be exchangeable for definitive Class B-2 Notes as described under "Description of the Class B-2 Notes—Form, Denomination and Registration of Class B-2 Notes." Beneficial interests in the temporary global or permanent global Class B-2 Notes may not be held by a U.S. Person at any time. Beneficial Interests in the temporary global or permanent global Class B-2 Note may be transferred to a person who takes delivery in the form of a Class B-2 Registered Note (as defined below) only upon receipt by the Trustee of a written certification by the transferee to the effect that, among other things, the transferee is (i) an Accredited Investor and (ii) is, or is acting for, the sole "beneficial owner" (as defined in the Investment Company Act of 1940, as amended (the "1940 Act")) of such Notes.

The Class B-2 Notes offered to Accredited Investors in reliance upon the exemption from registration provided for in Regulation D under the Securities act will be issued in definitive, fully registered form without interest coupons attached (each, a "Class B-2 Registered Note").

|  |  |
|---|---|
| Trustee: | United States Trust Company of New York is a banking organization organized under the laws of the State of New York. Pursuant to the Indenture, the Trustee and any successor trustee shall at all times be a bank or trust company authorized under the laws of its organization or licensed to exercise corporate trust power, having, or being an affiliate of an entity having, a combined capital and surplus of at least U.S. $50 million (or its equivalent in another currency), and be subject to supervision or examination by governmental authorities. The Trustee shall be an institution reasonably acceptable to MBIA which shall have an actual or implied short-term debt rating of "A-1" by Standard & Poor's and "P-1" by Moody's and an actual or implied long-term debt rating of at least "BBB+" from Standard & Poor's and "Baa1" from Moody's. |
| Taxation: | Holders of Class B-2 Notes will not be entitled to any additional amounts in respect of any withholding tax or |

9

other deductions in respect of payments on the Class B Notes. For a discussion of certain tax consequences to purchasers of the Class B-2 Notes, see "Tax Considerations" herein.

ERISA Considerations:          See "ERISA Considerations."

Governing Law:                 The Notes and the Indenture will be governed by, and construed in accordance with, the laws of the State of New York.

Listing:                       Application has been made to list the Class B-2 Notes on the Luxembourg Stock Exchange. See "Listing and General Information."

The Collateral Manager:        Certain advisory and administrative functions with respect to the Collateral Portfolio will be performed by Bear, Stearns & Co. Inc. acting through its division Bear Stearns Asset Management (the "Collateral Manager"). See "The Collateral Manager."

10                             FFNY03\ISAACLA\NORMAL\154068 03

# RISK FACTORS

An investment in the Class B-2 Notes involves certain risks. Prospective investors should carefully consider the following factors, in addition to the matters set forth elsewhere in this Offering Memorandum, prior to investing in the Class B-2 Notes.

Limited Recourse. The Class B-2 Notes will be limited recourse obligations of the Issuer, payable solely from amounts received on the Debt Securities and certain other assets of the Issuer. In connection with the issuance of the Class B-2 Notes, the Issuer will enter into an indenture with United States Trust Company of New York, as trustee, and MBIA pursuant to which the Class B-2 Notes will be secured by the Debt Securities and certain other collateral. The Class B-2 Notes are fully subordinated to the Class A Notes in respect of payment and the Class B-2 Notes and the Class A Notes are subordinated to the payment of certain fees payable by the Issuer. The Issuer will have no substantial assets other than the Debt Securities, the Class B-1 Collateral and other collateral securing the Notes.

Subordination of the Class B-2 Notes. The Class B-2 Notes are fully subordinated to (i) the Class A Notes in respect of principal and interest payments thereon, (ii) Hedge Counterparties in respect of amounts due under Hedge Agreements, (iii) MBIA in respect of the semi-annual premium due to MBIA and (iv) to the payment of certain fees and expenses payable by the Issuer. The use by the Issuer of payments received on (including proceeds from the sale of) the Debt Securities and short-term investments for the payments on the Class B-2 Notes will be made only to the extent sufficient funds are available therefor after the use of such payments (and proceeds) for the required payments on the Class A Notes, the payment of the fees and expenses of the Issuer, and the satisfaction of certain financial tests described herein. In addition, in the case of an Event of Default (as hereinafter defined) under the Indenture, as long as any Class A Notes are outstanding, the Controlling Beneficiary may liquidate the assets of the Issuer as described in the Indenture. Liquidation of the assets of the Issuer at such time or remedies pursued by the Controlling Beneficiary, as the case may be, could be adverse to the interests of the holders of the Class B-2 Notes. Once such an Event of Default and acceleration have occurred, holders of the Class B-2 Notes are not entitled to be paid until the Class A Notes have been paid in full in cash. If the holders of the Class B-2 Notes are improperly paid, they will be required to return such sums to the Trustee. The rights of the holders of the Class B-2 Notes with respect to the Issuer's assets will be subject to the prior claims of the Class A Notes and may be subject to the claims of other creditors of the Issuer which are entitled to priority as a matter of law or by virtue of such creditors' nonconsensual liens on the assets of the Issuer.

No Rating or Insurance of the Class B-2 Notes. The Class B-2 Notes will not be rated by any credit rating agency and will not be insured or guaranteed by any person.

Limited Liquidity. There is currently a limited market for the Class B-2 Notes. Consequently, a purchaser must be prepared to hold the Class B-2 Notes for an indefinite period of time or until Stated Maturity.

Nature of Collateral; Defaults. The Collateral is subject to credit, liquidity and interest rate risks. The market value of the Collateral will generally fluctuate in response to,

among other things, market interest rates, general economic conditions, the condition of certain financial markets and the financial condition of the obligors. It is expected that substantially all of the Debt Securities pledged to secure the Notes will be U.S. dollar denominated emerging markets bonds and loans rated below investment grade, which have greater credit and liquidity risk than investment grade sovereign or corporate bonds or loans. To the extent that a default occurs with respect to any Debt Security securing the Notes and the Trustee sells or otherwise disposes of such Debt Security, it is not likely that the proceeds of such sale or disposition will be equal to the unpaid principal and interest thereon. The composition of the Collateral may vary considerably over time.

Special Risks Associated with Investments in Emerging Markets. Investments in emerging markets bonds and loans involve certain special risks related to regional economic conditions and sovereign risks which are not normally associated with investments in the securities of United States issuers, including: (1) risks associated with political and economic uncertainty, including the risk of nationalization or expropriation of assets and the risk of war and revolution; (2) fluctuations of currency exchange rates (i.e., the cost of converting foreign currency into U.S. dollars); (3) lower levels of disclosure and regulation in foreign securities markets than in the United States; (4) confiscatory taxation, taxation of income earned in foreign nations or other taxes or restrictions imposed with respect to investments in foreign nations; (5) economic and political risks including potential foreign exchange controls (which may include suspension of the ability to transfer currency from a given country and repatriation of investments); and (6) uncertainties as to the status, interpretation and application of laws. In addition, there is often less publicly available information about foreign issuers than those in the United States. Foreign issuers are not generally subject to uniform accounting, auditing and financial reporting standards, and auditing practices and requirements may not be comparable to those applicable to U.S. companies. See "Emerging Markets Obligations."

Emerging markets bonds and loans are generally unsecured and may be subordinated to certain other obligations of the issuer thereof. Many of such securities have lower ratings than comparable U.S. securities, reflecting a greater possibility that adverse changes in the financial condition of an issuer or in general economic conditions or both may impair the ability of the issuer to make payments of principal and interest. Such investments may be speculative.

Economic and Political Risks. The economies of individual emerging markets countries may differ favorably or unfavorably from the U.S. economy in such respects as growth of gross domestic product, rate of inflation, volatility of currency exchange rates, depreciation, capital reinvestment, resource self-sufficiency and balance of payments position. Governments of many emerging markets countries have exercised and continue to exercise substantial influence over many aspects of the private sector. In some cases, the Government owns or controls many companies, including some of the largest in the country. Accordingly, government actions could have a significant effect on economic conditions in an emerging markets country and on market conditions, prices and yields of the Debt Securities. Moreover, the economies of developing countries generally are heavily dependent upon international trade and, accordingly, have been and may continue to be adversely affected by trade barriers, exchange controls, managed adjustments in relative currency values and other protectionist measures imposed or

12

negotiated by the countries with which they trade. These economies also have been and may continue to be adversely affected by economic conditions in the countries with which they trade. With respect to any emerging markets country, there is the possibility of nationalization, expropriation or confiscatory taxation, political changes, government regulation, economic or social instability or diplomatic developments (including war) which could affect adversely the economies of such countries or the value of the Debt Securities purchased from issuers in those countries. It also may be difficult to obtain and enforce a judgment relating to emerging markets Debt Securities in a court outside of the United States.

Average Life and Prepayment Considerations. The stated maturity of the Class B-2 Notes is April 10, 2015 (the "Stated Maturity"); however, the average life of the Class B-2 Notes is expected to be shorter than the number of years until Stated Maturity. Based on the Expected Portfolio as described under "Maturity and Prepayment Considerations" herein and assuming (i) payment of all scheduled amortization payments due in respect of the Debt Securities, (ii) no defaults occur in respect of any Debt Security and (iii) no optional redemptions are made on the Debt Securities, the average life of the Class B-2 Notes would be approximately 13.83 years. See "Maturity and Prepayment Considerations."

The approximations in the preceding paragraph are not predictive; in fact the average life of the Class B-2 Notes will be affected by the financial condition of the issuers of the underlying Debt Securities and the characteristics of such securities, including the existence and frequency of exercise of any optional redemption, mandatory prepayment or sinking fund features, the prevailing level of interest rates, the redemption price, the actual default rate and the actual level of recoveries on any Defaulted Securities, the frequency of tender or exchange offers for the Debt Securities and any sales of Debt Securities. See "Maturity and Prepayment Considerations" and "Security for the Notes—Substitute Securities and Reinvestment Criteria."

Redemption of Class A Notes. The Class A Notes may be redeemed by the Issuer at the direction of the Controlling Beneficiary (so long as it is MBIA) under the circumstances described under "Description of the Class B-2 Notes—Optional Redemption." Upon any such redemption of Class A Notes, Collateral may be sold (including by way of termination of Hedge Agreements) in order to pay the redemption price of Class A Notes. No assurance can be given as to whether any amounts will be available following any such sale and redemption of Class A Notes for the payment of any amounts in respect of the Class B-2 Notes. Neither the Issuer nor the Controlling Beneficiary shall be required to take into account the interests of the Class B-2 Noteholders in effecting any such sale of Collateral or redemption of Class A Notes.

Premium due to MBIA. As described under "—Subordination of the Class B-2 Notes" above, the Class B-1 Notes are subordinated to, among other things, the payment due to MBIA of the premium payments due to MBIA in respect of the insurance policies made by MBIA for the benefit of the holders of the Class A Notes and the Swap Counterparty. No amounts will be paid in respect of the Class B-2 Notes on any Payment Date until premium payments as well as any other amounts due to MBIA under such insurance policies have been paid. See "Description of the Class B-2 Notes—Priority of Payments." The premium payments due to MBIA will vary depending upon the amount of Class A Notes as are, from time to time, outstanding. See "Description of the Insurance Policy."

13

Floating Rate Note Interest Rate Risk; Fixed Rate Debt Securities. The Class A Notes will bear interest at a rate based on six-month LIBOR (as defined herein). The Collateral Manager expects that approximately 21.8% (in par amount) of the initial Debt Securities will constitute debt securities that bear interest based on LIBOR and approximately 78.2% of the Debt Securities will constitute Debt Securities that will be entitled to fixed rate interest payments. Although it is expected that the Interest Rate Swap Transaction will be used to exchange fixed rate payments for a LIBOR floating rate payment (in respect of a notional amount approximately equal to the expected principal amount of the Class A Notes), under certain circumstances a fixed/floating rate mismatch between the Class A Notes and the underlying Debt Securities may exist. The percentage of Debt Securities at any time that bear interest based on LIBOR is a function of the defaults, credit performance and substitutions in respect of the Collateral Portfolio. This mismatch may occur as a result of, among other things, the early amortization or redemption of the Debt Securities or defaults in respect of the Debt Securities. Such mismatch may adversely affect the Issuer's ability to pay amounts due in respect of the Notes. In addition, although the Cap Rate Transaction is intended to provide a hedge against increasing interest rates, no assurance can be provided as to whether such Cap Rate Transaction will, in fact provide an adequate hedge in certain interest rate environments. See "The Swap Agreement."

No Gross-Up. In the event that any withholding tax is imposed on payments of principal or interest on the Class B-2 Notes, the holders of the Class B-2 Notes will not be entitled to receive grossed-up amounts to compensate for such withholding tax.

Certain Conflicts of Interest. Various potential and actual conflicts of interest may arise from the overall investment activity of the Collateral Manager and its affiliates. The following briefly summarizes some of these conflicts, but is not intended to be an exhaustive list of all such conflicts. The Collateral Manager and its affiliates may invest in securities that would be appropriate as security for the Notes. Such investments may be different from those made on behalf of the Issuer. The Collateral Manager and its affiliates may also have ongoing relationships with companies whose securities are pledged to secure the Notes and may own equity securities issued by issuers of Debt Securities. In addition, affiliates and clients of the Collateral Manager may invest in securities that are senior to, or have interests different from or adverse to, the securities that are pledged to secure the Notes. In addition, the Collateral Manager may serve as a general partner and/or manager of limited partnerships or other limited liability companies organized to issue collateralized bond obligations secured by emerging markets bonds and loans. The Collateral Manager may at certain times be simultaneously seeking to purchase investments for the Issuer and any similar entity for which it serves as manager in the future, or for its clients or affiliates.

The Collateral Manager, on behalf of the Issuer, may also from time to time purchase securities from or sell securities to the Initial Purchaser or other affiliates of the Collateral Manager. The Issuer will deal with the Collateral Manager and affiliates of the Collateral Manager on an arm's length basis and anticipates that the commissions, mark-ups and mark-downs charged by the Collateral Manager or its affiliates will generally be competitive, although the Collateral Manager and its affiliates may have interests in such transactions that are

14

adverse to those of the Issuer, such as an interest in obtaining favorable commission rates, mark-ups and mark-downs.

It is expected that, upon the original issuance of the Debt Securities, the Initial Purchaser will have placed or underwritten certain of the Debt Securities and will have provided investment banking services and other services to issuers of Debt Securities. From time to time the Collateral Manager may purchase or sell Debt Securities through the Initial Purchaser or one or more of its affiliates. It is the intention of the Collateral Manager that all Debt Securities will be purchased by the Issuer on terms prevailing in the market. See "The Collateral Manager."

Control of Controlling Beneficiary. Under the Indenture, certain actions which are permitted to be taken by the Issuer or the Collateral Manager will be taken only at the direction, or with the prior consent, of the Controlling Beneficiary. Under the Indenture, MBIA will act as the Controlling Beneficiary unless at the time any determination is to be made by the Controlling Beneficiary an MBIA Default (as such term is defined under "Description of Class B Notes—Events of Default") has occurred and is then continuing. If such MBIA Default has occurred and is then continuing, the Trustee, acting at the direction of the holders of a majority in aggregate principal amount of the Controlling Class then outstanding, will be the Controlling Beneficiary under the Indenture. The Controlling Beneficiary is not required to act, and it is not expected that Controlling Beneficiary would act, in the interests of the holders of Class B Notes. The interests of the Controlling Beneficiary could be adverse to the interests of the holders of Class B Notes.

Participations in Loans. A portion of the Collateral Portfolio may be sovereign loans acquired through assignment or participations, subject to certain limits set forth in the Indenture. In purchasing participations, the Issuer will usually have a contractual relationship only with the selling institution, and not the borrower. The Issuer generally will have no right directly to enforce compliance by the borrower with the terms of the loan agreement, nor any rights of set-off against the borrower, nor have the right to object to certain changes to the loan agreement agreed to by the selling institution. The Issuer may not directly benefit from the collateral supporting the related loan and may be subject to any rights of set-off the borrower has against the selling institution.

The Issuer will not purchase a participation from a selling institution that at the time of purchase does not itself retain any portion of the Sovereign Loan. However, such selling institution may not retain an interest in such Sovereign Loan in the future and, therefore, may have limited interest in monitoring the terms of the loan agreement and the continuing credit worthiness of the Borrower.

In addition, in the event of the insolvency of the selling institution, under the laws of the United States of America and the States thereof the Issuer may be treated as a general creditor of such selling institution, and may not have any exclusive or senior claim with respect to the selling institution's interest in, or the collateral with respect to, the loan. Consequently, the Issuer may be subject to the credit risk of the selling institution as well as of the borrower. Neither the Issuer nor the Collateral Manager has performed independent credit analyses of the selling institutions.

FFNY03:ISAACLA:NORMAL\154068.03

Certain of the loans or loan participations may be governed by the law of a jurisdiction other than a United States jurisdiction. The Issuer is unable to provide any information with respect to the risks associated with purchasing a participation under an agreement governed by the laws of the jurisdiction other than the United States, including characterization under such laws of such participation or sub-participation in the event of the insolvency of the institution from whom the Issuer purchases such participation or sub-participation or the insolvency of the institution from whom the grantor of the sub-participation purchased its participation.

## DESCRIPTION OF THE CLASS B-2 NOTES

The Class B-2 Notes will be issued pursuant to the Indenture. The following summary describes certain provisions of the Class B-2 Notes and the Indenture. The summary does not purport to be complete and is subject to, and qualified in its entirety by reference to, the provisions of the Indenture. Copies of the Indenture will be available for inspection at the office of the Paying Agent in Luxembourg.

### Status and Security

The Class B-2 Notes will be junior in right of payment on each Payment Date to the payment of amounts due in respect of (i) the Class A Notes, (ii) the Hedge Agreements, (iii) the semi-annual premium due to MBIA and (iv) other required payments and expenses as described herein. See "—Priority of Payments."

Under the terms of the Indenture, the Issuer will grant to the Trustee a first priority perfected security interest in certain collateral to secure the Issuer's obligations under the Indenture and the Notes in favor of the Trustee, in its individual capacity, and the holders of the Notes. Each Hedge Counterparty, MBIA and the Trustee will also have a security interest in the Collateral. The security interest of (i) the Swap Counterparty and any other Hedge Counterparty will secure the Issuer's obligations to the Swap Counterparty and any other Hedge Counterparty under the Swap Agreement and any other Hedge Agreement, (ii) MBIA will secure the Issuer's obligation to MBIA under the Indenture and the Insurance Agreement and (iii) the Trustee will secure the Issuer's obligation to the Trustee under the Indenture. The Collateral will consist of (a) the Debt Securities that are delivered to the Trustee on the Closing Date or in the future, and all payments thereon or with respect thereto, (b) the Issuer's rights under the Collateral Management Agreement, (c) the Issuer's rights under the Swap Agreement, (d) the Issuer's rights under any other Hedge Agreements delivered to the Trustee pursuant to the terms of the Indenture, (e) the Collection Account, including, without limitation, Eligible Investments purchased with funds on deposit therein, and all income from the investment of funds therein and (f) all proceeds of the foregoing.

Payments on the Notes will be made in accordance with the priorities described under "—Priority of Payments" herein. The aggregate amount that will be available for payment on the Notes and of certain expenses of the Issuer on any Payment Date will be the sum of (i) the total amount of payments and collections in respect of the Collateral (including Sale Proceeds) received during the period (a "Due Period") ending on the fifth Business Day prior to such

Payment Date (or April 10, 2015, in the case of the Class B Note Maturity Date (as defined below)) and commencing immediately following the fifth Business Day prior to the preceding Payment Date (or on the Closing Date (as defined herein), in the case of the Due Period relating to the first Payment Date) and not reinvested in Substitute Debt Securities (as defined herein) or retained in the Collection Account for subsequent reinvestment and (ii) any such amounts received in prior Due Periods that were not disbursed on a previous Payment Date.

The Class B-1 Notes will be deemed to have a principal amount of U.S.$20,000,000 for purposes of making certain calculations set forth in the Indenture, including the calculation of the Class B Note Redemption Floor Amount and determining the pro rata allocation of payments to be made in respect of the Class B-1 Notes and Class B-2 Notes.

Under the Indenture, certain actions which are permitted to be taken by the Issuer or the Collateral Manager will be taken only at the direction, or with the prior consent, of the Controlling Beneficiary. Under the Indenture, MBIA will act as the Controlling Beneficiary unless at the time any determination is to be made by the Controlling Beneficiary a MBIA Default (as such term is defined under "—Events of Default") has occurred and is then continuing. If such MBIA Default has occurred and is then continuing, the Trustee will be the Controlling Beneficiary under the Indenture.

The Class B-1 Notes will be separately secured by the Class B-1 Collateral. Neither the Trustee, the Class A Noteholders, the Class B-2 Noteholders nor any of the secured parties under the Indenture shall have any rights in or to the Class B-1 Collateral.

**Subordination**

Anything in the Indenture or the Notes to the contrary notwithstanding, under the Indenture the Issuer and the Holders of the Class B-2 Notes agree for the benefit of the Holders of the Class A Notes, MBIA, the Trustee and any other person entitled to payment prior to the Holders of Class B-2 Notes (collectively, the "Senior Interests") that the Class B-2 Notes and the Issuer's rights in and to the Collateral (the "Subordinate Interests") shall be subordinate and junior to the Class A Notes and the rights of all other Secured Parties and any other person entitled to payment prior to the Holders of the Class B-2 Notes to the extent and in the manner set forth in the Indenture. If any Event of Default has not been cured or waived and acceleration occurs in accordance with the Indenture, the Class A Notes shall be paid in full before any further payment or distribution is made on account of the Subordinate Interests. The Holders of the Class B-2 Notes agree, for the benefit of the Holders of the Class A Notes, not to cause the filing of a petition in bankruptcy against the Issuer for failure to pay to them amounts due under the Class B-2 Notes.

In the event that notwithstanding the provisions of the Indenture, any holder of any Subordinate Interests shall have received any payment or distribution in respect of such Subordinate Interests contrary to the provisions of the Indenture, then, unless and until the Class A Notes shall have been paid in full, such payment or distribution shall be received and held in trust for the benefit of, and shall forthwith be paid over and delivered to, the Trustee, which shall pay and deliver the same to the Holders of Class A Notes, in accordance with the Indenture;

FFNY03\ISAACLA\NORMAL\154068.03

provided, however, that, if any such payment or distribution is made other than in cash, it shall be held by the Trustee as part of the Collateral and subject in all respects to the provisions of the Indenture.

Each Holder of Subordinate Interests agrees with all Holders of Senior Interests that such Holder of Subordinate Interests shall not demand, accept, or receive any payment or distribution in respect of such Subordinate Interests in violation of the provisions of the Indenture; provided, however, that after the Class A Notes have been paid in full, the Holders of Subordinate Interests shall be fully subrogated to the rights of the Holders of the Class A Notes.

So long as any Class A Notes remain outstanding, to the extent it may lawfully do so, each Class B-2 Noteholder by its acceptance of a Class B-2 Note:

    (a)    agrees that it will not step up, plead, claim or in any manner whatsoever take advantage of, any appraisement, valuation, stay, extension or redemption laws, now or hereafter in force in any jurisdiction, which may delay, prevent or otherwise hinder (i) the performance, enforcement or foreclosure of the Indenture, (ii) the sale of any of the Collateral, or (iii) the putting of the purchaser or purchasers thereof into possession of such property immediately after the sale thereof;

    (b)    waives all benefit or advantage of any such laws;

    (c)    waives and releases all rights to have the Collateral marshalled upon any foreclosure, sale or other enforcement of the Indenture; and

    (d)    consents and agrees that, subject to the terms of the Indenture, all the Collateral may at any such sale be sold by the Trustee as an entirety.

## Interest

Payment of interest on the Class B-2 Notes will be junior to the payment of interest and principal on the Class A Notes.

The Class B-2 Notes will receive as interest only any Excess Interest received on the Debt Securities. Interest on the Class B Notes will be payable, to the extent funds are available therefor, semi-annually in arrears on April 10 and October 10 of each year, commencing October 10, 1997, or, if any such day is not a Business Day, the next succeeding Business Day (each, a "Payment Date") and at maturity. See "-Priority of Payments."

## Principal

No Principal Proceeds will be distributed in respect of the Class B-2 Notes during the Reinvestment Period. The Class B Notes are subordinated to the Class A Notes and payments due to MBIA, except in connection with a concurrent repayment in full of the Class A Notes, no Principal Proceeds will be distributed in respect of the Class B-2 Notes until the Class A Notes are repaid or otherwise paid in full.

The Class B-2 Notes will mature at par on April 10, 2015 (the "Class B Note Maturity Date") unless repaid earlier as described herein. The average life of the Class B-2 Notes is expected to be shorter than the number of years until Stated Maturity for the Class B-2 Notes. See "Risk Factors—Average Life and Prepayment Considerations" and "Maturity and Prepayment Considerations." Any distribution of Principal Proceeds in respect of the Class B-2 Notes will be made by the Trustee on a pro rata basis among the Class B Notes according to the respective Aggregate Face Amounts of such Class B Notes.

After the Reinvestment Period, Principal Proceeds in respect of the Class B-2 Notes will be payable in accordance with the priorities set forth under "—Priority of Payments."

The "Reinvestment Period" will commence on the Closing Date and continue through and including the earlier of (i) April 10, 2002, (ii) the Measurement Date (as defined herein) on which either of the Coverage Tests are not satisfied (provided if the Coverage Tests are subsequently satisfied the Reinvestment Period shall be reinstated) or (iii) any Measurement Date on which the Standard & Poor's Collateral Quality Test fails to be satisfied. In addition, under certain circumstances as set forth in "Security for the Notes—Substitute Securities and Reinvestment Criteria" MBIA shall have the right (so long as no MBIA Default shall have occurred and be continuing) during the Reinvestment Period to direct the purchase of any Debt Security. With respect to any Payment Date that does not occur during the Reinvestment Period, Interest Proceeds and Principal Proceeds will be used to redeem Class A Notes in accordance with the priorities set forth under "—Priority of Payments."

On any Payment Date on which either of the Coverage Tests was not met on the last day of the immediately preceding Due Period (as defined herein) (the "Determination Date"), Interest Proceeds and Principal Proceeds will be used to redeem Class A Notes in accordance with the priorities set forth under "—Priority of Payments" until the Coverage Tests are satisfied.

**Optional Redemption**

Optional Redemption at the Direction of Class B Noteholders

The Class A Notes may be redeemed in whole by the Issuer, at the direction of the holders of at least 66 2/3%, by principal amount, of the Class B Notes from Sale Proceeds and all other funds in the Collection Account on any Class A Note Call Date. The Class A Notes and the Class B Notes may, subject to certain conditions described below, be simultaneously redeemed in part by the Issuer from Sale Proceeds on any Class A Note Call Date, at the direction of one or more holders of the Class B Notes holding in the aggregate not less than $3,000,000, in principal amount, of Class B Notes. If Class A Notes are redeemed, such Class A Notes will be redeemed at a redemption price of 100% of the principal amount of the Class A Notes to be redeemed, plus accrued interest thereon. If Class B Notes are partially redeemed, such Class B Notes will be redeemed at a price equal to the Sale Proceeds of the Debt Securities sold in connection with such redemption minus the redemption price of the Class A Notes to be redeemed. In the event of a simultaneous partial redemption of the Notes, the holders of the Class B Notes directing such redemption will specify the principal amount of the Class B Notes to be redeemed, which shall not be less than $3,000,000, and the Class B Notes to be redeemed

will be all or a portion of the Class B Notes held by such holders. So long as any Class A Notes are outstanding, the aggregate principal amount of the Class B Notes, after giving effect to such redemption, shall not be less than the Class B Note Redemption Floor Amount. The "Class B Note Redemption Floor Amount" shall be $10,000,000; provided, however, for purposes of the calculation thereof, the Class B-1 Notes shall be deemed to have a principal amount of $20,000,000.

No Class A Notes may be redeemed at the direction of the holders of the Class B Notes unless the Issuer has received the written consent of MBIA, which consent shall not be unreasonably withheld. In determining whether to withhold its consent to any redemption of Class A Notes, MBIA shall act in a commercially reasonable manner and may (i) take into account its obligations provided for under the Insurance Policy and (ii) withhold its consent if in the sole judgment of MBIA, security or collateral protection afforded to MBIA or the Class A Noteholders would be adversely affected, or it could be required to make a payment under the Insurance Policy as a result of such redemption.

A holder of Class B Notes that elects to direct a simultaneous partial redemption of the Notes must provide written notice of its intention to direct such redemption to the Principal Paying Agent. The Principal Paying Agent will then notify Bear, Stearns International Limited ("Bear Stearns") at its address at One Canada Square, London E14 5AD, England, Attention: Derivatives/Structured Products and MBIA. Upon receipt of notice from the Issuer or the Trustee, Bear Stearns or an affiliate will have the right to make an offer to purchase such holder's Class B Notes, either as principal or agent. In the event Bear Stearns and its affiliates decline to make an offer or do not make an offer within five days of Bear Stearns' receipt of such notice of intention and in the event that MBIA has consented to the simultaneous partial redemption of the Notes, the holder may proceed to direct the Issuer to effect such redemption by giving written notice of redemption (which shall recite that notice was given to Bear Stearns and the date such notice was given) to the Issuer (with copies to the Trustee and the Collateral Manager). The notice of redemption shall be irrevocable once given. In the event Bear Stearns or an affiliate makes an offer, the holder may, at its option proceed to direct the Issuer to effect such redemption as set forth above or may respond to the offer by Bear Stearns or such affiliate and negotiate the terms of a purchase of such holder's Class B Notes.

The Partial Redemption Percentage applicable to the Class A Notes and the Class B Notes in the case of a simultaneous partial redemption of the Notes will be equal to the principal amount of the Class B Notes being redeemed divided by the aggregate principal amount of all Class B Notes outstanding. In any event, the Collateral Manager, in its discretion, will direct the Trustee to sell Debt Securities; provided that the Sale Proceeds therefrom and all other funds in the Collection Account (after the payment of any amounts due to all Hedge Counterparties as described below) will be at least sufficient to redeem the Class A Notes in whole or, in the case of a partial redemption, that the Sale Proceeds therefrom will be at least sufficient to pay principal on the Class A Notes and, if applicable, the Class B Notes based on the Partial Redemption Percentage of the applicable Class of Notes, in accordance with the procedures described under "Redemption Procedures" below; and provided, further, that such Sale Proceeds are used, to the extent necessary, to make such a redemption.

FFNY03\ISAACLA\NORMAL\154068.03

No redemption of Class A Notes will occur at the direction of Class B Noteholders unless the Sale Proceeds to be applied in respect thereof are sufficient to pay in full (i) the principal amount of, plus accrued interest on, the Class A Notes to be redeemed, (ii) all amounts due to any Hedge Counterparty under any Hedge Agreement on or prior to such date of redemption or as a result of such redemption and (iii) any Accrued Liabilities owing to MBIA (so long as it is the Controlling Beneficiary).

The Debt Securities to be sold in connection with a partial redemption will be equal to the Partial Redemption Percentage of the aggregate market value of the Debt Securities and the amounts and Eligible Investments in the Collection Account, (determined by the Collateral Manager on the seventh Business Day prior to the scheduled redemption date). On the date the market value determination is made, the Collateral Manager will, in its sole discretion, select the Debt Securities to be sold; provided that, to the extent practicable, the Collateral will be sold pro rata based on the principal balances of the Collateral. The Sale Proceeds will be applied pro rata to the repayment of the Partial Redemption Percentage of the principal of each outstanding Class A Note and, thereafter, will be applied to the redemption of the Class B Notes to be redeemed, if any.

"Sale Proceeds" are all proceeds (including accrued interest) received with respect to Debt Securities as a result of sales of such Debt Securities (including Equity Securities) pursuant to the Indenture, net of or inclusive of, as appropriate, termination or settlement payments paid or received in respect of any Hedge Agreement terminated in connection with such sales, in each case, net of any reasonable amounts expended by the Collateral Manager or the Trustee in connection with such sale, disposition, termination or settlement.

<u>Optional Redemption of Class A Notes by Issuer</u>

In addition to those circumstances under which the Class A Notes may be redeemed in whole or part at the direction of Class B Noteholders, the Class A Notes will be subject to redemption at the option of the Issuer at the direction of the Controlling Beneficiary (so long as it is MBIA) under the circumstances described below:

Outstanding Class A Notes may be redeemed on any Payment Date in whole but not in part, if it is determined by independent legal counsel selected by the Trustee and acceptable to the Controlling Beneficiary that (i) (a) the Issuer, or interest or other amounts payable on or with respect to the Collateral, the Swap Agreement or any Hedge Agreement will be subject to taxes imposed by the United States, the Cayman Islands or any other jurisdiction and such taxes, after taking into account gross up amounts available to the Issuer, result in an inability to make payments on the Class A Notes on a materially timely basis, (b) interest payments on the Class A Notes are subject to withholding tax (other than "backup withholding" as defined in the Code or any similar withholding), (c) payments under the Insurance Policy are subject to withholding tax (other than "backup withholding" as described in the Code or other similar withholding tax) or (d) the Class A Notes are not treated as indebtedness of the Issuer for United States federal tax purposes and (ii) if a substitution for, or relocation of, the Issuer in accordance with the Indenture, a substitution of a different counterparty or item of Collateral or

other reasonable measures would fail to remedy any such result, at a redemption price equal to 100% of the principal amount of the Class A Notes plus accrued interest thereon.

Redemption Procedures. Notice of redemption will be given to the Noteholders in accordance with the Indenture. Notice of a simultaneous partial redemption of the Notes will be given by the Trustee to Moody's and Standard & Poor's not less than 20 days prior to the scheduled redemption date. Class A Notes called for redemption must be surrendered at the office of the Trustee or Paying Agent (each, a "Paying Agent") appointed under the Indenture in order to receive the redemption price.

The Class A Notes shall not be optionally redeemed unless (1) with respect to a redemption in whole or in part, at least seven Business Days before the scheduled redemption date, the Collateral Manager shall have furnished to the Trustee and MBIA evidence, in form reasonably satisfactory to the Trustee and MBIA, that the Collateral Manager on behalf of the Issuer has entered into a binding agreement or agreements with a financial institution or institutions whose short-term unsecured debt obligations have a credit rating of at least "P-1" and of at least "A-1" from Moody's and Standard & Poor's, respectively, to purchase, not later than the Business Day immediately preceding the scheduled redemption date in immediately available funds, all or part of the Debt Securities at a purchase price at least equal to an amount sufficient, together with the Eligible Investments maturing on or prior to the scheduled redemption date to pay all administrative and other fees and expenses payable under "—Priority of Payments" prior to the payment of the Class A Notes and to redeem the Class A Notes on the scheduled redemption date at the appropriate redemption price, together with all accrued interest to the date of redemption or to pay principal on the Class A Notes and, if applicable, the Class B Notes based on the Partial Redemption Percentage of the applicable class of Notes, and (2) with respect to a redemption in whole, prior to selling any Debt Securities and/or Eligible Investments, the Collateral Manager shall certify that the expected proceeds from such sale would equal (a) at least 110% of the sum of (i) the principal amount of the outstanding Class A Notes and (ii) all administrative and other fees and expenses payable under "—Priority of Payments" prior to the payment of the Class A Notes, if the Debt Securities and/or Eligible Investments are to be sold within five Business Days after such certification or (b) at least 125% of the sum of clauses (i) and (ii) above if the Debt Securities and/or Eligible Investments are to be sold more than five but within ten Business Days after such certification.

Any such notice of redemption may be withdrawn by the Issuer up to the sixth Business Day prior to the scheduled redemption date by written notice to the Trustee, the Principal Paying Agent, MBIA and the Collateral Manager only if the Collateral Manager shall be unable to deliver such sale agreement or agreements or certifications, as the case may be, in form reasonably satisfactory to the Trustee and MBIA. In addition, in the event the rating on the Class A Notes has been reduced or withdrawn prior to the seventh Business Day before the scheduled redemption date with respect to a simultaneous partial redemption of the Notes, the Issuer will promptly withdraw such notice of redemption by written notice to the Trustee, the Principal Paying Agent and the Collateral Manager. No redemption of Class A Notes will occur at the direction of Class B Noteholders unless the Sale Proceeds to be applied in respect thereof are sufficient to pay in full the principal amount of plus accrued interest on the Class A Notes to be redeemed.

**Mandatory Redemption**

On any Payment Date on which either of the Coverage Tests (as described under "Security for the Notes—The Coverage Tests") was not met on the immediately preceding Determination Date, Interest Proceeds and Principal Proceeds will be used to redeem Class A Notes in accordance with the priorities described under "—Priority of Payments," until each such Coverage Test is satisfied. See "—Priority of Payments."

**Cancellation**

All Class B Notes that are redeemed or paid and surrendered for cancellation as described herein will forthwith be canceled and may not be reissued or resold.

**Payments**

Payments on the Global Notes

Payments of principal of and interest on the Global Notes (as defined below) will be made against presentation of and, in the case of payment in full of principal and interest, surrender of, the temporary or permanent global Class B-2 Note (in either case, the "Global Note") and, in the case of any other payment, endorsement of the Global Note at the specified office of the Principal Paying Agent located outside of the United States. Payments of principal and interest on the Global Notes shall be made by check drawn on, or, at the option of the holder, by wire transfer to an account maintained by the payee with a bank outside the United States. A record of each payment made, distinguishing between any payment of principal and any payment of interest, will be made on the Global Note by the Paying Agent to which the Global Note was presented for the purpose of making such payment, and such record shall be *prima facie* evidence that the payment in question has been made. Payments of principal and interest in respect of the Global Notes will be made only outside the United States. If a Payment Date for the Global Notes occurs while such Notes are represented by a Temporary Global Note, the related interest payment will be made against presentation of the Temporary Global Note outside the United States and its possessions only to the extent that certification of non-U.S. beneficial ownership (in the form set out in the Temporary Global Note) has been received by Euroclear or Cedel Bank. Payments of principal or interest (if any) with respect to a Permanent Global Note will be made through the Euroclear Operator and Cedel Bank against presentation or surrender, as the case may be, of the Permanent Global Note outside of the United States and its possessions without any requirement for further certification. Payments of principal with respect to definitive Notes, if any, will be made against surrender of definitive Notes and payments of interest with respect to the definitive Notes will be made against surrender of coupons, in each case at the specified office of any Paying Agent outside the United States and its possessions.

Each of the persons shown in the records of Euroclear or Cedel Bank as the holder of a Global Note (an "Accountholder") must look solely to Euroclear or, as the case may be, Cedel Bank, for his share of each payment so made by the Issuer to the bearer of the Global Note (for so long as the Global Notes remain represented by a Global Note), subject to and in accordance with the respective rules and procedures of Euroclear or, as the case may be, Cedel

FFNY03\ISAACLA\NORMAL\154068.03

Bank. The Accountholders shall have no claim directly against the Issuer in respect of payments due on the Global Notes for so long as the Global Notes remain represented by a global Note and the Issuer will be discharged by payment to the bearer of the global Note in respect of each amount so paid. Payments of principal of and interest on the Global Notes will be subject in all cases to any fiscal or other laws and regulations applicable thereto.

### Payments on the Registered Notes

Payments of principal of and interest on the Class B-2 Registered Notes shall be made by U.S. Dollar check drawn by the Principal Paying Agent (or other Paying Agent, as the case may be) on an account maintained by it and mailed from outside the United States to the holder of such Class B-2 Registered Note as its name appears in the Note Register or by wire transfer, if directed by such Holder, from an account maintained by it located outside of the United States (subject to usual and necessary banking procedures regarding United States Dollar denominated accounts) to the account credit of a U.S. Dollar account maintained by such Noteholder with a bank located outside the United States or subject in all cases to any tax, fiscal or other laws or regulations applicable in the place of payment if the holder shall have provided wiring instructions in writing to the Paying Agent on or before the related Record Date.

If the payments due in respect of the Global Notes at Stated Maturity on any Payment Date are due on a day that is not a Business Day, then payment will not be made until the next succeeding Business Day with the same force and effect as if made on the date for payment, and no interest will accrue for the period from or after that day.

"Business Day" means a day other than a Saturday or a Sunday or any other day on which commercial banks are authorized or required by law, regulation or executive order to be closed in New York, New York or London, England or Luxembourg.

The Luxembourg Stock Exchange will be informed of the principal amounts outstanding of the Notes following each Payment Date and if the Class A Notes do not receive scheduled payments of principal or interest on a Payment Date.

For so long as the Class B-2 Notes are listed on the Luxembourg Stock Exchange and the rules of such exchange shall so require, the Issuer will have a paying agent and transfer agent in Luxembourg.

**Priority of Payments**

### Interest Proceeds

"Interest Proceeds" shall mean, with respect to each Due Period and without duplication, the sum of: (i) all payments of interest collected on each item of Collateral during such Due Period; (ii) all payments of accrued interest to the extent included in Sale Proceeds (excluding Sale Proceeds received in respect of Defaulted Securities) which were received during such Due Period and not utilized in connection with a redemption or substitution; (iii) all payments of interest (including any amount representing the accreted portion of a discount from the face amount of an Eligible Investment) collected on each Eligible Investment in the

FFNY03\ISAACLA\NORMAL\154068.03

Collection Account during such Due Period and all payments of principal collected on each Eligible Investment purchased with amounts in the Interest Collection Subaccount in the Collection Account during such Due Period; (iv) the positive difference, if any, between all periodic payments collected during such Due Period under any Hedge Agreement in effect during such Due Period minus all periodic payments due and payable by the Issuer during such Due Period under any such Hedge Agreement; (v) all prepayment penalties or late payment fees collected on Collateral during such Due Period; (vi) all fees and commissions received in connection with amendments or waivers with respect to the Collateral or the administration or restructuring of Collateral during such Due Period and (vii) all other payments received on the Collateral not included in Principal Proceeds.

Distribution of Interest Proceeds

On each Payment Date, Interest Proceeds received with respect to the related Due Period will be distributed in the following order of priority:

(i)     to the payment to the Issuer of any Issuer Expenses (as defined herein);

(ii)    to the payment to the Trustee of the Trustee Fees (as defined herein) up to an amount equal to the sum of (a) $8,250 and (b) the greater of (x) .00875% of the Principal Balance of the Debt Securities and Eligible Investments and the amount of cash outstanding at the beginning of such Due Period and (y) $14,000 per annum;

(iii)   to the payment of Administrative Expenses (as defined herein) up to an amount equal to $10,000 per annum;

(iv)    to the payment to the Collateral Manager of the Senior Collateral Management Fee (as defined herein) due on such Payment Date;

(v)     to the payment, on a pro rata basis to (a) MBIA for the payment of premium, if any, due under the Insurance Agreement and (b) the net payment of any Scheduled Swap Amounts (as defined herein) due and payable by the Issuer under any Hedge Agreements on such Payment Date (such amounts shall be paid pro rata if Interest Proceeds remaining are insufficient to pay such amounts in full);

(vi)    to the payment of accrued and unpaid interest on the Class A Notes;

(vii)   to MBIA to the extent of any due and unpaid Accrued Liabilities;

(viii)  in the event the Class A Par Value Test or the Class A Interest Coverage Test is not satisfied on the related Measurement Date to repay the Class A Notes, in whole or in part, to the extent necessary to cause the Class A Par Value Test or the Class A Interest Coverage Test, as applicable, to be met;

25

--

(ix)    to the payment to the Trustee of Trustee Fees (to the extent that MBIA (so long as it is the Controlling Beneficiary) has consented in writing to such payment (which consent shall not be unreasonably withheld)) to the extent not paid under clause (ii) above;

(x)    to the payment to the Collateral Manager for payment of the Subordinated Collateral Management Fee;

(xi)    to the payment to the Collateral Manager of any accrued and unpaid Collateral Management Fee and any other amounts owed to the Collateral Manager under the Collateral Management Agreement to the extent not paid in (x) above;

(xii)    to the payment on a pro rata basis (to the extent not paid in clauses (i) or (iii) above and to the extent that MBIA (so long as it is the Controlling Beneficiary) has consented in writing to such payment (which consent shall not be unreasonably withheld)) to (a) the Issuer of Issuer Expenses and (b) the Issuer or Administrator of Administrative Expenses; and

(xiii)    the balance of Interest Proceeds remaining after application of amounts described in clauses (i) to (xii) above (such balance of Interest Proceeds, "Excess Interest") will be, on a pro rata basis, paid as interest on the Class B Notes; provided, however, no distribution shall be made under this clause (xiii) if and to the extent either of the Coverage Tests would not be satisfied following such distribution.

"Administrative Expenses" means all expenses reasonably required to be incurred by or on behalf of the Issuer (including, without limitation, fees and expenses payable to its administrator, registered office fees, Cayman Islands Government annual return and filing fees and any legal, accounting or other professional fees and expenses).

"Issuer Expenses" means all withholding taxes, stamp taxes or other taxes, fees and assessments levied against the Collateral or payable by the Issuer, including, but not limited to, the annual return fee and filing fees payable by the Issuer in the Cayman Islands.

"Scheduled Swap Amounts" means (i) if an MBIA Default shall have occurred and be continuing or if MBIA shall have directed the termination of a Hedge Agreement, all amounts due and payable by the Issuer under any Hedge Agreements during the period in which such Payment Date occurs or (ii) if no MBIA Default shall have occurred or be continuing and MBIA shall not have directed the termination of a Hedge Agreement, (A) all scheduled payments due and payable by the Issuer under any Hedge Agreement on such Payment Date (such scheduled payments being pursuant to Section 2(a) of an ISDA Master Agreement or similar analogous provision) and (B) all other amounts insured by MBIA under the Swap Insurance Policy.

"Trustee Fees" means all compensation and indemnification payable to the Trustee under the terms of the Indenture and all expenses reasonably required to be incurred by or on behalf of the Trustee under the terms of the Indenture.

– Principal Proceeds

"Principal Proceeds" shall mean with respect to any Due Period, without duplication, (i) all proceeds from the sale of the Notes not applied to purchase the Expected Portfolio; (ii) all payments or collections of principal of each item of the Collateral received during such Due Period (including any payment or collection of premium); (iii) all payments of principal collected on each Eligible Investment purchased with amounts in the Principal Collection Subaccount (excluding any amount representing the accreted portion of a discount from the face amount of an Eligible Investment) in the Collection Account during such Due Period; (iv) all settlement payments collected under any Hedge Agreement, less all settlement payments payable by the Issuer under any Hedge Agreement during such Due Period; (v) all other fees and commissions (not constituting Interest Proceeds) received in connection with the purchase or sale of Collateral and (vi) all Sale Proceeds received during such Due Period except as reinvested as provided for in "Security for the Notes—Substitute Securities and Reinvestment Criteria" and except as provided in the definition of "Interest Proceeds" (excluding prepayment penalties, late penalties and accrued interest).

Distribution of Principal Proceeds

On each Payment Date, Principal Proceeds with respect to the related Due Period will be distributed in the following order of priority:

(i)     to the payment of the amounts referred to in clauses (i) to (vii) and (ix) of "Distribution of Interest Proceeds" above in the same order of priority specified therein, but only to the extent not paid in full thereunder;

(ii)    during the Reinvestment Period, if the Class A Par Value Test or the Class A Interest Coverage Test is not satisfied on the related Measurement Date and to the extent the application of Interest Proceeds for such purpose in accordance with the procedures set out in "Distribution of Interest Proceeds" above is insufficient, to repay the Class A Notes, in whole or in part, to the extent necessary to cause the Class A Par Value test or the Class A Interest Coverage Test, as applicable, to be met;

(iii)   after the Reinvestment Period, to the payment of principal on the Class A Notes until the Class A Notes have been paid in full;

(iv)    to the payment of any other amount then owed to any Hedge Counterparty;

(v)     to the Collateral Manager for the payment of any accrued and unpaid Collateral Management Fee and any other amounts due under the Collateral Management Agreement, if any, to the extent that such

27

remaining Collateral Management Fee and other amounts have not already been paid in full after the application of available Interest Proceeds;

(vi)    to the payment of any accrued and unpaid Administrative Expenses and Issuer Expenses (to be payable on a pro rata basis), if any, to the extent that such expenses have not already been paid in full after the application of available Interest Proceeds;

(vii)    during the Reinvestment Period, to the purchase of additional Debt Securities or to the Collection Account for investment in additional Debt Securities at a later date in accordance with the Reinvestment Criteria; and

(viii)    after the Reinvestment Period, to the holders of the Class B Notes.

<u>Payments on the Class B Notes</u>

Except as set forth below, all payments on the Class B Notes will be paid pro rata to each of the Class B-1 Notes and Class B-2 Notes in accordance with their respective Aggregate Face Amounts.

<u>Distribution of the Class B-1 Collateral</u>

In connection with the earlier to occur of (x) the final payment of any Excess Interest in respect of any Class B-1 Note, whether as a result of the redemption or maturity of such Class B-1 Note or otherwise or (y) the Stated Maturity of the Class B-1 Notes, each Class B-1 Noteholder shall be entitled to direct the Trustee to and the Trustee shall either (x) liquidate on behalf of such Class B-1 Noteholder or (y) subject to all relevant laws and regulations, distribute to such Class B-1 Noteholder, such Class B-1 Noteholder's pro rata portion of the Class B-1 Collateral, such pro rata portion being based on the Aggregate Face Amount of the Class B-1 Notes held by such Class B-1 Noteholder to the Aggregate Face Amount of all Class B-1 Notes.

If the Class B-1 Collateral is to be liquidated as directed by such Class B-1 Noteholder, the Trustee shall obtain prices from three dealers making a market in the Class B-1 Collateral or, if fewer such dealers are so making a market in the Class B-1 Collateral, from as many of such dealers as are so making a market. If no dealers are making a market in the Class B-1 Collateral, the Trustee shall obtain prices in respect of the Class B-1 Collateral from dealers or traders quoting such prices. The Trustee shall accept such price quotations in respect of the Class B-1 Collateral as, after consultation with the Collateral Manager, would realize the greatest liquidation value in respect of the Class B-1 Collateral. In the absence of the Trustee's bad faith or gross negligence, the Trustee shall not be responsible for obtaining the best price for such Class B-1 Collateral and shall be fully protected in relying upon the price quotations obtained in accordance with the Indenture.

None of the Trustee, the Class A Noteholders, the Class B-2 Noteholders or any other secured party under the Indenture shall have any rights in or to the Class B-1 Collateral.

28

No Gross Up

All payments of principal and interest by the Issuer on the Class B-2 Notes will be made without withholding or deduction for, or on account of, any present or future taxes, duties, assessments or governmental charges of whatever nature imposed or levied by or on behalf of the jurisdiction of incorporation of the Issuer or any political subdivision thereof or any authority therein or thereof having power to tax unless the withholding or deduction of such taxes, duties, assessments or governmental charges is required by law. If any such withholding or deduction is required, the Issuer will not be obligated to pay any additional amounts in respect of such withholding or deduction.

## Form, Denomination and Registration of the Class B-2 Notes

The Class B-2 Notes offered hereby will be represented initially by a single global note (the "Temporary Global Note") in bearer form, without interest coupons attached. Title to the Temporary Global Note will pass by delivery. Upon deposit of the Temporary Global Note with the Common Depositary for the Euroclear Operator and Cedel Bank, the Euroclear Operator and Cedel Bank will credit each subscriber with a principal amount thereof for which such subscriber has subscribed and paid. Interests in the Temporary Global Note may be exchanged for interests in a permanent global note (the "Permanent Global Note" and, together with the Temporary Global Note, the "Global Notes") not earlier than the date 40 days after the Closing Date upon certification (in the manner provided for in the Indenture) that the beneficial owner of such Global Notes is not a United States person. Interests in the Temporary Global Note must be exchanged for interests in the Permanent Global Note before interest payments in relation thereto can be collected, unless exchange for interests in the Permanent Global Note is improperly withheld. The Permanent Global Note will be exchangeable in its entirety for definitive Class B-2 Notes upon the demand of any Class B-2 Noteholder. No definitive Class B-2 Note delivered in exchange for a portion of the Permanent Global Note shall be mailed or otherwise delivered to any location in the United States in connection with such exchange.

For so long as the Class B-2 Notes are represented by a Global Note, (i) Class B-2 Notes will be transferable in accordance with the rules and procedures for the time being of Euroclear or Cedel Bank as appropriate and (ii) each person who is for the time being shown in the records of Euroclear or Cedel Bank as the holder of a particular principal amount outstanding of the Class B-2 Notes (other than each such clearing system to the extent that it is an account holder with the other clearing system for the purpose of operating the "bridge" between them) shall be treated by the Issuer, the Principal Paying Agent and the Trustee as the holder of such principal amount outstanding of Class B-2 Notes (and the expression "Noteholder" shall be construed accordingly) for all purposes other than with respect to the payment of principal of and interest on the Class B-2 Notes, the right to which shall be vested, as against the Issuer and the Trustee, solely in the bearer of the Global Note in accordance with and subject to its terms.

Temporary and Permanent Global Class B-2 Notes and definitive Class B-2 Notes (if any) will be issued in bearer form only. The following legend will appear on all Class B-2 Global Notes, definitive Class B-2 Notes (if any), and any interest coupons:

"Any United States person (as defined in the Internal Revenue Code of the United States) who holds this obligation will be subject to limitations under the United States income tax laws, including the limitations provided in sections 165(j) and 1287(a) of the Internal Revenue Code of the United States."

The sections of the Internal Revenue Code of the United States referred to above provide that United States holders, with certain exceptions, will not be entitled to deduct any loss on Notes or coupons and will not be entitled to capital gains treatment of any gain on any sale, disposition or payment of principal with respect to Notes or coupons.

The Class B-2 Notes may be sold in the United States only to Accredited Investors who purchase such Notes for their own account or for the account of an Accredited Investor and in reliance on the exemption provided for in Regulation D. The Class B-2 Notes sold to Accredited Investors will be represented by one or more notes in definitive, fully registered form without interest coupons (each, a "Class B-2 Registered Note"). A Class B-2 Registered Note may be transferred only upon receipt by the Trustee of a written certification from the transferee to the effect that the transferee is a Accredited Investor in a transaction meeting the requirements of Regulation D and in accordance with any applicable securities laws of any State of the United States or any other jurisdiction and in compliance with the 1940 Act. See "Transfer Restrictions."

Any beneficial interest in a Global Note that is transferred to a person who takes delivery in the form of a Class B-2 Registered Note will, upon transfer, cease to be an interest in such Global Note and become an interest in the Class B-2 Registered Note and, accordingly, will thereafter be subject to all transfer restrictions and other procedures applicable to interests in a Class B-2 Registered Note for as long as it remains such an interest.

**The Indenture**

The following summary describes certain provisions of the Indenture. The summary does not purport to be complete and is subject to, and qualified in its entirety by reference to, the provisions of the Indenture.

<u>Events of Default</u>

The Indenture provides that any of the following shall be an event constituting an "Indenture Default":

(a)    a default shall occur and shall continue for a period of three Business Days in the payment of any interest, principal or Additional Amounts due in respect of Notes of the Controlling Class;

(b)    the Issuer fails to perform or observe any of its other obligations under the Indenture or the Insurance Agreement and such failure continues for a period of 10 Business Days after the Issuer shall have received notice of such failure;

(c)    an order is made or an effective resolution is passed for the winding up of the Issuer except a winding up for the purpose of a merger, reconstruction or amalgamation in accordance with the requirements therefor in the Indenture;

(d)    an involuntary case or proceeding is initiated against the Issuer under any applicable liquidation, insolvency, bankruptcy, rehabilitation, composition, reorganization, conservation or other similar law now or hereafter in effect ("Insolvency Law"), including presentation to the court of an application for an administration order, or seeking the appointment of a curator, administrative receiver, custodian, rehabilitation, liquidation, sequestration, conservation or other receiver, administrator, assignee or trustee in bankruptcy or liquidation or other similar official ("Bankruptcy Custodian") in relation to the Issuer or to the whole or any substantial part of the undertaking or assets of the Issuer, or a Bankruptcy Custodian is appointed in relation to the Issuer or in relation to the whole or any substantial part of the undertaking or assets of the Issuer or an encumbrancer takes possession or execution or other process is levied or enforced upon or sued out against the whole or any substantial part of the undertaking or assets of the Issuer; or if the Issuer initiates or consents to any case or judicial proceeding relating to itself or its assets under any applicable Insolvency Law, makes a conveyance or assignment for the benefit of its creditors generally, admits in writing its inability to pay its debts generally as they become due or takes corporate action in furtherance of any such action;

(e)    the Issuer shall be required to register as an "investment company" under the Investment Company Act of 1940, as amended;

(f)    the imposition of taxes, governmental fees, assessments or other charges on the Issuer in an aggregate amount in any 12 month period in excess of US$5,000,000;

(g)    notification to remove the Collateral Manager is provided in accordance with the Collateral Management Agreement and no replacement Collateral Manager has succeeded to the obligations of the Collateral Manager under the Collateral Management Agreement within 60 days following such notification;

(h)    any representation or warranty made by the Issuer in the Insurance Agreement, the Administration Agreement, the Indenture, the Collateral Management Agreement, and the Swap Agreement (collectively, the "Transaction Documents") shall prove to be false or incorrect in any material respect and the Issuer fails to remedy the same within 30 Business Days of the date of receipt of the notice thereof as specified in the Indenture; or

(i)    the occurrence of an "Event of Default" under the Swap Agreement as to which the Issuer is the "Defaulting Party" (as such term is defined in the Swap Agreement).

An "MBIA Default" shall be any of the following events listed below:

31

FFNY03\USAACLA\NORMAL\154068.03

(a)     default is made by MBIA for a period of three days or more in the payment of any amount due under the Insurance Policy in accordance with its terms;

(b)     any of the following occurs and the Issuer fails to replace MBIA on terms and conditions satisfactory to the holders of a majority of the aggregate outstanding principal amount of Class A Notes within 30 days of the occurrence of such event:

(i)     an involuntary case or other proceeding is commenced or a petition is filed against MBIA in a court having jurisdiction in the premises seeking liquidation, rehabilitation, reorganization, conservation or other relief with respect to its debts under any Insolvency Law or seeking the appointment of a Bankruptcy Custodian of MBIA or of all or substantially all of its property and such case, proceeding or petition has not been dismissed or stayed within 60 days of commencement or filing or (ii) an order for relief or any order or decree appointing a Bankruptcy Custodian of MBIA or of all or substantially all of its property shall be entered in respect of MBIA or of all or substantially all of its property under any Insolvency Law by a court having jurisdiction in the premises; or

(ii)    a voluntary case or other proceeding is commenced by MBIA seeking liquidation, rehabilitation, reorganization, conservation or other relief with respect to its debts under any Insolvency Law, or seeking the appointment of a Bankruptcy Custodian of MBIA or of all or substantially all of its property, or MBIA consents to any such relief or the taking possession by any such official in an involuntary case or other proceeding commenced against MBIA, or a petition or answer or consent is filed by MBIA seeking liquidation, rehabilitation, reorganization, conservation or other relief under any applicable Insolvency Law, or MBIA makes a general assignment for the benefit of creditors, admits in writing its inability to pay its debts generally as they become due, or takes corporate action in furtherance of any such action.

A "Simultaneous Default" shall be the occurrence of an Indenture Default at any time at which a MBIA Default has occurred and is continuing or vice versa. A Simultaneous Default shall be deemed to continue at any time when both an Indenture Default and a MBIA Default shall be continuing. An "Automatic Default" shall be an Indenture Default specified in clauses (c) or (d) of the definition thereof. An "Event of Default" shall be the occurrence of an Indenture Default or an MBIA Default.

At any time after any Indenture Default the Trustee shall (i) so long as no Simultaneous Default shall have occurred and be continuing, at the direction of MBIA or (ii) in the event that a Simultaneous Default shall have occurred and be continuing, at the direction of the holders of a majority in principal amount of the Notes of the Controlling Class, declare on written notice to the Issuer the aggregate outstanding amount of all the Notes to be immediately due and payable, and upon any such declaration, such principal, together with all accrued and unpaid interest thereon, and other amounts payable hereunder, shall automatically become

FFNY03\SAACLA\NORMAL\154068.03

immediately due and payable in accordance with the "Priority of Payments." If an Automatic Default shall have occurred and be continuing, all unpaid principal, together with all accrued and unpaid interest thereon, of all of the Notes, and other amounts payable under the Indenture, shall automatically become due and payable provided that such acceleration shall not result in an acceleration of payments under the Insurance Policy other that at the sole option of MBIA.

After an Event of Default, if no Simultaneous Default shall have occurred and be continuing, the Trustee shall invest or dispose of Collateral solely as directed by the Controlling Beneficiary. After an Event of Default, if a Simultaneous Default shall have occurred and be continuing, the Trustee shall at the direction of the holders of 66 2/3% in principal amount of the Notes of the Controlling Class invest or dispose of Collateral as directed by such holders. Upon the acceleration of the Class A Notes, the Trustee shall, at the direction of the Controlling Beneficiary, institute proceedings to enforce the rights of the Trustee with respect to the Collateral, including without limitation to foreclose upon the Collateral or sell the Collateral under a decree of court or courts of competent jurisdiction, and may in its discretion take any other action of a secured party as permitted by the laws of the State of New York. The liability of the Issuer to the Noteholders, MBIA, the Collateral Manager, the Trustee and the Hedge Counterparties under or in relation to the Notes, the Indenture, the Insurance Agreement, the Indemnification Agreement, the Collateral Management Agreement and the Hedge Agreements is limited in recourse to the Collateral. Following realization of the Collateral, no further steps may be taken against the Issuer or any of its other assets to recover any sums still unpaid, which shall be extinguished. In particular, neither the Trustee, any Noteholder, MBIA, the Collateral Manager nor any Hedge Counterparty shall be entitled to petition or take any other steps for the winding up of the Issuer. Except as described below under this heading, the Trustee will have no right of enforcement against the Collateral unless and until the Notes have been accelerated. The Trustee shall not be bound to institute any such proceedings or take any such other action unless (i) with respect to an acceleration of the Class A Notes at the direction of the Controlling Beneficiary (so long as it is MBIA), it shall have been directed to accelerate the Class A Notes and to take such actions and institute such proceedings by the Controlling Beneficiary (so long as it is MBIA) in accordance with and subject to the preconditions to acceleration described above, (ii) with respect to an acceleration of the Class A Notes pursuant to a Simultaneous Default, it shall have been so requested by a resolution of the Class A Noteholders or in writing by the holders of a majority in outstanding principal balance of the Class A Notes then outstanding, and (iii) it shall have been provided security or indemnity to its reasonable satisfaction.

In the case of an MBIA Default or Simultaneous Default, the Trustee shall institute proceedings or take such other action to enforce the obligations of MBIA under the Insurance Policy as the holders of a majority in outstanding principal balance of the Controlling Class shall direct. However, the terms of the Insurance Policy will not provide for accelerated payment by MBIA upon acceleration of the Class A Notes or in the event of a MBIA Default or any other breach of the terms of the Insurance Policy. The Trustee will also be entitled, with the consent or at the direction of the Controlling Beneficiary, to enforce any rights against the obligor in respect of any of the Collateral, including causing the termination of any Hedge Agreements.

No Noteholder shall be entitled to institute proceedings or take other action directly against the Issuer, MBIA or the Collateral unless the Trustee, having become bound so to act, fails to do so within a reasonable time and such failure is continuing.

Under the Indenture, MBIA and the Trustee have agreed, and each Noteholder by its acceptance of a Note will be deemed to have agreed, not to take any action or institute any proceeding against the Issuer under any Insolvency Law applicable to the Issuer or which would be likely to cause the Issuer to be subject to, or to seek the protection of, any such Insolvency Law; provided that MBIA, the Trustee and the Noteholders may become parties to and participate in any proceeding or action under any such Insolvency Law that is initiated by any person other than one of its affiliates. The Issuer has covenanted under the Indenture not to seek the protection of any Insolvency Law applicable to it.

In the case of an acceleration of the Class A Notes and a liquidation of the Collateral, the proceeds of such liquidation will be applied in accordance with the priority of distributions set forth under "—Priority of Payments—Distribution of Principal Proceeds."

Notwithstanding the occurrence of an Event of Default, payments shall be made to the Class B-1 Noteholders in accordance with "Distributions of the Class B-1 Collateral" and none of the secured parties under the Indenture shall have any right to impair, restrict or otherwise prevent the payment of such amounts to the holders of the Class B-1 Notes in accordance with "—Priority of Payments—Distributions of the Class B-1 Collateral."

<u>Covenants</u>

The Indenture contains covenants on the part of the Issuer which provide, inter alia, that so long as any of the Notes remain outstanding and except as otherwise permitted under the Indenture or the Collateral Management Agreement, the Issuer shall not without the prior written consent of MBIA (unless an MBIA Default shall have occurred and be continuing and if so, of the Controlling Beneficiary), among other things, (i) sell, convey, transfer or grant any rights in respect of any of the Collateral to any other person, permit to exist any lien, security interest or other charge or encumbrance upon or with respect to any of the Collateral except for certain liens permitted under the Indenture, take any other action in connection with any of the Collateral, including (but not limited to) any amendment of, or any consent to any waiver of rights or to any other action under or in respect of the Collateral; (ii) engage in any business or undertake any activity or incur any indebtedness otherwise than in compliance with, or as contemplated by, or for purposes incidental to, the Notes, any other Transaction Document (as defined herein) or any Hedge Agreement, (iii) make or declare any dividends or other distributions to the holders of any of its shares (upon redemption or otherwise), except for up to $2,000 per annum; (iv) have any subsidiaries; (v) amend, supplement or otherwise modify its Memorandum and Articles of Association, Certificate of Incorporation or any of the Transaction Documents or waive any breach or proposed breach of any provision of the Transaction Documents or give any consent thereunder; (vi) sell, transfer, exchange or otherwise grant any rights in or dispose of any of its assets except as provided in the Indenture; (vii) dissolve or liquidate; (viii) merge or consolidate except as described in the Indenture; (ix) terminate the appointment of the Collateral Manager or the Custodian or agree to the appointment of any sub-

FFNY03\ISAACLA\NORMAL\154068.03

custodian; (x) permit the validity or effectiveness of the Notes or the Insurance Agreement, the Administration Agreement, the Indenture, the Collateral Management Agreement, or any Hedge Agreement to be impaired, or permit the lien of the Indenture to be amended, hypothecated, subordinated, terminated or discharged; (xi) take any action to permit the lien of the Indenture not to constitute a valid first priority perfected security interest in the Debt Securities as provided therein, (xii) take any action, or fail to take any action, if such action or failure to take action may interfere with the enforcement of any rights relating to any of the Debt Securities that relate to or affect the rights, benefits or obligations of MBIA under the Indenture, the Insurance Agreement or the Insurance Policy; (xiii) except as otherwise expressly permitted by the Indenture, waive or alter any rights under any of the Debt Securities (or any agreement or instrument relating thereto); (xiv) take any action, or fail to take any action, if such action or failure to take action may interfere with the enforcement of any rights of MBIA and the Trustee under the agreements or instruments relating to any of the Collateral; (xv) fail to pay any tax, assessment, charge or fee with respect to the Debt Securities, or fail to defend any action, if such failure to pay or defend may adversely affect the priority or enforceability of the lien over the Debt Securities created by the Indenture; (xvi) establish or maintain an office or other fixed place of business in the United States; (xvii) take any action in furtherance of, or indicating its consent to, approval of, or acquiescence in, any of the acts set forth above; or (xviii) acquire any of the Notes in open market transactions.

In addition the Issuer shall take all actions, and shall direct the Trustee to take all actions, necessary to preserve and protect a first priority security interest in the Collateral, including, but not limited to, the removal and transfer of any such Collateral from any existing location or jurisdiction to another location or jurisdiction so as to prevent the impairment of the security interest in such Collateral created by the Indenture.

<u>Notices</u>

*Notices Regarding the Global Notes*

All notices regarding the Global Notes will be deemed duly given if published once in an Authorized Newspaper and, so long as the Global Notes are listed on the Luxembourg Stock Exchange and the rules of the Luxembourg Stock Exchange so require, a daily newspaper of general circulation in Luxembourg (which is expected to be the *Luxemburger Wort*) or, if in the opinion of the Trustee or the Principal Paying Agent publication in such manner is not practicable, notices will be deemed duly given if published in such other leading English language daily newspaper(s) with general circulation in Western Europe as the Trustee may approve. Any such notice shall be deemed to have been given on the date of such publication or, if published more than once or upon different dates, on the date of the first such publication.

So long as the Class B-2 Notes are represented by a Global Note and such Global Note is held on behalf of a clearing system, notices to Class B-2 Noteholders may be given by delivery of the relevant notice to that clearing system for communication by it to entitled account holders in substitution for publication except that so long as the Class B-2 Notes are listed on the Luxembourg Stock Exchange and the rules of that Exchange so require, notices shall also be

published in a leading newspaper having general circulation in Luxembourg (which is expected to be the *Luxemburger Wort*).

*Notices Regarding the Registered Notes*

All notices to holders of the Class B Registered Notes shall be given by first class mail, postage prepaid to the registered holders of such Class B Registered Notes at their address appearing in the Note Register.

Prescription

Claims for payment of principal and interest will not be enforceable unless the Notes are presented for payment within a period of ten years from the payment dates relating thereto.

Modification of Indenture

With the consent of the holders of not less than a majority, in aggregate principal amount, of the outstanding Notes of each Class adversely affected thereby, the Trustee and the Issuer may execute a supplemental indenture to add provisions to, or change in any manner or eliminate any provisions of, the Indenture or modify in any manner the rights of the holders of the Notes of such Class. The Trustee may, consistent with the written advice of counsel, determine whether or not the holders of Notes would be affected by such change (after giving notice of such change to the holders of Notes). Such determination shall be conclusive and binding on all present and future holders.

The Collateral Manager will not be bound by any amendment to the Indenture that affects the obligations of the Collateral Manager unless the Collateral Manager has consented thereto (which consent will not be unreasonably withheld).

Without the consent of the holders of each outstanding Note affected, however, no supplemental indenture may (i) change the Stated Maturity of the principal of or the due date of any installment of interest on Notes, reduce the principal amount thereof or the rate of interest thereon, change the provisions of the Indenture relating to the application of proceeds of any Collateral to the payment of principal of or interest on Notes or change any place where, or the coin or currency in which, Notes or the principal thereof or interest thereon is payable, or impair the right to institute suit for the enforcement of any such payment on or after the Stated Maturity thereof, (ii) reduce the percentage in aggregate principal amount of holders of Notes of each Class whose consent is required for the authorization of any supplemental indenture or for any waiver of compliance with certain provisions of the Indenture or certain defaults thereunder or their consequences, (iii) impair or adversely affect the Collateral except as otherwise permitted by the Indenture, (iv) permit the creation of any lien ranking prior to or on a parity with the lien of the Indenture with respect to any part of the Collateral or terminate such lien on any property at any time subject thereto or deprive the holder of any Note of the security afforded by the lien of the Indenture, (v) reduce the percentage of holders of Notes of each Class whose consent is required to request the Trustee to preserve the Collateral or rescind the Trustee's election to

36

preserve the Collateral or to sell or liquidate the Collateral pursuant to the Indenture, (vi) modify any of the provisions of the Indenture with respect to supplemental indentures except to increase the percentage of outstanding Notes whose holders' consent is required for any such action or to provide that other provisions of the Indenture cannot be modified or waived without the consent of the holder of each outstanding Note affected thereby, (vii) modify the definition of the term "Outstanding" or the priority of payments set forth in the Indenture, (viii) release MBIA from all or any part of its obligation to make each and every payment under the Insurance Policy, or (ix) modify any of the provisions of the Indenture in such a manner as to affect the calculation of the amount of any payment of interest or principal on any Note on any Payment Date or to affect the right of the holders of Notes to the benefit of any provisions for the redemption of such Notes contained therein; provided, however, that no supplemental indenture may reduce the permitted minimum denominations of the Notes.

The Issuer, MBIA and the Trustee may also enter into supplemental indentures, without obtaining the consent of holders of the Notes, in order to, among other things, (i) evidence the succession of any person to the Issuer and the assumption by any such successor of the covenants of the Issuer in the Notes and the Indenture, (ii) add to the covenants of the Issuer or the Trustee for the benefit of the holders of the Notes or to surrender any right or power conferred upon the Issuer, (iii) convey, transfer, assign, mortgage or pledge any property to or with the Trustee, or add to the conditions, limitations or restrictions on the authorized amount, terms and purposes of the issue, authentication and delivery of the Notes, (iv) evidence and provide for the acceptance of appointment by a successor trustee and to add to or change any of the provisions of the Indenture as shall be necessary to facilitate the administration of the trusts under the Indenture by more than one Trustee, (v) correct or amplify the description of any property at any time subject to the lien of the Indenture, or to better assure, convey and confirm unto the Trustee any property subject or required to be subject to the lien of the Indenture (including, without limitation, any and all actions necessary or desirable as a result of changes in law or regulations) or subject to the lien of the Indenture any additional property, (vi) otherwise correct any inconsistency or cure any ambiguity or (vii) take any action necessary or advisable to prevent the Issuer or the Trustee from becoming subject to any withholding or other taxes, fees or assessments or to reduce the risk that the Issuer will be engaged in a United States trade or business or otherwise subject to United States income tax on a net income basis; provided that in any such case, (i) such supplemental indenture would not cause the rating on the Class A Notes to be reduced or withdrawn and (ii) notice is given to the holders of the Notes as provided for in the Indenture. In addition, no supplemental indenture shall be entered into without the consent of holders of the Notes if such supplemental indenture would have a material adverse effect (as evidenced by an officer's certificate of the Issuer) on any Notes.

The Indenture provides that no amendment to or modification of, or waiver or authorization of any breach or proposed breach of, any Class A Notes or any provision of the Indenture shall be of any effect unless MBIA consents thereto (unless a MBIA Default has occurred and is then continuing).

Substitution

Subject as provided in the Indenture, the Trustee may agree with the Issuer and MBIA (so long as it is the Controlling Beneficiary), without the consent of the Noteholders, to the substitution of any other company in place of the Issuer as the principal debtor under the Indenture and the Class A Notes. The Trustee shall agree with the Issuer and MBIA (if it is the Controlling Beneficiary) as to such substitution, and such substitution shall be effected if the Controlling Beneficiary so directs, in the event that MBIA (if it is the Controlling Beneficiary) reasonably believes that such substitution would have the result of avoiding the imposition of, or the lessening of, any present or future tax (including but not limited to any withholding tax) assessment or other governmental charge on the Issuer, the Collateral or the Notes. Such Substitution shall be subject to the relevant provisions of the Indenture and to such amendments thereto and such other conditions as the Trustee may require.

Any such substitution shall be binding on the Noteholders and, unless the Trustee agrees otherwise, the Noteholders shall be given notice of any such substitution not later than 15 days thereafter. In connection with any proposed substitution as aforesaid, the Trustee shall not have regard to the consequences of such substitution for individual Noteholders resulting from their being for any purpose domiciled or resident in, or otherwise connected with, or subject to the jurisdiction of, any particular state, country or territory.

Purchase of Notes

The Issuer may acquire Notes, in open market or privately negotiated transactions, or otherwise and without restrictions as to price, all as set forth in the Indenture, including without limitation, the requirement that after giving effect to such purchase, the Coverage Tests and the Collateral Quality Test will be satisfied.

Consolidation, Merger or Transfer of Assets

Except under the limited circumstances set forth in the Indenture, the Issuer may not consolidate with, merge into, or transfer or convey all or substantially all of its assets to, any other corporation, partnership, trust or other person or entity.

Petitions for Bankruptcy

The Indenture will provide that the secured parties thereunder may not petition or take any other step toward the Issuer or cause the Issuer to petition for bankruptcy or winding up.

Satisfaction and Discharge of the Indenture

The Indenture will be discharged with respect to the Collateral securing the Notes upon delivery to the Trustee for cancellation of all of the Notes, or, within certain limitations (including the obligation to pay principal and interest), upon deposit with the Trustee of funds sufficient for the payment or redemption thereof and the payment by the Issuer of all other amounts due under the Indenture including, but not limited to, payment to MBIA of all amounts owed to it.

Trustee

United States Trust Company of New York will be the Trustee under the Indenture for the Notes. The Issuer may maintain other banking relationships in the ordinary course of business with the Trustee. The payment of the fees and expenses of the Trustee relating to the Notes is solely the obligation of the Issuer. The Trustee and/or its affiliates may receive compensation in connection with the Trustee's investment of trust assets in certain Eligible Investments as provided in the Indenture.

The Indenture contains provisions for the indemnification of the Trustee for any loss, liability or expense incurred without negligence, willful misconduct or bad faith on its part, arising out of or in connection with the acceptance or administration of the Indenture.

Governing Law

The Indenture and the Notes will be governed by, and construed in accordance with, the laws of the State of New York.

## USE OF PROCEEDS

The proceeds from the sale of the Notes, after the payment of applicable fees and expenses, are expected to be approximately $263,000,000 and will be available to purchase the Debt Securities, the Class B-1 Collateral and to pay the Swap Counterparty amounts due to the Swap Counterparty in respect of the Swap Agreement. The net proceeds of the Offering hereunder and the net proceeds from the sale of the Class A Notes and a portion of the net proceeds from the sale of the Class B-1 Notes will be used by the Issuer to purchase a diversified portfolio of Debt Securities consisting, at the time of acquisition of such portfolio, of approximately $308,000,000 (in outstanding principal amount) of U.S. dollar denominated emerging markets bonds and loans satisfying the investment criteria described herein. A portion of the proceeds of the offering of the Class B-1 Notes will be used to purchase the Class B-1 Collateral (which collateral will not be available for any payments in respect of the Class A Notes or the Class B-2 Notes). Any offering proceeds not invested in Debt Securities by the Effective Date will be deposited by the Trustee in the Collection Account as described herein and will be distributed as Principal Proceeds on the next succeeding Payment Date. See "Security for the Notes."

## SECURITY FOR THE NOTES

The composition of the Debt Securities will be determined by the selections of the Collateral Manager designed to meet the Collateral Quality Test, the Coverage Tests and the Reinvestment Criteria (as defined herein).

Debt Securities

The Collateral Manager expects that, by the Closing Date, the Issuer will have purchased, or entered into agreements to purchase the Expected Portfolio of Debt Securities. To the extent that the Issuer is unable to purchase, or enter into agreements to purchase, any of the

Expected Portfolio by the Closing Date, the Issuer will have the Ramp-Up Period to purchase such Debt Securities, subject to the restrictions described below.

The Ramp-Up Period will continue for 30 days from the Closing Date unless terminated prior to such time by the Collateral Manager. If, at any time prior to the Closing Date or during the Ramp-Up Period, the Issuer determines that a Debt Security included in the Expected Portfolio should not or cannot be purchased for any reason (an "Unavailable Debt Security") then the Issuer must purchase one or more other Debt Securities (each, a "Replacement Debt Security"); provided, however, that after giving effect to the purchase of the Replacement Debt Securities, the Debt Securities included in the Expected Portfolio which are actually purchased, together with such Replacement Debt Securities, would meet the Collateral Quality Test, the Coverage Tests and the criteria set forth in the last paragraph of this "Debt Securities" section; provided, further, the aggregate Principal Balance of all Unavailable Debt Securities shall not exceed 10% of the aggregate Principal Balance of the Expected Portfolio. See "—The Collateral Quality Test" and "—The Coverage Tests " In addition, Replacement Debt Securities must meet the following criteria: (i) have a final maturity date equal to or earlier than the first Payment Date following the maturity date of the Unavailable Debt Security, in the case of an Unavailable Debt Security on which 100% of the principal payments occur on its final maturity date, (ii) a weighted average life, at the next Payment Date, equal to or shorter than that of the Unavailable Debt Security, in the case of an Unavailable Debt Security on which the principal balance is amortized and (iii) (a) if the Unavailable Debt Security bore interest pursuant to a floating rate, then the Replacement Debt Security must (1) bear interest pursuant to a floating rate which rate must have a current margin which is greater than or equal to the margin of the Unavailable Debt Security, and (2) be of equal or greater par amount, (b) if the Unavailable Debt Security bore interest at a fixed rate, then the Replacement Debt Security (1) may bear interest at either a fixed rate which is greater than or equal to the rate of the Unavailable Debt Security or at a floating rate and (2) must be of equal or greater par amount or (c) must have been selected by the Collateral Manager in a manner consistent with the maintenance of the original rating on the Class A Notes. In the event that the Issuer is unable to purchase any of the Debt Securities in the Expected Portfolio and is similarly unable to purchase Replacement Debt Securities meeting these criteria during the Ramp-Up Period, then the uninvested portion of the net proceeds of the Offerings of the Notes will be invested in Eligible Investments and distributed as Principal Proceeds on the next succeeding Payment Date.

The Business Day following the end of the Ramp-Up Period shall be the "Effective Date," unless the Issuer is able to purchase the entire portfolio of Debt Securities prior to the expiration of the Ramp-Up Period, in which case, the Collateral Manager shall declare the Effective Date as set forth in the Indenture.

A security meeting the standards set forth below, whether pledged to the Trustee on the Closing Date or during the Ramp-Up Period or acquired in addition to or substitution for securities previously pledged (a "Substitute Debt Security") will constitute a Debt Security. A Debt Security will be eligible for purchase by the Issuer and pledged to the Trustee if it is a bond issued by a sovereign issuer or a non-sovereign issuer that is not an affiliate of the Issuer or a loan issued by a sovereign issuer, in each case that was issued by an issuer in (I) the countries of Central America and South America and the Dominican Republic (excluding the countries of the

Caribbean Basin) ("Latin America"), (II) the countries of Asia and the Pacific Basin ("Asia"), (III) the countries of Africa and the Middle East ("Africa"), (IV) the countries of Eastern Europe, including Russia ("Eastern Europe") or (V) the countries of the Caribbean Basin (excluding the Dominican Republic) (the "Caribbean"), or is a security representing an interest therein, which (A) by its terms is unsubordinated and U.S. dollar denominated; (B) provides for periodic payments of interest in cash no less frequently than semi-annually, except for 20.0% (by principal amount) of the Debt Securities in the Collateral Portfolio which may provide for periodic payments of interest in cash less frequently than semiannually but no less frequently than annually; (C) is not, at the time it is purchased a Defaulted Security, a Credit Risk Security or an Equity Security; (D) matures prior to the longest stated maturity of the Class A Notes, except that up to $46,950,000 of the aggregate principal payments with respect to the Debt Securities may be scheduled to be paid after April 10, 2010 and up to $16,500,000 of the aggregate principal payments with respect to the Debt Securities may be scheduled to be paid after October 10, 2011; (E) is not, at the time it is purchased, the subject of an Offer (other than for a security which is an eligible Debt Security meeting the Reinvestment Criteria herein) or subject to currently pending optional redemption by the Issuer prior to its stated maturity; (F) at the time it is purchased, does not provide at any time over its life for conversion into either (i) an Equity Security or (ii) a debt security with a maturity later than, a weighted average life longer than or a level of subordination or rating lower than, that of the original security; (G) is eligible to be sold, assigned or participated to the Issuer; (H) is a general intangible, chattel paper or instrument within the meaning of the UCC; and (I) requires the issuer of the security or loan to make "gross-up" payments that cover the full amount of any withholding tax in a substantially similar manner as the Issuer is obligated to pay Additional Amounts in respect of the Class A Notes (subject to such exceptions as would generally be consistent with market practice); provided that by Principal Balance (i) not more than 79% of the Collateral Portfolio will consist of fixed rate debt securities (which percentage shall decline to 75% in accordance with the Indenture); (ii) not more than 20.0% of the Collateral Portfolio will consist of senior obligations of non-sovereign issuers; or sovereign loan Participations (provided that all loan Participations shall be with a participating entity or guarantor thereof that is rated at least "A3" by Moody's and "A-" by Standard & Poor's) and not more than 10.0% of the Collateral Portfolio will consist of loan Participations issued by a single obligor; (iii) at the time of purchase, each item in the Collateral Portfolio shall be rated no lower than "B-" by Standard & Poor's and "B3" by Moody's (except as provided in clause (iv) below and except if the Issuer purchases Debt Securities which are unrated by either Rating Agency and the Issuer obtains a rating in respect thereof within 21 days from the date of purchase from both Standard & Poor's and Moody's); (iv) not more than 10.0% of the Collateral Portfolio will consist of securities not rated by Standard & Poor's and by Moody's or consist of securities rated in the general rating categories of "CCC" or lower by Standard & Poor's or "Caa" or lower by Moody's; (v) not more than 40.0%, nor less than 20.0%, of the Collateral Portfolio will consist of securities or loans issued by issuers in Latin America, not more than 15.0% of the Collateral Portfolio will consist of securities or loans issued by issuers in any one country within Latin America, not more than 10.0% of the Collateral Portfolio will consist of securities or loans issued by issuers in any second country within Latin America, not more than 6.0% of the Collateral Portfolio will consist of securities or loans issued by issuers in any third country within Latin America, and not more than 5.5% of the Collateral Portfolio will consist of securities or loans issued by issuers in any of the remaining countries within Latin America; (vi) not more than

30.0%, nor less than 5.0%, of the Collateral Portfolio will consist of securities or loans issued by issuers in Asia, and not more than 15.0% of the Collateral Portfolio will consist of securities or loans issued by issuers in any single country within Asia, not more than 10.0% of the Collateral Portfolio will consist of securities or loans issued by issuers in any second country within Asia, not more than 6.0% of the Collateral Portfolio will consist of securities or loans issued by issuers in any third country within Asia, and not more than 4.0% of the Collateral Portfolio will consist of securities or loans issued by issuers in any of the remaining countries within Asia; (vii) not more than 30.0%, nor less than 10.0%, of the Collateral Portfolio will consist of securities or loans issued by issuers in Africa, and not more than 15.0% of the Collateral Portfolio will consist of securities or loans issued by issuers in one country within Africa, not more than 10.0% of the Collateral Portfolio will consist of securities or loans issued by issuers in any second country within Africa, not more than 6.0% of the Collateral Portfolio will consist of securities or loans issued by issuers in any third country within Africa, and not more than 4.0% of the Collateral Portfolio will consist of securities or loans issued by issuers in any of the remaining countries within Africa; (viii) not more than 40.0%, nor less than 10.0%, of the Collateral Portfolio will consist of securities or loans issued by issuers in Eastern Europe, and not more than 15.0% of the Collateral Portfolio will consist of securities or loans issued by issuers in one country within Eastern Europe, not more than 10.0% of the Collateral Portfolio will consist of securities or loans issued by issuers in any second country within Eastern Europe, not more than 6.0% of the Collateral Portfolio will consist of securities or loans issued by issuers in any third country within Eastern Europe, and not more than 4.5% of the Collateral Portfolio will consist of securities or loans issued by issuers in any of the remaining countries within Eastern Europe; (ix) not more than 20.0%, nor less than 1.0%, of the Collateral Portfolio will consist of securities or loans issued by issuers in the Caribbean and not more than 5.0% of the Collateral Portfolio will consist of securities or loans issued by issuers in any single country within the Caribbean. The term "Debt Security" shall not include any debt obligation (1) pursuant to which future advances may be required to be made to the borrower, (2) incurred in connection with a merger, acquisition, consolidation, sale of all or substantially all of the assets of a person or entity or similar transaction which obligation by its terms is required to be repaid within one year of the incurrence thereof with proceeds from additional borrowings or other refinancing or (3) whose repayment is subject to substantial non-credit related risk as determined by the Collateral Manager with the consent of MBIA (so long as it is the Controlling Beneficiary. With the consent of the Controlling Beneficiary (so long as it is MBIA, a particular "Debt Security" may be in the form of a custodial or depository receipt which evidences an interest in a security or loan which otherwise satisfies the definition of Debt Security.

The term "Equity Security" shall mean any security that does not entitle the holder thereof to receive periodic payments of interest and one or more installments of principal (which entitlement for an asset-backed security may be on a pass-through basis).

The term "Offer" shall mean, with respect to any Debt Security, an offer of exchange, conversion or tender by its issuer, or by any other person, for cash, securities or any other type of consideration.

The Issuer intends to acquire Debt Securities only after the Debt Securities have been originated by non-affiliated third parties. The Issuer will not act as agent, negotiator or

FFNY03\ISAACLA\NORMAL\154068.03

structuror with respect to any Debt Security, nor will the Issuer enter into a binding commitment to purchase any Debt Security prior to the issuance of such Debt Security. The Issuer will therefore not receive payments associated with acting in such capacities.

- **The Collateral Quality Test**

The "Collateral Quality Test" will be used primarily as the criterion for purchasing Debt Securities. See "Substitute Securities and Reinvested Criteria."

Measurement of the degree of compliance with the Collateral Quality Test will be required (i) as of the Effective Date, (ii) after the Effective Date, upon a substitution or default of Debt Securities, (iii) on the last day of each Due Period (each, a "Determination Date"), (iv) upon the sale or purchase of a Debt Security, (v) upon the downgrade, withdrawal or suspension of a credit rating by either Standard & Poor's or Moody's in respect of a Debt Security and (vi) on any Business Day upon at least five Business Days notice to the Issuer and the Collateral Manager by Moody's, Standard & Poor's or MBIA (any such date, a "Measurement Date").

The Collateral Quality Test is composed of two tests: the Standard & Poor's Collateral Quality Test and the Moody's Collateral Quality Test. The Collateral Quality Test will be satisfied as of the Effective Date and on any Measurement Date if each of the Standard & Poor's Collateral Quality Test and the Moody's Collateral Quality Test is satisfied as of such date.

Standard & Poor's Collateral Quality Test

The Standard & Poor's Collateral Quality Test uses a computer program to compare the "Scenario Loss Rate" with the "Breakeven Loss Rate." The Scenario Loss Rate is the percentage of the Collateral assumed to default given a specific rating level. The Breakeven Loss Rate is the loss rate which the Collateral could withstand at the Closing Date, as adjusted. To the extent the Scenario Loss Rate of the Collateral would be equal to or less than the Breakeven Loss Rate, the Standard & Poor's Collateral Quality Test would be satisfied.

The computer program applied in measuring compliance with the Standard & Poor's Collateral Quality Test associates a probability of default to each Debt Security in the Collateral. The probability is based on the rating of the obligor, the remaining tenor of the Debt Security and the transaction's requested rating. This probability is based on varying levels of stress applied to historical default experience. The default probabilities assigned to the Debt Securities are used to construct a distribution of potential principal losses arising from the default of rated obligors in the Collateral.

In order to determine the Scenario Loss Rate of any pool, the program determines the Collateral's tolerance for loss given the requested rating level. This tolerance is the stressed probability of default of a benchmark bond rated at the same level as the transaction and with the same tenor and weighted average maturity of the Collateral. The program identifies the Scenario Loss Rate by determining the loss rate where the probability of exceeding that loss rate is less than or equal to the probability of the default of the benchmark bond.

43

For Debt Securities whose obligors are not rated by Standard & Poor's, Standard & Poor's will assign an issuer credit rating only for the purpose of determining the Collateral's Scenario Loss Rate. Unrated sovereign obligors which have not been assigned an issuer credit rating will be assigned a "CCC" default probability and unrated non-sovereign obligors which have not been assigned an issuer credit rating will be assigned a "CCC-" default probability.

Moody's Collateral Quality Test

The Moody's Collateral Quality Test will be satisfied if the Minimum Rating Distribution of the Debt Securities is equal to a numerical value of not more than 2,220, which corresponds to a rating of "B1" by Moody's. The Minimum Rating Distribution is expected to be approximately 2,150 as of the Effective Date. The "Minimum Rating Distribution" is determined by summing the products obtained by multiplying the principal amount of each Debt Security and Eligible Investment, including Defaulted Securities, by its Rating Factor, dividing such sum by the aggregate principal amount of all such securities and rounding the result up to the nearest whole number. The "Rating Factor" relating to any Debt Security is the number set forth in the table below opposite the applicable Rating of such Debt Security.

| Moody's Rating | Rating Factor | Moody's Rating | Rating Factor |
|---|---|---|---|
| Aaa | 1 | Baa3 | 610 |
| Aa1 | 10 | Ba1 | 940 |
| Aa2 | 20 | Ba2 | 1,350 |
| Aa3 | 40 | Ba3 | 1,780 |
| A1 | 70 | B1 | 2,220 |
| A2 | 120 | B2 | 2,720 |
| A3 | 180 | B3 | 3,490 |
| Baa1 | 260 | Caa | 6,500 |
| Baa2 | 360 | Ca | 10,000 |

For purposes of the Moody's Collateral Quality Test, any Eligible Investment issued or guaranteed by the United States government or any agency or instrumentality thereof is assigned a Rating Factor of 1. Short-term securities rated "P-1" will be assigned a Rating Factor equivalent to that of the senior unsecured rating of the issuer. Short term securities rated "P-1" of an issuer that does not have such a senior unsecured rating will be assigned a Rating Factor of 120. For purposes of the Moody's Collateral Quality Test, (i) any Defaulted Security will be assigned a Rating Factor of 10,000 and the principal amount of a Defaulted Security will be deemed to be equal to its outstanding principal amount; (ii) if such Debt Security is unsecured and is not rated by Moody's and the secured obligations of the issuer are rated by Moody's, such Debt Security will be deemed to be rated one rating category below the rating ascribed to such secured obligation; and (iii) if such Debt Security is not rated by Moody's (a) in the case that either (I) the Issuer or the Collateral Manager seek to obtain an estimate of the Rating Factor from Moody's and no such estimate is produced by Moody's following 21 days after the purchase thereof by the Issuer or (II) the Issuer or the Collateral Manager do not seek to obtain a Rating Factor from Moody's, the Rating Factor of such Debt Security shall be deemed to be 10,000, (b) in the case that the Issuer or the Collateral Manager seek to obtain an estimate of the Rating

Factor from Moody's, the Rating Factor of such Debt Security shall be deemed to be 3,490 during such 21 day period and (c) in the case that no other security or obligation of the issuer is rated by Moody's and the Issuer or the Collateral Manager seeks to obtain an estimate of a Rating Factor and Moody's produces such an estimate, then the Rating Factor of such Debt Security will be deemed to be the estimate thereof as may be assigned by Moody's upon the request of the Issuer or the Collateral Manager.

### The Coverage Tests

The "Coverage Tests" will be used primarily to determine whether interest may be paid on the Class B Notes and whether Principal Proceeds may be reinvested in Substitute Debt Securities, or whether Principal Proceeds and, to the extent needed, funds which would otherwise be used to pay interest on the Class B Notes must instead be used to pay principal on the Class A Notes, to the extent necessary to cause the Coverage Tests to be met.  See "—Substitute Securities and Reinvestment Criteria" and "Description of the Class A Notes—Principal" and "Priority of Payments." The Debt Securities pledged to the Trustee as of the Closing Date and thereafter, as additional Debt Securities are acquired during the Ramp-Up Period, together with any cash and Eligible Investments then pledged to the Trustee, will be required to satisfy the Coverage Tests.  The Coverage Tests will consist of the Class A Par Value Test and the Class A Interest Coverage Test.

Measurement of the degree of compliance with the Coverage Tests will be required as of each Measurement Date.

Class A Par Value Test.  The Class A Par Value Ratio is expected to be approximately equal to 140% as of the Effective Date.  The "Class A Par Value Test" will be satisfied as of such date and any subsequent Measurement Date if the Class A Par Value Ratio is at least 135%.

The "Class A Par Value Ratio" as of any Measurement Date is the ratio (expressed as a percentage) obtained by dividing:

(a)    the sum of:

(i)    the aggregate principal balance (or portion thereof) of the Debt Securities (other than Defaulted Securities or Equity Securities) and Eligible Investments; and

(ii)    the amount on deposit in the Principal Collection Sub-Account; and

(iii)    with respect to each Defaulted Security, the lesser of (A) the market value of such Defaulted Security and (B) (I) in the case of a Defaulted Security issued by a sovereign issuer, 25% of the principal balance of such Defaulted Security or (II) in the case of a Defaulted Security issued by a non-sovereign issuer, 10% of the principal balance of such Defaulted Security, in each case of such Measurement Date; by

(b)    the aggregate principal amount of the outstanding Class A Notes.

Class A Interest Coverage Test.  The Class A Interest Coverage Ratio is expected to be approximately equal to 150% as of the Closing Date.  The "Class A Interest Coverage Test" will be satisfied as of such date and any subsequent Measurement Date if the Class A Interest Coverage Ratio is at least 125% on any Measurement Date or if it is less than 125% on any such Measurement Date, such amount increases to 125% immediately after such Measurement Date as a result of transactions or payments to be made on such Measurement Date.

The "Class A Interest Coverage Ratio" will be determined as of any Measurement Date as the ratio (expressed as a percentage) obtained by dividing:

(a)    the sum of (I) the aggregate amount of scheduled Interest Proceeds due (in each case regardless of whether the due date for any such interest payment has yet occurred) in the Due Period in which such Measurement Date occurs on (A) the Debt Securities and (B) the Eligible Investments held in the Collection Account and (II) the aggregate positive net amount of scheduled payments to be received by the Issuer from any Hedge Counterparty under any Hedge Agreement on or before the following Payment Date (after taking into account any payments payable by the Issuer thereunder), net of the amounts payable in respect of clauses (i) through (iv) in "Distribution of Interest Proceeds"; by

(b)    the aggregate amount of scheduled interest payments due (in each case regardless of whether the due date for any such interest payment has yet occurred) on the Class A Notes on the following Payment Date, plus the aggregate net positive amount scheduled to be paid by the Issuer to any counterparty under any Hedge Agreement on or before the following Payment Date (after taking into account any payments payable to the Issuer thereunder).

For the purposes of calculating the Class A Interest Coverage Ratio, scheduled interest payments will not include any scheduled interest payments in respect of a Defaulted Security or as to which the Issuer or the Collateral Manager has actual knowledge that such payment will not be made.  For the purposes of calculating the Class A Interest Coverage Ratio and for the purposes of the criteria described under "—Substitute Securities and Reinvestment Criteria," the expected interest income on floating rate Debt Securities and Eligible Investments and the expected interest payable on the Class A Notes will be calculated using the then current interest rates applicable thereto.

**Substitute Securities and Reinvestment Criteria**

The Debt Securities may be retired prior to their respective final maturities due to, among other things, the existence and exercise of any optional or mandatory redemption features of such Debt Securities.  In addition, pursuant to the Indenture, the Collateral Manager may direct the Trustee to sell any (i) Defaulted Security, (ii) Debt Security that, in the Collateral Manager's judgment and with the consent of the Controlling Beneficiary (so long as it is MBIA),

has a significant risk of declining in credit quality and, with a lapse of time, becoming a Defaulted Security (a "Credit Risk Security"), (iii) Debt Security (a) that has been upgraded or put on a watch list for possible upgrade by a nationally recognized rating agency, (b) whose issuer has shown improved financial results, (c) whose issuer has raised equity capital subsequent to the purchase by the Issuer and which, in the Collateral Manager's reasonable judgment, has shown improved liquidity, (d) whose issuer has raised other capital which has in the Collateral Manager's judgment improved the liquidity or credit standing of the issuer, or (e) which, in the Collateral Manager's reasonable judgment, has significantly improved in credit quality, and which has increased in price to 103% of the purchase price paid by the Issuer for such security in each case since the date on which such Debt Security was purchased (a "Credit Improved Security"), and (iv) any Equity Security.

A Credit Improved Security may be sold only (i) with MBIA's written approval (so long as no MBIA Default shall have occurred and be continuing) and (ii) if in the Collateral Manager's judgment, the proceeds therefrom can be reinvested, on the same trade date on which such Credit Improved Security is sold, in one or more Substitute Debt Securities having a par amount at least equal to 100% of the par amount of such Credit Improved Security in compliance with the Reinvestment Criteria described below. A Credit Improved Security may only be sold during the Reinvestment Period. Following the sale of a Credit Risk Security during the Reinvestment Period, the Collateral Manager must use its best efforts to purchase, prior to the end of the Due Period in which such Credit Risk Security is sold, one or more Substitute Debt Securities in an aggregate principal amount at least equal to the Sale Proceeds from such sale in compliance with the Reinvestment Criteria described below.

An Equity Security must be sold within 90 days of the Issuer's receipt thereof.

During the Reinvestment Period, a Defaulted Security may be sold without regard to the foregoing restrictions or the Reinvestment Criteria described below. The Collateral Manager must use its best efforts to purchase, prior to the end of the Due Period in which such Defaulted Securities are sold, Substitute Debt Securities with an aggregate principal balance at least equal to the Sale Proceeds from such sale, in compliance with the Reinvestment Criteria.

No Debt Security (other than a Non-Credit Risk Security) may be sold following the Reinvestment Period. Following the Reinvestment Period, the Trustee shall sell any Non-Credit Risk Security as directed by the Collateral Manager. The Collateral Manager will also be required to direct the Trustee to sell within 30 days of its purchase, any debt instrument that, as of the date of purchase thereof, does not satisfy the definition of a Debt Security.

No Debt Security other than an Equity Security, a Defaulted Security, or a Credit Risk Security (a "Non-credit Risk Security") may be sold unless such security has been held by the Issuer for at least one year and if such security has been held by the Issuer for less than two years, after giving effect to such sale (A) Non-credit Risk Securities sold in the then current fiscal year of the Issuer do not represent obligations of more than 10.0% of the obligors whose obligations were held by the Issuer at the beginning of such fiscal year (or the Effective Date for the initial fiscal year) and (B) the aggregate principal balance of Non-credit Risk Securities sold in the then current fiscal year do not exceed 10.0% of the aggregate principal balance of Debt

Securities held by the Issuer at the beginning of the fiscal year (or the Effective Date for the initial fiscal year). No Non-Credit Risk Security may be sold if after giving effect to such sale the aggregate principal balance of all Non-Credit Risk Securities sold since the Closing Date exceeds 30% of the aggregate principal balance of the Debt Securities held by the Issuer on the Effective Date. Notwithstanding the provisions of the first sentence of this paragraph to the contrary, a Debt Security may be sold subject to the other restrictions described herein based on the advice of counsel that such sale would not cause the Issuer to be engaged in a trade or business in the United States.

Notwithstanding anything in the foregoing to the contrary and subject to the restrictions contained in the first sentence of the preceding paragraph, if (A) as of any Measurement Date the Class A Par Value Ratio is equal to or less than 120% or the Class A Interest Coverage Ratio is equal to or less than 115% or (B) as of any date on or after April 10, 2008, the Class A Par Value Ratio is equal to or less than 120% (which for purposes of this clause (B) and the calculation of the numerator of the Class A Par Value Ratio shall exclude an amount equal to the excess, if any, of (x) the aggregate principal payments payable in respect of the Debt Securities after the Class A Note Maturity Date over (y) $15,400,000), then on or after any such date and so long as no MBIA shall have occurred and be continuing:

(i)     no Debt Securities may be sold or purchased without the consent of MBIA; and

(ii)    MBIA shall have the right to direct the sale (at any time) or purchase (during the Reinvestment Period) of any Debt Security without compliance with the Reinvestment Criteria.

In the event of an optional redemption at the direction of Class B Noteholders of the Class A Notes, and, if applicable, the Class B Notes, the Collateral Manager will direct the Trustee to sell Debt Securities without regard to the foregoing limitations; provided that the Sale Proceeds therefrom will be at least sufficient to pay certain expenses and redeem in whole or in part the Class A Notes and, if applicable, the Class B Notes; and provided, further, that such Sale Proceeds are used to make such a redemption. See "Description of the Class A Notes—Optional Redemption."

During the Reinvestment Period, Principal Proceeds may be reinvested in Substitute Debt Securities if, after such reinvestment, the following criteria (the "Reinvestment Criteria") are satisfied:

(a)    the Substitute Debt Security or Securities purchased must have a weighted average life at the next Payment Date equal to or shorter than the weighted average life of the security the sale. prepayment or scheduled amortization of which resulted in the proceeds used for the purchase of such Substitute Debt Security or Securities;

(b)    the Substitute Debt Security or Securities must have a principal amount equal to or greater than the Principal Proceeds used to purchase such Substitute Debt Security or Securities;

FFNY03\JSAACLA\NORMAL\154068 03

(c)    the next scheduled coupon payments in respect of the Substitute Debt Security or Securities are equal to or greater than 90% of the next scheduled coupon payments in respect of the Debt Security the sale or amortization of which resulted in the Principal Proceeds used for the purchase of such Substitute Debt Security or Securities;

(d)    the Coverage Tests and the Collateral Quality Tests must be satisfied following any reinvestment, except to the extent described in clause (e) below;

(e)    if immediately prior to such reinvestment the Moody's Collateral Quality Test was not satisfied, and (A) if the Rating Factor of the Debt Security being replaced as of the date it is sold is 2,220 or less, the weighted average of the Moody's Rating Factors of the Substitute Debt Securities must be higher than the Moody's Rating Factor of the replaced Debt Security, or (B) if the Moody's Rating Factor of the Debt Security being replaced as of the date it is sold is greater than 2,220 the Moody's Rating Factor of the Substitute Debt Security must be no less than the Moody's Rating Factor of the replaced security; and

(f)    it must satisfy the definition of the term Debt Security; provided that if any limit set forth in clauses (i) through (ix) of the definition of Debt Security is not satisfied, such limit is at least closer to being satisfied after giving effect to the reinvestment than it was before giving effect to the reinvestment.

It is expected that the Collateral Manager will reinvest Principal Proceeds, to the extent permitted or required as described above, in Substitute Debt Securities promptly following such sale. If, however, at the time of sale the Collateral Manager is not required to and has not identified Substitute Debt Securities for purchase, Principal Proceeds may be reinvested in Eligible Investments in the Collection Account on a temporary basis, pending reinvestment in Substitute Debt Securities.

During the Reinvestment Period, the Collateral Manager must use its best efforts to purchase, prior to the end of the Due Period in which such securities are sold, Substitute Debt Securities with an aggregate principal balance at least equal to the Sale Proceeds from such sale, in compliance with the Reinvestment Criteria.

## Adjustments to Reinvestment Criteria and Coverage Tests

The Collateral Manager may, from time to time, propose amendments or adjustments to the Collateral Quality Test and/or the Reinvestment Criteria. In addition, the Controlling Beneficiary may direct amendments or adjustments to the Collateral Quality Test and/or the Reinvestment Criteria in order to comply or conform with the rating requirements of Moody's and/or Standard & Poor's. Upon the receipt by the Trustee and the Issuer of the written consent or direction of the Controlling Beneficiary, such amendments or adjustments shall become effective for all purposes and shall be binding upon the Issuer, MBIA and Noteholders. Notice of any such amendments or adjustments shall be provided to Noteholders as soon as practicable following the effectiveness thereof.

FFNY03\ISAACLA\NORMAL\154068.03

## The Collection Account

All distributions on the Debt Securities and any proceeds received from the disposition of any Debt Securities will be remitted to a single, segregated account held in the name of the Trustee (the "Collection Account") for the benefit of the holders of the Notes, the Swap Counterparty and MBIA and will be available, together with reinvestment earnings thereon, for application to the payment of the amounts set forth under "Description of the Class B-1 Notes—Priority of Payments" and for the acquisition of Substitute Debt Securities under the circumstances and pursuant to the requirements described herein and in the Indenture.

The Collection Account will consist of two subaccounts. The Trustee shall from time to time deposit into the Collection Account all amounts received in respect of the Collateral or under the Swap Agreement or any Hedge Agreement, including any Sale Proceeds immediately upon the receipt thereof (and in any event within 24 hours of receipt). The Trustee shall release from the Collection Account and pay to the related counterparty any periodic payments due under the related Hedge Agreement immediately upon any such payment becoming due and payable, which payments will be made free and clear of the lien of the Indenture. The Trustee shall also release from the Collection Account and pay to the related counterparty any settlement payments due under the related Hedge Agreement immediately upon any such payment becoming due and payable, which payments will be made free and clear of the lien of the Indenture.

Amounts received in the Collection Account during a Due Period will be invested in Eligible Investments. Eligible Investments shall mean any investment that, at the time of its inclusion in the Trust Estate, is one or more of the following obligations or securities: (i)(a) direct obligations of, and obligations fully guaranteed by the United States or any agency or instrumentality of the United States whose obligations are backed by the full faith and credit of the United States, (b) demand and time deposits of any depository institution or trust company incorporated in the United States, whose short term unsecured obligations are rated "A-1" by Standard & Poor's and "P-1" by Moody's, (c) commercial paper rated "A-1" by Standard & Poor's and "P-1" by Moody's, (d) repurchase obligations with respect to any security which is an obligation of, and fully guaranteed by, the United States and collateralized at 104%, entered into with a depository institution described in clause (b), (e) debt securities sold at a discount and issued by a corporation whose senior unsecured obligations are rated at least "A" by Standard & Poor's and "A2" by Moody's, or (f) guaranteed investment contracts approved in writing by MBIA (so long as no MBIA Default shall have occurred and be continuing) and issued by any insurance company, corporation or entity whose senior unsecured obligations or claims paying ability are rated at least "A" by Standard & Poor's and "A2" by Moody's. Each such Eligible Investment shall mature on or immediately prior to each Payment Date. Each such Eligible Investment shall be held to maturity unless the Collateral Manager shall direct the Trustee to sell such Eligible Investment.

## Hedge Agreements

On the Closing Date, the Issuer shall execute and deliver the Swap Agreement. Following the Closing Date, the Issuer may enter into one or more additional Hedge Agreements

in compliance with the requirements therefor specified herein. The Issuer may enter into such Hedge Agreements (i) if such Hedge Agreement shall constitute a Qualifying Swap, (ii) if such Hedge Agreement satisfies the definition thereof, (iii) if the Hedge Agreement shall be terminable by the Issuer if the long-term debt or derivatives obligations of such counterparty are lowered to "BBB-" or below by Standard & Poor's or "Baa3" or below by Moody's, (iv) if the execution and delivery thereof by the Issuer is consented to by MBIA (so long as it is the Controlling Beneficiary) and (v) the Qualifying Counterparty to such Hedge Agreement by virtue of becoming a secured party under the Indenture agrees to be bound by the limited recourse and non-petition provisions of the Indenture. Any Hedge Agreements must be governed by, and construed in accordance with, the laws of the State of New York.

"Qualifying Counterparties" means (i) the Swap Counterparty, (ii) entities whose senior unsecured long-term debt are rated or whose derivatives counterparty rating is at the date of execution of a Qualifying Swap at least "A" by Standard & Poor's (and does not include a "t" qualification) and "Aa2" by Moody's or (iii) such other counterparties as may be approved by MBIA.

"Qualifying Swap" shall mean the Swap Agreement and any other hedging or derivative instrument, including, without limitation, any interest rate swap, swaption, interest rate cap, floor or collar or other similar derivative product which is entered into by the Issuer with a Qualifying Counterparty.

Any Hedge Agreements will be governed by, and construed in accordance with, the laws of the State of New York.

## THE SWAP AGREEMENT

**General**

On the Closing Date, the Issuer and Bear Stearns Financial Products Inc. (the "Swap Counterparty") will execute and deliver a Swap Agreement in the form of the 1992 ISDA Master Agreement (Multicurrency - Cross Border) (the "1992 Master Agreement") published by the International Swaps and Derivatives Association, Inc. ("ISDA") (which, together with the related confirmations and schedules, is referred to herein as the "Swap Agreement"). The Swap Agreement will incorporate the 1991 ISDA Definitions (as published by ISDA, the "ISDA Definitions") except as modified to reflect the transactions provided for in such Swap Agreement. With approximately $8.9 billion in total capital, the Swap Counterparty serves governments, corporations and individuals worldwide. The Swap Counterparty's business includes corporate finance and mergers and acquisitions, institutional equities and fixed income sales and trading, private client services, derivatives, asset management, correspondent clearing, securities lending and custody services. Headquartered in New York City, the Swap Counterparty has over 7,800 employees located in domestic offices in Atlanta, Boston, Chicago, Dallas, Los Angeles and San Francisco; and in international presence in Beijing, Buenos Aires, Geneva, Hong Kong, London, Madrid, Paris, Sao Paulo, Shanghai, Singapore and Tokyo.

party, that it will be required to be paid with respect to payments under the Swap Agreement (*i.e.*, a "Tax Event");

(c)    due to a merger, sale of assets or other consolidation or amalgamation, a tax or withholding will be required to be paid with respect to payments under the Swap Agreement (*i.e.*, a "Tax Event Upon Merger"); or

(ii)    as a result of a redemption by the Issuer of all or any portion of the Class A Notes;

(iii)    the Issuer elects to terminate the Swap Agreement if the Class A Notes and all accrued interest thereon shall have become due and payable; and

(iv)    the Swap Counterparty elects to terminate the Swap Agreement in accordance with the terms and notice requirements thereof if:

(a)    MBIA fails to meet its payment obligations under the Swap Insurance Policy such failure is continuing with respect to MBIA under such policy;

(b)    MBIA fails at any time during the term of the Swap Agreement to have (a) a claim paying ability rating of at least "A-" or higher by Standard & Poor's and (b) a financial strength rating of at least "A3" or higher from Moody's; provided that

(x)    an Event of Default under the Swap Agreement shall have occurred and be continuing as to which the Issuer is the "defaulting party;" or

(y) a Termination Event shall have occurred and be continuing with respect to the Issuer; or

(c)    as a result of certain downgrades relating to the "shadow rating" ascribed to the Class A Notes.

### Settlement Amount

If an Event of Default or a Termination Event under the Swap Agreement occurs, a lump-sum amount would be payable by the Swap Counterparty to the Issuer or by the Issuer to the Swap Counterparty (the "Termination Amount"). The Termination Amount would generally be based on the sum of (i) payments under the Swap Agreement that became due prior to the date on which the Swap Agreement (or portion thereof) is terminated, but remain unpaid and (ii) an amount determined by obtaining quotations from at least three leading swap dealers of the amount that each such dealer would pay to, or be required to be paid by, the party obtaining such quotation in consideration for having that dealer enter into a swap transaction with such party on the same terms as the swap transaction that was terminated.

54

Amount) related to such Preference Amount and (ii) an assignment at the time a claim is made hereunder, conditional upon payment in full of such Insured Payment and otherwise in such form as is reasonably required by the Insurer from the Trustee, irrevocably assigning to the Insurer all rights and claims of the Owner, if any, relating to or arising under the Obligations against the debtor which made such preference payment, to the extent of such preference payment; provided that if such documents are received after 11:00 a.m. New York City time on such Business Day, they will be deemed to be received on the following Business Day. Such payments shall be disbursed to the Bankruptcy Trustee named in the order of the court exercising jurisdiction on behalf of the Owner and not to any Owner directly unless such Owner provides certification or other evidence reasonably satisfactory to the Insurer that it has returned principal or interest paid on the Obligations to such Bankruptcy Trustee, in which case such payment shall be disbursed to such Owner.

The Insurer will pay any amount payable under the Insurance Policy no later than 11:00 a.m. New York City time on the later of (i) any Payment Date on the Obligations on which the related Distribution Amount (as described below) is due or (ii) the second Business Day following receipt on a Business Day by the Insurer, of a Notice (as described below, which Notice may be transmitted by telephone, telecopy or telex and shall be effective when received); provided that if such Notice is received after 12:00 noon New York City time on such Business Day, it will be deemed to be received on the following Business Day. If any such Notice received by the Insurer is not in proper form or the information given by the Trustee in the Notice is incomplete for the purpose of making claims hereunder it shall be deemed not to have been received by the Insurer for purposes of this paragraph, and the Insurer shall by 2:00 p.m. New York City time on the date received or deemed received, promptly so advise the Trustee of such deficiency and of the nature of the deficiency, and the Trustee may submit an amended Notice by 5:00 p.m. New York City time on such date. If such an amended Notice in proper form and not otherwise insufficient for the purpose of making claim under the Insurance Policy is received by the Insurer no later than 5:00 p.m. New York City time on the Business Day the Notice it amends was received, it shall be deemed to have been timely received on such Business Day.

Insured Payments due under the Insurance Policy unless otherwise stated in the Insurance Policy will be disbursed by the Insurer acting through its Insurer Paying Agent on behalf of the Owners by wire transfer of immediately available funds in the amount of the Insured Payment.

The Insurer Paying Agent is the agent of the Insurer only and the Insurer Paying Agent shall in no event be liable to Owners for any acts of the Insurer Paying Agent or any failure of the Insurer to deposit, or cause to be deposited, sufficient funds to make payments due under the Insurance Policy.

Subject to the terms of the Indenture and the Insurance Agreement the Insurer shall be entitled to be reimbursed by the Issuer for the payments made under the Insurance Policy at the times and in the priority of payments set forth in the Indenture.

As used herein, the following terms shall have the following meanings:

56

"Additional Amounts" means, for any Payment Date, the amount of any withholding or deduction for, or on account of, any taxes, duties, assessments or governmental charges levied by or on behalf of the jurisdiction of incorporation of the Issuer or any political subdivision thereof or any authority therein or having power to tax on the related Distribution Amount; provided that no Additional Amounts shall be payable in relation to any payment in respect of an Obligation (a) to, or to a third party on behalf of, an Owner to the extent such Owner is liable for such taxes, duties, assessments or governmental charges in respect of such Obligations by reason of his having some present or former connection with the jurisdiction of incorporation of the Issuer or any political subdivision thereof other than the mere holding of the Obligation or (b) presented for payment more than 30 days after the Relevant Date except to the extent that the Owner thereof would have been entitled to additional amounts on presenting the same for payment on the last day of such period of 30 days.

"Available Funds" means the amount of funds (excluding funds to be used for Issuer Expenses, Trustee Fees, Administrative Expenses, the Senior Collateral Management Fee, the payment of premium to MBIA and net payment of any amounts due and payable by the Issuer under the Swap Agreement or any Hedge Agreements) that the Trustee has available at 11:00 a.m. New York City time on any Payment Date for the payment of the Distribution Amount due to the Owners on such date.

"Bankruptcy Trustee" means the bankruptcy trustee or receiver named in the order of a court, administrator, authority or tribunal exercising competent jurisdiction in an insolvency proceeding which order permits such bankruptcy trustee or receiver to recover amounts of principal or interest paid on the Obligations to such bankruptcy trustee.

"Business Day" means for purposes of the Insurance Policy any day on which the Insurer and commercial banks and foreign exchange markets are open for business in New York City and the Cayman Islands; provided that if an event or determination is to be made on a day that is not a Business Day, then such event shall occur or be determined on the next following Business Day.

"Deficiency Amount" means, for any Payment Date, the excess, if any, of the Distribution Amount over Available Funds for such date.

"Distribution Amount" means, (a) with respect to any Payment Date, the sum of (i) the total amount of interest due on the Obligations and payable on such Payment Date and (ii) Additional Amounts, if any, related thereto and (b) with respect to the Payment Date in April 2010, the sum of (i) the total amount of principal due on the Obligations and payable on such Payment Date and (ii) Additional Amounts, if any, related thereto.

"Insured Payment" means (i) as of any Payment Date, any Deficiency Amount and (ii) any Preference Amount.

"Insurer Paying Agent" means State Street Bank and Trust Company, N.A. and any successor Insurer Paying Agent appointed by the Insurer.

"Issuer" means Augusta Funding Limited B.

"Notice" means the telephonic, telecopy or telex notice, promptly confirmed in writing substantially in the form of (i) with respect to an Insured Amount, Exhibit A to the Insurance Policy, from the Trustee specifying the Insured Payment to be made which shall be due and owing on the applicable Payment Date, and (ii) with respect to a Special Insured Amount, Exhibit B to the Insurance Policy from the Trustee specifying the Special Insured Amount to be made which shall be due and owing on the applicable Payment Date.

"Obligations" means the U.S. $224,568,335 Guaranteed Floating Rate Secured Senior Notes, Class A Due 2010 issued by the Issuer, as described on the face of the Issuance Policy.

"Owner" means each Noteholder or Holder of the Obligations who, on the applicable Payment Date, is entitled under the terms of the Obligations to receive payment thereunder

"Payment Date" means, with respect to an Insured Payment, (i) any payment date with respect to the Obligations when interest is due on the Obligations and (ii) the payment date in April 2010 with respect to the Obligations when principal, if any, is due on the Obligations; provided that any payment date upon which the Obligations are subject to optional redemption at the direction of the Insurer shall be a payment date with respect to interest and principal due on the Obligations.

"Preference Amount" means any amount previously distributed to an Owner on the Obligations or the coupons related thereto that is recoverable and sought to be recovered as an avoidable preference by a Bankruptcy Trustee in accordance with an order of a court, administrator, authority or tribunal having competent jurisdiction.

"Premium" means the amount payable (as set forth in the Insurance Agreement) to the Insurer in accordance with the terms of the Insurance Agreement.

"Relevant Date" means the date on which such payment first becomes due but, if the full amount of the money payable has not been received by the Trustee on or prior to such due date, it means the date on which the full amount of such money having been so received, notice to that effect shall have been duly given to the Owners.

"Trustee" means United States Trust Company of New York, or any successor trustee under the Indenture.

Any notice under the Insurance Policy or service of process on the Insurer Paying Agent may be made at the address listed below for the Insurer Paying Agent or such other address as the Insurer shall specify in writing to the Trustee as the address of the Insurer Paying Agent.

The notice address of the Insurer Paying Agent is State Street Bank and Trust Company, N.A., 15th Floor, 61 Broadway, New York, New York 10006, Attention: Municipal

Registrar and Paying Agency, or such other address as the Insurer shall specify to the Trustee in writing as the address of the Insurer Paying Agent.

The Insurance Policy is being issued under and pursuant to, and shall be construed under, the laws of the State of New York, without giving effect to the conflict of laws principles thereof.

The insurance provided by the Insurance Policy is not covered by the Property/Casualty Insurance Security Fund specified in Article 76 of the New York Insurance Law.

The Insurance Policy is irrevocable and not cancelable for any reason (including nonpayment of premium) and may not be modified, altered, amended or endorsed by the Insurer without the prior written consent of all the Owners. The premium on the Insurance Policy is *not refundable* for any reason, including payment, or provision being made for payment, prior to maturity of the Obligations.

## Payment of Accrued Liabilities

Under an Insurance Agreement between the Issuer and MBIA (the "Insurance Agreement") and the Indenture, the Issuer will agree to pay or reimburse MBIA for "Accrued Liabilities," which generally shall consist of: (i) all amounts paid by MBIA under the Insurance Policy for the benefit of the Noteholders; (ii) all amounts paid by (and not reimbursed to) MBIA under the Swap Policy or under any insurance policy provided in respect of any Hedge Agreements; (iii) all amounts advanced or paid by MBIA (but not in the form of a payment under the Insurance Policy) under the Indenture or any substitute therefor; (iv) any and all costs and expenses incurred by MBIA, including, but not limited to, attorneys' and accountants' fees and expenses, in connection with (a) any accounts established to facilitate payments under the Insurance Policy, the Swap Policy, the Insurance Agreement or the Indenture, (b) the administration, enforcement, defense or preservation of any rights in respect of the Transaction Documents or the Insurance Policy, (c) the foreclosure against or sale or other disposition of any collateral securing any obligations under the Transaction Documents or pursuit of any other remedies under any of the Transaction Documents (to the extent such costs and expenses are not recovered from such foreclosure, sale or other disposition), (d) any amendment, waiver or other action with respect to, or related to, any Transaction Document, the Insurance Policy, or the Swap Policy whether or not executed or completed, or (e) any review or approval by MBIA in connection with the delivery of any additional or substitute collateral under any of the Transaction Documents and (v) any amounts paid by or owed to MBIA as a result of (a) any statement, omission or action (other than of or by MBIA) in connection with the offering, issuance, sale, or delivery of the Notes, (b) the negligence, bad faith, willful misconduct, misfeasance, malfeasance or theft committed by any director, officer, employee or agent of the Issuer in connection with any of the Transaction Documents, (c) the violation by the Issuer of any domestic or foreign law, rule or regulation in connection with any issuance, offer and sale of the Class A Notes, or any judgment, order or decree applicable to it, or (d) the breach by the Issuer of any representation, warranty or covenant under any of the Transaction Documents or any event of default under any Transaction Document, and interest on the foregoing amounts from the date of

payment to or reimbursement of MBIA at the Accrued Liabilities Interest Rate (as defined in the Insurance Agreement).

However, the Issuer shall have no obligation to reimburse MBIA for Accrued Liabilities, unless at the time of such reimbursement or payment no MBIA Default has occurred and is continuing (except that, notwithstanding the occurrence and continuance of a MBIA Default, the Issuer shall be obligated to reimburse MBIA for Accrued Liabilities following payment in full of the Class A Notes and all Issuer Expenses, Administrative Expenses and Trustee Fees).

In connection with the issuance of the Class A Notes and the Insurance Policy, the Issuer, MBIA, Bear Stearns and Bear, Stearns International Limited will enter into an indemnification agreement (the "Indemnification Agreement") and the Issuer and MBIA will enter into the Insurance Agreement which, taken together, will provide, among other things, for the indemnification by the Issuer and Bear Stearns and Bear, Stearns International Limited of MBIA (and, in the case of costs, losses and liabilities referred to in clause (i) below, certain officers, directors, agents and affiliates of MBIA) for any costs, losses and liabilities resulting from: (i) the misstatement or omission of a material fact in this Offering Memorandum (other than information supplied by MBIA and presented under the headings "Summary of Terms and Conditions—MBIA Insurance Corporation" and "MBIA Insurance Corporation" and in the financial statements of MBIA attached as Annex A); (ii) the breach by the Issuer, Bear Stearns or Bear, Stearns International Limited of any of its representations, warranties or obligations contained in the Indenture, the Indemnification Agreement, the Insurance Agreement or any other document relating to the issuance of the Notes; (iii) the negligence or willful misconduct of the Issuer, or any of its directors, officers, employees or agents; or (iv) the violation by the Issuer of any United States federal, state or local or Cayman Islands securities or banking laws, rules or regulations in connection with the issuance, offer and sale of the Notes during the initial distribution of the Notes or of any federal or state laws, rules or regulations relating to maximum interest rates.

## MATURITY AND PREPAYMENT CONSIDERATIONS

The Stated Maturity of the Class B-2 Notes is April 10, 2015. The actual maturity is expected to occur prior to Stated Maturity. Average life refers to the average amount of time that will elapse from the date of delivery of a security until each dollar of the principal of such security will be paid to the investor. The average life of the Class B-2 Notes will be determined by the amount and frequency of principal payments, which are dependent upon, among other things, the amount of sinking fund payments and any other payments received at or in advance of the scheduled maturity of Debt Securities (whether through sale, maturity, redemption, default or other liquidation or disposition). The actual average life and actual maturity of the Class B-2 Notes will be affected by the financial condition of the issuers of the underlying Debt Securities and the characteristics of such securities, including the existence and frequency of exercise of any optional or mandatory redemption features, the prevailing level of interest rates, the redemption price, the actual default rate and the actual level of recoveries on any Defaulted Securities, and the frequency of tender or exchange offers for such Debt Securities. Substantially all of the Debt Securities are expected to be subject to sinking fund or optional redemption by the issuer of such

FFNY03\ISAACLA\NORMAL\154068.03

securities. Any disposition of a Debt Security may change the composition and characteristics of the Debt Securities and the rate of payment thereon, and, accordingly, may affect the actual average life of the Class B-2 Notes. The rate of future defaults and the amount and timing of any cash realization from Defaulted Securities also will affect the maturity and average life of the Class B-2 Notes. The ability of the Collateral Manager to reinvest Principal Proceeds in the manner described under "Security for the Notes—Substitute Securities and Reinvestment Criteria" will also affect the average life of the Class B-2 Notes.

The "Expected Portfolio" of Debt Securities is the portfolio of Debt Securities constructed by the Collateral Manager on the basis of securities it expects the Issuer to purchase as described herein. The Expected Portfolio has been composed without reference to the Ramp-Up Period and is based on the assumption that all Debt Securities in the Expected Portfolio will be purchased on the Closing Date. The Debt Securities actually acquired by the Issuer may be acquired over time during the Ramp-Up Period, and may be different than those included in the Expected Portfolio. There can be no assurance that the Debt Securities actually acquired will not be materially different from the Expected Portfolio. Furthermore, the actual portfolio of Debt Securities will change from time to time as a result of sales of Debt Securities and reinvestment of principal, as described herein. Based on the assumption that Debt Securities which the Issuer purchases are the Expected Portfolio and assuming (i) payment of all scheduled amortization payments due in respect of the Debt Securities, (ii) no defaults occur in respect of any Debt Security, and (iii) no optional redemptions are made on the Debt Securities, the average life of the Class B Notes would be expected to be approximately 13.83 years. The assumptions set forth above do not necessarily reflect historical performance and defaults for emerging markets debt securities.

## THE COLLATERAL MANAGER

Bear, Stearns & Co. Inc. ("Bear Stearns") is one of the largest and longest established investment banking institutions in America. Bear Stearns has over $8.9 billion in total capital and employs approximately 7,700 people in 20 global locations. The firm is widely recognized as a leader in equity and fixed-income research, analytical capabilities, and emerging market expertise, among other areas.

Bear Stearns Asset Management ("BSAM"), a division of Bear Stearns, manages approximately $8.4 billion of equity and fixed-income investments for corporations, public systems, multiemployer plans, endowments, foundations, insurance companies and high-net-worth individuals. Founded in 1984, BSAM now comprises more than 70 employees, including a team of equity and fixed-income portfolio managers who average 16 years experience. These professionals provide clients with access to Bear Stearns' investment resources.

## THE COLLATERAL MANAGEMENT AGREEMENT

As compensation for the performance of its obligations as Collateral Manager under the Collateral Management Agreement, the Collateral Manager will receive a semiannual fee, payable in arrears on each Payment Date, equal to the sum of .10% per annum of the Average Semi-Annual Asset Amount with respect to such Due Period relating to such Payment

Collateral or otherwise, shall automatically and without action by any person or entity pass to and be vested in the successor Collateral Manager upon the appointment thereof.

## THE ISSUER

**General**

    Augusta Funding Limited B was incorporated on February 26, 1997 in the Cayman Islands. The registered office of Augusta Funding Limited B is at the offices of Messrs. Maples and Calder, P.O. Box 309, Grand Cayman, Cayman Islands, British West Indies. Augusta Funding Limited B has no prior operating experience.

    The Notes are obligations only of the Issuer and not of the Trustee, the Collateral Manager, the Swap Counterparty, the Initial Purchaser or any of their respective affiliates, the Share Trustee or any directors or officers of the Issuer.

    The authorized share capital of Augusta Funding Limited B consists of 500 ordinary shares, $1.0 par value per share, all of which shares have been issued (the "Issuer Ordinary Shares"). All of the outstanding Issuer Ordinary Shares are held on behalf of the Share Trustee, which holds the benefit of such shares on the terms of a charitable trust.

**Capitalization**

    The initial proposed capitalization of Augusta Funding Limited B as of the Closing Date after giving effect to the issuance of the Notes and the Issuer Ordinary Shares (before deducting expenses of the Offering) is as set forth below:

|  | Amount |
|---|---|
|  |  |
| Class A Notes | $224,568,355 |
| Class B Notes* | $ 58,201,777 |
|     Total Debt | $282,770,132 |
|  |  |
| Issuer Ordinary Shares | $        500 |
|  |  |
| Total Capitalization | $282,700,632 |

*Reflects the exchange of Class B Notes denominated in a foreign currency at the spot exchange rates as of the date of this Offering Memorandum.

64

FFNY03\JSAACLA\NORMAL\154068.03

## Business

The Issuer will not undertake any business other than the issuance of the Notes, the management of the Collateral and other related transactions. The Issuer will not have any subsidiaries. In general, subject to the need to satisfy the Collateral Quality Test and Coverage Tests and the need for funds for the redemption or payment of the Notes, and subject to the judgment of the Collateral Manager, the credit quality of the Debt Securities and general market conditions, the Issuer expects to hold the Debt Securities until maturity and will receive payments of interest as the principal source of its income. The ability to purchase Substitute Debt Securities and sell Debt Securities prior to maturity is subject to significant restrictions under the Indenture. See "Security for the Notes—Substitute Securities and Reinvestment Criteria."

### Directors and Officers

The directors of the Issuer (all of whom are employees of the Share Trustee) are:

| Name | Occupation |
|------|------------|
| Helen Allen | Assistant Manager - Capital Markets Queensgate Bank & Trust Company Ltd. |
| Karla J. Bodden | Financial Controller Queensgate Bank & Trust Company Ltd. |
| Martin Couch | Manager - Capital Markets Queensgate Bank & Trust Company Ltd. |
| J. Dennis Hunter | Managing Director Queensgate Bank & Trust Company Ltd. |

## EMERGING MARKETS OBLIGATIONS

The Debt Securities will consist of U.S. dollar denominated emerging markets obligations, which may include sovereign obligations of governments of emerging markets countries or debt of nongovernmental issuers in such countries. Such obligations are often unsecured, may be subordinated to other obligations of the issuer and are subject to greater credit and liquidity risk than is typically associated with investment grade corporate obligations. They are also subject to, and may be adversely affected by, risks associated with political and economic uncertainty, fluctuations of currency exchange rates, lower levels of disclosure and regulation in foreign securities markets than in the United States, risks of nationalization, expropriation, and confiscatory taxation, taxation of income earned in foreign nations or other taxes imposed with respect to investments in foreign nations, foreign exchange controls (which may include suspension of the ability to transfer currency from a given country and repatriation of investments) and uncertainties as to the status, interpretation and application of laws. In

FFNY03\ISAACLA\NORMAL\154068.03

addition, there is often less publicly available information about foreign issuers than those in the United States. Foreign issuers who are not generally subject to uniform accounting, auditing and financial reporting standards, and auditing practices and requirements may not be comparable to those applicable to U.S. companies.

## TAX CONSIDERATIONS

### General

The following is a summary of certain material United States federal income tax consequences of the ownership of the Class B-2 Notes offered herein as of the date hereof. This summary is based on the Internal Revenue Code of 1986 (the "Code") as well as Treasury regulations and administrative and judicial rulings and practice. Legislative, judicial and administrative changes may occur, possibly with retroactive effect, that could alter or modify the tax consequences discussed herein. This summary does not purport to address all federal income tax matters that may be relevant to particular holders. For example, it generally is addressed only to original purchasers of the Class B-2 Notes that are "United States Holders" (as described below) and will hold Class B-2 Notes as capital assets within the meaning of Section 1221 of the Code, and does not address tax consequences to holders that may be relevant to investors subject to special rules, such as non-U.S. investors, banks, insurance companies, tax-exempt organizations, dealers in securities or currencies, mutual funds, REITs, natural persons, cash method taxpayers, S corporations, estates and trusts, investors that hold the Class B-2 Notes as part of a hedge, straddle, integrated or conversion transaction, or holders whose "functional currency" is not the United States dollar. Further, it does not address alternative minimum tax consequences or the indirect effects on the holders of equity interests in a holder of a Class B-2 Note (a "Noteholder"). In addition, this discussion does not address the tax consequences to individual taxpayers, trusts and estates, and all such taxpayers are urged to consult their own tax advisors regarding special rules that are applicable to them with respect to being a holder of the Class B-2 Notes, including the effect and applicability of federal, state, local, foreign and other tax laws and the possible effects of changes therein.

For these purposes, a "United States Holder" is (i) a citizen or resident of the United States, (ii) a corporation or partnership organized in or under the laws of the United States, any state thereof or the District of Columbia, or (iii) an estate or trust the income of which is includible in gross income for United States federal income tax purposes regardless of its source. "Non-United States Holder" means any holder that is not a United States Holder.

IN VIEW OF THE INDIVIDUAL NATURE OF TAX CONSEQUENCES, EACH INVESTOR IS ADVISED TO CONSULT THE INVESTOR'S TAX ADVISER WITH RESPECT TO THE SPECIFIC TAX CONSEQUENCES OF BEING A HOLDER OF THE CLASS B-2 NOTES, INCLUDING THE EFFECT AND APPLICABILITY OF FEDERAL, STATE, LOCAL, FOREIGN AND OTHER TAX LAWS AND THE POSSIBLE EFFECTS OF CHANGES THEREIN.

FFNY03\ISAACLA\NORMAL\154068.03

**United States Tax Treatment of the Issuer**

Upon the issuance of the Class B-2 Notes, Fried, Frank, Harris, Shriver & Jacobson, counsel to the Issuer, will deliver its opinion generally to the effect that, as currently structured and intended to operate, the Issuer will not be considered to be engaged in the conduct of a United States trade or business solely by reason of owning the Debt Securities and Eligible Investments and its interest in the Swap Agreement and receiving income or realizing gain therefrom. This opinion will be based on (i) certain representations from the Issuer and other persons and (ii) the assumption that the Issuer and the other parties thereto comply with the terms and conditions of the Indenture, Memorandum and Articles of Association and certain other documents. If, contrary to the opinion of counsel, the Issuer were determined to be engaged in the conduct of a United States trade or business, there would be material adverse tax consequences to the Issuer and the Noteholders. In such a case, among other things, part or all of the income and gains of the Issuer would be subject to United States federal income tax at a maximum corporate tax rate of 35 percent and, in addition, a 30 percent branch profits tax would be imposed, each of which would materially reduce, if not entirely eliminate, cash available for distribution to Noteholders.

**United States Tax Treatment of Class B-2 Noteholders**

*In general.* Although the Class B-2 Notes are being issued in the form of debt, the Issuer intends to treat the Class B-2 Notes as equity in the Issuer for United States federal income tax purposes and the Class B-2 Notes are likely to be so characterized (with the consequences discussed below).

Subject to the anti-deferral rules discussed below, amounts distributed by the Issuer to a United States Holder of a Class B-2 Note that is subject to United States federal income tax will be taxable to such United States Holder as a dividend to the extent of the current and accumulated earnings and profits of the Issuer. Distributions in excess of earnings and profits will be non-taxable to the extent of, and will be applied against and reduce, the United States Holder's adjusted tax basis in the Class B-2 Notes. Distributions in excess of earnings and profits and such adjusted tax basis will be taxable to such United States Holder as gain from the sale or exchange of property.

The tax consequences discussed in the preceding paragraph may be materially modified by the anti-deferral rules discussed below. In general, each United States Holder's investment in a Class B-2 Note will be taxed as an investment in a "passive foreign investment company" ("PFIC"). In addition, each United States Holder's investment in a Class B-2 Note may be taxed as an investment in a "controlled foreign corporation" ("CFC"), or as an investment in a "foreign personal holding company" ("FPHC"), depending upon the percentage of the Class B-2 Notes that is acquired and held by such United States Holder and certain other United States Holders. If applicable, the rules pertaining to a CFC and a FPHC generally override those pertaining to a PFIC with respect to which a "QEF" election (described below) is in effect.

In reviewing the discussion regarding QEF elections, CFCs and FPHCs, prospective investors should note that the Issuer may have in any given year substantial income

for United States federal income tax purposes that is not distributed on the Class B-2 Notes. Such undistributed income may arise, from, among other reasons, the use of interest (and other) income on the collateral debt Securities to purchase additional Debt Securities or to retire Class A Notes.

Status of the Issuer as a PFIC. The Issuer will be treated as a "passive foreign investment company" or "PFIC" for United States federal income tax purposes. United States Holders in PFICs, other than United States Holders that make the "qualified electing fund" or "QEF" election described below, are subject to special rules for the taxation of "excess distributions" (which include both certain distributions by a PFIC and any gain recognized on a disposition of PFIC stock). In general, Section 1291 of the Code provides that the amount of any "excess distribution" will be allocated to each day of the United States Holder's holding period for its PFIC stock. The amount allocated to the current year will be included in the United States Holder's gross income for the current year as ordinary income. With respect to amounts allocated to prior years, the tax imposed for the current year will be increased by the "deferred tax amount" (an amount calculated with respect to each prior year by multiplying the amount allocated to such year by the highest rate of tax in effect for such year, together with an interest charge, as though the amounts of tax were overdue).

An excess distribution is the amount by which distributions for a taxable year exceed 125 percent of the average distribution in respect of the Class B-2 Notes during the three preceding taxable years (or, if shorter, the investor's holding period for the Class B-2 Notes). As indicated above, any gain recognized upon disposition of the Class B-2 Notes will be treated as an excess distribution and taxed as described above (*i.e.*, will not be taxable as capital gain).

Special rules apply to certain regulated investment companies that own interests in PFICs and any such investor should consult with its own tax advisors regarding the consequences to it of acquiring Class B-2 Notes.

QEF Election. If a United States Holder (including a United States Holder indirectly owning Class B-2 Notes) makes the qualified electing fund election (the "QEF election") provided in Section 1295 of the Code, the United States Holder will be required to include its pro rata share of the Issuer's ordinary income and net capital gains (unreduced by any prior year losses) in income (as ordinary income and long term capital gain, respectively) for each taxable year and pay tax thereon even if such income and gain is not distributed to the United States Holder by the Issuer. In addition, any losses of the Issuer will not be deductible by such United States Holder. If the Issuer later distributes the income or gain on which the United States Holder has already paid taxes, amounts so distributed to the United States Holder will not be further taxable to the United States Holder. A United States Holder's tax basis in the Class B-2 Notes will be increased by the amount so included and decreased by the amount of nontaxable distributions. In general, a United States Holder making the QEF Election will recognize, on the disposition of the Class B-2 Notes, capital gain or loss equal to the difference, if any, between the amount realized upon such disposition and his adjusted tax basis in such Class B-2 Notes.

The QEF election is effective only if certain required information is made available by the Issuer to the U.S. Internal Revenue Service ("IRS"). The Issuer will undertake to comply with the IRS information requirements necessary to be a QEF, which will permit Noteholders to make the QEF election, and to provide to each United States Holder information needed for the determination of such Noteholder's pro rata share of the Issuer's ordinary and net capital gain income. Nonetheless, there can be no absolute assurance that such information will always be available or presented.

Status of the Issuer as a CFC. United States tax law also contains special provisions dealing with "controlled foreign corporations" ("CFCs"). If a United States Holder owns at least 10 percent of the voting stock of a foreign corporation, the United States Holder is considered a "United States Shareholder" with respect to the foreign corporation. For this purpose, the Class B-2 Notes are likely to be considered voting stock. If United States Shareholders in the aggregate own more than 50% of the voting power or value of the stock of such corporation, the foreign corporation will be classified as a CFC. Complex attribution rules apply for purposes of determining ownership of stock in a foreign corporation such as the Issuer.

If the Issuer is classified as a CFC, a United States Shareholder would generally be subject to current U.S. tax on the income of the Issuer, regardless of cash distributions from the Issuer. In addition, gain on the sale of the CFC's stock by a United States Shareholder (during the period that the corporation is a CFC and thereafter for a five-year period) would be classified in whole or in part as dividend income.

Foreign Personal Holding Company Provisions. The Issuer will be classified as a "foreign personal holding company" if at any time during a taxable year more than 50 percent of the Class B-2 Notes of the Issuer (by vote or value) will be owned (directly or indirectly) by not more than five individuals who are citizens or residents of the United States. In the event the Issuer is classified as a foreign personal holding company and a Non-CFC, United States holders would include in income for the taxable year as a dividend their share of the undistributed foreign personal holding company income of the Issuer. In this event, the tax basis of a United States holder's Class B-2 Notes would be increased by the amount included in income.

Information Reporting Requirements. Under United States federal income tax law and regulations, certain categories of United States persons must file information returns with respect to their investment in, or involvement in, a foreign corporation. These reporting requirements apply to both taxable and tax-exempt United States Holders.

Tax-Exempt Investors. Special considerations apply to pension plans and other investors ("Tax-Exempt Investors") that are subject to tax only on their "unrelated business taxable income" ("UBTI"). A Tax-Exempt Investor's income from an investment in the Issuer generally should not be treated as resulting in UBTI under current law. It is unclear, however, if such income would be treated as UBTI if the investor directly or indirectly elects to treat the Issuer as a QEF.

Tax-Exempt Investors should consult their own tax advisors regarding an investment in the Issuer.

Taxation of Non-United States holders. Assuming that the Issuer at no time is engaged in a U.S. trade or business, dividends on, and gain from the sale, exchange or redemption of, Class B-2 Notes generally should not be subject to U.S. federal income tax in the hands of a non-U.S. Holder that has no connection with the United States other than the holding of the Class B-2 Notes.

## Cayman Islands Tax Considerations

The following is a general summary of Cayman Islands taxation in relation to the Class B-2 Notes.

Under existing Cayman Islands laws:

(i)    payments of principal and interest in respect of the Class B-2 Notes will not be subject to taxation in the Cayman Islands and no withholding will be required on such payments to any holder of a Class B-2 Note and gains derived from the sale of Class B-2 Notes will not be subject to Cayman Islands income or corporation tax. The Cayman Islands currently have no income, corporation or capital gains tax and no estate duty, inheritance tax or gift tax; and

(ii)    the holder of any Class B-2 Note (or the legal personal representative of such holder) whose Class B-2 Note is brought into the Cayman Islands may in certain circumstances be liable to pay stamp duty imposed under the laws of the Cayman Islands in respect of such Note.

The Issuer has been incorporated under the laws of the Cayman Islands as an exempted company and, as such, has applied for and obtained an undertaking from the Governor In Council of the Cayman Islands in the following form:

"The Tax Concessions Law
(1995 Revision)
Undertaking as to Tax Concessions

In accordance with the provisions of Section 6 of The Tax Concessions Law (1995 Revision), the Governor In Council undertakes with Augusta Funding Limited B "the Company":

(a)    that no Law which is hereafter enacted in the Islands imposing any tax to be levied on profits, income, gains or appreciations shall apply to the Company or its operations; and

(b)    in addition, that no tax to be levied on profits, income, gains or appreciations or which is in the nature of estate duty or inheritance tax shall be payable by the Company

(i)    on or in respect of the shares, debentures or other obligations of the Company; or

FFNY03\ISAACLA\NORMAL\154068.03

(ii)    by way of the withholding in whole or in part of any relevant payment as defined in Section 6(3) of the Tax Concessions Law (1995 Revision).

These concessions shall be for a period of twenty years from the 18 day of March 1997.

Governor In Council"

The Cayman Islands does not have an income tax treaty arrangement with the U.S. or any other country.

THE PRECEDING DISCUSSION IS ONLY A SUMMARY OF CERTAIN OF THE TAX IMPLICATIONS OF AN INVESTMENT IN CLASS B-2 NOTES. PROSPECTIVE INVESTORS ARE URGED TO CONSULT WITH THEIR OWN TAX ADVISORS PRIOR TO INVESTING TO DETERMINE THE TAX IMPLICATIONS OF SUCH INVESTMENT IN LIGHT OF SUCH INVESTOR'S CIRCUMSTANCES.

## ERISA CONSIDERATIONS

Section 406 of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), and Section 4975 of the Code prohibit "plan assets" of pension, profit-sharing or other employee benefit plans, as well as individual retirement accounts and Keogh Plans (each, a "Plan"), from being involved in certain transactions with persons that are "parties in interest" under ERISA or "disqualified persons" under the Code with respect to such Plan. A violation of these "prohibited transaction" rules may result in an excise tax or other penalties and liabilities under ERISA and Section 4975 of the Code for such persons, unless a statutory or administrative exemption is available.

Certain transactions involving the Issuer could be deemed to constitute prohibited transactions under ERISA and Section 4975 of the Code with respect to a Plan if Class B-2 Notes were acquired with "plan assets" of such Plan and assets of the Issuer were deemed to be "plan assets" of Plan investors. Under a regulation (the "Plan Assets Regulation") issued by the United States Department of Labor (the "DoL"), the assets of the Issuer would be treated as "plan assets" of a Plan for purposes of ERISA and Section 4975 of the Code only if "plan assets" of the Plan were used to acquire an equity interest in the Issuer and none of the exceptions contained in the Plan Assets Regulation were applicable. An "equity interest" is defined under the Plan Assets Regulation as any interest in an entity other than an instrument that is treated as indebtedness under applicable local law and that has no substantial equity features.

Employee benefit plans that are governmental plans (as defined in Section 3(32) of ERISA) and certain church plans (as defined in Section 3(33) of ERISA) are not subject to the requirements of ERISA or Section 4975 of the Code.

Because the Class B-2 Notes will likely be equity investments for purposes of applying ERISA and Section 4975 of the Code, the Class B-2 Notes may not be purchased or held by (a) an employee benefit plan (as defined in Section 3(3) of ERISA) that is subject to the provisions of ERISA, (b) a plan described in Section 4975 of the Code (other than a

71

governmental or church plan described in Section 4975(g)(2) or (3) of the Code) that is subject to Section 4975 of the Code, or (c) any entity whose underlying assets include "plan assets" by reason of any such plan's investment in the entity (excluding for purposes of this clause (c), any entity registered under the Investment Company Act of 1940, as amended), unless (A) such purchase and the holding of such Class B-2 Note or such interest therein is effected in reliance upon the exemptive relief afforded under Prohibited Transaction Class Exemption 95-60 and (B) sufficient documentation to that effect has been provided to the Trustee.

## SUBSCRIPTION AND SALE

Bear, Stearns International Limited and Bear Stearns, & Co. Inc. (in such capacity each an "Initial Purchaser" and collectively the "Initial Purchasers") have, pursuant to a Subscription Agreement dated as of April 8, 1997 agreed with the Issuer, subject to the satisfaction of certain conditions, to purchase from the Issuer, the Class B-2 Notes. Class B-2 Notes will be initially offered in negotiated transactions at prices to be determined at the time of sale.

The Issuer has been advised by the Initial Purchasers that the Initial Purchasers propose to resell the Class B-2 Notes to certain persons in offshore transactions in reliance on Regulation S under the Securities Act and to Accredited Investors in reliance on Regulation D under the Securities Act. Any offer or sale of Class B-2 Notes made in reliance on Regulation D will be made by broker-dealers, including certain affiliates of the Initial Purchasers, who are registered as broker-dealers under the Exchange Act. The Initial Purchasers may allow a concession, not in excess of the selling concession, to certain brokers or dealers.

The Class B-2 Notes have not been and will not be registered under the Securities Act and may not be offered, sold or delivered within the United States or to, or for the account or benefit of, a U.S. Person except to Accredited Investors in reliance on Regulation D or to Qualified Institutional Buyers in reliance on Rule 144A. Resales of the Class B-2 Registered Notes offered in reliance on Regulation D are restricted as described under "Transfer Restrictions" herein. As used in this paragraph, the terms "United States" and "U.S." have the meanings given to them by Regulation S under the Securities Act.

Each of the Initial Purchasers has agreed that (i) it has not offered or sold and that, until six months after the Closing Date, it will not offer or sell any Class B-2 Notes to persons in the United Kingdom except to persons whose ordinary activities involve them in acquiring, holding, managing or disposing of investments (as principal or agent) for the purposes of their businesses or otherwise in circumstances which have not resulted and will not result in an offer to the public in the United Kingdom within the meaning of the Public Offers of Securities Regulations 1995; (ii) it has complied and will comply with all applicable provisions of the Financial Services Act 1986 with respect to anything done by it in relation to the Class B-2 Notes in, from or otherwise involving the United Kingdom; (iii) it has only issued or passed on and will only issue or pass on in the United Kingdom any document received by it in connection with the proposed issue of the Class B-2 Notes to a person that is of a kind described in Article 11(3) of the Financial Services Act 1986 (Investment Advertisements) (Exemptions) Order 1996, or a person to whom the document may otherwise lawfully be issued or passed on.

Each of the Initial Purchasers has agreed that it has not made and will not make any invitation to the public in the Cayman Islands to subscribe for the Class B-2 Notes.

The Issuer and the Initial Purchasers extend to each prospective investor the opportunity, prior to the consummation of the sale of the Class B-2 Notes, to ask questions of, and receive answers from, the Issuer concerning the Class B-2 Notes and the terms and conditions of this Offering and to obtain any additional information it may consider necessary in making an informed investment decision and any information in order to verify the accuracy of the information set forth herein, to the extent the Issuer possesses the same.

No action is being taken or is contemplated by the Issuer that would permit a public offering of the Class B-2 Notes or possession or distribution of any Offering Memorandum (in preliminary or final form) or any amendment thereof, any supplement thereto or any other offering material relating to the Class B-2 Notes in any jurisdiction where, or in any other circumstances in which, action for those purposes is required. The Initial Purchasers understand and agree that they are solely responsible for their own compliance with all laws applicable in each jurisdiction in which they offer and sell Class B-2 Notes, or distribute any Offering Memorandum (in preliminary or final form) or any amendments thereof or supplements thereto or any other material and they agree to comply with all these laws.

The Issuer has agreed to indemnify the Initial Purchasers against certain liabilities, including liabilities under the Securities Act, or to contribute to payments they may be required to make in respect thereof.

Certain of the Debt Securities may have been originally underwritten or placed by the Initial Purchasers. In addition, the Initial Purchasers may have in the past and may in the future perform investment banking services or other services for issuers of Debt Securities.

## TRANSFER RESTRICTIONS

**Because of the following restrictions, purchasers of Class B-2 Registered Notes are advised to consult legal counsel prior to making any offer, resale, pledge or transfer of the Class B-2 Registered Notes.**

Each holder of a Class B-2 Registered Note will be required to execute a certificate, the form of which is attached to the form of such Class B-2 Registered Note, stating as follows:

(1)    We have received and reviewed the Offering Memorandum dated April 8, 1997 relating to the Class B-2 Notes, and such other information as we deem necessary in order to make our investment decision.

(2)    As a purchaser of the Class B-2 Notes in a private placement, we represent that (i) we are (or any account for which we are purchasing under (ii) below) is [a "qualified institutional buyer," as defined in Rule 144A under the United States Securities Act of 1933, as amended (the "Securities Act")] [an institutional accredited investor as defined in Rule 501(a)-(1)(3) or (7) of Regulation D promulgated under the United States Securities Act

73    FFNY03\USAACLA\NORMAL\154068.03

of 1933, as amended (the "Securities Act")] [not a "U.S. Person." as defined in Regulation S promulgated under the United States Securities Act of 1933, as amended (the "Securities Act"), and have purchased the Class B-2 Notes in a transaction in compliance with Rule 904 promulgated under the Securities Act] [include whichever is applicable] and (ii) we are purchasing such Class B-2 Notes for our own account (or for accounts as to which we exercise sole investment discretion) and have authority to make, and do make, the statements contained in this letter and not with a view to any distribution thereof.

(3)   We have such knowledge and experience in financial and business matters with respect to collateralized securities as to be capable of evaluating the merits and risks of an investment in the Class B-2 Notes and forming an investment decision with respect thereto and we are (or any account for which we are purchasing is) able to bear the risk of such investment for an indefinite period and to afford a complete loss thereof.

(4)   We understand that the Class B-2 Notes have not been registered under the Securities Act by reason of their issuance in a transaction that does not require registration under the Securities Act, and that such Class B-2 Notes must be held indefinitely unless a subsequent disposition is exempt from such registration. We agree that, if in the future we should decide to dispose of any of the Class B-2 Notes, we will not offer, sell, or deliver any such Class B-2 Notes directly or indirectly, except in a transaction pursuant to Regulation D under the Securities Act, Rule 144A under the Securities Act or pursuant to another exemption from the Securities Act.

(5)   We agree not to sell or transfer any of the Class B-2 Notes except upon compliance with the provisions of the Indenture and the Class B-2 Notes, including obtaining from any persons purchasing one or more Class B-2 Notes from us and delivering to the addressees hereof, a letter substantially in the form of this letter.

(6)   The Class B-2 Notes that we have purchased shall be issued in registered form and such Class B-2 Notes shall bear the following legend:

THIS SECURITY HAS NOT BEEN AND WILL NOT BE REGISTERED UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), AND THE ISSUER HAS NOT BEEN REGISTERED UNDER THE UNITED STATES INVESTMENT COMPANY ACT OF 1940, AS AMENDED (THE "1940 ACT"). THIS SECURITY MAY NOT BE OFFERED, SOLD, PLEDGED OR OTHERWISE TRANSFERRED, EXCEPT (A)(1) TO A PERSON WHOM THE SELLER REASONABLY BELIEVES IS A QUALIFIED INSTITUTIONAL BUYER WITHIN THE MEANING OF RULE 144A UNDER THE SECURITIES ACT PURCHASING FOR ITS OWN ACCOUNT OR FOR THE ACCOUNT OF A QUALIFIED INSTITUTIONAL BUYER IN A TRANSACTION MEETING THE REQUIREMENTS OF RULE 144A SO LONG AS THIS SECURITY IS ELIGIBLE FOR RESALE PURSUANT TO RULE 144A SUBJECT TO THE SATISFACTION OF CERTAIN CONDITIONS SPECIFIED IN THE INDENTURE REFERRED TO BELOW, (2) TO A NON-U.S. PERSON IN AN OFFSHORE TRANSACTION IN

ACCORDANCE WITH RULE 903 OR RULE 904 (AS APPLICABLE) OF REGULATION S UNDER THE SECURITIES ACT OR (3) TO AN ACCREDITED INVESTOR AND IN ACCORDANCE WITH ALL APPLICABLE SECURITIES LAWS OF ANY STATE OF THE UNITED STATES AND ANY OTHER APPLICABLE JURISDICTION. EACH PURCHASER OF THIS SECURITY WILL BE REQUIRED TO EXECUTE A TRANSFER CERTIFICATE IN ACCORDANCE WITH SECTION 2.05 OF THE INDENTURE. ANY TRANSFER IN VIOLATION OF THE FOREGOING WILL BE OF NO FORCE AND EFFECT, WILL BE VOID AB INITIO, AND WILL NOT OPERATE TO TRANSFER ANY RIGHTS TO THE TRANSFEREE, NOTWITHSTANDING ANY INSTRUCTIONS TO THE CONTRARY TO THE ISSUER, THE TRUSTEE OR ANY INTERMEDIARY.

(7)    We understand that, in connection with any proposed transfer or exchange of Class B-2 Notes, an opinion of counsel experienced in giving opinions with respect to questions relating to the securities laws of the United States may be required, to the effect that such transfer or exchange will be in compliance with the Securities Act and the Investment Company Act of 1940, as amended, together with such other documentation (including a letter to substantially the same effect as this letter) as the Trustee may reasonably request; provided that no such opinion or other documentation relating to compliance with the Securities Act shall be required if such transfer is made in accordance with Rule 144A under the Securities Act and the transferee furnishes a letter, signed by its chief financial officer or other executive officer, to substantially the same effect as this letter (excluding paragraph (1)).

(8)    We are the sole "beneficial owner" of the Note or are acquiring the Class B-2 Note for the sole "beneficial owner" of such Class B-2 Note (as such term is defined in Section 3(c)(1) of the Investment Company Act).

(9)    We understand that no employee benefit or other plan that is subject to ERISA or Section 4975 of the Code, and no entity whose underlying assets include "plan assets" by reason of any such plan's investment in the entity (excluding any entity registered under the Investment Company Act), may purchase or hold such Class B-2 Note or any interest therein, unless it is an insurance company, it is acquiring such Class B-2 Note or an interest therein with assets of its general account in reliance on the availability of the exemptive relief afforded by U.S. Department of Labor Prohibited Transaction Class Exemption ("PTCE") 95-60, 60 Federal Register 35925 (July 12, 1995), such general account satisfies the conditions set forth in Section I(a) of PTCE 95-60 and its holding of such Class B-2 Note or an interest therein after the date that is eighteen months after the issuance of final regulations under Section 401(c) of ERISA will be permissible thereunder or under such final regulations, PTCE 95-60 or another exemption under ERISA. Each prospective purchaser of a Note or any interest therein, by purchase such Class B-2 Note or any interest therein, represents that (A) it is neither an employee benefit or other plan that is subject to ERISA or Section 4975 of the Code nor any entity whose underlying assets include "plan assets" by reason of such plan's investment in the entity (excluding any entity registered under the Investment Company Act or (B) it is an insurance company, and it is acquiring such Class B-2 Note or interest therein with assets

of its general account in reliance on the availability of the exemptive relief afforded by PTCE 95-60 and its holding of such Class B-2 Note or an interest therein after the date that is eighteen months after the issuance of final regulations under Section 401(c) of ERISA is permissible thereunder or under such final regulations, PTCE 95-60 or another exemption under ERISA.

## LISTING AND GENERAL INFORMATION

1.    Application has been made to list the Class B-2 Notes on the Luxembourg Stock Exchange. Prior to the listing, a legal notice ("Notice Legale") relating to the issue of the Class B-2 Notes, copies of the Certificate of Incorporation, Memorandum of Association and Articles of Association of the Issuer will be deposited with the Chief Registrar of the District of Luxembourg ("Greffier en Chef du Tribunal d'Arrondissement de et à Luxembourg"), where copies thereof may be obtained, free of charge, upon request.

2.    As long as any of the Class B-2 Notes are outstanding, copies of the Memorandum of Association and Articles of Association of the Issuer, the Indenture and the Collateral Management Agreement will be available for inspection and any annual and any interim semi-annual financial statements of the Issuer will be obtainable at the offices of Banque Générale du Luxembourg S.A. (the "Listing Agent") in the City of Luxembourg, where copies thereof may be obtained upon request.

3.    Copies of the Memorandum of Association and Articles of Association of the Issuer, the resolutions of the Board of Directors of the Issuer authorizing the issuance of the Class B-2 Notes, the Indenture and the Collateral Management Agreement will be available during the term of the Class B-2 Notes in the City of New York, New York at the office of the Trustee and at the office of the Paying Agent in Luxembourg.

4.    The Issuer represents that there has been no material adverse change in its financial position since its date of incorporation.

5.    The Issuer is not involved in any litigation or arbitration proceedings relating to claims or amounts which are material in the context of the issue of Class B-2 Notes, nor, so far as such Issuer is aware, is any such litigation or arbitration involving it pending or threatened.

6.    The issuance of the Class B-2 Notes will be authorized by the Board of Directors of the Issuer by resolutions to be passed on or about April 9, 1997.

7.    The Class B-2 Notes have been accepted for clearance through Cedel Bank and Euroclear under the Common Code 7551487. The International Securities Identification Number (ISIN) for the Class B Notes is XS0075514876.

## LEGAL MATTERS

Certain legal matters with respect to the Notes will be passed upon for the Issuer by Fried, Frank, Harris, Shriver & Jacobson (a partnership which includes professional

FFNY03\USAACLA\NORMAL\U154068.03

corporations), New York, New York. Certain matters with respect to the Cayman Islands corporate law and tax law will be passed upon for the Issuer by Maples and Calder, Grand Cayman, Cayman Islands, British West Indies.

FFNY03\ISAACLA\NORMAL\154068.03

## INDEX OF DEFINED TERMS

Following is an index of defined terms used in this Offering Memorandum and the page number where each definition appears.

Defined Terms                                                                    Page No.

*1*

1940 Act ...................................................................................................... 1

*A*

Accountholder ............................................................................................ 24
Accredited Investor .................................................................................... 8
Accrued Liabilities ..................................................................................... 60
Administrative Expenses ........................................................................... 25
Africa ......................................................................................................... 41
Asia ............................................................................................................ 41
Automatic Default ...................................................................................... 33
Average Semi-Annual Asset Amount ....................................................... 62

*B*

Bankruptcy Custodian ............................................................................... 31
Bear Stearns .............................................................................................. 20
Breakeven Loss Rate ................................................................................. 44
BSAM ......................................................................................................... 62

*C*

Cap Rate Transaction ................................................................................ 52
Caribbean .................................................................................................. 41
Cedel Bank ................................................................................................ 1
CFC ............................................................................................................ 68
Class A Interest Coverage Ratio ............................................................... 46
Class A Interest Coverage Test ................................................................ 46
Class A Note Call Date .............................................................................. 3
Class A Notes ............................................................................................ 1
Class A Par Value Ratio ............................................................................ 46
Class A Par Value Test .............................................................................. 46
Class B Note Redemption Floor Amount .................................................. 20
Class B Notes ............................................................................................ 1
Class B-1 Collateral ................................................................................... 7
Class B-2 Notes ......................................................................................... 1
Closing Date ............................................................................................... 1
Code ........................................................................................................... 6
Collateral ................................................................................................... 6
Collateral Management Fee ....................................................................... 62
Collateral Manager .................................................................................... 10
Collateral Portfolio ..................................................................................... 1
Collateral Quality Test ............................................................................... 43
Collection Account ..................................................................................... 50
Common Depositary ................................................................................... 9
controlled foreign corporations .................................................................. 70
Coverage Tests .......................................................................................... 45
Credit Improved Security ........................................................................... 47

FFNY03\USAACLA\NORMAIM154068.03

—

Credit Risk Security ......................................................................................... 47
Credit Support Default ...................................................................................... 53

*D*

Debt Securities ................................................................................................... 1
deferred tax amount ......................................................................................... 69
Determination Date ......................................................................................... 19
DoL ................................................................................................................... 72
Dollars ................................................................................................................ i
Due Period ........................................................................................................ 17

*E*

Eastern Europe ................................................................................................. 41
Effective Date .................................................................................................... 41
Equity Security .................................................................................................. 43
ERISA ............................................................................................................... 72
Euroclear Operator ............................................................................................. 1
Event of Default ................................................................................................ 23
Event of Integrity ............................................................................................. 54
excess distributions .......................................................................................... 69
Excess Interest .................................................................................................. 26
Exchange Act .................................................................................................... iii
Expected Portfolio .............................................................................................. 7

*F*

FPHC ................................................................................................................ 68

*G*

Global Note ....................................................................................................... 23
Greffier en Chef du Tribunal d'Arrondissement de et à Luxembour .................. 77

*H*

Hedge Agreements .............................................................................................. 2

*I*

Indemnification Agreement .............................................................................. 61
Indenture ............................................................................................................ 1
Indenture Default ............................................................................................. 31
Initial Purchaser ................................................................................................. 1
Initial Purchasers ............................................................................................... 1
Insolvency Law ................................................................................................. 31
Insurance Agreement ........................................................................................ 60
Interest Proceeds .............................................................................................. 25
Interest Rate Swap Transaction ........................................................................ 52
IRS .................................................................................................................... 69
ISDA ................................................................................................................. 52
ISDA Definitions .............................................................................................. 52
Issuer ................................................................................................................... 1
Issuer Expenses ................................................................................................ 27
Issuer Ordinary Shares ..................................................................................... 65

*L*

Latin America ................................................................................................... 41
Listing Agent .................................................................................................... 77

*M*

MBIA .................................................................................................................. 1
MBIA ................................................................................................................. 32
MBIA Default .................................................................................................... 43
Measurement Date ............................................................................................. 54
Merger without Assumption ............................................................................. 44
Minimum Rating Distribution .......................................................................... 44

*N*

Non-Call Period .................................................................................................. 3
Non-credit Risk Security ................................................................................... 48
Notholder ........................................................................................................... 67
Notes .................................................................................................................... 1
Notice Legale .................................................................................................... --

*O*

Offering .............................................................................................................

*P*

Partial Redemption Percentage ........................................................................ 22
Paying Agent ....................................................................................................... 1
Payment Date ..................................................................................................... 29
Permanent Global Note ..................................................................................... 68
PFIC ................................................................................................................... 72
Plan .................................................................................................................... 72
Plan Assets Regulation ..................................................................................... 27
Principal Proceeds ............................................................................................ 76
PTCE

*Q*

QEF election ...................................................................................................... 69

*R*

Ramp-Up Period ................................................................................................. 8
Rating Factor ...................................................................................................... 8
Regulation S ...................................................................................................... 49
Reinvestment Criteria ........................................................................................ 3
Reinvestment Period ........................................................................................... 3
Replacement Debt Security ............................................................................... 40

*S*

Sale Proceeds .................................................................................................... 21
Scenario Loss Rate ........................................................................................... 44
Securities Act ...................................................................................................... 1
Securities and Exchange Law ........................................................................... 62
Senior Collateral Management Fee .................................................................... 2
Share Trustee ...................................................................................................... 2
Stated Maturity .................................................................................................. 17
Subordinate Interests ........................................................................................ 62
Subordinated Collateral Management Fee ....................................................... 41
Substitute Debt Security ..................................................................................... 6
Swap Agreement ................................................................................................. 1
Swap Counterparty ............................................................................................. 8
Swap Insurance Policy ......................................................................................

*T*

Tax..................................................................................................................................56
Tax Event.........................................................................................................................54
Tax Event Upon Merger.....................................................................................................54
Tax-Exempt Investors.........................................................................................................70
Temporary Global Note......................................................................................................29
Termination Amount..........................................................................................................55
Transaction Documents......................................................................................................32
Transfer Restrictions..........................................................................................................74
Trustee...............................................................................................................................1
Trustee Fees.......................................................................................................................27

*U*

.........................................................................................................................................
Unavailable Debt Security...................................................................................................40
United States......................................................................................................................73
United States Noteholder....................................................................................................71

FFNY03\USAACLA\NORMAL\154068.03

### REGISTERED OFFICE OF THE ISSUER:

**Augusta Funding Limited B**
P.O. Box 309
Grand Cayman, Cayman Islands
British West Indies

### PRINCIPAL PAYING AGENT
**Bankers Trust Company, London Branch**
1 Appold Street
Broadgate, London EC2A 2HE

### PAYING AGENT
Bankers Trust Luxembourg, S.A.
P.O. Box 807
14 Boulevard F.D. Roosevelt
L-2450 Luxembourg

### TRUSTEE
**United States Trust Company of New York**
114 West 47th Street
New York, NY 10036-1532

### LEGAL ADVISORS

*To the Issuer as to matters*
*of Cayman Islands law*

**Maples and Calder**
P.O. Box 309
Ugland House
South Church Street
Grand Cayman, Cayman Islands
British West Indies

*To the Issuer as to matters*
*of United States law*

**Fried, Frank, Harris, Shriver & Jacobson**
One New York Plaza
New York, NY 10004

### LISTING AGENT
**Banque Générale du Luxembourg S.A.**
27 Avenue Monterey
L-2951 Luxembourg

**EXHIBIT 4**

NASD Dispute Resolution Arbitration
UNIFORM SUBMISSION AGREEMENT

In the Matter of the Arbitration Between                    *Claimant(s)*

      Name(s) of Claimant(s)

      Raymond G. Perelman Charitable Remainder Unitrust

_____

_____

_____

      and

      Name(s) of Respondent(s)

      Bear Stearns & Company

_____

      Mark Seruya

_____

_____

1. The undersigned parties hereby submit the present matter in controversy, as set forth in the attached statement of claim, answers, and all related counterclaims and/or third-party claims which may be asserted, to arbitration in accordance with the Constitution, By-Laws, Rules, Regulations, and/or Code of Arbitration Procedure of the sponsoring organization.

2. The undersigned parties hereby state that they have read the procedures and rules of the sponsoring organization relating to arbitration.

3. The undersigned parties agree that in the event a hearing is necessary, such hearing shall be held at a time and place as may be designated by the Director of Arbitration or the arbitrator(s). The undersigned parties further agree and understand that the arbitration will be conducted in accordance with the Constitution, By-Laws, Rules, Regulations, and/or Code of Arbitration Procedure of the sponsoring organization.

4. The undersigned parties further agree to abide by and perform any award(s) rendered pursuant to this Submission Agreement and further agree that a judgment and any interest due thereon, may be entered upon such award(s) and, for these purposes, the undersigned parties hereby voluntarily consent to submit to the jurisdiction of any court of competent jurisdiction which may properly enter such judgment.

5. The parties hereto have signed and acknowledged the foregoing Submission Agreement.

    Raymond G. Perelman Charitable Remainder Unitrust
_____
Claimant Name (please print)

_____    11/15/01
Claimant's Signature                                   Date

    Copy of the Trust Agreement annexed hereto
_____
Claimant Name (please print)

_____
Claimant's Signature                                   Date

_____
If needed, copy this page.

21

STATE OF PENNSYLVANIA          )
                               )   ss.:
COUNTY OF MONTGOMERY           )


      On November 15, 2001 before me personally appeared Raymond G. Perelman, to me known and known to me to be the person who executed the foregoing instrument, who did depose and say that he is the Trustee of the Raymond G. Perelman Charitable Remainder Unitrust, that he has full and complete authority to file and execute the said instrument and all papers contained here in the name of and on behalf of that trust, and he acknowledged to me that he executed the same.

                   *Mary E. Mack*
                   Notary Public

NOTARIAL SEAL
MARY E. MACK, Notary Public
East Lansdowne, Delaware County
My Commission Expires Dec. 22, 2003

RAYMOND G. PERELMAN
CHARITABLE REMAINDER UNITRUST

I, RAYMOND G. PERELMAN, intending to be legally bound, and desiring to establish a charitable remainder unitrust within the meaning of Section 4 of Revenue Procedure 90-30 and Section 664(d)(2) of the Internal Revenue Code, do hereby establish the following trust, and I do hereby name myself, RAYMOND G. PERELMAN, and my wife, RUTH PERELMAN, as Trustees (who, together with any additional or successor Trustees, shall hereinafter be referred to as "Trustees").

NOW, THEREFORE, intending to be legally bound, I hereby transfer, assign and set over unto Trustees the property which is listed on Schedule "A" hereto attached and made part hereof. The assets shall be held, administered and disposed of by Trustees in accordance with the terms hereinafter set forth:

I.    ADDITIONAL PROPERTY

Trustees shall also accept any other property which may be transferred to them by me or others by Will or other instrument making appropriate reference to this Indenture, provided that such property is transferred subject to the terms of this Indenture.

II.    DISTRIBUTIONS OF INCOME AND PRINCIPAL

Trustees shall hold all of the assets received by them, IN TRUST, the net income and principal of which shall be disposed of as follows:

A.    Distributions During the Lifetimes of My Wife and Me:

1.    During each taxable year of the trust, Trustees shall distribute to me, during my lifetime, and after my death, to my wife, RUTH PERELMAN, during her lifetime, an amount (hereinafter referred to as the "Unitrust Amount") equal to ten percent (10%) of the net fair market value of the assets of the trust valued as of the first day of each taxable year of the trust. Trustees shall pay the Unitrust Amount in quarterly installments from the net income and, to the extent the net income is insufficient, from the principal of

the trust. Any net income not distributed in accordance with the foregoing provisions of this paragraph shall be accumulated and added to the principal of the trust.

2.    If for any year the net fair market value of the trust assets is incorrectly determined, then within a reasonable period of time after the value is finally determined for federal tax purposes, Trustees shall pay to (in the case of an undervaluation) or receive from (in the case of an overvaluation) my wife or me, as the case may be, an amount equal to the difference between the Unitrust Amount properly payable and the Unitrust Amount actually paid to her or me pursuant to subparagraph 1 hereof.

3.    In determining the Unitrust Amount, Trustees shall prorate the same on a daily basis for a short taxable year and for the taxable year ending with the death of the survivor of my wife and me.

4.    If any additional property is contributed to this trust after the initial contribution, the Unitrust Amount for the taxable year in which the additional property is contributed shall be ten percent (10%) of the sum of (a) the net fair market value of the trust property (excluding the property so added, and any income from, or appreciation of, such property), and (b) that proportion of the fair market value of the property so added, valued as of the date of contribution, that the number of days in the period that begins with the date of contribution and ends with the earlier of the last day of the taxable year or the date of death of the survivor of my wife and me bears to the number of days in the period that begins on the first day of such taxable year and ends with the said earlier date.

Any additional property contributed at the death of either my wife or me shall be subject to the foregoing provisions of this subparagraph 4, and the obligation to pay the unitrust amount shall commence on the date of death of the first of us to die, but payment thereof may be deferred from the said date of death to the end of the taxable year of the trust in which the complete funding of the additional property occurs. Within a reasonable time after the occurrence of the said event, Trustees shall pay the amount determined under the method described in Section 1.664-1(a)(5)(ii) of the Federal Income Tax regulations less the sum of any amounts previously distributed and interest thereon, compounded annually, from the date of distribution to the occurrence of said event.

5.    Notwithstanding any other provisions hereof, Trustees shall make distributions at such time and in such manner as not to subject the trust hereunder to tax under Section 4942 of the Internal Revenue Code. Except for the payment of the Unitrust Amount to my wife or me, Trustees shall not engage in any act of self-dealing, as defined in Section 4941(d), and shall not make any taxable expenditures, as defined in Section 4945(d). In addition, upon termination of this trust, Trustees shall not make any investments that jeopardize the charitable purpose of the trust, within the meaning of Section 4944 and the regulations thereunder, or retain any excess business holdings, within the meaning of Section 4943.

6.    Notwithstanding the foregoing provisions of this paragraph A, the unitrust interest of my wife shall take effect upon my death only if my wife furnishes the funds for payment of any federal estate taxes or state death taxes attributable to any assets of this trust for which Trustees may be liable as a result of my death, only to the extent, however, that such taxes are not otherwise paid by the Personal Representatives of my estate in accordance with the provisions of my Will, including any codicils thereto in effect at the time of my death.

B.    <u>Distributions Following the Death of the Survivor of My Wife and Me</u>:

Upon the death of the survivor of my wife and me, Trustees shall distribute the balance of principal then remaining, other than any amounts due to either my wife or me pursuant to subparagraph A1 hereof, to THE RAYMOND AND RUTH PERELMAN FAMILY CHARITABLE FOUNDATION, heretofore established by my wife and me on this date to be held and administered in accordance with the terms thereof. Notwithstanding the foregoing sentence, if the said Foundation does not qualify as an organization described in Sections 170(c), 2055(a) and 2522(a) of the Internal Revenue Code at the time set for distribution to them hereunder, then Trustees shall distribute the said balance of principal to and among the separate private charitable foundations established by my wife and me on August 21, 1995, or any of them, to be held and administered in accordance with the terms thereof, as my Trustees determine, or if none of those foundations is an organization described in the aforesaid Sections of the Internal Revenue Code, then the

-3-

said balance of principal shall be distributed to one or more organizations described in the said Sections, in such amounts or proportions, as Trustees, in their absolute discretion, shall determine. Notwithstanding the foregoing provisions of this paragraph, each distribution made to any of the aforesaid charitable foundations shall be divided equally between the separate foundations attributable to my sons, JEFFREY and RONALD, to be established at the death of the survivor of my wife and me pursuant to the terms of each of the separate charitable foundations.

III.    TAXABLE YEAR

The taxable year of the trust established hereunder shall be the calendar year.

IV.    SPENDTHRIFT PROVISION

Until actual distribution, no part of the income or principal shall be subject to anticipation or alienation by any beneficiary, and the same shall be free of the obligations of any beneficiary and may not be attached or taken because of any such obligations.

V.    DISABILITY PROVISION

If any beneficiary entitled to a distribution of income or principal hereunder has been adjudicated an incompetent (hereinafter each such condition is referred to as "incapacity"), the title to such property shall vest in the beneficiary, but during such incapacity Trustees may retain and administer such property as follows:

A.    Trustees may distribute or apply so much of the property and any income thereon as they, in their absolute discretion, may deem advisable for the health, maintenance, support and education of such beneficiary, without the intervention of a guardian or any other fiduciary.

B.    Upon termination of the incapacity, the balance of the property and any income remaining shall be distributed to such beneficiary, or if he or she dies during the incapacity, the said balance shall be distributed to his or her estate.

VI.    POWERS OF TRUSTEES

Subject to the provisions of Article II hereof, Trustees shall have the following powers in addition to those vested in them by law and granted to them elsewhere in this Indenture, which powers shall continue after termination of the trust hereunder until actual distribution of the assets:

A.    To retain and to invest in all forms of real and personal property, regardless of: (1) any limitations imposed by law on investments by Trustees; (2) any principle of law concerning delegation of investment responsibility by Trustees; or (3) any principle of law concerning investment diversification.  I specifically authorize Trustees to retain all or any of the assets which I may transfer to the trust hereunder for as long as they, in their absolute discretion, may deem advisable.

B.    To sell, pledge, mortgage, lease without limit of time or exchange any assets held hereunder.  Any such transaction may be made for such consideration and on such terms and conditions, either for cash or for credit, or partly for each, and either secured or unsecured, as they, in their absolute discretion, may decide.

C.    To exercise, refrain from exercising, purchase, grant, sell or exchange options, warrants, subscription rights and conversion privileges for the acquisition or transfer of any assets, including securities, for such periods of time and on such other terms and conditions as they may decide in their absolute discretion.

D.    With respect to any interest in any business enterprise, whether such interest was transferred by me or acquired on behalf of the trust by the Trustees, and whether such enterprise is owned directly or indirectly as a subsidiary, affiliate or otherwise, and whether such enterprise is in the form of a corporation, general or limited partnership, joint venture, sole proprietorship or in any other form (hereinafter "business enterprise"):

1.    To disregard any principle of investment diversification and to retain any part or all of such interest as long as Trustees consider it advisable to do so;

2.    To sell any part or all of such interest at such time or times, for such prices, to such persons and on such terms and conditions as Trustees may deem advisable

-5-

and to incur any expenses in connection with a public offering of debt, equity or any other type of security;

    3.    To do anything that may seem advisable with respect to the operation or liquidation of any such business enterprise or any change in the purpose, nature or structure of any such business enterprise including, without limitation, any reorganization, recapitalization and/or the creation of multiple classes of debt and/or equity (whether such classes are preferred or common, voting or non-voting or have any other attributes);

    4.    To delegate authority to any director, stockholder, manager, agent, partner or employee, and to approve payment from the business enterprise of compensation to any such person;

    5.    To cause the business enterprise to borrow money from the banking department of any corporate fiduciary, regardless of any rule of law with respect to conflict of interest;

    6.    To ratify and confirm all shareholder, partnership and joint venture agreements; and

    7.    To exercise all other powers with respect to such interest which I could have exercised if I were the owner thereof.

It is my intention to provide Trustees with the broadest authority permissible by law in the management of each such business enterprise held hereunder (irrespective of whether such interest was transferred by me or acquired subsequently by Trustees), and Trustees and their counsel may, from time to time, issue such opinions as may be required to effectuate any of the foregoing.

    E.    To vote at any election or meeting of any business enterprise in person or by proxy or to appoint agents to do so, and to enter into or extend the time of any voting trust agreement.

    F.    To hold, maintain, repair, alter or improve any real estate, and to enter into any agreement relating to the development, construction, management, financing, operation, lease, sale or demolition of such real property. Trustees are authorized to exercise any power

with respect to real property which they are authorized to exercise with respect to any interest in any business enterprise.

        G.      To borrow money for any purpose which they consider to be for the benefit of the trust. Furthermore, Trustees are authorized to mortgage or pledge assets of the trust as security therefor, and to execute any documents in connection therewith. In addition, Trustees are authorized to lend money for any purpose. Any moneys borrowed or lent may be for such period of time, at such rates of interest and on such other terms as Trustees, in their absolute discretion, may determine.

        H.      To hold or register assets in the names of their nominee, the nominee of their custodian, of their agent or of their agent's custodian, or in bearer form, without disclosing any fiduciary relationship.

        I.      To retain and pay a custodian, accountants, bookkeepers, agents, attorneys, investment counsel and investment bankers, and to grant discretionary investment authority.

        J.      To compromise any claims, including claims for taxes, by or against the Trust.

        K.      To delegate among themselves or to others any powers granted by law or under the provisions hereof, including (without limitation) the power to sign checks and to have access to safe deposit boxes, the power to give instructions regarding the purchase, sale or management of investments to any stockbroker, custodian or other agent and the power to execute instruments required in the purchase, sale or other transfer of any assets held hereunder.

## VII.   DISCLAIMER PROVISION

        Notwithstanding the foregoing provisions hereof, each Trustee serving hereunder and each beneficiary shall have the right, by instrument in writing, to disclaim, release or renounce, at any time and from time to time, any power or beneficial interest granted to him or her by law or under the provisions hereof, provided, however, that in the case of a Trustee, no such disclaimer, release or renunciation shall be binding upon his or

her successor or successors, unless the said successors shall similarly disclaim, release or renounce such power or powers.

VIII.  SITUS OF TRUSTS

The Commonwealth of Pennsylvania is hereby designated as the situs of the trust herein provided, and all questions pertaining to the validity and construction of this Indenture or the administration of the trust hereunder shall be determined in accordance with the laws of Pennsylvania, regardless of the jurisdiction in which the trust may at any time actually be administered.  Trustees, however, are prohibited from exercising any power or discretion granted under the said laws that would be inconsistent with the qualification of the trust under Section 664(d)(2) of the Internal Revenue Code and the corresponding regulations, or upon the death of the survivor of my wife and me, with the qualification of any Foundation as a tax exempt organization under Section 501(c)(3) of the Internal Revenue Code.

IX.  DEFINITIONS

A.  The use of the masculine shall be deemed to include the feminine and the use of the singular to include the plural, and vice versa.

B.  All references to any provisions of the Internal Revenue Code shall mean the Internal Revenue Code of 1986, as amended, and any successor provisions thereto.

C.  The terms "child", "children" and "issue" shall include adopted persons, but only if the adoption occurred prior to the adopted person's reaching eighteen years of age.

X.  TRUSTEES

A.  I hereby appoint myself, RAYMOND G. PERELMAN, and my wife, RUTH PERELMAN, as Trustees hereunder.

B.  During my lifetime, I shall have the authority to appoint and/or remove any number of additional Trustees to serve hereunder.  This power of appointment and

removal shall not be exhausted by one exercise thereof, but may be exercised from time to time.

C.    Upon the death, resignation or inability of my wife and me to serve as Trustee, either or both of us may be succeeded by such individual or individuals, to serve concurrently or consecutively, as I shall have designated in writing.

D.    In the event there is no Trustee serving hereunder during the lifetime of the survivor of my wife and me, my sons, RONALD O. PERELMAN and JEFFREY PERELMAN, shall commence serving hereunder.

E.    If either of my sons predeceases me, I shall have the power to appoint one or more individuals as successor Trustees of the Foundation attributable to a deceased son, and such successors shall commence serving hereunder at such time as a deceased son would have commenced serving hereunder.

F.    1.    RONALD O. PERELMAN and JEFFREY PERELMAN shall each have the right to designate one individual to serve as his successor Trustee, subject to the following provisions:

(a)    A son may designate a successor Trustee at any time after the son is serving as Trustee hereunder, and each such designation may be revoked or modified by such son at any time.

(b)    Each successor Trustee shall be an issue of the appointing Trustee.

2.    Each successor Trustee shall have the right to designate one individual as his or her successor, provided such successor shall be an issue of the appointing Trustee.

XI.    OTHER FIDUCIARY PROVISIONS

A.    Each successor Trustee shall have the same powers, rights, duties, discretions and immunities as are herein conferred upon the original Trustee named by me.

B.    I direct that no Trustee serving hereunder shall be required to give bond or enter security in order to qualify or to continue as such, any rule or law to the contrary notwithstanding.

C.    I relieve Trustees from any and all liability which results from their decisions, acts or failures to act arrived at in good faith, and they shall be absolved of any liability if they obtain approval for any past or future action from a majority of the beneficiaries affected thereby who are then sui juris.

D.    Each determination made by Trustees which is stated to be in their absolute discretion shall be conclusive and binding upon all parties and shall not subject Trustees to any liability whatsoever, at law or in equity.

E.    I hereby waive any and all periodic accounting requirements of the Trustees with respect to the trust established hereunder, and I authorize Trustees to cause the trust to be subject to the jurisdiction of the courts of the state which Trustees, in their absolute discretion, may deem most appropriate, taking into account the residence of the beneficiaries of the trust and the residence of Trustees then serving of the trust.

F.    Nothing herein shall be construed to restrict Trustees from investing trust assets in a manner that could result in the annual realization of a reasonable amount of income or gain from the sale or disposition of trust assets.

XII.   UNDERLINE IRREVOCABILITY

Subject to the provisions of subparagraph B.8. of Article II, this Indenture shall be irrevocable, and I reserve no right or power to revoke, alter or amend any of the provisions of this Indenture in any respect whatsoever. However, Trustees shall have the power, acting alone, to amend the Indenture in any manner required to ensure that the trust hereunder qualifies and continues to qualify as a charitable remainder unitrust within the meaning of Section 664(d)(2) of the Internal Revenue Code, or upon the death of the survivor of my wife and me, that any Foundation qualifies as a tax exempt organization under Section 501(c)(3) of the Internal Revenue Code.

IN WITNESS WHEREOF, I have hereunto set my hand and seal this 25th day of April, 1996.

SIGNED SEALED and DELIVERED
IN THE PRESENCE OF:

_____  _____ (SEAL)
                           Raymond G. Perelman


Trustees hereby accept the trust hereby created and agree to carry out the provisions on their part to be performed.

_____  _____
                           Raymond G. Perelman, Trustee

_____  _____
                           Ruth Perelman, Trustee

-11-

STATE OF Pennsylvania :
: SS
COUNTY OF Montgomery. :

On the 25th day of April, 1996, before me, the subscriber, a Notary Public in and for the State and County aforesaid, personally appeared the above-named RAYMOND G. PERELMAN and in due form of law acknowledged the foregoing Indenture of Trust to be his act and deed and desired that the same might be recorded as such.

WITNESS my hand and seal the day and year aforesaid.

_____
Notary Public

My commission expires:

NOTARIAL SEAL
GRACE M. LITE, Notary Public
Lower Merion Twp., County
My Commission Expires June 21, 1999

-12-

**EXHIBIT 5**

R THE EASTERN DISTRICT OF PENNSYLVANIA

**JURY TRIAL DEMANDED**

| | |
|---|---|
| RAYMOND G. PERELMAN<br>CHARITABLE REMAINDER<br>UNITRUST,<br>225 City Avenue, Suite 14<br>Bala Cynwyd, PA 19004<br><br>Plaintiff<br><br>vs.<br><br>BEAR STEARNS & CO., INC.<br>245 Park Avenue<br>New York, NY 10167<br><br>Defendant | CIVIL ACTION<br><br>NO. 02-cv-3530 |

## COMPLAINT

The Raymond G. Perelman Charitable Remainder Unitrust ("the Unitrust"), by its attorneys, the Law Offices of Michael Conley, and Barry L. Katz, for its Complaint against the Defendant Bear Stearns & Co. ("Bear Stearns"), hereby alleges as follows:

### PARTIES AND JURISDICTION

1. The Unitrust is a trust within the meaning of Section 4 of the Revenue Procedure 90-30 and Section 664 (d) (2) of the Internal Revenue Code. The Unitrust has its principal place of business at 225 City Avenue, Suite 14, Bala Cynwyd, PA 19004.

2. Upon information and belief, the Defendant Bear Stearns is and was at all relevant times a corporation with principal place of business in the City and State of New York, and is a securities broker dealer firm that conducts business in the Eastern District of Pennsylvania.

3. This Court has jurisdiction of this action pursuant to the provisions of 28 U.S.C. §1331 because this action arises under the laws of the United States, and under 28 U.S.C. § 1332

because it is an action between citizens of a state and a citizens of a different state and the matter in controversy exceeds the sum of $75,000.00 exclusive of interest and costs. There also is pendent jurisdiction over the state claims under 28 U.S.C. § 1337.

4.   Venue is proper in this Court under 28 U.S.C. § 1391. A substantial part of the events giving rise to the claim herein occurred in this district.

<u>FACTS</u>

5.   In March 1997, Bear Stearns solicited the purchase of, and caused to be sold to the Unitrust, a security called the Augusta Fund Junior Notes ("the Notes") as part of a collateralized bond offering (the "CBO"). The Notes were issued at a discount and the Unitrust paid a total of $2,607,792.10 for $3,000,000 face amount of Notes.

6.   Subsequent to the Unitrust's purchase of the Notes, the Unitrust discovered that certain intentionally false and misleading statements, and omissions of material facts, were made to the Unitrust in connection with the sale to it and the purchase by it of the Notes. The claims of the Unitrust in this regard are presently the subject of an arbitration proceeding before the NASD. The NASD dispute is entitled <u>Raymond G. Perelman Charitable Remainder Unitrust v. Bear Stearns & Co., and Mark Seruya</u>, (the "NASD Arbitration"), and bears the case number 01-06336. The NASD Arbitration is presently ongoing.

7.   Prior to the institution of the NASD Arbitration, the Unitrust moved its account from Bear Stearns to Barclays Private Bank ("Barclays"). Thereafter, all the securities that had been held at the Unitrust's account at Bear Stearns were transferred to Barclays. The Notes were included in the securities transferred.

8.   Bear Stearns was aware that the primary objective of the Unitrust with respect to any investment it made was receiving a steady stream of income on any such investment. Indeed, the Notes were marketed and sold to the Unitrust as a security investment that would likely provide a

high rate of return. However, shortly after the Notes were sold to the Unitrust, they ceased

paying interest. Therefore, the Unitrust was very dissatisfied with this investment, not only

because of the misrepresentations and omissions made by Bear Stearns, but because the Notes

were no longer paying interest. Bear Stearns was fully aware of this dissatisfaction and the

reasons therefore.

9.  Beginning in or about early February 2002, Bear Stearns, through its outside and

inside counsel, began to put pressure on the Unitrust to seek redemption/sale of the Notes. Bear

Stearns did this without providing to the Unitrust critical and material non-public information

which it possessed, as well as making intentionally false and misleading statements. The fraud

and scheme to defraud alleged herein was orchestrated by Bear Stearns and effected through the

information that it communicated to its inside and outside counsel, who then provided, or did not

provide, such information to the Unitrust through letters and phone calls from such counsel to the

Unitrust.

10.  Bear Stearns, through its outside and inside counsel, continued to put significant

pressure on the Unitrust to sell its Notes under the guise of requiring the Unitrust to mitigate its

alleged damages relating to the NASD Arbitration. Significant to the Unitrust on the issue of

Bear Stearn's demand that it mitigate damages was the fact that the Notes were not paying any

interest, and the Unitrust was not aware of any prospect that they would pay interest. Therefore,

the Unitrust understood the repeated assertions by Bear Stearns that the Unitrust sell its bonds in

order to mitigate damages as Bear Stearns' desire to have the Unitrust recover at least a portion

of its investment and thereafter obtain some rate of return thereon.

11.  It was important to Bear Stearns that it cause the Unitrust sell/redeem the Notes

because Bear Stearns viewed that such sale would significantly reduce the exposure it faced in

the NASD Arbitration. In addition, Bear Stearns wanted the Unitrust to sell the Notes to Bear

3

Stearns at a price less than they were worth in order to resell them at a profit. In order to accomplish this Bear Stearns made intentionally false and misleading statements and omissions of material fact in order to induce and cause the Unitrust to sell its Notes.

12.    Upon information and belief prior to the time period beginning in February 2002 that Bear Stearns began encouraging and pressuring the Unitrust to sell the Notes, Bear Stearns was aware that the Notes were going to pay interest on the next interest payment date, that being on or about April 10, 2002. Irrespective of being aware of this information, Bear Stearns intentionally and/or with reckless disregard for the truth withheld this information from the Unitrust with the intention to defraud the Unitrust and to cause the Unitrust to sell the Notes at less than their true value and without obtaining payment for any accrued interest.

13.    In addition, since there was no available market value for the Notes, the issue of what they were worth was critical to the Unitrust in connection with any decision to sell the Notes. Bear Stearns was aware that the valuation to be received by the Unitrust was critical. Bear Stearns provided two separate intentionally misleading valuations of the then purported estimated value of the Notes to the Unitrust. Bear Stearns, which through its related companies acted as the portfolio manager for the CBO, had material non-public information as to the value of the Notes and the collateral underlying the Notes. Bear Stearns intentionally used this knowledge to its advantage and intentionally did not disclose to the Unitrust the material non-public information it possessed relating to the true value of the Notes and the basis for determining valuation.

14.    On February 22, 2002 Bear Stearns, though its counsel, represented to the Unitrust that the true value of the Notes was 66 percent of their face amount. Thereafter, on or about February 26, 2002 Bear Stearns changed its estimate and its counsel told the Unitrust they were worth 82.5 percent of their face value. The value of 82.5 percent was continually

4

represented by counsel for Bear Stearns to the Unitrust as the estimated value from February 26

through to on or about March 6, 2002.

15.    During this time, despite repeated requests by the Unitrust for information, Bear

Stearns refused to provide to the Unitrust any basis for its valuation of the Notes, except on one

occasion its counsel stated that it was based upon an unidentified analyst's estimate. However,

upon information and belief, Bear Stearns and its affiliates possessed material non-public

information which related to what the Notes were worth, with such information indicating that

the Notes were worth more than was represented to the Unitrust by Bear Stearns. Bear Stearns

knowingly and intentionally withheld this information from the Unitrust with the intent of

defrauding the Unitrust and causing it to sell the Notes at less than their true value.

16.    That Bear Stearns knew that the Notes were going to pay interest, and that they

were worth more than Bear Stearns had represented they were worth, is evidenced by Exhibit A

hereto. Although requested prior thereto, these documents were furnished to the Unitrust only

after the Notes were purchased by Bear Stearns from the Unitrust. The Collateral Manager

Report prepared by Bear Stearns Asset Management, Inc. ("BSAM") shows that as of December

31, 2001 the portfolio held as the underlying assets to the CBO had passed all the Par and

Interest Tests and therefore interest would be paid. Irrespective, as stated above, Bear Stearns

intentionally withheld this information from the Unitrust.

17.    In addition to the Collateral Manager Report, which BSAM prepared, Bear

Stearns possessed the other documents contained in Exhibit A hereto, that being a detailed

summary of the portfolio's holdings as of December 31, 2001 and a schedule of transactions for

the 3rd and 4th Quarters of 2001. This information was not public and was all material in

determining the true value of the Notes. In addition, upon information and belief, Bear Stearns

itself and through BSAM had possession of material non public information relating to the CBO

5

portfolio and transactions with respect to the portfolio for the period subsequent to December 31, 2001. This material non-public information was possessed by Bear Stearns, was used by it to determine the true value of the Notes and was not disclosed to the Unitrust until after Bear Stearns had purchased the Notes from the Unitrust. Bear Stearns intentionally and with the intent to defraud withheld this information from the Unitrust until after it had purchased the Notes from the Unitrust. The non-public information contained in Exhibit A hereto, which upon information and belief was possessed by Bear Stearns during February and March 2002, was material inside information relating to the Notes.

18.    In addition to the above, after Bear Stearns began pressuring the Unitrust to seek redemption pursuant to Indenture, the Unitrust requested that Bear Stearns inform it whether or not the conditions necessary for redemption to be allowed had been satisfied. Although, as evidenced by Exhibit A hereto, Bear Stearns possessed this information, and knew redemption would be permitted, it refused to provide such information and directed the Unitrust to U.S. Trust, as Trustee. Although the Unitrust had attempted to obtain this information from the person directed by Bear Stearns, it was unable to do so. Thus, Bear Stearns knew that redemption would be permitted, but the Unitrust did not.

19.    In addition, upon information and belief, Bear Stearns had information as to whether or not a minimum price could be requested if redemption was sought. The Unitrust obtained this information from another Noteholder that was considering redemption. By letter dated March 5, 2002 the Unitrust identified the person at Bear Stearns that supposedly knew about conditioning redemption on a minimum price and asked Bear Stearns to confirm this information. Bear Stearns refused, and instead pressured the Unitrust to sell its Notes to Bear Stearns. Bear Stearns also refused to provide any information about redemptions requested by other Noteholders, although requested to do so by the March 5 letter. Finally, upon information

6

and belief, if Bear Stearns forced the Unitrust to seek redemption Bear Stearns would be afforded

the option to purchase the Notes prior to redemption. This information was obtained by the

Unitrust from the Trustee for the Notes, but Bear Stearns never disclosed this information. This

was another reason Bear Stearns desired to have the Unitrust seek to redeem its Notes.

20.    The above information was material to the Unitrust in determining to sell its

Notes to Bear Stearns and not seek redemption. The Unitrust had no information as to valuation

other than the false and misleading information supplied by Bear Stearns, it did not know that the

Notes would pay interest, it did not know if redemption would be allowed (if requested) and it

did not know what, if anything, it would obtain if redemption was requested because it did not

know if a minimum price could be set.

21.    As a result of the intentionally false and misleading statements, and intentional

omissions of material information by Bear Stearns, on or about March 6, 2002 the Unitrust

agreed to sell its Notes to Bear Stearns for a price of 82.5 percent or face value. Among the

reasons the Unitrust agreed to this was because, in addition to the above, Bear Stearns, through

its counsel, put constant pressure on the Unitrust by stating that unless the decision to

sell/redeem the Notes was made by various dates, the last one being March 6 (which itself was

represented by counsel for Bear Stearns as an extended date), the opportunity to sell/redeem the

Notes on April 10, 2002 (pursuant to their Indenture) would be lost. Once again, upon

information and belief, this information was knowingly false and misleading and there existed

more time to elect to have the Notes redeemed or sold. Indeed, in late March, after Bear Stearns

had purchased the Unitrust's Notes, another Noteholder informed the Unitrust that approximately

one week after the Unitrust sold its Notes to Bear Stearns, Bear Stearns purchased the other

Noteholder's Notes at a price in excess of that paid to the Unitrust. Bear Stearns intentionally

caused these false statements and omissions to be made with the intent to pressure and cause the

7

Unitrust to sell its Notes based upon the false and misleading information provided by Bear Stearns.

22.    On or about March 15, 2002, pursuant to the agreement reached on March 6, 2002, the Unitrust sold to Bear Stearns the Notes in return for a price of 82.5 percent of face value or a total of $2,475,000. Bear Stearns purchased the Notes knowing that the Notes were worth significantly more than $2,475,000, as well as that the Notes would be paying interest on the next interest payment date (April 10, 2002). Had the Unitrust been aware that the Notes would be paying interest, and the estimated amount thereof, it would not have sold its Notes without obtaining payment for accrued interest or at the price of 82.5 percent. Similarly, had the Unitrust been aware of the true value of the Notes, it would not have agreed to sell them at a price of 82.5 percent.

23.    After Bear Stearns purchased the Notes from the Unitrust, upon information and belief it caused them to be redeemed pursuant to the Indenture relating to the Notes. Upon information and belief the total amount that Bear Stearns received relating to these Notes was 92.775 percent of the face value, or a total of $2,783,245. The 92.775 percent amount that was received was comprised of 87.55 percent, or $2,626,674, for principal and 5.22 percent, or $156,561, for interest. Attached hereto as Exhibit B are the calculations prepared by the Trustee for the CBO showing the amounts paid as interest and principal with respect to the Notes that were redeemed. Thus, within a little more than three weeks from the date it purchased the Notes from the Unitrust, Bear Stearns sold them for over 10 percent, or $308, 245, more than it had paid for them. A significant portion of this amount was for interest (approximately $134,195) earned by the Unitrust for the period prior to and including March 15, 2002. Irrespective, Bear Stearns has not paid to the Unitrust any of the interest it had earned on the Notes, nor did it ever disclose to the Unitrust that this interest was going to be paid on the Notes.

8

## CLAIMS FOR RELIEF

## COUNT ONE

### Liability Pursuant to Section10(b) of the 1934 Act and SEC Rule 10b-5

24.    Plaintiff incorporates and re-alleges the allegations of paragraphs 1- 23 as if fully set forth herein.

25.    This Count is based upon §10(b) of the 1934 Act, 15 U.S.C. §78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

26.    Defendant engaged in a scheme and unlawful course of deceptive and manipulative conduct, pursuant to which it knowingly or recklessly engaged in acts, transactions, practices, and courses of business that operated as a fraud and deceit upon Plaintiff and made various deceptive and untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading to the Plaintiff. The purpose and effect of the plan and unlawful course of conduct was to induce Plaintiff to sell its Notes and to do so without payment for accrued interest and at less than their true value.

27.    Defendant knowingly and intentionally deceived Plaintiff or, in the alternative, acted with reckless disregard for the truth when it directly and indirectly falsely represented the value of the Notes, omitted to disclose that the Notes would pay interest and misrepresented the time in which the Unitrust had to decide whether to redeem/sell the Notes.

28.    The false statements and omissions of material information by Bear Stearns were provided by Bear Stearns to its inside and outside counsel, who then provided such false and misleading information to the Unitrust through telephone calls and letters from them to the Unitrust.

9

29.    As a result of Defendant's false and misleading statements set forth above, the Plaintiff sold the Notes to the Defendant. Had Plaintiff known of the information misrepresented or not disclosed by the Defendant, it would not have sold the Notes to Defendant without payment for accrued interest or at a price of 82.5 percent of face value.

30.    As a result of the Defendant's material misrepresentations and omissions, and as a result of the wrongs alleged in this Complaint, Plaintiff has suffered substantial damages.

31.    By reason of the forgoing, Defendant directly or indirectly violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder in that it knowingly or recklessly:

(a) Employed devices, schemes and artifices to defraud;

(b) Made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of circumstances under which they were made, not misleading; and/or

(c) engaged in acts, transactions, practices and courses of business that operated as a fraud and deceit and a scheme to defraud the Plaintiff in connection with its sale of the Notes.

32.    Plaintiff did not know, and in the exercise of reasonable diligence could not have known, of the falsity of the Defendant's misrepresentations and omissions until after April 10, 2002.

33.    Plaintiff has been damaged as a result of Defendant's violations of Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder in an amount to be determined at trial and is entitled to receive its damages.

## COUNT TWO

Liability Pursuant to 70 P.S. § 1-401

34.    Plaintiff incorporates and re-alleges the allegations of paragraphs 1-33 as if fully set forth herein.

35.    Plaintiff has been damaged as a result of Defendant's violations 70 P.S. § 1-401 in an amount to be determined at trial and is entitled to receive its damages.

## COUNT THREE

Liability Pursuant to 70 P.S. § 1-403

36.    Plaintiff incorporates and re-alleges the allegations of paragraphs 1-35 as if fully set forth herein.

37.    Plaintiff has been damaged as a result of Defendant's violations 70 P.S. § 1-403 promulgated thereunder in an amount to be determined at trial and is entitled to receive its damages.

## COUNT FOUR

Common Law Fraud Against Defendant

38.    Plaintiff incorporates and re-alleges the allegations of paragraphs 1-37 as if fully set forth herein.

39.    Upon information and belief, the misrepresentations by Defendant alleged above were false when made, and were known by it to be false when made.

40.    Upon information and belief, the representations made by Defendant were rendered false when made, and were known by it to be false when made by virtue of the Defendant's omission of material facts.

11

41.     Upon information and belief, the misrepresentations and omissions of Defendant were made with the knowledge that Plaintiff would rely on them to its detriment and with the intent to deceive the Plaintiff.

42.     Plaintiff reasonably relied to its detriment on the misrepresentations and the representations rendered misleading by material omissions.

43.     As a result of Plaintiff's reasonable reliance on the misrepresentations and the representations rendered misleading by material omissions, Plaintiff is entitled to recover its damages in an amount to be proved at trial.

44.     As a result of Defendant's fraud, Plaintiff is entitled to punitive damages in an amount to be proved at trial.

## COUNT FIVE

### Common Law Negligent Misrepresentation

45.     Plaintiff incorporates and re-alleges the allegations of paragraphs 1-44 as if fully set forth therein.

46.     The misrepresentations alleged above were made in the course of Defendant's business or in the course of a transaction in which the Defendant had a pecuniary interest.

47.     Upon information and belief, the misrepresentations by Defendant alleged above were false when made.

48.     Upon information and belief, the representations to Plaintiff made by the Defendant were rendered false when made by virtue of the Defendant's omission of material facts.

49.     Upon information and belief, in making representations to Plaintiff regarding the Notes, Defendant failed to exercise the reasonable care or competence that Plaintiff was justified in expecting.

12

50.    The misrepresentations and omissions of Defendant were made with the knowledge and intent that Plaintiff would rely on them.

51.    Plaintiff reasonably and justifiably relied to its detriment on the misrepresentations and the representations rendered misleading by material omissions. As a result of Plaintiff's reasonable reliance on the misrepresentations and the representations rendered misleading by material omissions, Plaintiff is entitled to recover its damages, in an amount to be proved at trial.

## COUNT SIX

### EQUITABLE FRAUD

52.    Plaintiff incorporates and re-alleges the allegations of paragraphs 1- 51 as if fully set forth herein.

53.    Bear Stearns made false representations to and fraudulently concealed material information from the Unitrust in order to induce the Unitrust to sell the Notes to Bear Stearns.

54.    The Unitrust relied on those false representations and fraudulent non-disclosures in deciding to sell the Notes to Bear Stearns. The price that Bear Stearns paid for the Notes was significantly less than their actual value.

55.    As a result Bear Stearns was unjustly enriched by the difference between the purchase price and the true value of the Notes that it purchased, which includes the undisclosed accrued interest on the Notes.

## COUNT SEVEN

### PUNITIVE DAMAGES

56.    Plaintiff incorporates and re-alleges the allegations of paragraphs 1- 55 as if fully set forth herein.

13

57.    Bear Stearns' conduct in deceiving and misleading the Unitrust was willful, wanton and malicious. Bear Stearns' conduct was in direct disregard of the rights of the Unitrust, and reflected a conscious indifference to the damages it would inflict upon the Unitrust.

58.    Accordingly, the Unitrust is entitled to an award of punitive damages against Bear Stearns in an amount to be determined.

WHEREFORE, Plaintiff prays that this Court

1. Award to it the compensatory damages it has suffered.

2. Award to it consequential damages, including attorneys fees and interest.

3. Award to it punitive damages.

4. Tax the costs of this action against the Defendant.

5. Grant such other and further relief as the Court deems just and proper.

Respectfully Submitted

LAW OFFICES OF MICHAEL CONLEY

By: Michael Conley, Esq.
225 City Avenue, Suite 14
Bala Cynwyd, PA 19004
(610) 660-8814

BARRY L. KATZ, ESQ.

By:
Barry L. Katz, Esq.
225 City Avenue, Suite 14
Bala Cynwyd, PA 19004



**BEAR STEARNS**

**Bear Stearns
Asset Management Inc.**
383 Madison Avenue
New York, New York 10179
www.bearstearns.com

**Edward R. Vaimberg**
Managing Director
Tel 212-272-2887
800-436-4148
evaimberg@bear.com

March 15, 2002

Mr. Raymond Perelman
Belmont Holdings
225 City Line Avenue
Suite 114
Bala Cynwyd, PA 19004

Dear Raymond:

We have enclosed for your review the following information on Augusta Funding Limited B:

      -the Collateral Manager Report, by BSAM

      -a detailed summary of the portfolio's holdings as of December 31, 2001

      -a schedule of transactions for 3rd and 4th Quarter, 2001

We look forward to hearing your thoughts regarding these reports.

Very truly yours,

*Ed Vaimberg*

cc:

Stuart Hendry                   John Geissinger
Bear Stearns Asset Management   Bear Stearns Asset Management

## Augusta B

### Collateral Manager Report

### Portfolio Structure

The portfolio allocation (par amount) by region and country appears below (subtotals reflect rounding).

| | 3/31/01 | 6/30/01 | 9/30/01 | 12/31/01 |
|---|---|---|---|---|
| **Latin America** | | | | |
| Argentina | 0.2% | 0.2% | 0.2% | 0.2% |
| Brazil | 5.6 | 5.7 | 5.7 | 6.0 |
| Colombia | 5.3 | 5.3 | 5.3 | 5.6 |
| Costa Rica | 3.3 | 3.2 | 3.2 | 3.2 |
| Dominican Republic | 1.0 | 1.0 | 0.9 | 1.0 |
| Ecuador | 3.2 | 3.2 | 3.2 | 3.4 |
| Mexico | 3.9 | 3.9 | 3.9 | 4.1 |
| Panama | 6.3 | 6.4 | 6.2 | 6.5 |
| Venezuela | 3.8 | 3.5 | 3.5 | 3.4 |
| Subtotal | 32.6% | 32.4% | 32.1% | 33.4% |
| **Asia** | | | | |
| China/Hong Kong | 6.2% | 6.2% | 6.2% | 5.4% |
| Indonesia | 4.9 | 5.0 | 5.0 | 0.0 |
| Korea | 4.6 | 4.6 | 4.6 | 4.9 |
| Philippines | 4.1 | 3.9 | 3.9 | 3.8 |
| Thailand | 1.8 | 1.8 | 1.8 | 1.9 |
| Vietnam | 3.9 | 3.9 | 3.9 | 4.1 |
| Subtotal | 25.4% | 25.3% | 25.3% | 20.1% |
| **Eastern Europe** | | | | |
| Bulgaria | 5.0% | 5.1% | 5.1% | 5.4% |
| Croatia | 2.6 | 2.6 | 2.4 | 2.5 |
| Kazakhstan | 3.2 | 3.2 | 3.2 | 3.4 |
| Poland | 3.2 | 3.2 | 3.2 | 3.4 |
| Russia | 9.7 | 9.8 | 9.8 | 10.3 |
| Slovak Republic | 4.2 | 4.3 | 4.3 | 4.5 |
| Subtotal | 27.9% | 28.1% | 27.9% | 29.4% |
| **Africa** | | | | |
| Algeria | 2.4% | 2.4% | 2.2% | 2.3% |
| Morocco | 5.6 | 5.7 | 5.3 | 5.6 |
| Nigeria | 2.7 | 2.7 | 2.6 | 2.7 |
| Subtotal | 10.8% | 10.8% | 10.1% | 10.6% |
| **Principal Cash** | 3.4% | 3.4% | 4.6% | 6.5% |

## Coverage and Quality Tests

The portfolio as of 12/31/01 passed the threshold level for Par and Interest Coverage tests as well as quality tests.

|  | 3/31/01 | 6/30/01 | 9/30/01 | 12/31/01 |
|---|---|---|---|---|
| Par Coverage Test |  |  |  |  |
| Portfolio | 135.2%* | 134.8%* | 136.7%* | 138.3%* |
| Required | >135% | >135% | >135% | >135% |
|  | Passed | Failed | Passed | Passed |
|  |  |  |  |  |
| Interest Coverage Test |  |  |  |  |
| Portfolio | 122%* | 144%* | 144%* | 173%* |
| Required | >125% | >125% | >125% | >125% |
|  | Failed | Passed | Passed | Passed |
|  |  |  |  |  |
| Moody's Quality Test |  |  |  |  |
| Portfolio | 2.387 | 2.363 | 2,405* | 1,829 |
| Required | <2.220 | <2.220 | <2,220 | <2,220 |
|  | Failed | Failed | Failed | Passed |
| Standard & Poor's Quality Test |  |  |  |  |
| Portfolio | 27.4% | 26.0% | 25.3% | 24.5% |
| Required | <32.2% | <31.6% | <31.6% | <26.8% |
|  | Passed | Passed | Passed | Passed |

*Provided by the trustee

**Defaulted/Credit Watch Security Update**

Zhuhai Highway

Zhuhai Highway 11.5% 7/1/2008 is 1.9% face (par) of Augusta Funding B. Coupon payments on this bond have not been received by bondholders since January 2000. In July 2000, Chase Manhattan Bank, the bond trustee, placed the subordinated Zhuhai 2008 (and the senior Zhuhai 2006) in technical default, and escrowed the coupon of the junior bonds held in the CBO. The junior bond then experienced an actual coupon payment default in January 2001 because the highway authority deposited insufficient funds for coupon service. In May 2001, at the request of the seniors, the trustee issued a notice of acceleration for the senior bonds following a payment on the senior notes as well. The junior notes that we hold were subsequently accelerated as well, and are currently rated D by S&P.

We are monitoring developments and have moved forward in an effort to extract more value from this holding. Working through conventional channels had been of limited value, because the bond is subordinated and the issuer had been involved in fraudulent activity and was evasive. As such, we have taken the initiative to negotiate a success-fee contract with another significant holder of the subordinated bond, Elliott Associates, in an effort to maximize the recovery value. For your information, Elliott successfully sued the Peruvian government in a similar situation.

Greater Beijing Expressway

Augusta B sold its $3 million position in Greater Beijing 9.25% 6/15/04, equivalent to approximately 1% of the Portfolio's total par amount. It had been in default and in the process of liquidation. The liquidation process had not been going well, however. Progress was slow because the liquidation was involuntary (it was through court action), and because the Chinese government has discouraged public sector companies from selling assets at "cheap" prices. Following a significant rise in the bond's price, we determined that a sale was in the best interests of the CBO at that time.

APP International Finance

Augusta B held $14 million of APP 2001, equivalent to 5.0% of the Portfolio's total par amount. As previously reported, the bond had been defeased with AAA-rated bonds. We had held on to the original equity-collateralized bond, through two APP-promoted exchange offers, and were rewarded when the original holders who did not exchange (only 10%) were ultimately defeased. Though APP generally is in default on its debt, we received full coupon and principal in October when this defeased bond matured.

CHRONOLOGY OF KEY DEVELOPMENTS

As you know, the indenture contains provisions that require minimum levels of coverage on certain key variables before certain payments can be made to Class B noteholders. *Par coverage* is defined as the ratio of the total face amount of bonds in the collateral portfolio (after adjustment for "Defaulted Securities") and undistributed interest proceeds from debt securities, divided by the outstanding face amount of senior (Class A) notes. (Defaulted securities are written down to the lesser of 10–25% of par, or market value, depending on the type of issuer.) *Interest coverage* is defined as the sum of the scheduled interest proceeds due in the Due Period (excluding scheduled interest proceeds of Defaulted Securities) and any payments to be received under the Hedge Agreement, minus fees and expenses payable pursuant to the indenture, divided by the sum of the total amount of scheduled interest payments due on the Class A notes and any amounts to be paid under the Hedge Agreement. If the par coverage or interest coverage ratio falls below 135% or 125%, respectively, on the measurement date several days before the scheduled distribution of collected interest to noteholders, the principal of the Senior notes must be amortized to the extent necessary to re-establish par and interest coverage of 135% and 125%, respectively. Only then can the Trustee distribute the subordinated fees and expenses, and, if available, interest due to the Class B noteholders.

The Trustee has not distributed excess interest to Class B noteholders on the last six Payment Dates because the required levels of coverage were not met. At inception of the CBO in April 1997, par coverage for Augusta B was approximately 137%. Later that year, par coverage had fallen to 133.5%, largely as a result of the default of GMD, a Mexican corporate bond that represented approximately 5% of the portfolio's par value. Following this default, several transactions were implemented to restore par coverage to 135%. However, par coverage was approximately 134.1% on the April 1999 Determination Date as a result of sales of Credit Risk securities. We sold our position in Romania and part of our position in Mechala (Jamaica) and Ecuador because we believed there was a significant and growing risk of default. We were unable to agree with the insurer on an appropriate reinvestment for the sale proceeds by the Determination Date immediately preceding the April 1999 Payment Date. (The insurer has the absolute right to decline all reinvestment proposals.) Because the level of par coverage was below 135%, the Class A notes of Augusta Funding B amortized $1.5 million of principal, equal to 0.7% of the Class A notes outstanding on the April 12 1999 Payment Date. The holders of Class B notes did not receive a distribution because, after the distribution of interest and principal to Class A note holders, and payments for fees and expenses pursuant to the terms of the indenture, the level of par coverage fell to approximately 130.1%. Both events were triggered under the indenture because the level of par coverage was below 135% on April 5, the Determination date for the April 12 payment.

Following the April 1999 Determination Date, we and the insurer agreed on a mutually satisfactory reinvestment strategy for the proceeds of the earlier securities sales. On the October 1999 Determination Date, par coverage was 135%, the required level. The increase from 134.1%, the level on the prior Determination Date, reflected the reinvestment of principal cash, largely offset by the default of Mechala, a Jamaican corporate bond that represented approximately 3% of the portfolio's par value. In the absence of other developments, this level of par coverage would have been sufficient to preclude another amortization in October 1999, but would have still been too low to

allow the distribution of excess interest proceeds to the holders of Class B notes, because the level of par coverage was approximately 131% after the payment of interest to Class A note holders and payments for fees and expenses. However, on the October 1999 Determination Date, the level of *interest* coverage had fallen to approximately 112%, below the required level of 125%, as a result of the default of Mechala, and a scheduled rise in the fixed payment under the hedge agreement. Because the interest coverage test fell below the required level, the trustee was obligated to use the remaining excess interest proceeds, as well as uninvested principal paydowns that were received within several months of the Payment Date, to amortize approximately $3.4 million of Class A notes, equal to 1.5% of the Class A notes outstanding on the October 1999 Payment Date.

Following the October 1999 Determination Date, Ecuador defaulted on its Brady and Euro bonds. This CBO held the Ecuador PDI Bonds, which represented approximately 4% of the portfolio. In addition, on December 1999, the coupon for Greater Beijing 2004 was paid not by the company, but from a debt reserve fund that was not replenished in the time required by the indenture. The Chase Manhattan Bank, trustee for the Notes, declared the Notes to be in default and accelerated them on 2/11/00. Therefore, we determined that the Greater Beijing Notes were Defaulted Securities within the meaning of the Indenture for Augusta Funding B. The CBO held approximately 1% of the Greater Beijing 2004 bonds. As a result of the defaults, par coverage declined by approximately 3.8%, and stood at 128% (excluding undistributed interest proceeds from debt securities) as of the April 2000 Determination Date, versus the required level of 135%. As reported by the trustee, interest coverage as of the April 2000 Determination Date was 112%, compared to the required level of 125%. Because at least one of the coverage tests fell below the required level, similar to the prior two payment dates, the trustee was required under the indenture of the CBO to use the excess interest proceeds as well as principal cash from paydowns and the Mechala bond settlement to amortize approximately $7.0 million of Class A notes, equal to 3.2% of the Class A notes outstanding on the April 2000 Payment Date.

Following the April 2000 Determination Date, we participated in the Ecuador debt exchange. We exchanged $11.1 million PDI Brady bonds for $8.6 million 30-year Global bonds, $390,000 12-year Global bonds and cash. The exchange increased par coverage by approximately 2.9%. However, the increase in par coverage from the Ecuador exchange was largely offset by the default of Zhuhai Highway. As a result, par coverage (excluding undistributed interest proceeds from debt securities) as of the October 2000 Determination Date was approximately 130%, versus the required level of 135%. Similar to the prior 3 payment dates, the trustee was required under the indenture of the CBO to use the excess interest proceeds to amortize approximately $1.3 million of Class A notes, equal to 0.6% of the Class A notes outstanding on the October 2000 Payment Date.

On the April 2001 Determination Date, as reported by the trustee, interest coverage was 122%, compared to the required level of 125%. Par coverage (excluding undistributed interest proceeds from debt securities) was 131% versus the required level of 135% during this time. Because at least one of the coverage tests fell below the required level, similar to the prior 4 payment dates, the trustee was required under the indenture of the CBO to use the excess interest proceeds as well as principal cash from paydowns to amortize approximately $ 3.4 million of Class A notes. The $3.4 million that amortized

represented approximately 1.6% of the Class A notes outstanding on the April 2001 Determination Date.

On the October 2001 Determination Date, interest coverage was 144%, above the required level. Par coverage (excluding undistributed interest proceeds from debt securities) was approximately 132%, compared to the required level 135%. The par level was still too low to allow the distribution of excess interest to the Class B noteholders. Because the Reinvestment Period is still suspended, the trustee was required under the indenture of the CBO to use the excess interest proceeds as well as principal cash to amortize approximately $15.2 million of Class A notes. It represented approximately 7.3% of the Class A notes outstanding on the October 2001 Determination Date.

Following the October 2001 Determination Date, we sold the defaulted Greater Beijing 2004 bonds following a significant rise in the bond's price. The sale of Greater Beijing, combined with the effects of the amortization of the Class A notes, helped boost the par coverage (excluding undistributed interest proceeds from debt securities) to 136%. Interest Coverage as of 12/31/01 was 173%. Both coverage ratios are above the required level as of 12/31/01. In the absence of any significant defaults, distribution of excess interest to Class B noteholders is expected in the upcoming April 2002 Payment Date.

Looking forward, the final date of the Reinvestment Period is 4/10/02. Once the RP has ended, principal proceeds from paydowns, sales and maturities will be used to amortize Class A Notes. The Trustee can resume distribution of excess interest on the Class B notes in an amount that does not cause the coverages to fall below the required levels. In the interim, if either par coverage or interest coverage fall below 120% and 115%, respectively, the insurer also has the right under the indenture to instruct the collateral manager to direct the sale or purchase of any Debt Security without compliance with the Reinvestment Criteria.

The probability of default in the emerging markets has increased over the last few years, particularly among corporate issuers in certain countries and regions. As collateral managers, we have been most concerned with a small number of issuers where we believe the probability of default is greatest. We have reduced or eliminated exposure to the weakest credits. Because we undertook additional sales in an effort to restore par coverage, the Augusta B portfolio exceeded the 30% lifetime limit on total sales (excluding defaults) prescribed in the indenture in early 1999. Thus, the insurer's consent has been required for all sales from the portfolio since that date.

The total amounts of Class A, Class B-1 Notes and Class B-2 notes outstanding as of 12/31/01 were US$192,718,969, CHF40,000,000 and US$30,424,000, respectively.

## MARKET ENVIRONMENT & OUTLOOK

As measured by the JPM EMBI Global Constrained index, emerging market debt generated a total return of 3.38% in the fourth quarter of 2001. The average "stripped" sovereign yield spread of the JPM index decreased 105 basis points, to 694 bp. For calendar year 2001, the JPM index returned 9.70%, and the stripped sovereign yield spread of the JPM index tightened slightly from 707 to 694 bp.

| Total Returns by Country | | | | |
|---|---|---|---|---|
| | 3 Best | | 3 Worst | |
| 4Q 2001 | Pakistan | 23.0% | Argentina | -57.1% |
| | Ecuador | 20.0% | Venezuela | -3.5% |
| | Russia | 19.1% | Ivory Coast | -3.3% |
| Year 2001 | Ukraine | 57.1% | Argentina | -66.9% |
| | Russia | 55.8% | Venezuela | 5.6% |
| | Nigeria | 36.3% | Lebanon | 6.2% |

During the fourth quarter, concerns about slowing economic growth, reductions in oil and other commodity prices, and the turmoil in Argentina could have resulted in far more difficult markets. Slowing growth in the world's major industrial nations typically has, as you know, a trickle-down effect on emerging markets-many of which rely on commodity exports to fuel their economies. In spite of difficult circumstances, emerging market debt rallied during the quarter, with 25 of the 30 markets in the benchmark posting positive returns.

Our outlook for the months ahead is cautiously optimistic, though the outlook for the near-term remains uncertain. Restraining influences include ongoing concerns over global economic growth, low commodity prices, political developments in Argentina and elsewhere - as well as the significant narrowing in spreads that took place in the fourth quarter of 2001. However, the basic themes that have supported the emerging markets for a number of years remain intact. Among them: Foreign direct investment, though down, remains significant, and the desire to attract it will likely continue to spur emerging economies to pursue reforms designed to improve their creditworthiness. Multilateral institutions such as the International Monetary Fund and the World Bank remain well positioned to help encourage reform with loans. The market is increasingly differentiating among issuers, focusing more on individual creditworthiness and less on the possibility of contagion effects. Volatility is decreasing, as the number of sovereign securities and the sophistication of investors increases. Additionally, while lower oil prices have adversely impacted the revenues of several emerging economies, average oil prices -- even at the current levels -- are close to or above the budget assumptions of most emerging market oil exporters. Moreover, we need to keep in mind that the performance of emerging market debt is heavily influenced by how a country *responds* to lower commodity prices, and not simply to the drop in prices themselves.

REGIONAL OUTLOOK

The overall medium-term outlook for emerging market economies remains positive but important differences between regions and countries will determine absolute and relative performance.

In Latin America, **Mexico** should benefit most from by the improving economic climate in the United States, favorable financing environment and the absence of major political events. Recent positive rating actions should help to broaden and consolidate the investor base for Mexican fixed income assets. In the case of **Brazil**, the benefits of improving external conditions will be somewhat offset by risks associated with sizable domestic financing requirements during an election year. Political risk, always an important factor, will be crucial as the new administration will be hard-pressed to show concrete actions to maintain the same level of credibility in the market place. The outlook for **Argentina** depends on the ability of the current administration to secure broad political support in order to gain the necessary loans from the IMF. Although there has been some progress in formulating a consistent economic program, the political capital of the current administration is very weak and time is of the essence given rapidly deteriorating economic and social conditions. In **Venezuela**, lower oil prices, misguided economic policies and a heightened level of political tension resulted in a major increase in the level of country risk. Recent measures and announcements by the government are a step in the right direction to reduce macroeconomic imbalances. In our view, external financing needs for 2002 are manageable and the government should be able to service its debt in a timely fashion. The outlook for **Colombia** is the most uncertain in the region as the leading presidential contender is openly in favor of a head-to-head confrontation with the rebel groups. The financial and economic impact of such an action will be significant. In addition, lower oil and coffee prices will have a negative impact on the fiscal and current accounts. Other countries in the region need to make some serious efforts on the structural front to make their economies more resilient.

The emerging economies of Europe are well positioned given strong foreign direct investment flows, reduction of macroeconomic imbalances and continued efforts to deepen structural reforms. A number of countries (**Poland, Hungary, Bulgaria**) have benefited significantly in recent months from favorable global conditions. In **Russia**, the outlook continues to be positive reflecting on-going economic growth of 3.5 percent coupled with an extremely strong fiscal and external position that should limit the impact of lower oil prices. It should be noted, however, that foreign direct investment in Russia during 2002 must be high in order for the re-pricing of Russian sovereign risk in recent years to be of a permanent nature. The outlook for **Turkey** with its substantial domestic financing requirements is an issue of concern. For 2002, net interest payments (as percent of GDP) of almost 20 percent are untenable in the medium-term and much of the success of the current economic program hinges on a drastic reduction in domestic interest rates in 2002.

The outlook for **Asia** remains constrained by uncertainties in global demand despite strong foreign direct investment and strong macroeconomic policies. The outlook for the **Philippines** continues to benefit from a fiscal and monetary stance that is reducing macroeconomic imbalances despite the significant exposure of the export sector to electronics. **Indonesia**

continues to implement the necessary fiscal and monetary adjustments at the macro level, but for growth to be sustainable and broad based, the country needs to immediately address the inherent weakness in the banking system including the privatization of assets assumed during the 1997 crisis.

In Africa, presidential elections in **Nigeria** coupled with lower oil prices are likely to delay the prospects of an agreement between the government and official creditors. In the short turn this is positive for bond prices as an agreement with multilateral creditors may be contingent on a restructuring in foreign bonded external debt. For countries like the **Ivory Coast**, the prospects of a successful restructuring on external debt that is beneficial for bondholders are limited given significant concessions granted by official lenders under the Heavily Indebted Poor Countries Initiative (HIPC) and large medium-term financing constraints.

# CBO - REGIONAL ANALYSIS AND FUNDAMENTAL DATA

Portfolio: Augusta B-209
As of December 31st 2001

| SECURITY DESCRIPTION | CUSIP SEDOL | CURR FACE | % FACE ALLOC | PAY FREQ | RATE TYPE | SECTOR | MOODY INCEPT | MOODY RATING | S & P INCEPT | S & P RATING |
|---|---|---|---|---|---|---|---|---|---|---|
| Asia & China (PRC) | | | | | | | | | | |
| HUPEWL 8 875 8/15/04 GS SUPERHIWAY | 40065VAC3 | 3,000,000 | 1.124 | 2 | BF | NON-GOVT | | Ba3 | BB | BB- |
| :SubTotals: Hong Kong | | 3,000,000 | 1.124 | | | | | | | |
| PHILIP 5 98157 6/1/2008 SER B FLIRB | 4179081 | 10,075,000 | 3.773 | 2 | BF,T | GOVT | Ba1 | Ba1 | BB+ | BB- |
| :SubTotals: Philippines | | 10,075,000 | 3.773 | | | | | | | |
| KDB 6 75 12/1/2005 | 5006I0AJ7 | 9,000,000 | 3.371 | 2 | BF | NON-GOVT | Baa2 | Baa3 | BBB | BBB |
| EIBKOR 6 375 2/15/06 | 5016853 | 4,000,000 | 1.498 | 2 | BF | NON-GOVT | Baa2 | Baa1 | BBB | BBB |
| :SubTotals: South Korea | | 13,000,000 | 4.869 | | | | | | | |
| THAI 6 27 9/30/2003 | 88322LAB5 | 4,000,000 | 1.498 | 2 | BF | GOVT | Ba1 | Baa2 | BBB- | BBB- |
| THAI 7 75 4/15/2007 | 88322KAC5 | 1,000,000 | 0.375 | 2 | BF | GOVT | Ba1 | Baa3 | BBB- | BBB- |
| :SubTotals: Thailand | | 5,000,000 | 1.873 | | | | | | | |
| VIETNM 3 5 03/14/2016 SER 18YR PDI | 5435577 | 11,000,000 | 4.120 | 2 | BF,T | GOVT | B1 | B1 | NR | NR |
| :SubTotals: Vietnam | | 11,000,000 | 4.120 | | | | | | | |
| :SubTotals: Asia Excl China(PRC) | | 42,075,000 | 15.759 | | | | | | | |
| CHGNF 10 125 12/15/2006 AES | 00098DAA4 | 6,489,000 | 2.430 | 2 | BF | NON-GOVT | Ba3 | Ba3 | BB- | BB- |
| ZHUHAI 11 5 7/1/2008 | 985500AC7 | 5,000,000 | 1.873 | 2 | BF | NON-GOVT | Ba1 | C | BB- | D |
| :SubTotals: China | | 11,489,000 | 4.303 | | | | | | | |
| :SubTotals: Asia & China (PRC) | | 53,564,000 | 20.062 | | | | | | | |
| Eastern Europe & CIS | | | | | | | | | | |
| KAZAKS 8 375 10/2/02 SER REGS | 5336829 | 9,000,000 | 3.371 | 2 | BF | GOVT | Ba3 | Ba2 | BB- | BB |
| :SubTotals: Kazakhstan | | 9,000,000 | 3.371 | | | | | | | |
| RUSSIA 8 75 7/24/05 SER REGS | 5511069 | 12,500,000 | 4.682 | 2 | BF | GOVT | B3 | Baa3 | B | B |
| RUSSIA 3 5/14/11 SER VII MIN FIN | 5104918 | 15,000,000 | 5.618 | 1 | BF | GOVT | B3 | Baa3 | B- | B+ |
| :SubTotals: Russia | | 27,500,000 | 10.300 | | | | | | | |
| :SubTotals: CIS | | 36,500,000 | 13.671 | | | | | | | |
| BGARIA 2 5 7/28/2012 SER A FLIRB | 4042525 | 14,300,000 | 5.356 | 2 | BF,T | GOVT | B3 | B1 | B- | B- |
| :SubTotals: Bulgaria | | 14,300,000 | 5.356 | | | | | | | |
| CROATI 5 8125 7/31/06 SER B | 5110874 | 6,687,498 | 2.505 | 2 | BF,T | GOVT | Ba3 | B1 | BB- | BB- |
| :SubTotals: Croatia | | 6,687,498 | 2.505 | | | | | | | |
| POLAND 3 10/27/24 SER PAR | 4688631 | 9,000,000 | 3.371 | 2 | BF,T | GOVT | Baa3 | Baa1 | BBB- | BBB+ |
| :SubTotals: Poland | | 9,000,000 | 3.371 | | | | | | | |
| SLOVAK 9 5 5/28/2003 SER REGS | 5466179 | 5,500,000 | 2.060 | 1 | BF | GOVT | Ba1 | Baa3 | BB+ | BBB+ |
| VODVYS 7 25 12/19/2006 SER REGS | 5269442 | 6,500,000 | 2.434 | 2 | BF | GOVT | Ba1 | Baa3 | BB+ | BB+ |
| :SubTotals: Slovakia | | 12,000,000 | 4.494 | | | | | | | |
| :SubTotals: Eastern Europe & Central CIS | | 78,487,498 | 29.396 | | | | | | | |
| Latin America & Carribbean | | | | | | | | | | |
| COLOM 7 625 2/15/2007 | 195325AK1 | 15,000,000 | 5.618 | 2 | BF | GOVT | Baa3 | Baa2 | BBB- | BB |
| :SubTotals: Colombia | | 15,000,000 | 5.618 | | | | | | | |
| :SubTotals: Chile & Columbia | | 15,000,000 | 5.618 | | | | | | | |
| ARGENT 6 1875 3/31/2009 SER FRB | 4025140 | 560,600 | 0.210 | 2 | | | Ba3 | Ca | | B- |
| :SubTotals: Argentina | | 560,600 | 0.210 | | | | | | | |
| BRAZIL 5 4/15/2009 SER 15YR FLIRB | 4739824 | 16,000,000 | 5.993 | 2 | BF,T | GOVT | B1 | B1 | B+ | BB- |

# CBO - REGIONAL ANALYSIS AND FUNDAMENTAL DATA

Portfolio: Augusta B-209
As of December 31st 2001

| SECURITY DESCRIPTION | CUSIP SEDOL | CURR FACE | % FACE ALLOC | PAY FREQ | RATE TYPE | SECTOR | MOODY INCEPT | MOODY RATING | S & P INCEPT | S & P RATING |
|---|---|---|---|---|---|---|---|---|---|---|
| CUSTAR 0 25 5/21/2010 | 411Z707 | 16,000,000 | 5.993 | | BF | GOVT | Ba3 | | BB | BB |
| :SubTotals: Brazil | | 8,500,000 | 3.184 | | | | | | | |
| DOMREP 6 8/30/09 PDI | 501S937 | 8,500,000 | 3.184 | 2 | BFLT | GOVT | B1 | | B+ | BB |
| :SubTotals: Costa Rica | | 2,536,203 | 0.950 | | | | | | | |
| :SubTotals: Dominican Repub | | 2,536,203 | 0.950 | | | | | | | |
| ECUA 12 11/15/2012 SER REGS | 4229306 | 390,000 | 0.146 | 2 | BF | GOVT | Caa3 | Caa2 | CCC+ | CCC+ |
| ECUA A 08/15/2030 SER REGS | 4229094 | 8,619,000 | 3.228 | 2 | BF | GOVT | Caa3 | Caa2 | B- | CCC+ |
| :SubTotals: Ecuador | | 9,009,000 | 3.374 | | | | | | | |
| BNCE 11 25 5/30/06 SER REGS | 5070866 | 11,000,000 | 4.120 | 2 | BF | GOVT | Ba2 | Ba3 | BB | BB |
| :SubTotals: Mexico | | 11,000,000 | 4.120 | | | | | | | |
| PANAMA 4 7/17/2014 SER 18YR IRB | 5111695 | 17,333,333 | 6.492 | 2 | BFLT | GOVT | Ba1 | Ba1 | BB+ | BB |
| :SubTotals: Panama | | 17,333,333 | 6.492 | | | | | | | |
| VENZ 5 9375 12/18/2007 SER DL OCB | 4934439 | 9,142,765 | 3.424 | 2 | BFLT | GOVT | Ba2 | B2 | B | B |
| :SubTotals: Venezuela | | 9,142,765 | 3.424 | | | | | | | |
| :SubTotals: Latin Amer. Excl. Columbia & Chile | | 74,081,301 | 27.746 | | | | | | | |
| :SubTotals: Latin America | | 89,081,901 | 33.364 | | | | | | | |
| :SubTotals: Panama | | 89,081,901 | 33.364 | | | | | | | |
| :SubTotals: Latin America & Carindbean | | 89,081,901 | 33.364 | | | | | | | |
| :SubTotals: Latin Amer. & Carrib. Excl Col. & C | | 74,081,901 | 27.746 | | | | | | | |
| Middle East & Africa | | | | | | | | | | |
| ALGER 6 0 09/04/2006 | EC2512365 | 6,153,846 | 2.305 | 2 | BFLT | LOAN PART | NR | NA | NR | NA |
| :SubTotals: Algeria | | 6,153,846 | 2.305 | | | | | | | |
| MOROC 0 01/01/2009 | 6179930W55 | 15,000,000 | 5.618 | 2 | BFLT | EMERGING MKT GOVERNMENT | Ba1 | Ba1 | BB | BB |
| :SubTotals: Morocco | | 15,000,000 | 5.618 | | | | | | | |
| NGERIA 5 092 1/5/10 SER RIC P-NOTE | 4199428 | 7,238,214 | 2.711 | 4 | BF | GOVT | NR | NA | NR | NA |
| :SubTotals: Nigeria | | 7,238,214 | 2.711 | | | | | | | |
| :SubTotals: Middle East & Africa | | 28,392,060 | 10.634 | | | | | | | |
| North American | | | | | | | | | | |
| UNITED STATES DOLLARS | .USD. | 17,472,515 | 6.544 | 0 | CASH | CASH | NR | NA | NR | NA |
| :SubTotals: United States | | 17,472,515 | 6.544 | | | | | | | |
| :SubTotals: North American | | 17,472,515 | 6.544 | | | | | | | |
| :Securities | | 249,525,459 | 93.456 | | | | | | | |
| :Cash | | 17,472,515 | 6.544 | | | | | | | |
| :Securities and Cash :GrandTotals: | | 266,997,974 | 100.000 | | | | | | | |

# TRANSACTION DETAIL REPORT

gusta 'B'

Beginning : 07/01/2001
Ending : 09/30/2001

| DATE | QUANTITY | SECURITY | COUPON RATE | MATURE DATE | UNIT COST | TOTAL COST | PRICE | PROCEED | REALIZED GAIN/LOSS | INCOME |
|---|---|---|---|---|---|---|---|---|---|---|
| **MATURITIES** | | Pay Princl L. | | | | | | | | |
| 7/02/01 | 999,999.987 | RESTRUC & CONSOL AGREEMT (SALI PART | 5.0938 | 01/01/09 | 87.250 | 872,499.99 | 100.000 | 999,999.99 | 127,500.00 | ···· |
| 5/05/01 | 173,421.000 | NIGERIA PROMISSORY NOTES | 5.0920 | 01/05/10 | 75.143 | 130,313.78 | 100.000 | 173,421.00 | 43,107.22 | ···· |
| 7/27/01 | 666,666.666 | PANAMA-INT REDUCTION BND | 4.7500 | 07/17/14 | 73.750 | 491,666.67 | 100.000 | 666,666.67 | 175,000.00 | ···· |
| 7/01/01 | 590,073.220 | CROATIA | 4.5625 | 07/31/06 | 89.875 | 530,328.29 | 100.000 | 590,073.22 | 59,744.93 | ···· |
| 0/00/01 | 51,660.000 | DOMINICAN REPUBLIC PDI | 4.3750 | 08/30/09 | 76.000 | 39,261.60 | 100.000 | 51,660.00 | 12,398.40 | ···· |
| 9/00/01 | 106,832.880 | DOMINICAN REPUBLIC PDI | 4.3750 | 08/30/09 | 77.250 | 82,528.40 | 100.000 | 106,832.88 | 24,304.48 | ···· |
| 9/04/01 | 230,769.228 | ALGERIA LOAN TRANCHE I (SALOMON) | 4.3125 | 09/04/06 | 69.750 | 160,961.54 | 100.000 | 230,769.23 | 69,807.69 | ···· |
| /04/01 | 384,615.380 | ALGERIA LOAN TRANCHE I (SALOMON) | 4.3125 | 09/04/06 | 69.750 | 268,269.23 | 100.000 | 384,615.38 | 116,346.15 | ···· |
| /28/01 | 80,000.000 | REPUBLIC OF ARGENTINA BEAR FRB | 3.3750 | 03/31/05 | 80.050 | 64,040.00 | 100.000 | 80,000.00 | 15,960.00 | ···· |
| **MATURITIES** | | | | | | 2,639,869.50 | | 3,284,038.37 | 644,168.87 | ···· |
| **rCHASES** | | Buy | | | | | | | | |
| 7/06/01 | 1,007,592.000 | GENERAL ELECTRIC CAPITAL CO CPIB | 3.6200 | 10/01/01 | 100.000 | 1,007,592.00 | ···· | ···· | ···· | ···· |
| 7/11/01 | 269,363.000 | GENERAL ELECTRIC CAPITAL CO CPIB | 3.6200 | 10/01/01 | 100.000 | 269,363.00 | ···· | ···· | ···· | ···· |
| /24/01 | 1,072,047.000 | GENERAL ELECTRIC CAPITAL CO CPIB | 3.6600 | 10/01/01 | 100.000 | 1,072,047.00 | ···· | ···· | ···· | ···· |
| 5/26/01 | 546,875.000 | GENERAL ELECTRIC CAPITAL CO CPIB | 3.5500 | 10/01/01 | 100.000 | 546,875.00 | ···· | ···· | ···· | ···· |
| /01/01 | 1,033,260.000 | GENERAL ELECTRIC CAPITAL CO CPIB | 3.5300 | 10/01/01 | 100.000 | 1,033,260.00 | ···· | ···· | ···· | ···· |
| /16/01 | 699,375.000 | GENERAL ELECTRIC CAPITAL CO CPIB | 3.4800 | 10/01/01 | 100.000 | 699,375.00 | ···· | ···· | ···· | ···· |
| /17/01 | 172,380.000 | GENERAL ELECTRIC CAPITAL CO CPIB | 3.4800 | 10/01/01 | 100.000 | 172,380.00 | ···· | ···· | ···· | ···· |
| /20/01 | 148,125.000 | GENERAL ELECTRIC CAPITAL CO CPIB | 3.4600 | 10/01/01 | 100.000 | 148,125.00 | ···· | ···· | ···· | ···· |
| /20/01 | 148,125.000 | GENERAL ELECTRIC CAPITAL CO CPIB | 3.4600 | 10/01/01 | 100.000 | 148,125.00 | ···· | ···· | ···· | ···· |

# RANSACTION DETAIL REPORT

Augusta 'B'

Beginning : 07/01/2001
Ending : 09/30/2001

## ICHASES

| DATE | QUANTITY | SECURITY | COUPON RATE | MATURE DATE | UNIT COST | TOTAL COST | PRICE | PROCEED | REALIZED GAINLOSS | INCOME |
|---|---|---|---|---|---|---|---|---|---|---|
| | | **Buy - cont.** | | | | | | | | |
| 09/05/01 | 238,997.000 | GENERAL ELECTRIC CAPITAL CO CP/B | 3.5000 | 10/01/01 | 100.000 | 238,997.00 | .... | .... | .... | .... |
| 09/05/01 | 238,997.000 | GENERAL ELECTRIC CAPITAL CO CP/B | 3.5000 | 10/01/01 | 100.000 | 238,997.00 | .... | .... | .... | .... |
| 08/19/01 | 220,000.000 | GENERAL ELECTRIC CAPITAL CO CP/B | 1.5000 | 10/01/01 | 100.000 | 220,000.00 | .... | .... | .... | .... |
| 08/19/01 | 220,000.000 | GENERAL ELECTRIC CAPITAL CO CP/B | 1.5000 | 10/01/01 | 100.000 | 220,000.00 | .... | .... | .... | .... |
| 08/31/01 | 815,395.000 | GENERAL ELECTRIC CAPITAL CO CP/B | 2.0000 | 10/01/01 | 100.000 | 815,395.00 | .... | .... | .... | .... |
| 08/21/01 | 815,395.000 | GENERAL ELECTRIC CAPITAL CO CP/B | 2.0000 | 10/01/01 | 100.000 | 815,395.00 | .... | .... | .... | .... |
| | | **ICHASES** | | | | 7,645,926.00 | | ---- | ---- | ---- |

## ICOME

| DATE | QUANTITY | SECURITY | COUPON RATE | MATURE DATE | UNIT COST | TOTAL COST | PRICE | PROCEED | REALIZED GAINLOSS | INCOME |
|---|---|---|---|---|---|---|---|---|---|---|
| | | **Coupon** | | | | | | | | |
| 09/05/01 | 95,942.000 | NIGERIA PROMISSORY NOTES | 5.0920 | 01/05/10 | .... | .... | .... | .... | .... | 95,942.00 |
| 07/17/01 | 405,000.000 | PANAMA-INT REDUCTION BND | 4.7500 | 07/17/14 | .... | .... | .... | .... | .... | 405,000.00 |
| 07/24/01 | 546,875.000 | RUSSIAN FEDERATION | 8.7500 | 07/24/05 | .... | .... | .... | .... | .... | 546,875.00 |
| 07/28/01 | 214,500.000 | FLIRB- BEAR FLIRB SER A | 4.5625 | 07/28/12 | .... | .... | .... | .... | .... | 214,500.00 |
| 07/31/01 | 228,687.570 | CROATIA | 4.5625 | 07/31/06 | .... | .... | .... | .... | .... | 228,687.57 |
| 08/15/01 | 571,875.000 | REPUBLIC OF COLOMBIA | 7.6250 | 02/15/07 | .... | .... | .... | .... | .... | 571,875.00 |
| 08/15/01 | 148,125.000 | GS SUPERHIGHWAY HLDGS | 9.8750 | 08/15/04 | .... | .... | .... | .... | .... | 148,125.00 |
| 08/15/01 | 172,380.000 | REPUBLIC OF ECUADOR | 5.0000 | 08/15/30 | .... | .... | .... | .... | .... | 172,380.00 |
| 08/15/01 | 127,500.000 | EXPORT-IMPORT BK KOREA | 6.3750 | 08/15/06 | .... | .... | .... | .... | .... | 127,500.00 |
| 08/30/01 | 80,483.860 | DOMINICAN REPUBLIC PDI | 3.7500 | 08/30/09 | .... | .... | .... | .... | .... | 80,483.86 |
| 09/04/01 | 200,009.620 | ALGERIA LOAN TRANCHE I (SALOMON) | 4.3125 | 09/04/06 | .... | .... | .... | .... | .... | 200,009.62 |
| 09/12/01 | 220,000.000 | SOCIALIST REP OF VIETNAM PDI SER 18YR | 4.0000 | 03/14/16 | .... | .... | .... | .... | .... | 220,000.00 |

# TRANSACTION DETAIL REPORT

gusta 'B'

| DATE | QUANTITY | SECURITY | COUPON RATE | MATURE DATE | UNIT COST | TOTAL COST | PRICE | PROCEED | REALIZED GAIN/LOSS | INCOME |
|---|---|---|---|---|---|---|---|---|---|---|
| **OME - cont.** | | | | | | | | | | |
| **Coupon - cont.** | | | | | | | | | | |
| 9/28/01 | 18,000.000 | REPUBLIC OF ARGENTINA BEAR FRB | 3.3750 | 03/31/05 | ---- | ---- | ---- | ---- | ---- | 18,000.00 |
| 9/30/01 | 125,400.000 | KINGDOM OF THAILAND | 6.2700 | 09/30/03 | ---- | ---- | ---- | ---- | ---- | 125,400.00 |
| **Income** | | | | | | | | | | |
| 08/01/01 | 7,591.240 | RESTRUC & CONSOL AGREEMT (SALI PART | 5.0938 | 01/01/09 | ---- | ---- | ---- | ---- | ---- | 7,591.24 |
| 07/17/01 | 53.330 | PANAMA-INT REDUCTION BND | 4.7500 | 07/17/14 | ---- | ---- | ---- | ---- | ---- | 53.33 |
| 08/23/01 | 326.970 | AMERICAN EXPRESS COMPANY CP/B | | | ---- | ---- | ---- | ---- | ---- | 326.97 |
| **OME** | | | | | | ---- | ---- | ---- | ---- | 3,162,749.59 |
| **Add Long** | | | | | | | | | | |
| 3/19/997 | 18,000,000.000 | PANAMA-INT REDUCTION BND | 4.7500 | 07/17/14 | 73.750 | 13,275,000.00 | 73.750 | 13,275,000.00 | ---- | -774,000.00 |
| 3/19/997 | 15,000,000.000 | RESTRUC & CONSOL AGREEMT (SALI PART | 5.0938 | 01/01/09 | 87.250 | 13,087,537.50 | ---- | ---- | ---- | -110,364.58 |
| **Deliver Long** | | | | | | | | | | |
| 08/01/01 | 18,000,000.000 | PANAMA-INT REDUCTION BND | 4.7500 | 01/01/09 | 73.750 | 13,275,000.00 | 73.750 | 13,275,000.00 | 0.00 | 774,000.00 |
| 08/22/01 | 15,000,043.089 | RESTRUC & CONSOL AGREEMT (SALI PART | 5.0938 | 01/01/09 | 87.250 | 13,087,537.60 | 87.250 | 13,087,537.60 | 0.00 | 220,729.80 |
| | | | | | | 52,725,075.10 | | 26,362,537.60 | 644,168.88 | 110,365.22 |
| | | | | | | | | | 0.00 | 3,273,114.81 |

_r...1_

# TRANSACTION DETAIL REPORT

egusta 'B'
ginning : 10/01/2001
ding : 12/31/2001

| DATE | QUANTITY | SECURITY | COUPON RATE | MATURE DATE | UNIT COST | TOTAL COST | PRICE | PROCEED | REALIZED GAIN/LOSS | INCOME |
|---|---|---|---|---|---|---|---|---|---|---|
| **Maturities** | | | | | | | | | | |
| **Sell Long** | | | | | | | | | | |
| 11/09/01 | 3,000,000.000 | GREATER BEIJING FIRST | 9.2500 | 06/15/04 | 46.333 | 1,390,000.00 | 42.000 | 1,260,000.00 | -130,000.00 | ---- |
| **Pay Princl L** | | | | | | | | | | |
| 11/05/01 | 175,621.500 | NIGERIA PROMISSORY NOTES | 5.0920 | 01/05/10 | 75.143 | 131,967.30 | 100.000 | 175,621.50 | 43,654.20 | ---- |
| 05/21/01 | 500,000.000 | BANCO CENTRAL COSTA RICA | 6.2500 | 05/21/10 | 85.000 | 425,000.00 | 100.000 | 500,000.00 | 75,000.00 | ---- |
| 07/03/01 | 775,000.012 | REPUBLIC OF PHILIPPINES FLIRB SER B | 2.9375 | 06/01/08 | 93.500 | 724,625.01 | 100.000 | 775,000.01 | 50,375.00 | ---- |
| 05/18/01 | 761,920.000 | REPUBLIC OF VENEZUELA DCB SER DL | 2.8750 | 12/18/07 | 87.375 | 665,727.60 | 100.000 | 761,920.00 | 96,192.40 | ---- |
| **Mature Long** | | | | | | | | | | |
| 10/01/01 | 8,485,098.000 | GENERAL ELECTRIC CAPITAL CO CPIB | 4.0900 | 10/05/10 | 100.000 | 8,485,098.00 | 100.000 | 8,485,098.00 | ---- | ---- |
| 10/01/01 | 658,917.000 | GENERAL ELECTRIC CAPITAL CO CPIB | 4.5000 | 10/01/01 | 100.000 | 658,917.00 | 100.000 | 658,917.00 | ---- | ---- |
| 10/01/01 | 168,750.000 | GENERAL ELECTRIC CAPITAL CO CPIB | 4.0800 | 10/01/01 | 100.000 | 168,750.00 | 100.000 | 168,750.00 | ---- | ---- |
| 10/01/01 | 608,376.000 | GENERAL ELECTRIC CAPITAL CO CPIB | 3.8900 | 10/01/01 | 100.000 | 608,376.00 | 100.000 | 608,376.00 | ---- | ---- |
| 10/01/01 | 484,060.000 | GENERAL ELECTRIC CAPITAL CO CPIB | 3.8400 | 10/01/01 | 100.000 | 484,060.00 | 100.000 | 484,060.00 | ---- | ---- |
| 10/01/01 | 894,324.000 | GENERAL ELECTRIC CAPITAL CO CPIB | 3.7900 | 10/01/01 | 100.000 | 894,324.00 | 100.000 | 894,324.00 | ---- | ---- |
| 10/01/01 | 1,141,250.000 | GENERAL ELECTRIC CAPITAL CO CPIB | 3.8000 | 10/01/01 | 100.000 | 1,141,250.00 | 100.000 | 1,141,250.00 | ---- | ---- |
| 10/01/01 | 1,215,820.000 | GENERAL ELECTRIC CAPITAL CO CPIB | 3.7700 | 10/01/01 | 100.000 | 1,215,820.00 | 100.000 | 1,215,820.00 | ---- | ---- |
| 10/01/01 | 303,750.000 | GENERAL ELECTRIC CAPITAL CO CPIB | 3.6900 | 10/01/01 | 100.000 | 303,750.00 | 100.000 | 303,750.00 | ---- | ---- |
| 10/01/01 | 1,159,609.000 | GENERAL ELECTRIC CAPITAL CO CPIB | 3.5800 | 10/01/01 | 100.000 | 1,159,609.00 | 100.000 | 1,159,609.00 | ---- | ---- |
| 10/01/01 | 235,625.000 | GENERAL ELECTRIC CAPITAL CO CPIB | 3.5500 | 10/01/01 | 100.000 | 235,625.00 | 100.000 | 235,625.00 | ---- | ---- |
| 10/01/01 | 328,505.000 | GENERAL ELECTRIC CAPITAL CO CPIB | 3.3100 | 10/01/01 | 100.000 | 328,505.00 | 100.000 | 328,505.00 | ---- | ---- |
| 10/01/01 | 1,007,592.000 | GENERAL ELECTRIC CAPITAL CO CPIB | 3.6200 | 10/01/01 | 100.000 | 1,007,592.00 | 100.000 | 1,007,592.00 | ---- | ---- |
| 10/01/01 | 269,363.000 | GENERAL ELECTRIC CAPITAL CO CPIB | 3.6200 | 10/01/01 | 100.000 | 269,363.00 | 100.000 | 269,363.00 | ---- | ---- |

# RANSACTION DETAIL REPORT

gust, 'B'
ginning : 10/01/2001
ding : 12/31/2001

### Mature Long - cont.

| DATE | QUANTITY | SECURITY | COUPON RATE | MATURE DATE | UNIT COST | TOTAL COST | PRICE | PROCEED | REALIZED GAIN/LOSS | INCOME |
|---|---|---|---|---|---|---|---|---|---|---|
| 10/01/01 | 1,072,047.000 | GENERAL ELECTRIC CAPITAL CO CPIB | 3.6000 | 10/01/01 | 100.000 | 1,072,047.00 | 100.000 | 1,072,047.00 | .... | .... |
| 10/01/01 | 546,875.000 | GENERAL ELECTRIC CAPITAL CO CPIB | 3.5500 | 10/01/01 | 100.000 | 546,875.00 | 100.000 | 546,875.00 | .... | .... |
| 10/01/01 | 1,033,260.000 | GENERAL ELECTRIC CAPITAL CO CPIB | 3.5500 | 10/01/01 | 100.000 | 1,033,260.00 | 100.000 | 1,033,260.00 | .... | .... |
| 10/01/01 | 699,375.000 | GENERAL ELECTRIC CAPITAL CO CPIB | 3.4800 | 10/01/01 | 100.000 | 699,375.00 | 100.000 | 699,375.00 | .... | .... |
| 10/01/01 | 172,380.000 | GENERAL ELECTRIC CAPITAL CO CPIB | 3.4800 | 10/01/01 | 100.000 | 172,380.00 | 100.000 | 172,380.00 | .... | .... |
| 10/01/01 | 148,125.000 | GENERAL ELECTRIC CAPITAL CO CPIB | 3.4600 | 10/01/01 | 100.000 | 148,125.00 | 100.000 | 148,125.00 | .... | .... |
| 10/01/01 | 238,997.000 | GENERAL ELECTRIC CAPITAL CO CPIB | 3.5000 | 10/01/01 | 100.000 | 238,997.00 | 100.000 | 238,997.00 | .... | .... |
| 10/01/01 | 238,997.000 | GENERAL ELECTRIC CAPITAL CO CPIB | 3.5000 | 10/01/01 | 100.000 | 238,997.00 | 100.000 | 238,997.00 | .... | .... |
| 10/01/01 | 148,125.000 | GENERAL ELECTRIC CAPITAL CO CPIB | 3.4600 | 10/01/01 | 100.000 | 148,125.00 | 100.000 | 148,125.00 | .... | .... |
| 10/01/01 | 220,000.000 | GENERAL ELECTRIC CAPITAL CO CPIB | 3.4600 | 10/01/01 | 100.000 | 220,000.00 | 100.000 | 220,000.00 | .... | .... |
| 10/01/01 | 220,000.000 | GENERAL ELECTRIC CAPITAL CO CPIB | 1.5000 | 10/01/01 | 100.000 | 220,000.00 | 100.000 | 220,000.00 | .... | .... |
| 10/01/01 | 148,125.000 | GENERAL ELECTRIC CAPITAL CO CPIB | 1.5000 | 10/01/01 | 100.000 | 148,125.00 | 100.000 | 148,125.00 | .... | .... |
| 10/01/01 | 815,395.000 | GENERAL ELECTRIC CAPITAL CO CPIB | 2.0000 | 10/01/01 | 100.000 | 815,395.00 | 100.000 | 815,395.00 | .... | .... |
| 10/01/01 | 220,000.000 | GENERAL ELECTRIC CAPITAL CO CPIB | 1.5000 | 10/01/01 | 100.000 | 220,000.00 | 100.000 | 220,000.00 | .... | .... |
| 10/01/01 | 815,395.000 | GENERAL ELECTRIC CAPITAL CO CPIB | 2.0000 | 10/01/01 | 100.000 | 815,395.00 | 100.000 | 815,395.00 | .... | .... |
| 10/01/01 | 815,395.000 | GENERAL ELECTRIC CAPITAL CO CPIB | 2.0000 | 10/01/01 | 100.000 | 815,395.00 | 100.000 | 815,395.00 | .... | .... |
| 10/04/01 | 14,000,000.000 | APP GLOBAL FINANCE LTD | 9.7500 | 10/04/01 | 99.424 | 13,919,360.00 | 100.000 | 14,000,000.00 | 80,640.00 | .... |
| 10/01/01 | 28,310,000.000 | GENERAL ELECTRIC CAPITAL CO CPIB | 2.3800 | 11/01/01 | 100.000 | 28,310,000.00 | 100.000 | 28,310,000.00 | .... | .... |
| /MATURITIES | | | | | | 68,896,689.92 | | 69,112,551.51 | 215,861.60 | .... |

### PURCHASES

#### Buy

| DATE | QUANTITY | SECURITY | COUPON RATE | MATURE DATE | UNIT COST | TOTAL COST | PRICE | PROCEED | REALIZED GAIN/LOSS | INCOME |
|---|---|---|---|---|---|---|---|---|---|---|
| 8/26/01 | 28,310,000.000 | GENERAL ELECTRIC CAPITAL CO CPIB | 2.3800 | 11/01/01 | 100.000 | 28,310,000.00 | .... | .... | .... | .... |
| 10/30/01 | 169,000.000 | GENERAL ELECTRIC CAPITAL CO CPIB | 2.0100 | 04/02/02 | 100.000 | 169,000.00 | .... | .... | .... | .... |
| 11/02/01 | 28,321,235.000 | GENERAL ELECTRIC COMPANY CP | 2.0100 | 04/02/02 | 100.000 | 28,321,235.00 | .... | .... | .... | .... |

# TRANSACTION DETAIL REPORT

Augusta 'B'

Beginning : 10/01/2001
Ending : 12/31/2001

## PURCHASES

### Buy - cont.

| DATE | QUANTITY | SECURITY | COUPON RATE | MATURE DATE | UNIT COST | TOTAL COST | PRICE | PROCEED | REALIZED GAIN/LOSS | INCOME |
|---|---|---|---|---|---|---|---|---|---|---|
| 11/19/01 | 1,283,400.000 | GENERAL ELECTRIC COMPANY CP | | 04/01/02 | 100.000 | 1,283,400.00 | ... | ... | | |
| 12/03/01 | 618,750.000 | GENERAL ELECTRIC COMPANY CP | 1.8700 | 04/01/02 | 100.000 | 618,750.00 | ... | ... | | |
| 12/07/01 | 265,429.000 | GENERAL ELECTRIC COMPANY CP | 1.7500 | 04/01/02 | 100.000 | 265,429.00 | ... | ... | | |
| 12/20/01 | 235,625.000 | AMERICAN EXPRESS CREDIT CORP CP | | 04/01/02 | 100.000 | 235,625.00 | ... | ... | | |
| 9/27/01 | 3,472,927.000 | AMERICAN EXPRESS CREDIT CORP CP | | 01/03/02 | 100.000 | 3,472,927.00 | ... | ... | | |
| | | | | | | 61,676,366.00 | | | | |

## INCOME

### Coupon

| DATE | QUANTITY | SECURITY | COUPON RATE | MATURE DATE | UNIT COST | TOTAL COST | PRICE | PROCEED | REALIZED GAIN/LOSS | INCOME |
|---|---|---|---|---|---|---|---|---|---|---|
| 10/01/01 | 14,048.150 | GENERAL ELECTRIC CAPITAL CO CP1B | 4.5000 | 10/01/01 | ... | ... | ... | ... | ... | 14,048.15 |
| 10/01/01 | 162,098.910 | GENERAL ELECTRIC CAPITAL CO CP1B | 4.0900 | 10/01/01 | ... | ... | ... | ... | ... | 162,098.91 |
| 10/01/01 | 2,997.570 | GENERAL ELECTRIC CAPITAL CO CP1B | 4.0800 | 10/01/01 | ... | ... | ... | ... | ... | 2,997.57 |
| 10/01/01 | 9,276.980 | GENERAL ELECTRIC CAPITAL CO CP1B | 3.8900 | 10/01/01 | ... | ... | ... | ... | ... | 9,276.98 |
| 10/01/01 | 7,125.460 | GENERAL ELECTRIC CAPITAL CO CP1B | 3.8400 | 10/01/01 | ... | ... | ... | ... | ... | 7,125.46 |
| 10/01/01 | 11,926.000 | GENERAL ELECTRIC CAPITAL CO CP1B | 3.7900 | 10/01/01 | ... | ... | ... | ... | ... | 11,926.00 |
| 10/01/01 | 15,012.140 | GENERAL ELECTRIC CAPITAL CO CP1B | 3.8000 | 10/01/01 | ... | ... | ... | ... | ... | 15,012.14 |
| 10/01/01 | 15,342.680 | GENERAL ELECTRIC CAPITAL CO CP1B | 3.7700 | 10/01/01 | ... | ... | ... | ... | ... | 15,342.68 |
| 10/01/01 | 3,400.150 | GENERAL ELECTRIC CAPITAL CO CP1B | 3.6900 | 10/01/01 | ... | ... | ... | ... | ... | 3,400.15 |
| 10/01/01 | 12,118.260 | GENERAL ELECTRIC CAPITAL CO CP1B | 3.5800 | 10/01/01 | ... | ... | ... | ... | ... | 12,118.26 |
| 10/01/01 | 2,370.370 | GENERAL ELECTRIC CAPITAL CO CP1B | 3.5500 | 10/01/01 | ... | ... | ... | ... | ... | 2,370.37 |
| 10/01/01 | 3,136.500 | GENERAL ELECTRIC CAPITAL CO CP1B | 3.5100 | 10/01/01 | ... | ... | ... | ... | ... | 3,136.50 |
| 10/01/01 | 10,616.740 | GENERAL ELECTRIC CAPITAL CO CP1B | 3.6200 | 10/01/01 | ... | ... | ... | ... | ... | 10,616.74 |

# TRANSACTION DETAIL REPORT

Augusta 'B'

Beginning : 10/01/2001
Ending : 12/31/2001

Coupon - cont.

| DATE TIME | QUANTITY - cont. | SECURITY | COUPON RATE | MATURE DATE | UNIT COST | TOTAL COST | PRICE | PROCEED | REALIZED GAIN/LOSS | INCOME |
|---|---|---|---|---|---|---|---|---|---|---|
| 10/01/01 | 7,573,540 | GENERAL ELECTRIC CAPITAL CO CPIB | 3.6600 | 10/01/01 | ---- | ---- | ---- | ---- | ---- | 7,573.54 |
| 10/01/01 | 3,637,200 | GENERAL ELECTRIC CAPITAL CO CPIB | 3.5500 | 10/01/01 | ---- | ---- | ---- | ---- | ---- | 3,637.20 |
| 10/01/01 | 6,217,520 | GENERAL ELECTRIC CAPITAL CO CPIB | 3.5300 | 10/01/01 | ---- | ---- | ---- | ---- | ---- | 6,217.52 |
| 10/01/01 | 3,123,780 | GENERAL ELECTRIC CAPITAL CO CPIB | 3.4800 | 10/01/01 | ---- | ---- | ---- | ---- | ---- | 3,123.78 |
| 10/01/01 | 753,130 | GENERAL ELECTRIC CAPITAL CO CPIB | 3.4800 | 10/01/01 | ---- | ---- | ---- | ---- | ---- | 753.13 |
| 10/02/01 | 376,875,000 | REPUBLIC OF KAZAKHSTAN | 8.3750 | 10/02/02 | ---- | ---- | ---- | ---- | ---- | 376,875.00 |
| 10/04/01 | 615,057,920 | APP GLOBAL FINANCE LTD | 9.7500 | 10/04/01 | ---- | ---- | ---- | ---- | ---- | 615,057.92 |
| 10/05/01 | 93,731,950 | NIGERIA PROMISSORY NOTES | 5.0920 | 01/05/10 | ---- | ---- | ---- | ---- | ---- | 93,731.95 |
| 10/15/01 | 437,416,670 | REP OF BRAZIL - BEARER FLRB 15YR | 3.1875 | 04/15/09 | ---- | ---- | ---- | ---- | ---- | 437,416.67 |
| 10/15/01 | 38,750,000 | KINGDOM OF THAILAND | 7.7500 | 04/15/07 | ---- | ---- | ---- | ---- | ---- | 38,750.00 |
| 10/27/01 | 168,750,000 | POLAND-REGD PAR | 3.7500 | 10/27/24 | ---- | ---- | ---- | ---- | ---- | 168,750.00 |
| 11/01/01 | 11,234,090 | GENERAL ELECTRIC CAPITAL CO CPIB | 2.3800 | 11/01/01 | ---- | ---- | ---- | ---- | ---- | 11,234.09 |
| 11/15/01 | 23,400,000 | REPUBLIC OF ECUADOR | 12.0000 | 11/15/12 | ---- | ---- | ---- | ---- | ---- | 23,400.00 |
| 11/21/01 | 281,250,000 | BANCO CENTRAL COSTA RICA | 6.2500 | 05/21/10 | ---- | ---- | ---- | ---- | ---- | 281,250.00 |
| 11/30/01 | 618,750,000 | BANCOMEXT TRUST DIVISION | 11.2500 | 05/30/06 | ---- | ---- | ---- | ---- | ---- | 618,750.00 |
| 12/01/01 | 265,429,430 | REPUBLIC OF PHILIPPINES FLRB SER B | 2.9375 | 06/01/08 | ---- | ---- | ---- | ---- | ---- | 265,429.43 |
| 12/01/01 | 303,750,000 | KOREA DEVELOPMENT BANK | 6.7500 | 12/01/05 | ---- | ---- | ---- | ---- | ---- | 303,750.00 |
| 12/15/01 | 328,505,630 | AES CHINA GENERATING CO | 10.1250 | 12/15/06 | ---- | ---- | ---- | ---- | ---- | 328,505.63 |
| 12/18/01 | 239,143,360 | REPUBLIC OF VENEZUELA DCB SER DL | 2.8750 | 12/18/07 | ---- | ---- | ---- | ---- | ---- | 239,143.36 |
| 12/19/01 | 235,625,000 | VODOHOSPODARSKA VYSTAVBA | 7.2500 | 12/19/06 | ---- | ---- | ---- | ---- | ---- | 235,625.00 |

Income

| DATE TIME | QUANTITY | SECURITY | | | | | | | | INCOME |
|---|---|---|---|---|---|---|---|---|---|---|
| 10/05/01 | 2,047,850 | SWEEP INTEREST INCOME | | | | ---- | ---- | ---- | ---- | 2,047.85 |

Page 4

# TRANSACTION DETAIL REPORT

usta 'B'

Beginning : 10/01/2001
Ending : 12/31/2001

| DATE | QUANTITY | SECURITY | COUPON RATE | MATURE DATE | UNIT COST | TOTAL COST | PRICE | PROCEED | REALIZED GAIN/LOSS | INCOME |
|---|---|---|---|---|---|---|---|---|---|---|
| **Income - cont.** | | - cont. | | | | | | | | |
| 7/10/01 | 28,474.930 | SWEEP INTEREST INCOME | | | ::: | | ::: | ::: | ::: | 28,474.93 |
| 9/20/01 | 90,719.040 | BANCO CENTRAL COSTA RICA | 6.2500 | 05/21/10 | ::: | | ::: | ::: | ::: | 90,719.04 |
| 9/20/01 | 396,888.000 | RESTRUC & CONSOL AGREEMT (SALI PART | 5.0938 | 01/01/09 | ::: | | ::: | ::: | ::: | 396,888.00 |
| 9/26/01 | 1,306.710 | SWEEP INTEREST INCOME | | | ::: | | ::: | ::: | ::: | 1,306.71 |
| 9/30/01 | 3,642.540 | UNITED STATES DOLLARS | 2.5000 | | ::: | | ::: | ::: | ::: | 3,642.54 |
| 9/30/01 | 2,641.230 | SWEEP INTEREST INCOME | | | ::: | ::: | ::: | ::: | ::: | 2,641.23 |
| XME | | XME | | | | ::: | | ::: | ::: | 4,854,164.43 |
| **Contribution** | | | | | | | | | | |
| 9/05/01 | 2,308,491.410 | UNITED STATES DOLLARS | 2.5000 | | ::: | ::: | ::: | ::: | ::: | ::: |
| **Withdrawal** | | | | | | | | | | |
| 9/10/01 | -42,573.000 | UNITED STATES DOLLARS | 2.5000 | | ::: | | ::: | ::: | ::: | ::: |
| 9/10/01 | -2,127,971.910 | UNITED STATES DOLLARS | 2.5000 | | ::: | | ::: | ::: | ::: | ::: |
| 9/10/01 | -5,464,117.640 | UNITED STATES DOLLARS | 2.5000 | | ::: | | ::: | ::: | ::: | ::: |
| 9/25/01 | -159.120 | UNITED STATES DOLLARS | 2.5000 | | ::: | | ::: | ::: | ::: | ::: |
| 9/26/01 | -1,906,186.540 | UNITED STATES DOLLARS | 2.5000 | | ::: | | ::: | ::: | ::: | ::: |
| 9/29/01 | -2,298,375.000 | UNITED STATES DOLLARS | 2.5000 | | ::: | | ::: | ::: | ::: | ::: |
| 9/27/01 | -1,960.770 | UNITED STATES DOLLARS | 2.5000 | | ::: | | ::: | ::: | ::: | ::: |
| **Management Fee** | | | | | | | | | | |
| 9/10/01 | -338,384.370 | UNITED STATES DOLLARS | 2.5000 | | ::: | | ::: | ::: | ::: | ::: |

Page 6

# TRANSACTION DETAIL REPORT

ugusta 'B'

Beginning : 10/01/2001
Ending : 12/31/2001

| DATE | QUANTITY | SECURITY | COUPON RATE | MATURE DATE | UNIT COST | TOTAL COST | PRICE | PROCEED | REALIZED GAIN/LOSS | INCOME |
|---|---|---|---|---|---|---|---|---|---|---|
| UER | | | | | | | | | | |
| US: | | | | | | | | | | |
| Management Fee - cont. | | | | | | | | | | |
| | - cont. | | | | | | | | | |
| | -220,011.200 | UNITED STATES DOLLARS | 2.5000 | | ... | ... | ... | ... | | |
| 1/20/01 | | | | | | ... | | ... | 215,861.60 | 4,854,164.43 |

Exhibit B

## Augusta Funding Limited Series B
## Note Valuation Report as of: 04/03/02

Due Period covered by this Note Valuation Report:    10/03/01 to 04/03/02
Determination Date:    4/3/02
Payment Date relating to this Note Valuation Report:    4/10/02
Preceding Payment Date    10/10/01
Interest Accrual Period    10/10/01 to 04/10/02

### Noteholder Distribution Summary

| Class | Beginning Note Balance | Interest Rate Index | All Rate | Principal Distribution | Interest Distribution | Total Distribution | Ending Note Balance |
|---|---|---|---|---|---|---|---|
| A (REG S) | $ 115,144,517.70 | 6M Libor | 2.52125% | $ 54,597,128.66 | $ 1,467,668.80 | $ 56,064,797.47 | $ 60,547,389.04 |
| A (REG 144) | $ 77,574,451.30 | 6M Libor | 2.52125% | $ 36,782,839.37 | $ 988,788.74 | $ 37,771,628.10 | $ 40,791,611.93 |
| B-1 | $ 20,000,000.00 | Fixed | 0.00000% | | $ 1,043,737.18 | $ 1,043,737.18 | $ 20,000,000.00 |
| B-2 | $ 30,424,000.00 | Fixed | 0.00000% | $ 18,176,265.64 | $ 1,587,733.00 | $ 19,764,018.64 | $ 9,664,343.00 |
| Totals | $ 243,142,969.00 | | | 109,556,253.67 | $ 5,087,927.72 | $ 114,644,181.40 | $ 131,003,343.97 |

### Principal Distribution Detail

| Class | Original Note Balance | Beginning Note Balance | % of Note Outstanding | Mandatory Redemption | Principal Payable on Pymt Date | Balance after Principal Paydown | % of Note Outstanding after Distribution |
|---|---|---|---|---|---|---|---|
| A (REG S) | $ 140,000,005.41 | $ 115,144,517.70 | 82.24608% | $54,597,128.66 | $54,597,128.66 | $ 60,547,389.04 | 43.24813% |
| A (REG 144) | $ 84,568,349.59 | $ 77,574,451.30 | 91.72989% | $36,782,839.37 | $36,782,839.37 | $ 40,791,611.93 | 48.23508% |
| B-1 | $ 20,000,000.00 | $ 20,000,000.00 | 100.00000% | | | $ 20,000,000.00 | 100.00000% |
| B-2 | $ 30,424,000.00 | $ 30,424,000.00 | 100.00000% | $ 20,759,657.00 | $18,176,265.64 | $ 9,664,343.00 | 31.76552% |
| Totals | $ 274,992,355.00 | $ 243,142,969.00 | | $ 112,139,625.03 | 109,556,253.67 | $ 131,003,343.97 | |

### Interest Distribution Detail

| Class | Beginning Note Balance | Basis | Index | All Rate | Interest Distribution Amount | Deferred Interest | Interest Paid |
|---|---|---|---|---|---|---|---|
| A (REG s) | $ 115,144,517.70 | Actual/360 | 2.33375% | 2.52125% | $ 1,467,668.80 | | $ 1,467,668.80 |
| A (REG 144) | $ 77,574,451.30 | Actual/360 | 2.33375% | 2.52125% | $ 988,788.74 | | 988,788.74 |
| B-1 | $ 20,000,000.00 | 30/360 | 0.00000% | 0.00000% | $ 1,043,737.18 | | 1,043,737.18 |
| B-2 | $ 30,424,000.00 | 30/360 | 0.000000% | 0.00000% | $ 1,587,733.00 | | 1,587,733.00 |
| Totals | $ 243,142,969.00 | | | | $ 5,087,927.72 | 0.00 | 5,087,927.72 |



5 Penn Plaza, 15 floor
New York, NY 10001
Attn  Thomas Vlahakis, CDO Unit
(212) 328-7592

**Augusta Funding Limited Series B**
**Note Valuation Report as of: 4/03/02**

| | |
|---|---:|
| Aggregate Principal Balance of Portfolio Debt Securities as of Calculation Date | 246,316,297.37 |
| Collateral Interest Collection Balance as of Calculation Date | 7,884,802.58 |
| Collateral Principal Collections Balance as of Calculation Date | 20,461,057.04 |

| | |
|---|---:|
| Trustee Fee | 12,025.00 |
| Custody Fee | 25,274.17 |
| Paying Agent Fee | 0.00 |
| Cayman Agent Fee | 6,355.21 |
| Total  Expenses | 43,654.38 |

| | |
|---|---:|
| (i) Issuer Expenses | 0.00 |
| (ii) Trustee Fees | 43,654.38 |
| (iii) Administrative Expenses | 0.00 |
| (iv) Senior Collateral Management Fee (Unsubordinated) | 137,569.11 |
| (v) (a) MBIA Premium | 433,617.68 |
| (b) Net Payment due under Hedge Agreement | 1,975,680.02 |
| (vi) Class A Notes Interest | 2,456,457.54 |
| (vii) MBIA unpaid Accrued Liabilities | 0.00 |
| (viii) Repay the Class A Notes to satisfy Coverage Test | 0.00 |
| (ix) Trustee Fees (not paid in full) | 0.00 |
| (x) Subordinated Collateral Management Fee | 206,353.67 |
| (xi) Unpaid Collateral Management Fee and Expenses | 0.00 |
| (xii) Unpaid Issuer Expenses & Administrative Expenses | 0.00 |
| (xiii) Class B-1 Note Interest (Excess Interest) | 1,643,737.18 |
| Class B-2 Note Interest (Excess Interest) | 1,587,733.00 |
| **Total Distribution of Interest Proceeds** | **7,884,802.58** |

| | |
|---|---:|
| (i) Interest Distribution Amounts not paid under clauses (i) to (vi) & (ix) | 0.00 |
| (ii) Payment of Class A Notes to satisfy Coverage Test (Reinvestment Period) | 0.00 |
| (iii) Payment of Class A Notes Principal (After Reinvestment Period) | 20,461,057.04 |
| (iv) Payments owed to Hedge Counterparty | 0.00 |
| (v) Unpaid Collateral Management Fees | 0.00 |
| (vi) Unpaid Administrative Expenses & Issuer Expenses | 0.00 |
| (vii) Purchase of additional Debt Securities (Reinvestment Period) | 0.00 |
| Amount Deposited to Collection Account for Investment in additional Debt Securities at a Later Date in accordance with the Reinvestment Criteria | 0.00 |
| (viii) Payment to Class B-1 Notes (After Reinvestment Period) | 0.00 |
| Payment to Class B-2 Notes (After Reinvestment Period) | 0.00 |
| **Total Distribution of Principal Proceeds** | **20,461,057.04** |



5 Penn Plaza, 16 floor
New York, NY 10001
Attn: Thomas Vlahakis, CDO Unit
    (212) 328-7592

**Augusta Funding Limited Series B**
**Note Valuation Report as of: 4/03/02**

| | |
|---|---:|
| Aggregate Principal Balance of Portfolio Debt Securities as of Calculation Date | 142,219,753.74 |
| Collateral Interest Collection Balance as of Calculation Date | 0.00 |
| Collateral Principal Collections Balance as of Calculation Date | 89,095,196.64 |

| | |
|---|---:|
| (i) Interest Distribution Amounts not paid under clauses (i) to (vii) & (ix) | 0.00 |
| (ii) Payment of Class A Notes to satisfy Coverage Test (Reinvestment Period) | 0.00 |
| (iii) Partial Redemption of Class A Notes (After Reinvestment Period) | 70,918,910.99 |
| (iv) Payments owed to Hedge Counterparty | 0.00 |
| (v) Unpaid Collateral Management Fees | 0.00 |
| (vi) Unpaid Administrative Expenses & Issuer Expenses | 0.00 |
| (vii) Purchase of additional Debt Securities (Reinvestment Period) | 0.00 |
| Amount Deposited to Collection Account for Investment in additional Debt Securities at a Later Date in accordance with the Reinvestment Criteria | 0.00 |
| (viii) Payment to Class B-1 Notes (After Reinvestment Period) | 0.00 |
| Payment to Class B-2 Notes (After Reinvestment Period - Part of Proceeds will be Paid at a later Date) | 18,176,285.64 |
| **Total Distribution of Principal Proceeds** | 89,095,196.64 |

Augusta Funding Limited Series B

The Class A Par Value Test : April 3, 2002

**Principal Collateral Value**
Sum of :
a) Collateral Obligations (other than Defaulted Obligations)    241,316,297.37
Defaulted Securities (5,000,000)
Eligible Investments                                              7,884,802.58
b) Cash deposited in Principal Collection Subaccount            20,461,057.04
c) Market Value of Defaulted Securities                            500,000.00

                                                               270,162,156.99    (A)

**Liabilities**
Aggregate Outstanding Amount of Class A Notes    192,718,969.00

                                                 192,718,969.00    (B)

**Class A Par Value Ratio (A/B)**    140.18%
Required Par Value Ratio              135.00%
Test Result                              Pass

# Augusta Funding Limited Series B

## The Class A Interest Coverage Test:  April 3, 2002

### Interest Coverage Numerator

Sum of :

| | | |
|---|---|---|
| a) Aggregate amount of scheduled Interest Proceeds due in the Due Period: | 7,884,802.58 | |
| Collateral Debt Security | 0.00 | |
| Eligible Investments | 0.00 | |
| b) Net Payments Expected to be Receive by the Issuer under the Hedge Agreement | 0.00 | |
| | **7,884,802.58** | (A) |

| | | |
|---|---|---|
| c) Issuer Expenses | 0.00 | |
| Trustee Fees | 43,654.38 | |
| Administrative Expenses | 0.00 | |
| Senior Collateral Management Fee | 137,569.11 | |
| | **181,223.49** | (B) |

### Interest Distribution Amounts

| | | |
|---|---|---|
| Class A Interest Distribution Amount | 2,456,457.54 | |
| Net Payments to be paid by the Issuer under the Hedge Agreement | 1,975,680.02 | |
| | **4,432,137.56** | (C) |

| | |
|---|---|
| Class A Interest Coverage Ratio ((A-B)/C)) | 173.81% |
| Required Interest Coverage Ratio | 125.00% |
| Test Result | Pass |

**AUGUSTA FUNDING LIMITED B**
Compostion Report as of April 3, 2002

**EXHIBIT 6**


# BEAR STEARNS

Bear, Stearns & Co. Inc.
383 Madison Avenue
New York, NY 10179
www.bearstearns.com

**Darya Geetter**
Managing Director
Phone (212) 272-2541
Fax (212) 272-5586
dgeetter@bear.com

Barry L. Katz, Esq.
225 City Avenue, Suite 14
Bala Cynwyd, PA 19004
Fax: (610) 660-8817

February 26, 2002

Re: Perelman Charitable Remainder Unitrust v. Bear Stearns et al.

Dear Mr. Katz:

This letter confirms the communications you have had with our outside counsel, Eric Rieder. Our understanding is as follows: your client, Mr. Perelman purchased $3 million of August B bonds, a high yield/high risk emerging market CBO at a price of 86.92 ($2,607,792). He alleges that he has lost all of his investment and that it has no value. Your client received three coupon payments (totaling over $386,000) and has been informed beginning last week that, pursuant to the deal documents, he has an opportunity <u>by the end today only</u>, to redeem these bonds on April 10, 2002. He has also been informed that according to our analyst's estimate at today's market conditions, which may be subject to change, the redemption rate on April 10 will be 82.5, allowing your client to recover approximately 95% of his payment – not including the three coupon payments of approximately $386,085. Taking the coupon payments into account, redemption at this estimated price puts your client ahead on his investment by over $300,000 at this time. We understand that, notwithstanding this information, your client has refused to mitigate his alleged losses.

Please understand we believe your client has a legal duty and obligation to mitigate any losses but by not redeeming he has chosen not to do so.

Should he change his mind about the redemption, he must notify the Trustee by close of business today. As a courtesy, we request that you notify us of Mr. Perelman's decision as well.

Sincerely,

Darya Geetter
Managing Director
Legal Department

Cc: Mark Seruya

ATLANTA | BEIJING | BOSTON | BUENOS AIRES | CHICAGO | DALLAS | DUBLIN | HONG KONG | LONDON
LOS ANGELES | LUGANO | NEW YORK | PUERTO RICO | SAN FRANCISCO | SÃO PAULO | SEOUL | SHANGHAI | SINGAPORE | TOKYO

**EXHIBIT 7**

BARRY L. KATZ
225 City Avenue, Suite 14
Bala Cynwyd, PA 19004
Direct: (610) 660-8806
Fax: (610) 660-8817
BarryLKatz@AOL.com

February 27, 2002

Eric Rieder, Esq.
Robinson Silverman Pearce Aronsohn & Berman
1290 Avenue of the Americas
New York, NY 10104

RE:    NASD-DR Case Number 01-06336
       Perelman Charitable Remainder Unitrust v.
       Bear Stearns & Co., Inc. and Mark Seruya

Dear Mr. Rieder,

        We have tried through sources you directed us and we were unable to get the redemption
value of the Augusta B Notes. We are again asking you to tell us the redemption value today.
You have informed us that the estimated value was 66 and in one business day you increased it
to 82.5. We find this unreliable. Therefore, we are requesting again that you inform us of today's
redemption value of these bonds so that we can consider mitigation. If your client is willing to
purchase the bonds at 82.5, or guarantee that the redemption price will not fall below 82.5, the
Unitrust will then seek redemption pursuant to the terms set forth in your letter of February 27,
2002. Please let me know how you would like to proceed.

                                              Very truly yours,

                                              Barry L. Katz

cc:    Raymond G. Perelman

**EXHIBIT 8**

*BARRY L. KATZ*
*225 City Avenue, Suite 14*
*Bala Cynwyd, PA 19004*
*Direct: (610) 660-8806*
*Fax: (610) 660-8817*
*BarryLKatz@AOL.com*

February 28, 2002

**Via Fax**

Darya Geeter, Esq.
Bear Stearns Securities Corp
245 Park Avenue
New York, NY 10067

Dear Ms. Geeter,

I am in receipt of your letter dated February 28, 2002. I understand Bear Stearn's position with respect to redemption and mitigation. We strongly disagree. In an effort to eliminate these continuing communications back and forth, with varying estimated prices being stated, I will try to set forth the Unitrust's position as clearly and succinctly as possible.

The Unitrust owns $3 million face value Augusta B Notes which were sold to it by Bear Stearns. You are suggesting that it redeem these Notes now without it knowing what it would receive for the redemption on April 10, 2002, or if redemption would even be allowed under all the prerequisites which I have previously outlined to Mr. Rieder. Apparently, the estimates you have provided are Bear Stearns internal ones based upon its calculation of the value at a set point in time, and do not account for the market risk between now and April 10, 2002. This is not mitigating at a fixed price. This is simply asking the Unitrust to take a significant risk with respect to the validity of your unsubstantiated estimates, and what may occur in the market in the next 40 days. We do not believe under these circumstances that mitigation in any way requires the Unitrust to request redemption.

Moreover, as you are aware, part of the complaint in this case alleges that the Unitrust was told that after five years the Notes could be liquidated similar to a mutual fund. This obviously is not the case. Indeed, it does not appear that the Notes even have any current market value. If they did, it would seem very simple for Bear Stearns to offer the 82.5 alleged current price to the Unitrust, and it could then take the market risk between now and April 10 if it wants the Notes to be redeemed. Indeed, if you expect the Unitrust to take action to try to liquidate the Notes, it is entitled to have a fixed price.

Based upon the above, the ball is in Bear Stearn's court with respect to redemption. The Unitrust would tender the Notes to Bear Stearns in exchange for an 82.5

FEB-28-2002  15:02        LEGAL DEPT.

Thursday, February 28, 2002
page 2

price under the terms of your February 27th letter. Bear Stearns can then take the market
risk between now and the April 10th redemption date, as well as any risk as to whether
redemption would even be allowed. Otherwise, the Unitrust flatly refuses to seek
redemption.

I believe the above is as clear as I can be. Please advise me if Bear Stearns desires
to purchase the Notes at 82.5 and then have it take the market risk between now and April
10, 2002. Otherwise, I suggest we have nothing further to say on the subject.

Very truly yours,

Barry L. Katz

cc:    Raymond G. Perelman
       Michael Conley, Esq.
       Eric Rieder, Esq.

TOTAL P.04

**EXHIBIT 9**

-28-2002  10:58        LEGAL DEPT.                          212 272    P.02/02

# BEAR STEARNS

Bear, Stearns & Co. Inc.
383 Madison Avenue
New York, NY 10179
www.bearstearns.com

**Darya Geetter**
Managing Director
Phone (212) 272-2541
Fax (212) 272-5586
dgeetter@bear.com

Barry L. Katz, Esq.
225 City Avenue, Suite 14
Bala Cynwyd, PA 19004
Fax: (610) 660-8817

February 28, 2002

Re: Perelman Charitable Remainder Unitrust v. Bear Stearns et al.

Dear Mr. Katz:

This letter responds to the letter you sent to Mr. Rieder at 5 p.m. on February 27, 2002. The estimates provided to you were for the redemption on April 10, 2002. At this time, no guarantee can be made that your client will achieve that price but, please keep in mind, the price could continue to rise, as it did between February 21 when the estimated redemption price was 66 and February 26, when the price was estimated to be 82.5.

Since you've alleged in your complaint that the price is currently zero, any price above zero would decrease your client's alleged loss. Moreover, if he fails to take this opportunity to mitigate his alleged losses, we will argue that any alleged loss must be decreased by the amount he could and would have received had he mitigated, in accordance with his obligation.

I understand that notification about intention to redeem must be received as soon as possible. Accordingly, please inform us of your decision today.

Sincerely,

Darya Geetter
Managing Director
Legal Department

Cc: Mark Seruya
Eric Rieder, Esq.

TOTAL P.02

**EXHIBIT 10**



# BEAR STEARNS

OFFICE SERVICING YOUR ACCOUNT
Bear, Stearns & Co. Inc.
383 Madison Avenue
New York, New York 10179
(212) 272-2000

GLOBAL CLEARING SERVICES
WHOLLY OWNED SUBSIDIARY
Bear, Stearns Securities Corp.
One Metrotech Center North
Brooklyn, New York 11201-3859
(212) 272-1000

**RAYMOND G PERELMAN**

| | |
|---|---|
| STATEMENT PERIOD | February 23, 2002 |
| THROUGH | March 28, 2002 |
| ACCOUNT NUMBER | 220-41681 R28 |
| TAXPAYER NUMBER | On File |
| LAST STATEMENT | February 22, 2002 |

RAYMOND G PERELMAN
CHARITABLE REMAINDER UNITRUST
DTD 4/25/96
RAYMOND & RUTH PERELMAN TTEES
225 CITY LINE AVENUE
BALA CYNWYD PA 19004-1704

## What's In This Statement

| | |
|---|---|
| ACCOUNT EXECUTIVE | SERJUA,MARK F. |
| TELEPHONE | (212) 272-2989 |
| VISIT OUR WEBSITE | www.bearstearns.com |

| | |
|---|---|
| Financial Summary | 1 |
| Transaction Detail | 2 |
| Your Messages | 3 |

## Cash Flow Analysis

| | THIS PERIOD |
|---|---|
| OpeningBalance | $0.00 |
| Securities Sold | 4,950,000.00 |
| Amount Credited | $4,950,000.00 |
| Securities Bought | -2,475,000.00 |
| Funds Withdrawn | -2,475,000.00 |
| Amount Debited | $4,950,000.00 |
| ClosingBalance | $0.00 |

## Income Summary

| | THIS PERIOD | YEAR TO DATE |
|---|---|---|
| Dividends | 0.00 | 58,558.12 |
| Credit Balance Int. | 0.00 | 3.73 |
| Total | $0.00 | $58,561.85 |

Please report any difference in names or receipt or delivery of funds or stocks, indicated or delivered to you, to Client Services at 800-854-1428 or write to Bear, Stearns Securities Corp. One Metrotech Center North, Brooklyn, N.Y. 11201-3859.

SIPC This summary is for informational purposes only. It is not intended as a tax document. This statement should be retained for your records. See reverse side for important information.

03/29/02 23:48:006
027

V66.6

# BEAR STEARNS

OFFICE SERVING YOUR ACCOUNT
Bear, Stearns & Co. Inc.
383 Madison Avenue
New York, New York 10179
(212) 272-2000



CLEARED THROUGH ITS
WHOLLY OWNED SUBSIDIARY

Bear, Stearns Securities Corp.
One Metrotech Center North
Brooklyn, New York 11201-3859
(212) 272-1000

RAYMOND G PERLMAN

| | |
|---|---|
| STATEMENT PERIOD | February 23, 2002 |
| THROUGH | March 28, 2002 |
| ACCOUNT NUMBER | 220-41581 R28 |
| TAXPAYER NUMBER | On File |
| LAST STATEMENT | February 22, 2002 |

## Transaction Detail

2 a4

### INVESTMENT ACTIVITY

| SETTLEMENT DATE | TRADE DATE | TRANSACTION | DESCRIPTION | SYMBOL/CUSIP | QUANTITY | PRICE | DEBIT AMOUNT | CREDIT AMOUNT |
|---|---|---|---|---|---|---|---|---|
| 03/11/02 | 03/07/02 | SOLD | AUGUSTA FDG LTD B CLASS B 2 FIN 144A DUE 9/10/2015 7.101% AO 10 REF 9438816486300000 AS OF 03/07/02 SD 03/14/02 AS OF 03/07/02 INTR COMPUTED TO 03/14/02 | 05114AAC7SP | -3,000.000 | 82.50000 | | 2,475,000.00 |
| 03/15/02 | | RECEIVED | AUGUSTA FDG LTD B CLASS B 2 FIN 144A DUE 9/10/2015 7.101% AO 10 REF 9438816486300000 AS OF 03/07/02 SD 03/14/02 INTR COMPUTED TO 03/14/02 | 05114AAC7 | 3,000.000 | | | |
| | | | AUGUSTA FDG LTD B CLASS B 2 FIN 144A 7.101 DUE 04/10/2015 | 05114AAC7 | 3,000.000 | | | |
| 03/11/02 | 03/07/02 | CANCEL SELL | AUGUSTA FDG LTD B CLASS B 2 FIN 144A DUE 9/10/2015 7.101% AO 10 REF 9438816486300000 AS OF 03/07/02 SD 03/14/02 10 CXL PREVIOUS SELL | 05114AAC7 | -3,000.000 | 82.50000 | 2,475,000.00 | |
| 03/11/02 | 03/07/02 | SOLD | AUGUSTA FDG LTD B CLASS B 2 FIN 144A DUE 9/10/2015 7.101% AO 10 REF 2002031548630000 AS OF 03/07/02 SD 03/14/02 AS OF 03/07/02 INTR COMPUTED TO 03/14/02 | 05114AAC7 | -3,000.000 | 82.50000 | | 2,475,000.00 |

| | | | | | | TOTAL | | 7,475,000.00 |

### DEPOSITS AND WITHDRAWALS

| DATE | TRANSACTION | DESCRIPTION | DEBIT AMOUNT | CREDIT AMOUNT |
|---|---|---|---|---|
| 03/15/02 | FND WIRED | MDM AMERICAS D FNDS WIRED TO BARCLAYS BANK PLC AC10112505 ID #07296 | 2,475,000.00 | |

| | | TOTAL | $2,475,000.00 | $4,950,000.00 |

| | | | TOTAL | $2,475,000.00 |

# BEAR STEARNS

OFFICE SERVICING YOUR ACCOUNT
Bear, Stearns & Co. Inc.
383 Madison Avenue
New York, New York 10179
(212) 272-2000

C/ FARTY THIRTEEN LTD
WARD L V FANELLI, SUBSIDIARY

Bear, Stearns Securites Corp.
One Metrotech Center North
Brooklyn, New York 11201-3859
(212) 272-1000

RAYMOND G PERELMAN

| | |
|---|---|
| STATEMENT PERIOD | February 23, 2002 THROUGH March 28, 2002 |
| ACCOUNT NUMBER | 220-41881 028 |
| TAXPAYER NUMBER | On File |
| LAST STATEMENT | February 22, 2002 |

3 of 4

## Your messages



Pursuant to SEC Rule 11Ac1-6, Bear, Stearns & Co., Inc will
publicly post its quarterly routing statistics at the following web link:
http://www.bearstearns.com/corporate/businessequitiesrop.htm



Bear, Stearns Securities Corp. Net Capital and Net Capital
Requirements:

At November 30, 2001 and January 31, 2002, the Company's net
capital of approximately $2.6 billion and $2.6 billion was
approximately 9% and 8% of aggregate debit items and exceeded
the minimum regulatory net capital requirement of approximately
$604.1 million and $646.0 million by approximately $2.0 billion and
$2.0 billion, all respectively.

A complete copy of the Bear, Stearns Securities Corp. Statement
of Financial Condition is available on the web site
www.bearstearns.com.   Alternatively, to request a free printed copy
please call toll free 1-866-299-9331.

(STOP)

`······· End of Statement *······`

027    OXP3M02 23 46 001    V656

4 of 4

STATEMENT BACKER IS PRINTED ON THIS PAGE

007

03P807 21 46 004

V665

CLEARED THROUGH  ITS
WHOLLY OWNED SUBSIDIARY

Bear, Stearns Securities Corp.
One Metrotech Center North
Brooklyn, New York 11201-3859
(212) 272-5000

RAYMOND G PERELMAN

**EXHIBIT 11**

*BARRY L. KATZ*
*225 City Avenue, Suite 14*
*Bala Cynwyd, PA 19004*
*Direct: (610) 660-8806*
*Fax: (610) 660-8817*
*BarryLKatz@AOL.com*

February 26, 2002

Eric Rieder, Esq.
Robinson Silverman Pearce Aronsohn & Berman
1290 Avenue of the Americas
New York, NY 10104

RE:    NASD-DR Case Number 01-06336
       Perelman Charitable Remainder Unitrust v.
       Bear Stearns & Co., Inc. and Mark Seruya

Dear Eric,

I just wanted to confirm our telephone conversations of today so that there is no misunderstanding with respect to my position. You called this morning to inform me that you had a revised estimate for the value of the Augusta Bonds, that being 82.5, and that you thought redemption might still be possible. As you explained to me, this meant that the estimate was 82.5% of the face value of the bonds.

I later called you back to indicate that the Unitrust would be willing to undertake to seek to redeem the bonds based upon this estimate with the understanding that redemption would not be used in any way to prejudice its claim. I said your clients would have to agree not to claim that the redemption was premature and that if the value of the bonds thereafter increases you are entitled to any increased amount. Obviously, however, the amount that is actually received for the redemption would reduce the amount of any award. You later called and asked for my proposal in writing, which is the purpose of this letter. Please let me know whether your client is agreeable to this. If your client is not agreeable, we do not intend to seek redemption.

Thank you for your cooperation.

Very truly yours,

Barry L. Katz

cc:    Raymond G. Perelman
       Michael Conley, Esq.

**EXHIBIT 12**

### ROBINSON SILVERMAN PEARCE ARONSOHN & BERMAN LLP

1290 AVENUE OF THE AMERICAS

NEW YORK, NEW YORK 10104

(212) 541-2000

FACSIMILE: (212) 541-4630

WEB: www.robinsonsilverman.com

WRITER'S DIRECT NUMBER:

212-541-2057

WRITER'S DIRECT FACSIMILE:

212-541-1457

WRITER'S E-MAIL ADDRESS:

riedere@rspab.com

February 27, 2002

<u>By Facsimile</u>

Barry L. Katz
225 City Avenue, Suite 14
Bala Cynwyd, PA 19004
Fax: (610) 660-8817

      Re:    Perelman Charitable Remainder Unitrust v. Bear
              Stearns & Co., NASD 01-06336

Dear Barry:

       I write in response to your February 26, 2002 letter to me
regarding the redemption of the Augusta Bonds.

       If I understand your letter correctly, I believe that we are
generally in agreement as to the effect of your client's redemption.
However, just to ensure that there is no misunderstanding, I would like to
state my client's position in this letter.

       First, Bear Stearns agrees that it will not argue
that the redemption was premature if the bonds increase in value in the
future.  Bear Stearns would argue that, as you state in your letter, "the amount that
is actually received from the redemption would reduce the amount of any
award";  we understand from your letter that you agree with this point.

       Bear Stearns will further argue that the monies you receive in the redemption
plus the interest payments you have received to date are of sufficient
amount as to make your client whole on your investment.  We understand that
you will argue that these payments do not make your client whole and that the Unitrust
is entitled to additional monies in the way of interest or other payments.

       If the above is consistent with your understanding we cannot see any reason
why your client would not take this opportunity to mitigate its damages.

99991-00001/955827.1

ROBINSON SILVERMAN PEARCE ARONSOHN & BERMAN LLP

Barry L. Katz
February 27, 2002
Page 2

Sincerely yours,

Eric Rieder

cc:    Darya Geetter, Esq.
       Mark Seruya

99991-00001/955827.1

**EXHIBIT 13**

*13*

**BARRY L. KATZ**
*225 City Avenue, Suite 14*
*Bala Cynwyd, PA 19004*
*Direct: (610) 660-8806*
*Fax: (610) 660-8817*
*BarryLKatz@AOL.com*

March 6, 2002

Eric Rieder, Esq.
Robinson Silverman Pearce Aronsohn & Berman
1290 Avenue of the Americas
New York, NY 10104

RE:   NASD-DR Case Number 01-06336
      Perelman Charitable Remainder Unitrust v.
      Bear Stearns & Co., Inc. and Mark Seruya

Dear Mr. Rieder,

   I am in receipt of your letter dated March 6, 2002. Without waiver of any of our rights or information requests we have made, and in accordance with Bear Stearns request that the Unitrust mitigate its damages pursuant to the non-waiver of rights positions previously set forth, the Unitrust agrees to tender its Notes to Bear Stearns for the 82.5 price. Pursuant to your prior instructions, I will contact Darya Geetter to arrange the details.

Very truly yours,

Barry L. Katz

cc:   Raymond G. Perelman

**EXHIBIT 14**

212-541-2057

March 5, 2002                                            212-541-1457

riedere@rspab.com

<u>By Facsimile</u>

.

Barry L. Katz, Esq.
225 City Avenue, Suite 14
Bala Cynwyd, Pennsylvania 19004
Fax: (610) 660-8817

        Re:    Perelman Charitable Remainder Unitrust v. Bear
              <u>Stearns & Co., Inc., NASD 01-06336</u>

Dear Mr. Katz:

        I write to inform you that Bear Stearns accepts the offer made in your February 28, 2002 letter to Darya Geetter, in which the Unitrust stated that it would tender its Augusta B holdings to Bear Stearns for a price of 82.5.

        Redemption at such a fixed price would remove any arguable impediment to your client's mitigation, even under your view of the case, since it would remove any market risk to the Unitrust as referred to in your February 28 letter.. Under these circumstances, the Unitrust's duty to mitigate is clearcut, and its failure to mitigate in the event it does not redeem at such a price would be equally clearcut.

        The relevant facts are undisputed. Your client purchased its $3 million in face value of Augusta B at a price of 86.92, for an investment of $2,607,792. Redemption of its interest at 82.5 would yield proceeds of $2,475,000. The Unitrust has also received interest payments on Augusta B of $386,085. Thus, a sale of Augusta B at 82.5 would mean that the Unitrust receives a total of $2,861,000, after an investment of $2,607,792, a gain of $253,208.

        Let me repeat that the Unitrust's failure to mitigate under these terms would, in addition to the other defenses in the answer, constitute a complete defense to the Unitrust's claim, and would compel dismissal of this action.

        Please confirm in writing within 24 hours that the Unitrust wishes to proceed as outlined above.

13632-00002/956973.3

Barry L. Katz, Esq.
March 5, 2002
Page 2

Very truly yours,

Eric Rieder

cc:    Darya Geetter, Esq.
       Mr. Mark Seruya

## **CERTIFICATE OF SERVICE**

I hereby certify that on August 5, 2002, a copy of the foregoing Motion to Compel Arbitration and to Stay This Action, proposed order, supporting memorandum, and Declaration of Elizabeth Goldberg (with attached exhibits), was served by hand delivery upon the following attorney for plaintiff:

    Barry L. Katz, Esq.
    225 City Avenue, Suite 14
    Bala Cynwyd, PA  19004

_M. Duncan Grant_
M. Duncan Grant